

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JAN 03 2022

KEVIN P WEIMER, Clerk
By_____ Deputy Clerk

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **MAURA O'NEILL,**<br><br>Plaintiff,<br><br>v.<br><br>**NYU LANGONE MEDICAL CENTER, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL, GRADY HEALTH SYSTEM, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL FORSYTH, COLLEGE PARK POLICE DEPARTMENT,**<br><br>Defendants. | **CIVIL ACTION FILE NO.:**<br><br>1. Common Law Fraud, Georgia<br>2. Common Law Fraud, New York<br>3. Civil RICO, 18 U.S.C. § 1962(c)<br><br>1:22-CV-0011<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Maura O'Neill brings this action against Defendants, and under

penalty of perjury, states as follows:

## PARTIES

1. Plaintiff Maura O'Neill has a mailing address at 712 H Street, NE, #1707,

Washington, DC 20002.  O'Neill has an undergraduate degree from Columbia

1

College in the City of New York, and a M.B.A. from The University of Chicago. Plaintiff has been an investment banker, pharmaceutical and healthcare consultant, and CFO for technology companies.  Given the events described herein, O'Neill was also forced to earn a paralegal degree.

2. NYU Langone Medical Center, ("NYU Langone") is a health care organization located in New York.  It has an address at 550 First Avenue, New York, New York 10016.  NYU Langone is located in Manhattan, and has additional facilities throughout New York, and consists of six inpatient locations.

3. Lenox Hill Hospital ("LHH") is a hospital in New York that offers inpatient and surgical care.  It has an address at 100 East 77th Street, New York, New York 10075.

4. Mount Sinai Beth Israel ("Beth Israel") is a hospital founded in 1889 on Manhattan's Lower East Side.  It has an address at 281 First Avenue, New York, NY 10003

5. New York-Presbyterian Queens ("NYP Queens") is a healthcare organization located at 56-45 Main Street, Flushing, NY 11355.  It has centers dedicated to treating cancer, cardiovascular diseases, neurologic disorders and digestive conditions

2

6. Grady Health System ("Grady") is a health care organization in Georgia, located at 80 Jesse Hill Jr Drive SE, Atlanta, GA 30303.  Grady primarily provides healthcare services to residents of Atlanta and Georgia.

7. Northside Hospital Forsyth ("NHF") is a hospital based in Forsyth County Georgia with an address at 200 Northside Forsyth Drive, Cumming, GA 30041.

8. College Park Police Department ("CPPD") is a police department based in College Park, Georgia.  CPPD has an address at 3667 Main Street, College Park, GA 30337.

## INTRODUCTION

9. This case arises from a series of related, outrageous incidents designed to undermine and discredit Plaintiff in order to aid and abet a sex trafficking operation.  The events descried herein reflect a level of stupidity and craziness that are difficult to believe.  Yet, there are records from NYU Langone, NYP Queens, LHH, Grady, and NHF video footage CPPD refuses to release in violation of O.C.G.A. § 50-18-70 *et. seq*., and falsified police reports from CPPD and the New York City Police Department ("NYPD"), describing the actions of Defendants and others, to prove that the diabolical, outrageous, and stupid incidents described below, which form the basis of this complaint and action, did in fact occur.

3

***The Bill Cosby of Wall Street***

10. O'Neill reported several crimes, including multiple rapes by Christopher M. Wilder, theft of keys to her apartment, multiple break-ins to her apartment, and the forgery of her medical records and writings to the NYPD in 2017 and 2018 and CPPD in 2018. O'Neill worked with Wilder at Deutsche Bank Securities, Inc. ("DB," "Deutsche Bank," or the "Bank") from 2004 to 2007. During that time, O'Neill was sexually harassed by Wilder, a credit trader and the "Bill Cosby of Wall Street."

11. Over the course of her two and a half years at DB, O'Neill was pimped out by her boss, used as a pawn in a war, forced to file a HR complaint, used as a form of entertainment for the trading floor through a series of "Goldilocks" updates distributed to the trading floor through emails, subjected to rampant, merciless propaganda, and fired in May of 2007 after Wilder issued a "she goes or I go" ultimatum to over-turn a DB Risk Committee decision not to terminate O'Neill's employment.

12. After leaving Deutsche Bank, O'Neill went to work as a M&A investment banker at Lehman Brothers Inc. ("Lehman" or "Lehman Brothers") in June of 2007. While O'Neill was at Lehman, Wilder continued to stalk O'Neill, and

4

O'Neill learned from her Lehman officemate, a male colleague who claimed to be part of the "Deutsche Bank Band of Brothers" that Wilder complained O'Neill had not "thrown him a bone."

13. Unbeknownst to O'Neill while she was an employee at Lehman Brothers, Wilder told O'Neill's colleague, Jeff Rabel, that Wilder intended to "drug" and "rape" O'Neill to cover for his sexual harassment. After Lehman management became concerned that Wilder intended to "drug" and "rape" O'Neill, Lehman management contacted DB and complained that Wilder was an obsessed stalker.

14. Wilder was fired from DB as a result, although DB covered for Wilder's criminal activities by stating Wilder was terminated due to a "FINRA Violation." Several other members of DB's senior management and various other teams either resigned, left or were demoted within a matter of months due to their involvement in the sexual harassment, stalking, pimping out, and potential rape scandal Wilder created.

15. O'Neill had no knowledge of Wilder's threat to drug and rape her until many years later. After O'Neill was informed about Wilder's rape threat, on January 6, 2017, Wilder or his agent drugged O'Neill, and Wilder broke into O'Neill's home, and raped O'Neill.

5

16.At no time in her entire life has O'Neill ever been in a "relationship" with Wilder, or even had a personal conversation with him for that matter. In fact, other than the times Wilder had O'Neill drugged from 2017 onwards, O'Neill has only ever spoken to Wilder for a grand total of three hours during the two and a half years O'Neill worked at DB from 2004 to 2007. Any claim of a "relationship" between Plaintiff and Wilder, a psychopath, stalker, and rapist, is completely false.

17.Instead, in order to create a "relationship" that never existed, Wilder set-up fake accounts in O'Neill's name in WhatsApp, Viber, Line, and Google Voice, and used those fake accounts to impersonate O'Neill. In addition, Wilder also set-up at least one email account in O'Neill's name to impersonate O'Neill. In addition, in 2021, Wilder also falsely claimed O'Neill called him even though Plaintiff does not have his phone number.

18.Wilder also enlisted others, including his nefarious attorney, Margaret Watson, and various "investigators," to work toward a mission to (1) thwart any investigation that would uncover Wilder's crimes, and (2) undermine, discredit and silence O'Neill. Wilder's modus operandi is to enlist powerful

6

people to discredit O'Neill and keep his "fingerprints" off of the illegal, coercive, and harmful tactics he, Watson, and his other operatives employed.

19. When *The New York Times* published its article on October 5, 2017 that played a large part in Harvey Weinstein's downfall, the *Times*, after months of investigation, had been able to track down eight settlement agreements Weinstein signed with his victims.[1]  O'Neill was informed Wilder has at least six or seven signed agreements with women he raped or abused.  At the time the *Times* article about Weinstein was published, Weinstein was 65 years old.  Wilder is only 49. Thus, Wilder has accumulated more signed documents per year than Weinstein.

**The NYPD**

20. Since the first time O'Neill walked into a police station in 2017 to report Wilder's sex crimes, she has been greeted by malfeasance by the NYPD.  Among other things, the NYPD (1) destroyed evidence, including one of O'Neill's rape kits in violation of 18 U.S.C.A. § 3772, (2) lied to O'Neill and claimed there was no evidence on her rape kits, and (3) withheld DNA and toxicology reports from O'Neill in violation of 18 U.S.C.A. § 3772 (a)(2)(B).

---

[1]Kantor, Jodi; Twohey, Megan. "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades." *The New York Times.*  October 5, 2017.

