FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 2 5 2022

KEVIN P. WEIMER, Clerk
By: _Kimberly Haskill_ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| MAURA O'NEILL,<br><br>Plaintiff,<br><br>v.<br><br>NYU LANGONE MEDICAL CENTER, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL, GRADY HEALTH SYSTEM, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL FORSYTH, COLLEGE PARK POLICE DEPARTMENT,<br><br>Defendants. | CIVIL ACTION FILE NO.<br>1:22-cv-00011-SEG |

## PLAINTIFF'S MOTION TO COMPEL

**COMES NOW** Plaintiff Maura O'Neill ("Plaintiff"), and, hereby files this Motion to Compel, showing this Court as follows:

On January 4, 2022, Plaintiff filed a complaint alleging several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Medical Center ("NYU Langone"), Grady Health System ("Grady"), Mount Sinai Beth Israel Hospital ("Beth Israel"), New York-Presbyterian Queens,

("NYP-Queens"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital Forsyth ("Northside"), together ("Defendants"), commit fraud and violated RICO statutes. (Docket No. 1).[1]

O'Neill worked with Christopher Wilder at Deutsche Bank Securities, Inc. ("DB," "Deutsche Bank," or the "Bank") from 2004 to 2007.  During that time, O'Neill was sexually harassed by Wilder, a credit trader and the "Bill Cosby of Wall Street."  Over the course of her two and a half years at DB, O'Neill was pimped out by her boss, used as a pawn in a war, forced to file a HR complaint, used as a form of entertainment for the trading floor through a series of "Goldilocks" updates distributed to the trading floor through emails, subjected to rampant, merciless propaganda, and fired in May of 2007 after Wilder issued a "she goes or I go" ultimatum to over-turn a DB Risk Committee decision not to terminate O'Neill's employment.

After leaving Deutsche Bank, O'Neill went to work as a M&A investment banker at Lehman Brothers Inc. ("Lehman" or "Lehman Brothers") in June of 2007.  While O'Neill was at Lehman, Wilder continued to stalk O'Neill, and O'Neill learned from her Lehman officemate, a male colleague who claimed to be part of the "Deutsche Bank Band of Brothers" that Wilder complained O'Neill had

---

[1]In 2017 and 2018, Plaintiff lived in New York, but worked as a Chief Financial Officer for a company based in Forsyth County, Georgia.

not "thrown him a bone."   Unbeknownst to O'Neill while she was an employee at

Lehman Brothers, Wilder told O'Neill's colleague, Jeff Rabel, that Wilder

intended to "drug" and "rape" O'Neill to cover for his sexual harassment.  After

Lehman management became concerned that Wilder intended to "drug" and "rape"

O'Neill, Lehman management contacted DB and complained that Wilder was an

obsessed stalker.

Wilder was fired from DB as a result, although DB covered for Wilder's

criminal activities by stating Wilder was terminated due to a "FINRA Violation."

Several other members of DB's senior management and various other teams either

resigned, left or were demoted within a matter of months due to their involvement

in the sexual harassment, stalking, pimping out, and potential rape scandal Wilder

created.

O'Neill had no knowledge of Wilder's threat to drug and rape her until many

years later.  After O'Neill was informed about Wilder's rape threat, on January 6,

2017, Wilder or his agent drugged O'Neill, and Wilder broke into O'Neill's home,

and raped O'Neill for the first time.  Thereafter, as O'Neill identified holes in

Wilder's stories, Wilder commenced his rape rampage to create "evidence," to

discredit O'Neill and ensure he never faced consequences for his actions.  Wilder's

rape rampage led to O'Neill's visits to the hospital defendants in this action.

When *The New York Times* published its article on October 5, 2017 that played a large part in Harvey Weinstein's downfall, the *Times*, after months of investigation, had been able to track down eight settlement agreements Weinstein signed with his victims.[2]  O'Neill was informed Wilder has at least six or seven signed agreements with women he raped or abused.  At the time the *Times* article about Weinstein was published, Weinstein was 65 years old.  Wilder is only 50. Thus, Wilder has accumulated more signed documents per year than Weinstein.