21.Further, in violation of New York Civil Rights Law § 50-b, the NYPD shared that there was male DNA and sperm on one rape kit and acetone, a component of chloroform, on another, with agents of Wilder, a known psychopath and serial rapist while O'Neill was lied to about the test results of her own rape kits. No rational and unbiased person believes O'Neill would have been treated this way by the NYPD if Wilder was poor, black, lived in the Bronx, and worked in the mail room.

22.Likewise, CPPD deliberately filed an inaccurate request form to ensure that the Georgia Bureau of Investigation ("GBI") would run the wrong tests on O'Neill's sample, and there would be "no evidence" Wilder drugged and raped O'Neill.

23.Unfortunately, O'Neill is only one of hundreds of documented victims of a law enforcement system that has repeatedly protected wealthy and well-connected predators and ensured affluent rapists and sex traffickers can break the law with impunity. As shown through numerous court filings and media reports about Jeffrey Epstein, Harvey Weinstein, and Dr. Robert Hadden, the fact law enforcement lied to O'Neill, destroyed evidence, and covered up for Wilder's

8

numerous sex crimes is part and parcel of a pattern of behavior in cases in which law enforcement aids and abets wealthy and well-connected sex crime perpetrators.

### *This Action*

24. The events described in this complaint are an extension of the pattern of racketeering activity the Wilder and DB teams engaged in since 2007 to cover-up for DB's and Wilder's various and numerous criminal acts.

25. From 2017 onwards, the Wilder and DB teams have attempted to undermine and discredit O'Neill by falsely claiming O'Neill has a series of mental health disorders she does not have. Over time, as the Wilder and DB teams' stories have changed, the police's story has changed as well. In fact, since 2017, the police have mindlessly mimicked every story fed to them by the Wilder and DB teams. No matter how many times the Wilder and DB teams' story changes, the police simply mindlessly mimic the latest nonsense, no matter how false or ludicrous and no matter how many times the story has changed.

26. On February 14, 2020, O'Neill learned the police, the Wilder and DB teams, and Corporation Counsel had to stop using the "Trump Has Malaria Defense" which is described below.

9

***The Trump Has Malaria Defense***

27. In May of 2020 it was publicly announced that President Trump decided to take hydroxychloroquine as a prophylactic treatment for COVID-19 even though hydroxychloroquine is indicated for the treatment of malaria and certain autoimmune conditions.[2]

28. Cable news reported on the President's decision to take a malaria drug as preventive treatment for COVID-19 despite the fact President Trump clearly does not have malaria.  In its numerous reports, cable news and other media outlets did not find it necessary to explain to the public that simply because a drug is indicated to treat malaria, does not mean President Trump has malaria. The general public seemed to have absolutely no problem understanding that one drug can treat many different types of unrelated diseases.

29. Despite the fact it is clearly basic public knowledge that a drug indicated to treat one disease (e.g. malaria) can be frequently prescribed to treat or ameliorate another disease (e.g., COVID-19), the DB and Wilder teams and police expect the public to believe that when O'Neill went to emergency rooms for rape kits,

---

[2] Knowles, David. "Hydroxychloroquine: The drug Trump can't quit." *Yahoo! News.* July 7, 2020.

medical personnel O'Neill met with simply could not grasp the concept that simply because a drug is indicated to treat an ailment does not mean the person taking the drug has every condition a drug is indicated to treat (e.g., New York medical personnel cannot understand that Trump does not have malaria).

30. More specifically, in O'Neill's case, through a series of crimes and HIPPA violations, the DB and the Wilder teams found out O'Neill took drugs to treat depression. However, as proven through blood tests, O'Neill never had depression. Instead, as shown through blood tests, O'Neill has hypothyroidism, and was given the wrong medication by primary care physicians. At no time was O'Neill ever diagnosed with depression by a psychiatrist. Despite the fact O'Neill was prescribed the wrong medication for the wrong condition and her hypothyroidism was not properly treated, the Wilder and DB teams then decided to claim that any condition a drug O'Neill was prescribed was indicated to treat was a condition O'Neill had. Thus, since O'Neill took Zoloft, and Zoloft is indicated to treat "paranoia," the idiotic DB and Wilder teams believed they could claim O'Neill was "paranoid."

31. When O'Neill went to hospitals to have rape exams, Wilder's attorney, Watson, called and/or had others call on her behalf and provided hospitals with the

ludicrous Trump Has Malaria Defense. The DB and Wilder teams used the Trump Has Malaria Defense to claim O'Neill (1) belonged in a mental institution, and was (2) delusional, (3) schizophrenic, (4) bi-polar, (5) paranoid, and (6) anxious. In addition, the DB and Wilder teams also falsely claimed O'Neill was a drug addict, was "traumatized" as a child, and used "circular" reasoning even these claims are not true either.

32. In addition, Watson made fake claims about O'Neill based on messages Wilder wrote to himself in the various messaging accounts he set up in O'Neill's name, without her knowledge or consent, to impersonate O'Neill. Corrupt ER physicians and medical personnel then used the information provided by Watson to harm O'Neill even though the Trump Has Malaria Defense is ludicrous, and using messaging accounts to make decisions about someone having a rape exam is insane.

33. In addition, fake information from the fake accounts set-up in messaging apps in O'Neill's name without her knowledge or consent that O'Neill never used was added into her medical records along with the Trump Has Malaria Defense by hospital personnel seeking to aid and abet Wilder despite the fact that 8 NYCRR § 29.2(a)(3) requires physicians to maintain accurate medical records, and under

New York, a patient has an absolute right not to have her medical records fraudulently altered by a physician.

34. Further, things O'Neill actually said and did were not included in her medical records. Instead, vague statements like O'Neill was "paranoid" were written in her medical records even though there was no basis for claiming O'Neill was paranoid based on what O'Neill actually said. Instead, the basis of how O'Neill was treated was the Trump Has Malaria Defense, and fake messages Wilder sent to himself.

35. The Trump Has Malaria Defense along with the fake messages from fake accounts were used as cover to ensure hospitals did not collect urine samples to include in rape kits or failed to run the right tests on the urine samples O'Neill provided. The police then used the Trump Has Malaria Defense to justify falsifying police reports, destroying her rape kits, and failing to run appropriate tests on the samples in rape kits (e.g., the rape kit with acetone, a component of chloroform, should have been tested further).

36. As described in greater detail below, everywhere O'Neill turns professionals, including the police, doctors, nurses, EMTs, insurance adjusters, and hotel management feign a level of stupidity that is simply not credible or

13

believable, all to achieve the same end goal – to work toward a mission to (1) thwart any investigation that would uncover Wilder's and DB's crimes, and (2) undermine, discredit and silence O'Neill.

37. While simple logic and reason make clear that O'Neill can simply not be a random victim, the math proves that it is simply not statistically possible that (1) almost all the medical professionals O'Neill meets with are incapable of even the most basic of tasks, (2) none of O'Neill's landlords or the hotels where she was assaulted can manage to give security camera footage, and (3) the police commit crimes, including by falsifying camera footage and police reports to harm O'Neill. O'Neill is not a random victim, and the events she experienced, described herein, are clearly an extension of an on-going pattern of racketeering activity.

## JURISDICTION & VENUE

38. This Court has diversity of citizenship jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

39. This Court has subject-matter jurisdiction over Plaintiff's federal claim, arising under the laws of the United States, pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiff's state-law claims, pursuant to 28

14

U.S.C. § 1367, because they are related to the federal claims and form part of the same case and controversy.