*A. Discovery*

The Emergency Medical Treatment and Labor Act ("EMTALA") requires anyone coming to an emergency department to be stabilized and treated, regardless of their insurance status or ability to pay.  42 U.S.C. § 1395dd.  Given hospital emergency rooms are required to treat and stabilize all patients, hospitals participate in the Medicare and Medicaid programs to receive payment for treating Medicare and Medicaid beneficiaries.  In fact, as of March of 2020, the average hospital in the US received 21.8% of its revenue from Medicare and 12.8% of its revenue from Medicaid.[3]  Thus, roughly 1 in 3 dollars a hospital receives to fund

---

[2]Kantor, Jodi; Twohey, Megan. "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades." *The New York Times.*  October 5, 2017.
[3]https://www.statista.com/statistics/1029719/composition-of-hospital-revenue-by-payer-contribution-in-the-us/

its operations is paid by the government under the Medicare and Medicaid programs.

The U.S. government imposes numerous conditions for healthcare providers, including hospitals, to participate in Medicare and Medicaid programs and receive payments, and hospitals are required to comply with federal statutes and policies. In fact, as a condition to receive payment, hospitals are required to create and maintain complete and accurate medical records. As a result, Emergency Room ("ER") physicians are well versed in the need to produce accurate and complete medical records that comply with federal policies and standards in order for their employers to receive reimbursement from Medicare and Medicaid. Yet, despite the fact ER physicians clearly understand there are medical record requirements, O'Neill's medical records from her rape exams fail to comply with even the most basic federal requirements, requirements the ER physicians she consulted are surely well aware of since, on average, over 33% of hospital revenue is paid by Medicare and Medicaid.

Medicare states, "All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered." *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 A.* Despite this requirements, on May 17, 2022, NYU Langone, in a filing for this action, stated (Docket No. 33, Page 3, ¶1):

NYU Langone would like this Court to consider its Motion to Dismiss as soon as possible to either dismiss Plaintiff's claims or commence discovery so that NYU Langone may uncover the claimed factual basis for Plaintiff's claims.

However, NYU Langone had no legal basis to need "discovery" for what it wrote in O'Neill's medical record or how NYU Langone mistreated Plaintiff. Rather, as stated in Medicare's CMS Manual, "All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered." *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 A.* As described in further detail below, NYU Langone, seems to believe it has a right to keep changing stories, even though U.S. government policies make clear NYU Langone has no such right, given NYU Langone should have known it should have created its medical record at the time it rendered services to O'Neill, and any delayed entries or amendments to O'Neill's medical record should have been clearly noted in her medical record.

### B. Conflicts of Interest

On June 7, 2022, NYU Langone filed papers on behalf of the hospital defendants requesting the court stay the requirement for NYU Langone and Grady to file Certificates of Interested Persons and reveal other parties that have an interest in the outcome of the case. (Docket No. 36). However, there is no authority to support the request to stay the requirement to disclose conflicts of interest. Rather, asking the Court to violate black letter court rules amounts to

requesting the court to engage in misconduct in order to allow NYU Langone and Grady to hide the fact both hospitals made decisions about O'Neill's healthcare due to conflicts of interest, conflicts that were not documented in O'Neill's medical records.

## C. *Disclosures of Protected Health Information to Police*

The Health Insurance Portability and Accountability Act ("HIPAA") permits hospitals to disclose protected health information in response to a law enforcement official's request for information about an individual who is or is suspected to be a victim of a crime if the individual agrees to the disclosure. 45 CFR § 164.512. In the case the individual is unable to consent due to incapacity, HIPAA proscribes a series of events in which providers can speak to law enforcement. *Id.* However, in Plaintiff's case, O'Neill was never unable to give consent, thus, Plaintiff's authorization was needed for any provider to speak to law enforcement. But, O'Neill never gave her consent for any Defendant to speak to law enforcement.

Despite HIPAA's explicit requirement that Plaintiff's consent was required for Defendants to speak to law enforcement about O'Neill, NYU Langone, Grady, and Beth Israel all spoke to law enforcement about O'Neill even though no Defendant had authorization to do so.

### D. Amendments

O'Neill recorded her visits to Defendants given the Wilder and DB teams' strategy of creating fake "documentation," and stated litigation strategy of "perjury and bribing judges." After O'Neill read her medical records from Defendants, in 2018, she sent amendment requests to Defendants. While most Defendants did modify their records as a result of O'Neill's recordings and amendment requests, they failed to comply with basic Medicare requirements to highlight and note the changes they made.