40. In addition, this Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1964.

41. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

### A. First Rape

42. Wilder broke into Plaintiff's apartment and raped Plaintiff for the first time on January 6, 2017. When O'Neill went the police station to report Wilder, Detective Biondi told Plaintiff the "DA's office was done with" Plaintiff, O'Neill had taken "psychiatric drugs," and been to "therapy." Thus, O'Neill would never say a corrupt DA was "done" with Plaintiff. Nor would O'Neill ever do something as stupid as claim O'Neill took "psychiatric drugs," when in fact, lab results prove O'Neill was misdiagnosed with a thyroid condition. Instead, the claims about Vance's corrupt office and "psychiatric drugs" was clearly presented to the NYPD before O'Neill arrived at the police station to undermine and discredit Plaintiff, and Detective Biondi acted exactly as Wilder, Watson, and DB wanted him to act.

**B. Thanksgiving:  Theft of Keys to Cover-Up**

43.  On Thanksgiving, November 23, 2017, O'Neill went to see her aunt in Bronxville, New York.  O'Neill had dinner with her aunt and did not consume any alcohol at dinner or on Thanksgiving.  After seeing her aunt, O'Neill went back to her apartment, watched a movie, and went to sleep.  She did not see or speak to anyone else.  The following morning, O'Neill noticed her keys were missing.  However, since she needed to go to the Queens courthouse to submit an Order to Show Cause in the case styled *Maura O'Neill v. AdMedia Partners, Inc.* (Index No. 704954/2018), she left her apartment with her spare set of keys.

44.  The evening of November 24, 2017, O'Neill scoured her apartment in search of her keys, but was unable to find them.  The next day, November 25, 2017, she did the same, and was unable to find her keys.  O'Neill also started developing symptoms of a UTI and was extremely concerned.  Thus, O'Neill called a locksmith to change the locks on her doors because her keys were stolen.

45.  There is no way O'Neill could have lost her keys on Thanksgiving because she had let herself into her apartment and she was the only person with keys to her home.  Thus, the keys had to have been on her person and in her apartment when she returned to her home on Thanksgiving.

16

46. On November 25, 2017, O'Neill called 911 to report a break-in to her apartment and the theft of her keys. Although she had simply gone to see her aunt for Thanksgiving and had nothing to drink that day, the two officers from the 107th Precinct of the NYPD that responded to Plaintiff's 911 call, claimed she had been "partying" on Thanksgiving in her apartment. Worse, the two officers claimed O'Neill belonged in a "mental institution" even though she did not do or say anything that would warrant that assessment. Their entirely unprofessional comments were particularly alarming in light of the fact O'Neill had called to report a serious crime. O'Neill asked the two officers how she could follow-up and was told she could follow-up with a detective.

47. The theft of her keys and break-in to her apartment in November 2017 were not isolated incidents. Rather, Wilder either broke into her apartment himself or hired someone else to do so to steal her keys on November 24, 2017. The theft of the keys in November was designed to cover for Wilder's break-in to Plaintiff's apartment and rape of Plaintiff on January 6, 2017 and/or July 28, 2017.

48. The timing of the theft of the keys was not random. Plaintiff hired private investigators in late October and early November to find an address for Wilder to

17

serve papers.  Thus, the break-in to her home occurred a few days after a private investigator had given Plaintiff an address for Wilder.

49. The NYPD later told Plaintiff that Wilder could face criminal charges from breaking into O'Neill's apartment on January 6, 2017 and/or July 28, 2017.  Thus, the break-in to Plaintiff's apartment on November 24, 2017 and theft of her keys were calculated actions to cover for the previous break-ins to O'Neill's home.

50. Given the symptoms of a UTI, theft of her keys, and the mindless mimicking and repetition of DB's propaganda from the officers of the 107th Precinct on November 25, 2017 claiming O'Neill was "partying" and belonged in a "mental institution," O'Neill went to LHH to get a rape kit.

51. LHH treated O'Neil horrendously.  Disgustingly, Wilder's agents had already spoken to O'Neill's physician, Dr. Huang, before Dr. Huang met with O'Neill for the first time.  In particular, Dr. Huang asked O'Neill what had changed about her a year ago that caused her to be raped.

52. O'Neill was outraged by the question.  Clearly, nothing had "changed" about O'Neill that caused her to be sexually assaulted.

53. Thus, the rape on January 6, 2017 was not due to anything O'Neill did.  It was due to Wilder's desire to "destroy" Plaintiff and claim she had "wild sex" with him to cover for his rape threat and termination from DB.

54. Dr. Huang also lied and told Plaintiff that LHH would need to speak to someone O'Neill knew to verify Plaintiff's story.  Rape victims are not required to tell anything to medical professionals in hospitals after they have requested rape kits.  All rape victims are legally required to do is request kits.  Thus, not only did O'Neill not have to tell Dr. Huang what transpired or why she was concerned, O'Neill was under no legal obligation to call someone else to verify her story.

55. When O'Neill declined the request, Dr. Huang then told her that someone else may be "noticing" something about her that she herself had not.  O'Neill responded that no one had said anything logical to her, and, if it was important, clearly someone would have done so.

56. Since O'Neill had been raped on January 6, 2017, Wilder was in the habit of creating his own evidence, and the keys to Plaintiff's apartment were stolen, O'Neill had every reason to be concerned.

57. Any sane woman who believed a rapist like Wilder had been in her apartment and stolen her keys while she was sleeping and started to develop

19

symptoms of a UTI would be terrified since Wilder is a known rapist that was fired from DB for telling O'Neill's Lehman Brothers colleagues that he intended to drug and rape her.

58. Since Dr. Huang repeatedly lied to O'Neill, Plaintiff asked to speak to the hospital administrator and change doctors. While the hospital administrator said O'Neill could have a new doctor, and Dr. Huang never came back and spoke to Plaintiff, O'Neill learned though her medical records that Dr. Huang remained her attending physician and the hospital administrator lied to her. But, Dr. Huang and the hospital administrator were only two of many LHH employees that were caught on tape lying repeatedly.

59. Plaintiff told the hospital administrator and nurse that she was recording. Despite the fact she was recording, LHH personnel continued to repeatedly lie and repeat Wilder's and DB's baseless propaganda. Shockingly, LHH than proceeded to create a medical record that contained numerous provable lies.

60. The LHH medical record contained false statements and claims O'Neill said things she never said and did things she never did. She also subsequently learned through the forged and fraudulent medical record prepared by LHH that the two officers from the 107th Precinct Plaintiff spoke to on November 25, 2017

20

lied to her or lied to others because according to the LHH medical record the officers from the 107th Precinct "dismissed" her even though they told O'Neill she could follow-up with a detective.

61. From the LHH medical record, Plaintiff also learned there was a signed document O'Neill knew nothing about prior to reading her medical record.

62. The events concerning the "escalation" of O'Neill's civilian complaint about the NYPD were also contained in her LHH medical record even though O'Neill did not know what happened prior to reading her LHH medical record because the NYPD refused to respond to her numerous follow-up requests for information.

63. In keeping with the DB/Wilder party line of "noticing" something, the LHH medical record also stated O'Neill exhibited "pressured speech." But, as shown in the recordings, O'Neill never exhibited "pressured speech."

64. Disgustingly, O'Neill's medical records had been forged to show the information Wilder wanted to read, not what O'Neill said. The medical record stated O'Neill was fired from DB because she did not participate in unseemly behavior, not because Wilder, a known rapist issued a "she goes or I go" ultimatum to have her fired. Nothing about the fact O'Neill was being stalked by Wilder, a

known rapist, was in her medical record, although, as shown on tape, O'Neill repeatedly mentioned this very pertinent fact.

65. O'Neill submit the recordings to LHH and requested to have her medical records fixed due to all the egregious lies and errors in her medical record.

66. Following the theft of her keys, O'Neill also contacted Argo Real Estate LLC ("Argo"), her building management company, to inform Argo that her keys were stolen, presumably by Wilder, a known rapist. O'Neill asked Argo to change the main lock to the building. O'Neill also asked for the security camera footage from the building from the time of the break-in and theft of her keys. Argo replied that the security camera system was working and recording, but there were problems with the play back of the footage. Argo said, when the problems were fixed, O'Neill could review the footage.