Specifically, as of August 22, 2017, pursuant to *CMS Manual System, Pub 100-08 Medicare Program Integrity*, when making amendments, Medicare required hospitals to:

1. Clearly and permanently identify any amendment, correction or delayed entry as such, and
2. Clearly indicate the date and author of any amendment, correction or delayed entry, and
3. Clearly identify all original content, without deletion. *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 B.*

Medicare also states, "All services provided to beneficiaries are expected to be documented in the medical record at the time they are rendered." *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 A.* Despite these requirements, several Defendants changed O'Neill's medical records after it provided services through delayed entries, but failed to note the changes according to Medicare's requirements.

8

### E. HIPAA Requests for Information

HIPAA gives an individual the right to access information about her healthcare, 45 CFR § 164.524, and requires healthcare organizations to disclose all records it used to make healthcare decisions.  45 CFR § 164.501.

On June 6, 2022 Plaintiff started sending letters to hospitals requesting two basic pieces of information:

- Confirmation the hospital does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at the hospital about O'Neill or receive any information about her medical records or have access to information about her medical care.
- Confirmation the hospital does not have any additional records, data, or information that the hospital used to make decisions about O'Neill's healthcare that are not included in her medical record.

Despite the fact that the two requests for information are incredibly basic, not a single one of the Defendants fully complied with HIPAA and state laws and

responded to O'Neill's request.[4,5,6,7,8,9]  Glaringly, New York's Public Health Law

§ 18(2) required the New York Defendants to respond within ten days. Yet, not a

single Defendant has complied with the law. Likewise, the time for the Georgia

hospital Defendants to respond passed weeks ago. Thus, all hospital Defendants

failed to comply with HIPAA and state law requirements.

---

[4]Northside stated it does not have a Power of Attorney, but has failed to state if it
has any other authorization to talk to a third party about O'Neill. Northside has
also not disclosed if all information used to make decisions about O'Neill are in
her medical record.

[5]Grady sent a medical record, but failed to include a Power of Attorney,
authorization, or any additional information outside the medical record.

[6]Lenox Hill has not provided any response.

[7]NYU Langone stated it has no Power of Attorney, and claimed it spoke to others
about O'Neill. Yet, NYU Langone has provided no authorization, and further
claimed it had not unlawfully disclosed O'Neill's medical information. O'Neill's
medical record also does not contain references to any third parties, even though
NYU Langone spoke to third parties.

[8]Beth Israel stated it does not have a Power of Attorney or authorization on file. It
also stated the only information it has on record is in O'Neill's medical record.
However, its parent company, Mount Sinai Health System ("MSHS") refuses to
respond to O'Neill's requests for information or state whether MSHS has records
about O'Neill Beth Israel does not possess.

[9]Like Beth Israel, NYP-Queens stated it does not have a Power of Attorney or
authorization on file. It also stated the only information it has on record is in
O'Neill's medical record. However, NYP-Queens refused to tell O'Neill if a
parent company or another another entity has additional records about O'Neill that
NYP-Queens does not possess. In February of 2019, Plaintiff sent letters to DB.
DB was willing to deny that DB had possession of Plaintiff's medical records,
but DB was not willing to deny that (1) a related entity or law firm hired by
DB had copies of those records, or (2) DB discussed O'Neill's medical records
with a third party. Thus, there is reason to believe Defendants would hide
information with a related entity or law firm.

## F. Deceptive Legalese

HIPAA requires healthcare providers to account for all disclosures of Protected Health Information ("PHI") that were made for purposes other than treatment, payment, or healthcare operations. HIPAA Accounting is the accounting, or the action or process of keeping records, of these disclosures. 45 CFR § 164.528. The letters O'Neill sent to Defendants in June clearly did not request an Accounting of Disclosures because, 45 CFR § 164.528, accounting of disclosures of protected health information, explicitly allows covered entities to exclude the fact that the covered entity disclosed protected health information to certain third parties under certain circumstances. Thus, Plaintiff's email did not ask for an Accounting of Disclosures pursuant to 45 CFR § 164.528 because 45 CFR § 164.528 explicitly allows covered entities to fail to disclose the very information O'Neill sought in her letters.