67. A few days after the break-in to her apartment on Thanksgiving, Plaintiff's right toenail started to break due the injection of a needle in her toe. Information about the use of needles to inject rape drugs is below.

**C. Gang Rape**

68. Prior to the arrival of the police at Plaintiff's apartment on November 25, 2017, Plaintiff called a locksmith and had the locks changed on her door. But,

22

another set of Plaintiff's keys was stolen on December 9, 2017. Early in the morning on December 10, 2017, around 1:00 a.m., O'Neill went to sleep, alone in her apartment with the doors locked.

69. She awoke a few hours later with pelvic pain and pain in her toe from where a needle had been inserted. O'Neill went to an urgent care center on the afternoon of December 10, 2017 and was diagnosed with a UTI.

70. After having the locks on her door changed yet again, O'Neill went to Beth Israel for a rape kit on December 10, 2017.

71. A nurse from Beth Israel told Plaintiff that unlike LHH, Beth Israel did not want to be "sued." Thus, Beth Israel had been told that LHH's treatment of Plaintiff was so atrocious it warranted legal action even though O'Neill did not mention LHH or suing LHH to any Beth Israel personnel. Yet, like LHH healthcare providers, Beth Israel personnel had information about Plaintiff O'Neill did not give them. The information provided to Beth Israel came from agents of Wilder.

72. At Beth Israel, O'Neill was also told by a nurse practitioner that Wilder claimed O'Neill had sex with both him and another man the previous evening.

O'Neill was also informed by Beth Israel that Wilder claimed he was in a "relationship" with O'Neill, a relationship O'Neill knew nothing about.

73. O'Neill has spoken to Wilder for a grand total of approximately three hours in her life.

74. O'Neill has never texted, emailed, called or communicated with Wilder since Wilder had her fired from DB. O'Neill has also never knowingly or voluntarily met with Wilder in public outside of Deutsche Bank's office. Yet, O'Neill was told by Beth Israel that Wilder claimed O'Neill had sex with Wilder and another unknown rapist without O'Neill's knowledge

75. Since O'Neill went to sleep by herself on December 10, 2017 and never got out of bed until the morning when she felt pelvic pain, there was no way O'Neill opened the door to let anyone into her apartment.

76. O'Neill later learned from a toxicologist that drug users frequently insert needles under their toenails and fingernails to hide needle marks. Thus, subcutaneous injections are very common among drug users because inserting needles under fingernails and toenails hides needle marks. When O'Neill asked the toxicologist how it was possible for someone to stick a needle in her toe without her waking up, the toxicologist replied it was actually very easy since there

24

are specially designed needles for diabetes patients that can be inserted without pain.

77. Thus, the toxicologist told Plaintiff that inserting needles under someone's fingernails and toenails is common, and it was entirely possible to stick a needle in a sleeping person's toe without the sleeping person's knowledge given the specially designed needles.  In these instances, however, on both Thanksgiving and December 10, 2017, the needles left marks.

78. A few weeks after the injection of needles into her toes while she was sleeping, at the end of December, the toenail on Plaintiff's right toe where the needles had been inserted fell off due to the trauma from the repeated needle injections into her toe while she was asleep.

79. The toxicologist also told O'Neill that the rape drugs work like anesthesia. Indeed, many common rape drugs are used as anesthesia or are in the same classes of drugs.  Thus, someone under a heavy dose of rape drugs would be on the equivalent of anesthesia.  While rapists traditionally used GHB, ketamine and rohypnol to drug victims, there are many other different types of drugs that can be used, including Ambien and sleep aids.

25

80. When a patient goes in for surgery and is anesthetized, the patient has surgery, but does not remember the surgery. O'Neill has had several knee surgeries due to congenital knee problems. During these surgeries, O'Neill was unconscious, but when she awoke from the anesthesia, there were scares on her legs from the surgeries. Thus, O'Neill knew surgeries had been performed even though she did not recall any part of the operations.

81. Likewise, when O'Neill woke up in her home on December 10, 2017, she had pelvic pain, developed a UTI within a matter of hours, and had pain from the visible needle mark in her toe. Yet, O'Neill went to sleep by herself, and O'Neill did not insert a needle into her toe, but, the mark was there.

82. O'Neill subsequently had her hair tested for rape drugs. The test revealed there was a rape drug put in her system on December 10, 2017. But, O'Neill did not take any drugs that evening. Thus, there was a needle mark in her toe and rape drug in her system she did not take.

83. Likewise, O'Neill immediately developed a UTI, presumably due to the fact she was gang raped. Thus, the infection occurred more rapidly than normal.

84. This is similar to what happened when O'Neill had knee surgeries. O'Neill does not remember the operations, but the scares were on her legs. Likewise,

26

O'Neill does not recall someone sticking needles in her toes, but the mark was visible, and O'Neill developed an infection.

85. Since the NYPD had been extremely unhelpful when O'Neill went to report the first drugging and rape on January 6, 2017, O'Neill called the New York State Police.

86. O'Neill met with Detective Fagan on December 18, 2017.  Detective Fagan informed O'Neill that Detective Fagan had been told prior to O'Neill's arrival at the office of the State Police that O'Neill had "consensual" sexual relations on December 10, 2017 with Wilder.  Detective Fagan also claimed Wilder was a "narcissist."

87. O'Neill has found the primary use of the police has been to learn the latest propaganda campaigns spread by DB's and Wilder's agents.  Since the DB and Wilder teams have gone out of their way to make sure O'Neill is undermined and discredited before she speaks to anyone, and since the police mindlessly mimic DB's and Wilder's ridiculous propaganda, the police have turned out to be an invaluable source of information on the latest campaigns to destroy Plaintiff.

88. Following the gang rape in her apartment and after learning about the fact Wilder claimed he was in a "relationship" with O'Neill at Beth Israel, O'Neill had

27

an ADT security system installed in her home. ADT promised her home would be like Fort Knox and Wilder would no longer be able to break-in when Plaintiff slept, but Plaintiff learned Wilder managed to break-in to her home despite the security system.

89. Following the incident on December 10, 2017, O'Neill went to Argo's office and again asked Argo to change the main lock to the building. O'Neill also asked for the security camera footage from the building from the time of the break-in on December 10, 2017. Argo replied that the security camera system was working and recording, but there were still problems with the play back of the footage. Argo said, when the problems were fixed, O'Neill could review the footage from that day as well.

**D. Known Access to Place of Living**

90. On December 31, 2017, O'Neill woke-up feeling nauseous. She vomited, had abnormally constricted pupils, and developed a UTI. She did not drink any alcohol on the evening of December 30, 2017. On December 31, 2017, she called a PCP, and was diagnosed with a UTI.

91. She called a toxicologist on December 31, 2017 because she was concerned. The toxicologist informed her that the symptoms of nausea and

vomiting and constricted pupils fit those of someone who was recovering for the effects of anesthesia. The toxicologist asked Plaintiff what happened to the size of her pupils when she drank coffee. Plaintiff responded her pupils returned to normal size. The toxicologist responded that the reason for this was that the stimulant in the coffee counteracted the effects of the anesthesia-like rape drugs he presumed she had been given. The toxicologist advised O'Neill to send a urine sample for testing. The sample subsequently tested positive for a rape drug, although O'Neill has never ingested that drug. After reviewing the results, the toxicologist told her she had been drugged with a "load" and was knocked out. However, O'Neill did not learn this information until January 9, 2018.

92. Prior to that, on January 1, 2018, O'Neill went to New York-Presbyterian Hospital in Queens for testing, although, the toxicologist later informed her that the testing capabilities of hospitals are limited. While drug testing companies are able to test for ~500 drugs, hospital toxicology labs only pick up a much smaller number, meaning that even if a drug is present in the system, the hospital will not be able to confirm the presence of the chemical.

93. At NYP Queens, O'Neill spoke to a nurse and then a physician assistant ("PA"). O'Neill told the PA she was terrified and was being stalked by Wilder, a rapist who drugs women.