Despite the fact that Accounting of Disclosures clearly allows Defendants to hide the very information O'Neill requested, NYP-Queens, Beth Israel, and NYU Langone all sent Accounting of Disclosures, even though their responses, which contained deceptive legalese, was explicitly and knowingly not responsive to O'Neill's request. Lenox Hill and Grady never responded to O'Neill's June requests for information.

After it became obvious Defendants were attempting to use deceptive legalese to fail to provide the information O'Neill requested, O'Neill sent emails to Defendants requesting that they not provide an accounting of disclosures pursuant to 45 CFR § 164.528, and instead requested plain language responses to the requests in her letters.  O'Neill even sent sample responses, and asked Defendants to provide a response like the following:

1.[Defendant] does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at [Defendant] about Maura O'Neill or receive any information about Maura O'Neill's medical records or have access to information about Maura O'Neill's medical care.

2.[Defendant] does not have any additional records, data, or information that [Defendant] used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in [2017 and/or 2018].

Despite the simple nature of O'Neill's requests, several Defendants had no intention of providing the information O'Neill sought even though HIPAA states she has a right to that information as described in the accompanying Memorandum of Law dated August 17, 2022.

### G. Two Sets of Records

In a letter sent to Plaintiff on July 5, 2022, NYU Langone stated, "Please know that the designated record set is limited to records that are used in whole or in part by or for NYU Langone to make decisions about individuals. This

information does not include the names of all individuals that have provided

information about you and/or their conversations."

Nowhere in O'Neill's medical record from NYU Langone does it state who

NYU Langone spoke to about O'Neill, nor did the medical record contain any

information about conversations NYU Langone had with third parties about

O'Neill.  Obviously, according to Medicare, NYU Langone was required to

document conversations about O'Neill in her medical record when NYU Langone

had those conversations, however, NYU Langone failed to do so.

O'Neill sent a response to NYU Langone on July 5, 2022, which stated:

It is clear when reading my medical record that my medical record is based
on information that is not contained in my medical record.  In fact, there is
no factual basis or support for numerous statements written in my medical
record, and it is clear that NYU Langone's support for several statements in
my medical record is due to conversations NYU Langone had with various
third parties about me without my knowledge or consent, and without giving
me an opportunity to respond to false information given to NYU about me
behind my back.

Since my medical record was written based on slanderous claims from third
parties, I have the legal right to know the names of all individuals that
provided information about me and the conversations NYU Langone had
with third parties about me since the comments in my medical record are
based on NYU Langone's conversations with those individuals.

In addition, my treatment at NYU Langone was also profoundly impacted by
conversations NYU Langone's personnel had with third parties about me.  In
particular, NYU Langone denied my request to speak to a toxicologist and
failed to run appropriate toxicology lab tests that were warranted under the
circumstances due to conversations NYU Langone had with third parties.

Given NYU Langone's medical record and treatment decisions make clear NYU relied on conversations with third parties to make decisions about me, the names of all of the individuals NYU Langone spoke to about me, and the details of NYU Langone's conversations about me must be included in my designated record sets under 45 CFR § 164.501and must be open for inspection under NY state law.

It appears as if NYU Langone is seeking to hide the identities of individuals NYU Langone spoke to about me by claiming that those people's names and information they provided are not part of the designated record set when in fact my medical record makes clear that my medical record and the way I was treated at NYU Langone was entirely dependent on slanderous claims made about me behind my back while I was at NYU Langone.  For example, if a reporter called NYU Langone and asked NYU Langone why it made certain statements in my medical record, NYU Langone would respond that the statements in my medical record are based on conversations it had with other individuals who are not me.  Given that numerous material statements in my medical record are based on claims from third parties, the individual's names and details about the conversations belong in my designated record set.

Under New York's Public Health Law § 18(2), NYU Langone had until July 15, 2022 to respond to O'Neill's letter.   However, NYU Langone, as usual, made no effort to follow the law.