94. Forging a medical record is a felony. Yet, the falsified medical record from NYP Queens Plaintiff subsequently received made it appear as if O'Neill was having a relationship with a rapist with "known access" to her "place of living" and the rapist "lives" with her. Plaintiff's medical record also made it appear that O'Neill was not concerned about "rape" when she went to the hospital for a rape kit. The medical record also said she denied feeling unsafe in her home when, in fact, she told the PA during a recorded conversation she was terrified.

95. O'Neill sent recordings of her conversations to NYP Queens to have the falsified medical record corrected. NYP Queens agreed to fix the following errors based on recordings O'Neill had of her conversations with NYP Queens providers:

   a. As shown on the tape, O'Neill said she was being stalked by Wilder, a crazy man that drugs and rapes women. Yet, before corrected, her medical record stated, "The alleged gentleman is known to patient and lives with patient with known access to her place of living."

30

b.  Even though O'Neill explicitly said she was concerned she had been raped again, her medical record before the corrections stated, "Denies concerns of 'rape.'"

c.  O'Neill said she was terrified and scared. Yet, her medical record before being corrected said, "Denies feeling unsafe at home. Denies feeling in immediate danger."

96.  Since the PA was competent and ethical, O'Neill did not believe the PA actually wrote what was contained in her medical record.  In fact, after O'Neill received a copy of the medical record, she went back to the ER and spoke to the PA about what was contained on the medical record.  The PA denied writing the information contained in O'Neill's medical record.

97.  Given O'Neill had been the victim of targeted cyberhacking in the past that has benefited the Wilder/DB teams, and her medical record contained the story the Wilder team wanted told, the errors in her medical record were not accidental since they conformed to Wilder's latest campaign to smear O'Neill.

**E. Relationship**

98.  On January 4, 2018, O'Neill initiated an action in Queens against Wilder styled *Maura O'Neill v. Christopher M. Wilder* (Index No. 712235/2018) (the

"Wilder Action"). That evening she went home and went to sleep by herself with her ADT security system active. She had no alcohol on January 4, 2018. However, she woke up the next morning with a needle mark in her thumb and blood on her thumb. O'Neill did not stick a needle in her finger while she was asleep. O'Neill took two OTC home test to test for rape drugs. The test came back positive for benzodiazepines on two separate occasions.

99. Since the OTC tests O'Neill took are 99% accurate and two showed positive results for a drug O'Neill did not take, O'Neill was gravely concerned since the "Bill Cosby of Wall Street" was claiming they were in a "relationship" and O'Neill did not stick a needle in her own thumb while she was asleep. Thus, O'Neill went to the hospital for another rape kit.

100. A urine test from a toxicology lab later revealed the presence of a drug in O'Neill's system that she did not consume.

101. The NYPD advised that she not stay in her apartment anymore since it clearly was not safe.

102. Since Wilder was claiming he found Plaintiff through "location monitoring services," and there was no history of any communication between Plaintiff and Wilder, O'Neill switched her prior phone number to a flip phone that did not have

"location monitoring services."  O'Neill also got a new iPhone since she needed a

mobile device to check email.

## F. No Place is Safe

103. Since O'Neill was unsafe in her home, she went to hotels.  On January 11,

2018, O'Neill went to the Shelburne Hotel & Suites (the "Shelburne") on

Lexington Avenue.  She went to her room and ordered a sandwich from a nearby

deli, and did not consume any alcohol.  Since she had gotten a new phone, a

message appeared on her phone.  O'Neill clicked on the message, and O'Neill fell

asleep shortly thereafter.

104. O'Neill woke up the next morning with symptoms of a UTI.  She went to

the hospital and had a rape kit performed.

105. Her medical record from Beth Israel stated that O'Neill had been screened

for "domestic violence."  O'Neill later submit tapes to Beth Israel to have all

"domestic violence" references deleted from her record.  Based on recordings,

Beth Israel agreed to delete all references to "domestic violence" since O'Neill told

Beth Israel Wilder is a stalker that drugs and rapes women, and O'Neill had not

communicated with Wilder since he had her fired from DB.

106. Under New York law, for someone to qualify as a victim of "domestic violence" that person must have at least been on a date with the other person. Since O'Neill never spoke to Wilder outside the office let alone went on a date with him, O'Neill is not a "domestic violence" victim under New York law.

## G. Georgia

107. O'Neill left New York on January 24, 2018, and flew to Georgia since O'Neill was working as the CFO of a company in Georgia.  Wilder stalked Plaintiff to Georgia, and O'Neill was drugged with opiates on January 24, 2018.

108. Plaintiff went to NHF for treatment.

109. While O'Neill was still in Georgia, Wilder broke into Plaintiff's hotel room on or about January 27, 2018, and unbeknownst to Plaintiff, stole copies of the medical records he had falsified from Plaintiff's rape exams.

110. A few days later, Plaintiff's employer lied to claim O'Neill "failed to protect confidential information" to cover for the theft and use of Plaintiff's falsified medical records.

## H. Grady

111. On February 5, 2018, CPPD also told Plaintiff that O'Neill "texted" Wilder. When O'Neill stated this was not the case and offered Plaintiff's phone as proof,

34

the Georgia police then fed this information to Wilder.  That same evening Wilder

stalked Plaintiff to an Embassy Suites hotel in Atlanta, but this time he used a

messaging app because the Georgia police provided Plaintiff's feedback to Wilder

so he could get away with drugging and raping Plaintiff.

112. The next day, February 6, 2018, O'Neill went to Grady to have a rape kit

performed, and the hospital refused to take a urine sample even though in so doing,

it violated every legal right O'Neill has.  Based on Wilder's rape at the Embassy

Suites, the Georgia police deliberately falsified the requisition form for the testing

of the drugs to test for opioids, not opiates.  On the same day the Georgia police

agreed to falsify the toxicology requisition form, another lab destroyed the urine

sample with the opiates to aid and abet Wilder.

113. O'Neill went to Beth Israel hospital in New York to get a urine sample since

Grady refused to get one at Watson's behest because Watson wanted to ensure

there was "no proof."

**I. No Evidence**

114. On January 24, 2017, O'Neill spoke to a former NYPD officer who sold

security systems and spyware to determine if there was anything she could do to

secure her home and communication devices to ensure she could sleep in her home

and secure her devices since Wilder, the "Bill Cosby of Wall Street," was claiming she was in a "relationship" with him.

115. She was informed by him, as well as others, that there are no home security systems that cannot be hacked or broken-into. Thus, there is no product on the market that guarantees that a person can be safe sleeping in her own home. O'Neill was also told that there were no phones or computers that could not be hacked. O'Neill has also spoken to several other cyber security professionals who have all told her the same. Sophisticated hackers and criminals can hack any phone, tablet, computer, or device. Thus, there are no systems on the market Plaintiff can buy to protect her communications from the sophisticated team Wilder hired to "destroy" Plaintiff.

116. O'Neill was told that she could switch phones from an iPhone to an Android phone and take the battery out of the phone to ensure that Wilder could not claim to find her through "location services" on her cell phone. Thus, O'Neill got an Android phone. However, the Android phone did not help either. Thus, O'Neill has been left defenseless since Wilder, a psychopath and sexual predator is "determined" to "destroy" and "break" her and claim a "relationship."

36

117. Even before the rape kits were complete, on January 24, 2017, the former NYPD officer told O'Neill there would be "no evidence" on the rape kits. Since Wilder and his team are in the habit of destroying evidence and given information about O'Neill had been provided to O'Neill healthcare providers at LHH, Beth Israel, and NYP Queens, O'Neill was not surprised since agents of Wilder or DB had interfered with O'Neill's medical care and provided information about O'Neill to her healthcare providers to undermine and discredit O'Neill and ensure she did not receive appropriate medical care or any "help."