### H. Story Changes

On July 11, 2022, Plaintiff filed an Amended Complaint highlighting the illegal nature of NYU Langone's actions.  (Case No. 1:20-cv-04632-SEG, Docket No. 39).  On July 22, 2022, over two months after NYU Langone filed papers on behalf of Defendants requesting the court stay the requirement for NYU Langone and Grady to file Certificates of Interested Persons and reveal other parties that have an interest in the outcome of the case, NYU Langone filed a Certificate of

Interested Persons stating there were no other parties with an interest in the action. (Docket No. 43). Clearly, the NYPD and City of New York have an interest in the action. Thus, NYU Langone's Certificate of Interested Persons was clearly fraudulent. In a move that can only be labelled as transparently suspect, NYU Langone failed to provide a rationale for its abrupt change and rationale for filing a Certificate of Interested Persons after NYU Langone had already motioned the Court to stay the requirement (Docket No. 36).

Grady has still not filed a Certificate of Interested Persons. Given the College Park Police, City of College Park, and Beth Israel all have an interest in Grady's outcome in this case, at least Grady did not attempt to deceive the Court in the way NYU Langone so clearly did. Overall, Grady and Lenox Hill appear to have adopted a strategy of silence, which, while failing to adhere to HIPAA and state laws, is at least better than NYU Langone's strategy of submitting filings and sending letters containing lies and ridiculous false statements like NYU Langone needs "discovery" to understand its own medical records.

On July 29, 2022, or over three weeks after O'Neill sent her July 5, 2022 email, and over a week after NYU Langone's deadline to respond under Public Health Law § 18(2), NYU Langone sent a new letter to Plaintiff stating:

> [W]e remain unable to substantiate that any inappropriate disclosures of your information have occurred. As previously explained, the only information we maintain is contained in your medical record... Additionally, there is no indication that any of your PHI was

inappropriately disclosed with a third party.

Clearly, O'Neill's PHI was inappropriately disclosed to the NYPD.  Next, NYU

Langone asked Plaintiff if she wanted to amend her medical record, a request

which apparently failed to recall O'Neill already sent an amendment request in

2018.

It is obvious by reading NYU Langone's medical record that the record itself

is fraudulent for numerous reasons.  Yet, rather than self-correct O'Neill's medical

record, or take responsibility for its fraudulent activities, after O'Neill submit her

amendment request in 2018, NYU Langone instead continued its established

pattern of bullying and deceptive behavior.  Given NYU Langone's past bad faith

actions, Plaintiff believes it is more statistically likely she will receive a visit from

the tooth fairy than NYU Langone will credibly manage an amendment request

from O'Neill.  Any sane and honest person simply reading this document can tell

that NYU Langone has repeatedly broken laws, statutes, and policies.  Thus, it is

difficult for O'Neill to fathom how, at this juncture, after NYU Langone's repeated

story changes and lies that engaging in any effort to try to get NYU Langone to

amend its medical record would be yield a productive result.  More likely than not,

all NYU Langone would do is delete obviously incorrect statements, and then

insert new false data to continue to cover-up.  The DB and Wilder teams and those

who aid and abet them seem to believe they are entitled to unlimited story changes

and a magic eraser. Thus, as one story is proven false, they are simply allowed to replace an old story with a new one and face no consequences as a result.

The fact NYU Langone has shown a repeated inability to comply with even the most basic Medicare documentation requirements shows NYU Langone has never had any intention of complying with applicable laws, and NYU Langone never intended to provide objective or competent healthcare to O'Neill. Neither did the other Defendants for the same reasons.

### I. Request

Given Defendants have broken numerous laws and statutes, failed to comply with even the most basic of requirements, changed stories, and bullied O'Neill, Plaintiff files this motion to compel Defendants to:

a. Produce copies of Plaintiff's medical records that comply with Medicare standards stated in *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 A & B.* Specifically, each Defendant should be required to comply with federal rules, and send O'Neill a copy of her medical record that:
   1. Clearly and permanently identify any amendment, correction or delayed entry as such,[10] and
   2. Clearly indicate the date and author of any amendment, correction or delayed entry, and
   3. Clearly identify all original content, without deletion. *CMS Manual System, Pub 100-08 Medicare Program Integrity, 3.32.5 B*

b. Provide the following information:
   1. [Defendant] [has / does not have], and [has had since (date) / has never had], an authorization on file that would allow any person or entity to speak to any

---

[10]It is clear that providers made entries in Plaintiff's medical records after O'Neill left Defendants' facilities. Those delayed entries should have been noted as such in O'Neill's medical records.

person at [Defendant] about Maura O'Neill or receive any information about Maura O'Neill's medical records or have access to information about Maura O'Neill's medical care.