118. In addition, Argo failed to save the video camera surveillance footage O'Neill had requested. Upon information and belief, Argo was bribed to destroy the security camera footage once Wilder became concerned he may not be able to get away with rape.

**J. Falsified Medical Records**

119. Since Wilder and Deutsche Bank have a pattern of behavior of claiming O'Neill said things she never said and did things she never did based on forged "documentation," O'Neill recorded her discussions with medical personnel while she had rape kits performed from November of 2017 through April of 2018. Thus, she is now able to prove that what she said and what happened in her medical

37

exams and what was/is contained on her medical records are two entirely different things.

120. Among other things, several hospitals have had to correct fraudulent references to "pressured speech." While no doctor ever told Plaintiff she exhibited "pressured speech," her medical records contained references to "pressured speech."

121. In March of 2018, the NYPD claimed that Wilder/Deutsche Bank were claiming O'Neill was "bipolar" and used "evidence" of "pressured speech" in her falsified medical records to back up the baseless and fraudulent claim she had bipolar disorder.

122. The NYPD also said that since O'Neill was going to paid off by Wilder, the NYPD did not need to investigate the crimes Wilder commit including the multiple break-ins to her apartment and forging of her medical records.

123. In addition, based in part on a forged Word document Deutsche Bank claims it got from the Dark Net and was criminally placed in Plaintiff's home in 2016, it appears DB and Wilder were trying to claim O'Neill had a love / hate relationship with Wilder because she was bipolar.

124. Likewise, a forged copy of her legal file O'Neill found in her apartment deleted references to O'Neill's complaints to the HR investigators about Wilder's sexual harassment. Thus, documentation has been altered to make it appear as if (1) O'Neill never complained, or (2) she went back and forth. Of course, all of these fraudulent statements are entirely false. Plaintiff is not bipolar, and as shown on the recordings from the rape exams, she did not exhibit "pressured speech" or any form of bipolar behavior.

125. What is most evil is that hospitals have been forced to make changes due to the fact a rape victim, O'Neill made recordings, and the changes the hospital were forced to make are due to Wilder's various, and constantly changing, false stories about Plaintiff.

126. It is believable that one hospital could incorrectly write "pressured speech" in a medical record. But, it is not believable that several independently operated hospitals in different states would make the same "pressured speech" mistake.

127. As shown in the recordings, there are numerous examples to prove that what O'Neill discussed with doctors and what is on her medical records are two entirely different things.

39

128. Hacking medical records is a common occurrence in the US, something a

criminal like Wilder or the team he hired to "destroy" Plaintiff in 2014 would

know.  As stated in an article in *Healthcare Informatics* on January 23, 2018:

> Although 2017 saw fewer massive health data breaches when compared to
> 2016, there was still an average of at least one health data breach per day
> throughout the entire year, according to a year in review report from
> cybersecurity software company Protenus…In 2017, there were 477
> healthcare breaches reported to the U.S. Department of Health and Human
> Services (HHS) or the media, and information available for 407 of those
> incidents, which affected a total of 5.579 million patient records.

129.  There are numerous other issues with the fraudulent "medical care"

Plaintiff received, and Plaintiff's medical records and recordings show numerous

false statements.

130.  Disgustingly, once O'Neill started sending recordings to hospitals to have

the errors in her medical records corrected, the recordings were stolen and

tampered with to destroy evidence and aid and abet Wilder in his criminal

activities.

**K. Illegal Access to Forged and Stolen Medical Records**

131.  Judge Rudolph Greco was assigned to the Wider Action, but O'Neill never

met him.  Instead, his then law secretary, Claudia Lanzetta, "handled" the case.  In

September of 2018, Wilder's attorney, Watson, an associate at Watson's firm, and

O'Neill had only one short meeting to discuss a briefing schedule with Lanzetta after Watson filed a motion to consolidate or dismiss. That one brief conversation was the only conversation ever about the case. There were no oral arguments about the motion to dismiss.

132. In November 2018, Greco dismissed O'Neill's claims stating that O'Neill stated causes of action for battery (i.e., rape) and intentional infliction of emotional distress (i.e., Wilder falsely claimed he and O'Neill were in a "relationship" based on a series of crimes, and Wilder falsified her medical records from rape exams). However, Greco stated her claims were "unsubstantiated" even though New York law explicitly states that a plaintiff's complaint need only to state a cause of action (*Rovello v. Orofino Realty Co. Inc.,* 389 N.Y.S.2d 314 (1976)) something Greco acknowledges O'Neill did. (Index No. 712235/2018, Docket No. 54, Page 7, ¶1). Despite the fact the legal standard entails stating a cause of action, Greco required O'Neill to prove a case in the complaint. Thus, the rationale offered by Greco in dismissing the action was absurd on its face.[3] Moreover, the

---

[3]*The order dismissing the Wilder Action is absurd on its face, and the order falsely focused on the Second Amended Complaint which the court falsely stated it had not agreed could be filed. As shown in a recording of the brief conversation with Lanzetta, Watson and O'Neill, that is a lie. However, the causes of action for intentional infliction of emotional distress were contained in the first amended*

Order from the Wilder Action is the result of illegal *ex-parte* communication, where false stories were fed to Greco and Lanzetta behind O'Neill's back without giving O'Neill a right to respond. Thus, the Order from the Wilder Action is largely a work of creative fiction that is not supported by the record.

133. In the 2019 film *Bombshell* that details the fall of Roger Ailes due to sexual harassment allegations from Gretchen Carlson, Megyn Kelly and others at Fox News, there is a scene in which it is revealed that Carlson's complaint regarding Ailes' sexual harassment did not specify that she recorded her conversations with Ailes and had proof of his sexual harassment.[4] No legal explanation was needed in the movie, and the general public clearly understood that legal complaints do not need to contain evidence. Nor does a complaint need to prove a plaintiff's case or explain how the plaintiff intends to prove her case.

---

*complaint which the court had an obligation to read since the first amended complaint was filed as a right pursuant to C.P.L.R. § 3025 (a).*
[4]*Bombshell*. Directed by Jay Roach, performances by Directed by Terry Gilliam, performances by Charlize Theron, Nicole Kidman, and Margot Robbie, Lionsgate, 2019.

**L. Power of Attorney**

134. O'Neill learned in June of 2020 that Wilder claimed to have a power of attorney to control her healthcare. In addition, in August of 2020, Watson, claimed that said power of attorney had "been through the courts." When O'Neill pointed out that O'Neill had never signed any agreement with Wilder, and all Watson's claims were entirely false, O'Neill was informed in August that O'Neill "lost" her copy of the agreement. Setting aside the fact that Wilder and Watson are stalking O'Neill and telling ridiculous lies about O'Neill, if the Power of Attorney Watson claims O'Neill signed was indeed legitimate, which of course it is not, then Wilder or Watson would simply send a copy to O'Neill in the mail and call her on her phone rather than stalk O'Neill, lie, and claim O'Neill "lost" her copy.

135. Moreover, even though Watson claims to be an attorney, she ignores the law. Specifically, HIPPA requires healthcare organizations to keep copies of any authorizations to release medical information on file for six years. Part of the HIPPA code states "A covered entity must document and retain any signed authorization under this section as required by § 164.530(j)." 45 C.F.R. § 164.508.

136. Thus, if Wilder really did have a Power of Attorney, and Watson really did have a legal right to make phone calls to healthcare organizations when O'Neill

was having rape exams performed, then those authorizations would to be kept on file for six years with each hospital and healthcare organization. Yet, no hospital has any such authorization on file.

137. What is indisputable is that Wilder, Watson and DB claim that Judge Greco authorized a Power of Attorney, when, in fact, the Power of Attorney Wilder claims to have was never raised as an issue in the Wilder Action, and O'Neill learned about this agreement over a year and half after Greco dismissed the action. There is, of course, no record of said Power of Attorney in the eFile system or anywhere on record in the Wilder Action.