2. [Defendant] [did/did not] have [an authorization] to speak with law enforcement about O'Neill.

3. [Defendant's] electronic medical record system as of 2017 [had features to allow users to comply with Medicare's requirements to / was and is not able to]:
   a. Clearly and permanently identify any amendment, correction or delayed entry as such, and
   b. Clearly indicate the date and author of any amendment, correction or delayed entry, and
   c. Clearly identify all original content, without deletion

4. [Defendant] does not have any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in [2017 and/or 2018].

5. No related entity, LLC, SPV, parent company, individual, partnership, corporation, or any other entity, or law firm hired by [Defendant] has any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in [2017 and/or 2018].[11]

---

[11]In February of 2019, Plaintiff sent letters to DB.  DB was willing to deny DB had possession of Plaintiff's medical records, but DB was not willing to deny that (1) a related entity or law firm hired by DB had copies of those records or (2) DB discussed O'Neill's medical records with a third party.  Thus, there is reason to believe Defendants would hide information with a related entity or law firm.

c.  Produce a list of names of all individuals and entities Defendants spoke to about O'Neill.  (e.g., NYU Langone spoke to the NYPD, Beth Israel spoke to Grady, and Grady spoke to the College Park Police).

d.  Provide detailed statement of all information procured from any third party (e.g., NYPD, College Park Police, other healthcare provider).

e.  Comply with Certificate of Interested Person requirement.

f.  Stop using deceptive legalese in an attempt to thwart and deceive Plaintiff (e.g., Accounting of Disclosures).

### J. Support

In support of her Motion, Plaintiff relies upon the following:

1)  A Memorandum of Law in support of this Motion filed contemporaneously herewith;

2)  An Affidavit of Maura O'Neill dated August 17, 2022 and contemporaneously filed herewith;

3)  All other pleadings, documents, and other materials of record filed in this action.

**WHEREFORE,** Plaintiff Maura O'Neill respectfully requests that this Court **GRANT** the instant Motion.

Dated:  Alexandria, VA
August 17, 2022

Respectfully submitted,


BY: Maura O'Neill

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

<table>
<tr><td>

**MAURA O'NEILL,**

      Plaintiff,

   v.

**NYU LANGONE MEDICAL
CENTER, NEW YORK-
PRESBYTERIAN QUEENS,
LENOX HILL HOSPITAL, GRADY
HEALTH SYSTEM, MOUNT
SINAI BETH ISRAEL,
NORTHSIDE HOSPITAL
FORSYTH, COLLEGE PARK
POLICE DEPARTMENT,**

      Defendants.

</td><td>

**CIVIL ACTION FILE NO.
1:22-cv-00011-SEG**

</td></tr>
</table>

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I have this day caused to be served a true and correct copy of the foregoing by emailing and mailing a copy of the foregoing to each Defendant at the following addresses:

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Brantley Rowlen, Esq.
Chase Parker, Esq.
24 Drayton Street, Suite 300
Savannah, GA 31401
Telephone: 912.525.4960
E-Mail: rowlen@lbbslaw.com
E-Mail: chase.parker@lewisbrisbois.com

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
Parks Kalervo Stone, Esq.
3348 Peachtree Road NE
Suite 1400
Atlanta, GA 30326
Telephone: 470.419.6651
E-Mail: parks.stone@wilsonelser.com

**WATSON SPENCE LLP**
Michael R. Boorman, Esq.
999 Peachtree Road, N.E.
Suite 1130
Atlanta, GA 30309
Telephone: 229.436.1545
E-Mail: mboorman@watsonspence.com

**THOMAS KENNEDY SAMPSON & TOMPKINS, LLP**
Jeffrey Emery Tompkins, Esq.
Candance J. Rodgers, Esq.
3355 Main Street
Atlanta, GA 30337
Telephone: 404.688.4503
E-Mail: j.tompkins@tkstlaw.com
E-Mail: c.rodgers@tkstlaw.com


in accordance with Rule 5(b)(2)(E).

Dated:  Alexandria, VA
August 17, 2022

Respectfully submitted,


BY: Maura O'Neill

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com