138. Likewise, it is also common knowledge that there are federal, state, and local laws, and federal laws are supreme to state laws. HIPPA is a federal law. Thus, Judge Greco has no authority to overrule a federal law. Thus, the Power of Attorney Wilder claims to have is a lie and is simply a cover for the fact that Wilder stole copies of O'Neill's medical records.

**M. Illegal Access**

139. O'Neill recorded her conversations with medical personnel when she had rape exams performed. After O'Neill collected copies of her medical records, in 2018 O'Neill sent some, but not all of the recordings to hospitals to have her

44

medical records amended which, as a matter of law, O'Neill have a right to do pursuant to 45 CFR § 164.526.  However, after O'Neill sent the some, but not all recordings, O'Neill stopped the amendment process since the hospitals were not acting in good faith due to interference from the Wilder and DB teams.

140.  As a matter of law, O'Neill has the right to amend her medical records from rape exams for as "long as the protected health information is maintained in the designated record set." 45 CFR § 164.526.  Since 2018, O'Neill has always intended to continue the amendment process, and has numerous recordings to compel healthcare organizations to amend her medical records.

141.  The medical professionals that spoke to others about O'Neill when she had rape exams face criminal liability.  So, does Wilder and Watson.

142.  Not only do HIPPA laws require hospitals and other healthcare organizations to keep copies of authorizations on file for six years (*See* 45 C.F.R. § 164.508 and 45 C.F.R. § 164.530 (j)), but HIPPA also requires healthcare organizations to gain a written authorization from the individual or, alternatively, the opportunity for the individual to agree or object before sharing information with law enforcement. Health Insurance Portability and Accountability Act of 1996, 101(a) *et seq.*, 42 U.S.C.A. § 1181 *et seq.*; 45 C.F.R. 164.508, V164.510.

Yet, in O'Neill's case, no hospital made any effort to give O'Neill an opportunity to object before providing health information about O'Neill to law enforcement.

## N. Fraudulent Medical Records and Failure to Meet Standards

143.  The Emergency Medical Treatment and Labor Act ("EMTALA") requires anyone coming to an emergency department to be stabilized and treated, regardless of their insurance status or ability to pay.  42 U.S.C. § 1395dd.

144.  Given hospital emergency rooms are required to treat and stabilize all patients, hospitals participate in the Medicare and Medicaid programs to receive payment for treating Medicare and Medicaid beneficiaries.  In fact, as of March of 2020, the average hospital in the US received 21.8% of its revenue from Medicare and 12.8% of its revenue from Medicaid.[5]  Thus, roughly 1 in 3 dollars a hospital receives to fund its operations is paid by the government under the Medicare and Medicaid programs.

145.  The U.S. government imposes numerous conditions for healthcare providers, including hospitals, to participate in Medicare and Medicaid programs and receive payments, and hospitals are required to comply with federal statutes.

---

[5]https://www.statista.com/statistics/1029719/composition-of-hospital-revenue-by-payer-contribution-in-the-us/

In fact, as a condition to receive payment, hospitals are required to create and maintain accurate medical records.  As a result, ER physicians are well versed in the need to produce accurate medical records in order for their employers to receive reimbursement from Medicare and Medicaid.

146.  Yet, despite the fact ER physicians clearly understand there are medical record requirements, O'Neill's medical records from her rape exams fail to comply with even the most basic federal requirements, requirements the ER physicians she consulted are surely well aware of since, on average, over 33% of hospital revenue is paid by the Medicare and Medicaid.

147.  The Medicare and Medicaid programs are administered by the Centers for Medicare & Medicaid Services ("CMS"), a part of the Department of Health and Human Services ("HHS").  The Office of the Inspector General ("OIG") at HHS fights waste, fraud and abuse and seeks to improve the efficiency of the Medicare and  Medicaid programs.

148.  OIG and CMS publish educational material that is available for free to the public online.[6]  In OIG's and CMS's educational material, the standards for

---

[6]https://www.cms.gov/About-CMS/About-CMS

medical records are described, and failing to meet the federal government's standards can result in non-payment of claims at a minimum.

149.  When a provider submits a claim for services provided to a Medicare beneficiary, the provider is filing a bill with the Federal Government and certifying the provider complied with the Medicare program's requirements.  To support payment claims, physicians are expected to maintain accurate and complete medical records.[7]  The Medicare Program may review beneficiaries' medical records.[8]  The federal government expects medical records to chronologically report the care a patient received and record pertinent facts, findings, and observations about the patient's health history to help physicians and other health care professionals evaluate and plan the patient's immediate treatment and monitor the patient's health care over time.  According to the Medicare program: "If you didn't document it, it's the same as if you didn't do it."[9]

---

[7]https://oig.hhs.gov/documents/physicians-resources/947/roadmap_web_version.pdf, Page 12, ¶1.
[8]https://oig.hhs.gov/documents/physicians-resources/947/roadmap_web_version.pdf, Page 12, ¶1.
[9]https://oig.hhs.gov/documents/physicians-resources/947/roadmap_web_version.pdf, Page 12, ¶1.

## CLAIM FOR RELIEF
### Count One:  Common Law Fraud
### (Against Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens)

150.  Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

151. Defendants willfully deceived O'Neill, intending to harm her and harming her as intended in order to aid and abet Wilder.

152. Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens each represent that they are credible medical providers, and that they follow New York state and federal laws governing patient privacy and the provision of medical care.

153. O'Neill justifiably relied on the false representations that Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens made.  Although she knew not to trust Wilder, she did not know or believe —and had no reason to know or believe — that hospitals with reputations to protect would abuse her and falsify medical records to enable a serial rapist like Wilder to rape with impunity.

154. As shown through the medical records, Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens had no intention of providing medical care to O'Neill.

155. Instead, when O'Neill went to Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens to have rape exams, Wilder's attorney, Watson, called and/or had others call on her behalf and provided hospitals with the ludicrous Trump Has Malaria Defense.

156. The Trump Has Malaria Defense was the basis for the abuse O'Neill was subjected to at Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens.

157. In addition, fake information from the fake accounts set-up in messaging apps in O'Neill's name without her knowledge or consent that O'Neill never used was added into her medical records along with the Trump Has Malaria Defense by hospital personnel seeking to aid and abet Wilder despite the fact that 8 NYCRR § 29.2(a)(3) requires physicians to maintain accurate medical records, and under New York, a patient has an absolute right not to have her medical records fraudulently altered by a physician.

158. Further, things O'Neill actually said and did were not included in her medical records.  Instead, vague statements like O'Neill was "paranoid" were written in her medical records even though there was no basis for claiming O'Neill was paranoid based on what O'Neill actually said.  Instead, the basis of how

O'Neill was treated was the Trump Has Malaria Defense, and fake messages Wilder sent to himself.

159. The Trump Has Malaria Defense along with the fake messages from fake accounts were used as cover to ensure Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens failed to run the right tests on the urine samples O'Neill provided.

160. The police then used the Trump Has Malaria Defense to justify falsifying police reports, destroying her rape kits, and failing to run appropriate tests on the samples in rape kits (e.g., the rape kit with acetone, a component of chloroform, should have been tested further).

161. Even if Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens did not have specific knowledge of every act that Wilder and his agents committed, Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens are vicariously liable for the intentional torts of Wilder and his agents.

162. O'Neill's reliance on Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens representations that they were credible medical providers harmed her greatly. Because O'Neill trusted Defendants NYU Langone, Mount

Sinai Beth Israel, LHH, and NYP Queens, the NYPD closed criminal cases under entirely false pretenses.

163. Damages include, but are not limited to, lost employment opportunities; legal fees and costs associated with various legal filings; and harm to O'Neill's reputation, including, but not limited to false claims O'Neill has mental health disorders she does not have.

### Count Two: Common Law Fraud, Georgia
### (Against Defendants Grady and NHF)

164. Plaintiff restates and realleges each of the foregoing paragraphs in this pleading with the same force and effect as if fully set forth within.

165. Defendants willfully deceived O'Neill, intending to harm her and harming her as intended in order to aid and abet Wilder.

166. Defendants Grady and NHF each represent that they are credible medical providers, and that they follow Georgia state and federal laws governing patient privacy and the provision of medical care.

167. O'Neill justifiably relied on the false representations that Defendants Grady and NHF made.  Although she knew not to trust Wilder, she did not know or believe —and had no reason to know or believe — that hospitals with reputations

to protect would abuse her and falsify medical records to enable a serial rapist like Wilder to rape with impunity.

168. As shown through the medical records, Defendants Grady and NHF had no intention of providing medical care to O'Neill.

169. Instead, when O'Neill went to Defendants Grady and NHF to have rape exams, Wilder's attorney, Watson, called and/or had others call on her behalf and provided hospitals with the ludicrous Trump Has Malaria Defense.

170. The Trump Has Malaria Defense was the basis for the abuse O'Neill was subjected to at Defendants Grady and NHF.

171. In addition, fake information from the fake accounts set-up in messaging apps in O'Neill's name without her knowledge or consent that O'Neill never used was added into her medical records along with the Trump Has Malaria Defense by hospital personnel seeking to aid and abet Wilder despite the fact that Georgia law requires physicians to maintain accurate medical records, and a patient has an absolute right not to have her medical records fraudulently altered by a physician.

172. Further, things O'Neill actually said and did were not included in her medical records. Instead, vague statements were written in her medical records even though there was no factual basis for the vague statements. Instead, the basis

of how O'Neill was treated was the Trump Has Malaria Defense, and fake messages Wilder sent to himself.

173. The Trump Has Malaria Defense along with the fake messages from fake accounts were used as cover to ensure Defendants Grady would not collect a urine sample to include in O'Neill's rape kit, and to ensure that Defendants NHF would fail to run the right tests on the urine sample O'Neill provided.

174. The police then used the Trump Has Malaria Defense to justify falsifying police reports, destroying O'Neill's rape kits, and failing to run appropriate tests on the samples in rape kits (e.g., the GBI should have run tests for opiates and opioids).

175. Even if Defendants Grady and NHF did not have specific knowledge of every act that Wilder and his agents committed, Defendants Grady and NHF are vicariously liable for the intentional torts of Wilder and his agents.

176. O'Neill's reliance on Defendants Grady and NHF representations that they were credible medical providers harmed her greatly.  Because O'Neill trusted Defendants Grady and NHF, the police closed criminal cases under entirely false pretenses.

177.  Damages include, but are not limited to, lost employment opportunities; legal fees and costs associated with various legal filings; and harm to O'Neill's reputation, including, but not limited to false claims O'Neill has mental health disorders she does not have.

### Count Three: Civil RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

178.  Plaintiff restates and realleges each of the foregoing paragraphs in this pleading with the same force and effect as if fully set forth within.

179.  Defendants NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens, Grady, NHF, and CPPD are each a "person" within the meaning of 18 U.S.C. § 1961(3).

180.  Defendants were all associated with an enterprise, referred to here as the Predator-Protection Enterprise.  The Predator-Protection Enterprise consists of Deutsche Bank, Christopher Wilder, Margaret Watson, Lehman Brothers, NYU Langone, Mount Sinai Beth Israel, LHH, and NYP Queens, Grady, NHF, and CPPD, and the NYPD as well as others known and unknown.  The common purpose of the Predator-Protection Enterprise was to protect Wilder's and DB's reputation, prevent negative public disclosures about Wilder, the Bank, and DB's

former employees' criminal acts, and discredit those who might accuse Deutsche

Bank and the Bank's former employees of wrongdoing or expose that wrongdoing.

Although new persons joined the Predator-Protection Enterprise over time, it has

existed and sought to accomplish its purposes since no later than 2005, and has

continued to the present, and will continue into the future until someone stops

Wilder, Deutsche Bank and their enablers.  It has set its sights on countless

victims, including but not limited to O'Neill, and the other woman Wilder abused

at Deutsche Bank.

181. The Predator-Protection Enterprise activities affected interstate commerce.

For instance, it used multiple facilities of interstate commerce, such as wire

transfers of money, telephone calls, and emails.

182. Defendants agreed to and did conduct and participate in conducting the

Predator-Protection Enterprise's affairs through a pattern of racketeering activity

and for the unlawful purpose of defrauding O'Neill and other victims. The pattern

of racketeering activity here is based on numerous instances of mail and wire

fraud, in violation of 18 U.S.C. § 1343.

183. Specifically, Defendants engaged in a scheme to defraud O'Neill, and to

defraud others who Wilder and Deutsche Bank believed might accuse them of

wrongdoing.  The acts in furtherance of the fraud scheme include those set forth in the paragraphs above.

184.  Each Defendant intended to defraud O'Neill, destroy evidence, and create false stories about O'Neill to undermine and discredit her and brand her "crazy" and a "liar."

185.  Since 2017 Plaintiff has been forced to disprove a series of false and ludicrous medical claims including, but not limited to (1) she belonged in a "mental institution," (2) had "delusions of grandeur," (3) exhibited "pressured speech" and was "bi-polar," (4) was an opioid addict, (5) suffered from paranoid schizophrenia, (6) had a stroke, (7) suffered from "migraines," and had (8) high blood pressure.

186.  However, as Plaintiff has proven each story false, each story is simply replaced with a new story.

187.  The medical providers that conducted rape exams denied Plaintiff's requests for appropriate tests, changed stories, failed to ask for a medical history, and wrote false statements in Plaintiff's records.

188.  In addition, the medical records from rape exams also contain several "conversations" that never occurred, and fail to contain conversations that did

occur.  In several cases, hospitals also refused to collect a urine sample, or ensured evidence was destroyed.

189.  In those cases, fake "medical" stories and fake "medical" claims were provided to the police as justification for closing criminal cases and harming Plaintiff.

190.  It is statistically impossible for someone like O'Neill to have experienced the problems that she has experienced due to "bad luck" or random coincidence. Rather, it is obvious there has been a consistent and concerted campaign undertaken to undermine and discredit Plaintiff in order to harm her and aid and abet those who have clearly repeatedly and consistently abused her to cover for their various and numerous crimes.

191.  Each Defendant actively participated in the mail fraud scheme.

192.  The acts described above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

193.  Just as the Predator-Protection Enterprise's activities affected interstate commerce, these predicate acts of racketeering likewise affected interstate commerce.

194. Defendants directly and indirectly conducted and participated in the conduct of the Predator-Protection Enterprise's affairs through this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

195. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), O'Neill—a "person" within the meaning of 18 U.S.C. § 1961(3)—has been injured in her business and property, suffering concrete financial losses, including but not limited to: lost employment opportunities; legal fees and costs associated with various legal filings; and harm to O'Neill's reputation, including, but not limited to false claims O'Neill is mentally ill.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests judgment in her favor and against Defendants as follows:

a.  Compensatory damages in an amount to be determined at trial;

b.  Punitive damages;

c.  Fees, costs, and expenses;

d.  Actual damages and treble damages for the RICO claim;

e.  Pre-judgment and post-judgment interest; and

f.  A grant of further relief this Court finds just and proper.

## DEMAND FOR JURY TRIAL

**NOW COMES** Plaintiff and hereby demands a jury trial in this matter.

Dated: Atlanta, GA                         Respectfully submitted,
January 3, 2023


BY: Maura O'Neill
Maura O'Neill, Plaintiff
712 H Street NE, #1707
Washington, DC 20002
(752) 228-9105
moneill@rahillco.com

60

## **CERTIFICATION**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: Atlanta, GA
January 3, 2022

Respectfully submitted,

BY: _Maura O'Neill_
Maura O'Neill, Plaintiff
712 H Street NE, #1707
Washington, DC 20002
(752) 228-9105/moneill@rahillco.com