FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 2 5 2022

KEVIN P. WEIMER, Clerk
By: _Kimberly Hubbuty_ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MAURA O'NEILL,** | **CIVIL ACTION FILE NO. 1:22-cv-00011-SEG** |
| Plaintiff, | |
| v. | |
| **NYU LANGONE MEDICAL CENTER, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL, GRADY HEALTH SYSTEM, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL FORSYTH, COLLEGE PARK POLICE DEPARTMENT,** | **AFFIDAVIT IN SUPPORT OF MOTION TO COMPEL** |
| Defendants. | |

I, Maura O'Neill, being duly sworn, deposes and states as follows:

### A. Background

1. This case is about illegal efforts of Deutsche Bank Securities, Inc.

("Deutsche Bank," "DB," or the "Bank"), and its former employee,

Christopher M. Wilder, and Wilder's nefarious attorney, Margaret Watson, to

1

silence me and cover-up for Wilder's sexual harassment and repeated sexual assaults.

2. I worked for Deutsche Bank from 2004 to 2007. During that time, I was sexually harassed by Wilder, a credit trader.

3. Angered that I rejected his sexual advances, Wilder repeatedly harassed and bullied me.

4. I avoided Wilder like the plague because I believed he was mentally ill, and only spoke to him for a grand total of three hours while I worked at DB.

5. Eventually, Wilder issued a "She goes or I go" ultimatum to have me fired, and the Bank's legal team, greenlighted my termination despite the fact there was no legitimate basis to terminate my employment.

6. Rather, my termination was based on my work at Merck & Company, Inc. ("Merck") on the VIOXX marketing team.

**B. VIOXX**

7. To justify my termination, DB prepared a false and retaliatory performance review in which DB tried to include the feedback of Valentine Foti, my prior fraudulent boss at Monitor Company ("Monitor"), in DB's first effort to establish a

2

"pattern of behavior" to justify Wilder's and the Bank's retaliatory treatment of me.

8.   DB's initial "pattern of behavior" approach, developed in 2006, was based on fraud.  Namely, before I attended business school at The University of Chicago, from September of 2000 to November of 2001, I worked at Monitor, and was staffed as the manager of the Vioxx marketing team while Merck, the manufacturer of Vioxx, was committing one of the largest fraud's in U.S. history.

9.   I was at Monitor when the VIOXX™ Gastrointestinal Outcomes Research ("VIGOR") trial results showing Vioxx increased the chances of heart attacks and strokes in patients taking Vioxx by five-fold were published in *The New England Journal of Medicine*.

10. Vioxx was a pain killer like aspirin.  One of the largest groups of people taking Vioxx were patients with arthritis pain who tended to be elderly.  Thus, Vioxx had the potential to be particularly damaging because many of the patients taking the drug were already at increased risk of heart attacks and strokes.

11. Prior to working at Monitor, I worked on the marketing plan for a drug to treat stroke patients.  In addition, I completed the pre-medical program at

3

Columbia College in New York as an undergraduate and had a strong scientific knowledge base my other Monitor teammates did not possess.

12. While I advocated for altering the Vioxx marketing strategy based on the VIGOR data, Monitor teammates and Merck personnel were intent on ignoring the increased cardiovascular risks shown in the VIGOR trial data.

13. I refused to support the "comforting care" strategy proposed by a Monitor teammate who was junior to me, named Cheryl Gray, and I was criticized for having "strong" opinions, "advocating" my own plan to alter the Vioxx marketing strategy to account for cardiovascular risks, not being "collaborative" with Monitor and Merck teammates who were committing fraud, not listening well to the ideas of others who ignored the cardiovascular risks of the drug, not being responsive to feedback because I refused to ignore the VIGOR data, and being a poor manager because I informed junior teammates that the VIGOR trial data was significant.

14. Due to my refusal to support fraudulent activities, I was terminated from Monitor in November of 2001.

15. In September of 2004, Merck was forced to recall Vioxx due to safety concerns over the increased cardiovascular risks of the drug. According to the

4

*Wall Street Journal*, "Merck's market capitalization plunged more than $37 billion in the month after the company stopped selling Vioxx." As of July 10, 2022, the market capitalization of DB was $17.2 billion, or about $20 billion less than the equity value Merck lost due to the Vioxx scandal in the month following the Vioxx recall. Thus, the Vioxx scandal cost Merck more than the current equity value of DB. By any standards, the Vioxx scandal was significant and the economic consequences were severe.

16. In 2004, Food and Drug Administration ("FDA") safety officer David Graham broke ranks with his employer and testified to the U.S. Senate that Vioxx killed as many Americans as the Vietnam War.

17. In 2007, Merck agreed to pay $4.85 billion to settle thousands of lawsuits alleging the painkiller caused injuries and deaths, the largest pharmaceutical settlement in U.S. history.

18. The U.S. Congress issued a comprehensive report on the Vioxx scandal while the U.S. Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission also investigated Merck for its deceptive and strong-armed marketing practices.

19. Even though I informed DB in my written response to the false and retaliatory 2006 performance review that I had been penalized for not aiding and abetting fraudulent activities that led to the premature deaths of thousands, DB chose to use the fact that I did not chose to participate in fraudulent schemes which led to the wrongful deaths of vulnerable, elderly people as part of the Bank's campaign to sabotage my career to this day.

20. Since my departure, DB and several of its former employees have engaged in a concerted effort to undermine, discredit, and sabotage me to cover for the bank's blatant violations of U.S. labor laws and cover-ups of Wilder's and the Bank's criminal activities.

### A. Marketing

21. At the time I was staffed on the Vioxx team in 2000, Merck had received FDA approval to market Vioxx for the treatment of osteoarthritis. At the same time, Merck was also testing Vioxx for the treatment of colon polyps, as well as exploring the use of Vioxx in patients with Alzheimer's disease and cancer.

22. As a result, the Vioxx marketing team needed a market overview and competitive landscape completed for each of the additional treatment areas Merck was considering for Vioxx.

23. Constructing the market overview and competitive landscapes for the different treatment areas was a time consuming process, and outsourcing this type of project was common for pharmaceutical manufacturers given the shorter-term but high intensity nature of the project.

24. I was pulled off another project at Monitor, and promoted into a higher role by being staffed on the Vioxx team in order to complete the market overviews and competitive landscapes Merck needed.

25. I was promoted and moved onto the Vioxx team, a plum assignment at Merck at the time, because I had a scientific background that was needed to compile scientific information on colon polyps, Alzheimer's Disease and cancer.

26. At the time I was staffed on the Vioxx marketing team, I joined an existing team composed of Foti, the overall manager of Monitor's relationship with Merck's Vioxx marketing team, and Cheryl Gray, a Harvard graduate that was junior to me.

7

27. Both Foti and Gray had worked on the Vioxx marketing team for a considerable period of time, and had been part of the team responsible for marketing Vioxx to osteoarthritis patients.

28. However, neither Foti or Gray had a science background, and the work I was brought on the team to complete was scientifically and medically oriented, and required reading advanced scientific and medical material.

29. More specifically, my responsibilities entailed reading scientific papers and other high level scientific material in order to gather information, and then incorporate that information into slide presentations.

30. The research was time consuming. Since Merck's R&D division was running clinical trials for colon polyps and Alzheimer's Disease, and employed numerous doctors and PhD scientists, it was critical that the market overviews and competitive landscapes Monitor produced were correct, and technically sophisticated.

31. For example, in order to construct the competitive landscape for Vioxx for the treatment of colon polyps, it was necessary to profile each drug that was then on the market and prescribed by doctors to treat colon polyps.

8

32. Likewise, it was also necessary to conduct extensive research to understand other drugs that were in development and could be prescribed in the future for the treatment of colon polyps.

33. As part of that work, it was also necessary to understand the diagnosis and treatment of colon polyps, and well as the patient experience and the types of issues patients typically experienced when seeking treatment.

34. A drug may not be marketed or promoted for "off-label" uses, which is defined as any use not specified in an application and approved by FDA, unless the company applies to the FDA for approval of the additional use.  21 U.S.C. §§ 331(a), 333(a)(1) and 352(f)(1).

35. Given it is illegal for pharmaceutical companies to market their products for conditions that have not been approved by the FDA, the work I was responsible for performing at Merck was *not* used in the then current marketing strategy for Vioxx.

36. While I was mainly focused on completing market overviews for colon polyps, Alzheimer's Disease and cancer, Foti and Gray were involved in the then current marketing strategy for Vioxx for the treatment of osteoarthritis.  Both Foti

9

and Gray were based in Boston, and, given their very close, personal relationship, had their offices moved right next to each other.

37.  While staffed on the Vioxx marketing team,  I spent a considerable amount of time, mainly working in New York, on the market overviews and competitive landscapes for colon polyps, Alzheimer's Disease, and cancer.

38.  The Merck team was based in New Jersey.

39.  I did not experience any significant problems until I was later invited to attend a meeting in Merck's facility in New Jersey in which the then current marketing strategy for Vioxx for patients with osteoarthritis was discussed.

40.  In particular, at one meeting, Gray, who was junior to me, but had been working on the marketing of Vioxx for osteoarthritis for a substantial period of time, stated that Merck should use "Comforting Care" as its marketing strategy for Vioxx.  Gray believed it was appropriate to ignore all the VIGOR data, and pretend the drug did not present cardiovascular risks.

41.  It was Gray's use of "Comforting Care" which prompted the problems I experienced at Monitor, which were due to the fact that both Foti and Gray were determined to ignore the VIGOR trial data.

10

42. Despite the fact I repeatedly tried to explain to Gray that it was incorrect and scientifically inaccurate to ignore the VIGOR data, Gray was unwilling to listen to me. Rather, Gray told me that Foti had "won an award" from Merck for helping to design the Vioxx marketing strategy for osteoarthritis. Thus, according to Gray, the VIGOR data and cardiovascular risks of the drug simply did not matter.

43. I also had conversations with Foti about "Comforting Care," and expressed my concerns that Monitor was ignoring the VIGOR data and increased cardiovascular risks Vioxx posed.

44. Foti told me that "Cheryl" was his "friend," and made it clear that Foti and Gray worked out strategies amongst themselves before sharing their combined ideas with me.

45. Foti also told me that the VIGOR data was not important, and that my focus on the VIGOR data meant I could not "see the forest from the trees," and informed me that I simply did not understand the Monitor way of developing marketing strategies. Foti believed Monitor had special marketing prowess and capabilities that made Merck and Monitor immune to data, and the VIGOR trial results.

11

46.   The reality was that Foti's statements were untethered to reality.  I doubted Foti and Gray ever read the VIGOR study, and they certainly did not have any credible facts or data to rebut my data driven, and scientifically accurate concerns. Maddeningly, nor did they even try.  Both were completely dismissive, and were annoyed that I even mentioned VIGOR.  Their responses to my well-founded concerns were arrogant, condescending, and lacking credible factual support.

47.   As shown in the subsequent Vioxx litigation, it was Merck's and Monitor's decision to lie about the VIGOR data and cardiovascular risks of Vioxx than led to Merck incurring massive liabilities and paying billions of dollars in settlements to families of patients killed by Vioxx, investors, and the U.S. government among others.

48.   On November 6, 2003, investors brought a securities fraud class action against Merck, alleging Merck and individual officers and directors made misrepresentations and omissions regarding Vioxx's safety and commercial viability.  In May of 2010, the Supreme Court issued its ruling on Merck's appeal. *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010).

49.  The Supreme Court noted in its ruling that Merck conceded in its filings that investors should have been on notice of Merck's intent to deceive, manipulate or defraud due to a "(1) September 2001 FDA warning letter, which said that Merck had " 'minimized' " the VIGOR study's " 'potentially serious cardiovascular findings' " and (2) pleadings filed in products-liability actions in September and October 2001 alleging that Merck had " 'omitted, suppressed, or concealed material facts concerning the dangers and risks associated with Vioxx' " and "purposefully downplayed and/or understated the serious nature of the risks associated with Vioxx." Brief for Petitioners 36–37 (quoting App. 340, 893)." *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010).

50.  Among other things, the FDA's September 17, 2001 warning letter to Merck, contained in Exhibit D, stated the following:

> The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 33l(a) and (b), 35i(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs)[1] compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).[2]

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.[3] That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by

[1]Myocardial infarctions ("MIs") are heart attacks.

[2]Merck misrepresented the VIGOR data, and was later chastised by *The New England Journal of Medicine*. Vioxx is really ~5x more likely to cause cardiovascular events. Gregory D. Curfman, M.D., Stephen Morrissey, Ph.D., and Jeffrey M. Drazen, M.D., "Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343:1520-8." N Engl J Med 2005; 353:2813-2814. (The fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect... Taken together, these inaccuracies and deletions call into question the integrity of the data on adverse cardiovascular events in this article.)

[3]Merck's hypothesis Naproxen was cardioprotective was a lie. There was never any credible evidence to support Merck's hypothesis. There is currently a warning label on Naproxen due to the fact Naproxen, according to the FDA, increases cardiovascular risks. Thus, not only does Naproxen not protect the heart, but Naproxen *causes* cardiovascular events. https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-fda-strengthens-warning-non-aspirin-nonsteroidal-anti-inflammatory

14

substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.[4]

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information. make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by <u>minimizing</u> the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

51.  Even though Merck later paid substantial penalties for its and Foti's and Gray's conduct, Foti promoted Gray to my level because Gray was willing to claim Vioxx was "comforting," while I was unwilling to ignore the VIGOR data.

52.  Shortly thereafter, it was decided in March of 2001, that I would leave the Vioxx team. Thus, Foti's retaliatory actions towards me also served as cover for

---

[4] Pro-thombotic means likely to cause a thrombosis. A thrombosis occurs when blood clots block veins or arteries, which can lead to heart attacks or strokes. (Please see Exhibit E, Page 2, Column 3, ¶2).

promoting Gray and offering her more money for agreeing to lie about the VIGOR data and Vioxx.

53. An article published in *The New York Times* in May of 2001 and contained in Exhibit E makes it clear, the cardiovascular risks of Vioxx were well-known at the time Foti took retaliatory actions towards me (Exhibit E, Page 2, ¶1-16), and Merck was "heavily dependent on" Vioxx "for the sales growth that Wall Street" expected to support Merck's stock price. (Exhibit E, Page 1, ¶3).

54. By lying, Foti ensured he was able to keep billing Merck for consulting services, thereby increasing his own compensation and promotion opportunities.

### C. Honest Concerns, Questions, and Critique

55. As the subsequent Vioxx litigation made clear, I was not alone in facing retaliation for stating the VIGOR trial results were material, and questioning Merck's actions.

56. Rather, Merck's conscious and repeated decisions to retaliate and purposefully and materially harm people that made negative comments about Vioxx is well known due to numerous investigations, litigation, and the large

16

number of high profile people Merck purposely sought to harm because they presented honest views about Vioxx.

***Threats to Scientists***

57.  Specifically, Merck went on the offensive against outside scientists who questioned the safety of Vioxx.  For example, Dr. Gurkirpal Singh, a COX-2 specialist at Stanford University who delivered presentations sponsored by Merck and other pharmaceutical companies, pressed Merck repeatedly for data on the cardiovascular risks of Vioxx following the publication of the VIGOR study.

58.  After Merck refused, Singh added a slide to his presentation that "showed a man -- representing the missing data -- hiding under a blanket."

59.  In response, Merck canceled several of his presentations and said Singh's presentations were irresponsibly anti-Merck and specifically anti-Vioxx.

60.  As revealed by *The New England Journal of Medicine (NEJM)*, the NEJM was contacted in 2005 after subpoenaed data revealed Merck had purposefully excluded data in its study that showed three other people had heart attacks (called "myocardial infarctions" or "MIs") after taking Vioxx, thereby increasing the actual risk Vioxx posed to patients taking Vioxx.

17

61.  In a December 2005 article, NEJM stated, "The fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect…Taken together, these inaccuracies and deletions call into question the integrity of the data on adverse cardiovascular events in this article."[5]

62.  Exhibit F, a paper published in the *Food and Drug Law Journal*, contains an explanation of the problems with the Vioxx publication in the *NEJM,* and the *NEJM*'s handling of the matter. (Exhibit F, Page 555-560).

63.  Despite the fact Merck was clearly attempting to hide the fact that its scientists improperly hid data, and Singh was absolutely correct in stating Merck hid data about Vioxx, not only did Merck retaliate against Singh by canceling his speaking fees, but Merck also called Singh's boss at Stanford, Dr. Fries, and threatened Fries, and implicitly Stanford's research budget if Singh did not stop

---

[5]Gregory D. Curfman, M.D., Stephen Morrissey, Ph.D., and Jeffrey M. Drazen, M.D., "Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343:1520-8." N Engl J Med 2005; 353:2813-2814.

making claims Merck was hiding data and Vioxx could pose significant safety risks.[6]

64. In 2004, Stanford's medical school received 9% of its research budget of $29 million from drug manufacturers.[7]

65. As shown in Exhibit G, a letter from Dr. Fries, Professor of Medicine at Stanford University, dated January 9, 2001, stated Fries concerns after he received a threatening phone call at home from Dr. Louis Sherwood of Merck on Saturday October 28, 2000. According to Fries' letter:

> Dr. Sherwood complained that Dr. Gurkirpal Singh of our group had an anti-Merck bias and was giving lectures that were irresponsibly anti-Merck and specifically anti-Vioxx. Dr. Singh was held to have used a slide which depicted a person hiding data under the covers, had called Merck the "Firestone of the drug industry," and had requested data from Merck...Dr. Sherwood suggested that if this continued Dr. Singh would "flame out" and there would be consequences for myself and for Stanford.

66. Fries letter went on to describe several other "allegations of Merck damage control by intimidation, often with a pattern of going to the Dean or Department

---

[6]Prakash, Snigdha. "Did Merck Try to Censor Vioxx Critics?" *NPR*, June 9, 2005.
[7]Prakash, Snigdha. "Did Merck Try to Censor Vioxx Critics?" *NPR*, June 9, 2005.

Head with complaints of anti-Merck bias and always alleging unbalanced anti-Vioxx presentations."

67.  Fries stated this had happened to at least eight investigators including the research chief at the Arthritis Institute; two Hopkins professors; the head of the FDA advisory panel; a Harvard professor;  and two others as shown in Exhibit G.

68.  Importantly, there is clear and compelling evidence that while Merck was threatening to harm Singh, Merck knew all along its drug was not safe, and, according to Merck's own internal email: Singh was "scientifically accurate."[8,9]

69.  In other cases, Merck asked outside scientists to "delete or tone down" negative statements about Vioxx.[10]

***Bullying Doctors***

70.  Disturbingly, when Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Spain edited a publication that included safety concerns about Vioxx, Merck officials sent him a "rectification" for publication.[11]  After he

---

[8]Prakash, Snigdha. "Documents Suggest Merck Tried to Censor Vioxx Critics." *NPR*, June 9, 2005.
[9]Wilde, Mathews, Martinez, *Wall Street Journal*, November 1, 2004.
[10]Wilde, Mathews, Martinez, *Wall Street Journal*, November 1, 2004.
[11]"Internal E-mails Indicate Merck Was Aware of Vioxx Risks," *California Healthline*, November 1, 2004.

refused, Merck filed a lawsuit against him and the institute.[12]  In 2004, Laporte

won the lawsuit.

71.  However, in the meantime, when organizers for an annual Spanish family

physician meeting denied a request from Merck to remove Laporte from the list of

scheduled speakers, Merck withdrew ~$140,000 in funds for the meeting.[13]

***Threatening Wall Street Analyst***

72.  In 2001, Richard Stover, a Wall Street analyst who was named five times as

an Institutional Investor "All-America Runner Up" in the pharmaceutical industry

published an analyst report highlighting the cardiovascular risks of Vioxx.  The last

paragraph of his report stated,

> We continue to believe that Vioxx's cardiovascular toxicity profile represents a
> serious public health issue.  But Merck's insistence in advancing the "myth" of
> "naproxen cardioprotection" may pose even more serious public health concern since
> naproxen lacks aspirin's ability to bind to platelets.

73.  On December 5, 2001, David Anstice, the former head of Merck's

marketing department sent a concerned message to Ed Scolnick the former head of

---

[12]"Internal E-mails Indicate Merck Was Aware of Vioxx Risks," *California Healthline*, November 1, 2004.
[13]Internal E-mails Indicate Merck Was Aware of Vioxx Risks," *California Healthline*, November 1, 2004.

Merck's R&D division about Stover's report and an upcoming meeting in which Stover might have been scheduled to speak.

74.   In response, in an email dated December 5, 2001, Scolnick stated that "If he [Stover] says this I will boil him in oil at the meeting…I think Merck should do something about him." A copy of the email chain is contained in Exhibit H.

75.   As shown in the examples above, it is clear Merck abused power, money, and influence in order to censor and bully scientist, doctors, and anyone else the company felt was "anti-Vioxx" and "anti-Merck," even when the company's own emails show Merck knew the doctors and scientists it bullied and abused were correct, and advancing scientifically sound conerns.

76.   It is disgusting Merck used its research budget as leverage to ensure doctors who raised scientifically valid concerns about Vioxx were threatened and silenced to ensure Merck's profits on the sale of Vioxx, and Merck's stock price, would not be impeded by truthful statements from physicians with legitimate concerns.

77.   A logical question is what did the FDA do about the VIGOR data? As explained in Exhibit F, a paper from the *Food and Drug Law Journal*, the ad hoc Arthritis Advisory Committee sidestepped its responsibility to acknowledge the

22

increased cardiovascular risk of the drug. (Exhibit G, Page 552). Of the ten

reviewers the FDA invited to participate in the Arthritis Advisory Committee,

seven of the ten had conflicts of interest, even though the conflicts of interest were

"significant." (Exhibit F, Page 562). All the reviewers with conflicts of interest

voted to approve Vioxx. (Exhibit F, Page 562).

### D.  R&D

78.   After I was removed from the VIOXX marketing team because I opposed

Merck's fraudulent activities, I was subsequently assigned to work in Merck's

R&D division.

79.   At first, I was assigned to the Project Management team in the R&D

division, working for John Matthews. Matthews reported to Doug Mackenzie,

who in turn reported to Steve Jennings.[14] Steve Jennings was a senior partner at

Monitor who managed the overall Monitor/Merck relationship. Jennings had

relationships with many of the named defendants in the 2003 securities fraud

litigation including David Anstice (Head of Marketing), Raymond V. Gilmartin

---

[14]Foti also reported to Jennings.

(CEO), Peter S. Kim (Head of R&D), and Edward M. Scolnick (Former Head of R&D).

80. Mackenzie worked directly with Kim, then the head of Merck's R&D division.

81. Foti's feedback was presented to my bosses in R&D before I ever met them, although Mackenzie acknowledged that Foti was "drinking his own dirty bathwater," and Mackenzie was senior enough to know the Vioxx marketing team was committing fraud. Jennings was also clearly well aware of the fraud as well as Merck's and Monitor's attempts to increase sales of Vioxx despite the cardiovascular risks posed by the drug. (Exhibit F, Page 552).

82. Matthews, however, appeared to be sold a bill of good by Monitor, and Matthews did not appear to question some of the false statements presented to him, although, he clearly did question others.[15]

---

[15]Matthews clearly questioned Foti, but he was unwilling to question Jennings or Monitor management. Obviously, Matthews own career would have been threatened had he questioned Jennings, Mackenzie, or Monitor management as described below.

83. During my time in Project Management, I did not see any evidence of any fraudulent activities, nor have I seen any evidence of any fraud in that department in any of the subsequent investigations, news reports or legal filings.

84. Given the nature of the work of Project Management, it is difficult to understand how that group would have played a part in the Vioxx fraud given Project Management was an operational group that was responsible for managerial functions (e.g., the Project Management division ensured that Merck's manufacturing division produced drugs that met clinical standards and satisfied regulatory requirements).

85. While the work was demanding and the hours were long, I did not have any notable problems while working with Matthews or the Project Management team as described in Exhibits A-C.

86. However, my life changed dramatically after there was a lay-off in the summer of 2001, and on August 7, 2001, I was also assigned to work for the Regulatory Affairs group after a lay-off.

87. As shown through numerous investigations and legal filings, the Regulatory Affairs team was one of the key groups directly responsible for the Vioxx fraud.

88.  I reported to Byron Winn on the Regulatory Affairs team.  Winn also reported to Mackenzie who also reported to Jennings.  Winn and Jennings were based in Boston.

89.  The night before an off-site meeting with Merck management at the end of August 2001, Jennings announced that his primary concern was increasing the value of Merck executives' stock options.  In addition, Jennings stated that he intended to bill Merck $50 million in consulting fees for Monitor services the following year.  Thus, Jennings goals were to maximize compensation for Merck executives, himself, and other key players at Monitor.

90.  The following day, after I questioned the leadership direction of Regulatory Affairs in one meeting, after having only been on the Regulatory Affairs team for three weeks (Exhibit A), I faced hostile blowback.

91.  In particular, at the off-site, Merck removed David Blois as the head of Regulatory Affairs, and put Bonnie Goldman in his place.  When I asked why, Mackenzie announced to a room full of people that "David was bent over a barrel and fucked" then Mackenzie started loudly laughing.  Goldman was largely responsible for some of the most destructive and fraudulent activities associated

with the Vioxx fraud as described in Exhibit I (Pages 26-29). The only official explanation I received was that Goldman was "more aggressive." It was the first, last, and only time in my career I have ever heard a man was replaced by a woman because she was more "aggressive."

92. In context, the story Goldman was more "aggressive," not only did not make sense, but was potentially very dangerous.

93. Prior to the off-site, Winn and I met with Goldman. She dodged questions, gave vague answers, and seemed dishonest and deceptive. She touted the fact that her "relationships" with the FDA allowed her to accomplish more. I remembered wondering, "What does that buy Merck?" However, Goldman was did not state with specificity what exact unique accomplishments she was able to generate.

94. Exhibit I contains a description of what exactly Goldman's activities bought Merck. As explained by U.S. Congressman Henry Waxman (Exhibit I, Page 26-27):

> Nearly two years after Merck filed a request for label changes for Vioxx based on the results of the VIGOR study, FDA approved a new label that discussed the cardiovascular risks of the drug. The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses. It also was due to a series of disputes between the agency and the company. Under the Food, Drug and Cosmetic Act, FDA and

manufacturer must agree on label changes. For approximately six months, Merck resisted a variety of FDA's proposals, leading to an extended series of conference calls to negotiate differences.

95.   As shown in Exhibit J, Goldman led those conference calls for Merck, and was the senior person in Regulatory Affairs responsible for delaying changes to Vioxx's label.

96.   While a few sentences on a label may not appear to be significant, the specific text of what is, and what is not, contained on a label for a drug have profound marketing implications.  For example, the opioid crisis in the U.S., which has now killed more than 700,000 Americans, was fueled by deceptive marketing from Purdue Pharmaceuticals, the maker of OxyContin, based on one sentence in OxyContin's label.  As described by an article:

At the center of [Purdue's] marketing aimed at physicians was a single sentence in OxyContin's original label:

"Delayed absorption as provided by OxyContin tablets, is believed to reduce the abuse liability of a drug."

Purdue's marketing campaign relied on that sentence, which claimed OxyContin was believed to be less likely to be abused than other prescription opioids, according to depositions from various sales reps and

28

physicians that were pitched on the drug. But that claim was not backed up by clinical studies.[16]

97.  A few days after the offsite, I informed Matthews that I planned to resign and was applying to business school.  I also asked Matthews to provide recommendations for me for business school.

98.  My work in the Regulatory Affairs division, coupled with the nightmare I experienced working with Foti and Gray, set-up a situation in which it was clearly necessary to leave Monitor because the work environment was intolerable.  While I had not witnessed any blatant fraudulent activities in the R&D division because the work was organizational and operational in nature, I had no faith in Monitor's or Merck's management, and was concerned I would be again asked to say or do things I believed were unethical.  Thus, I was essentially constructively discharged in late August of 2001.

99.  Jennings wanted his $50 million in billings, and was willing to do whatever was necessary to earn more fees for Monitor and himself.  It was also clear that Jennings way of ensuring he was able to earn his $50 million, was by making sure

---

[16]Esch, Caitlin, "How one sentence helped set off the opioid crisis." *Markeplace.*  December 13, 2017.

Merck's stock price was as high as possible. In order for Merck's stock price to be as high as possible, Merck needed to maximize Vioxx's revenue. (Exhibit E, Page 1, ¶3).

100. Any reasonable person with integrity, and a scientific knowledge base, could not have survived in that environment.

101. I was simply not willing to compromise my ethics the way Jennings, Mackenzie, Foti, and Gray were clearly willing to do with no regard for the people they harmed. Thousands of people died as a result of the Vioxx fraud. (Exhibit F, Page 552). I knew death was a distinct possibility in light of the VIGOR and other scientific data, and there was no way I was going to lie or aid and abet clearly fraudulent activities.

102. Within a matter of days following the end of August offsite, in early September 2001, Monitor then took action to terminate my employment.

103. Matthews told me in the fall of 2001 that Winn had pled with management on my behalf, Winn also stated I did a "wonderful" job in my performance review.[17] However, it was clear that management at Monitor, that was senior to

---

[17]Winn's performance review and Matthews's performance review went out of their way to directly contradict portions of Foti's feedback. Winn's review was

Matthews and Winn, was using the HR system to harm me. Thus, my termination

was not a result of Winn or Matthews, but of those above them seeking to protect

Monitor's billings from Merck.[18]

104. Among other things, although I previously had a positive working

relationships with two junior members of my team based in Boston, Kaun Wu and

Stephanie Mayer, and as shown in Exhibit B, both submitted positive upwards

reviews of me, Monitor asked both to change stories, and lie in order to produce

data to support Foti's false stories and justify my termination.

---

better than Matthews, presumably because by the time I was staffed on Winn's
team, Matthews had already determined a great deal of Foti's feedback was clearly
false. Also, Mackenzie and Jennings clearly knew the Vioxx marketing team was
committing fraud, and they knew Foti and Grey were key players in that fraud.
[18]Winn left Monitor shortly after I did. My perception of Winn was that he had a
degree of integrity which was incompatible with Monitor management and Merck.
It was clear to me that it would be difficult for Winn to survive long on the R&D
team, particularly since Winn was tasked with working with some of the worst
perpetrators of the Vioxx fraud, including Alise Reicin, a named defendant in the
investor fraud suit that found its way to the Supreme Court and Goldman. Reicin
was one of the authors of the deeply flawed and dishonest NEJM paper (Exhibit F,
Page 554). Descriptions of Goldman's and Reicin's activities can be found in
Exhibit F, Pages 561-570.

105. However, not only did Wu and Mayer submit positive performance reviews, but both also sent me flowers in thanks for all I had done for them. (Exhibit A).

106. When I told Matthews that the feedback I had received from Wu and Mayer was positive, and there had not been any issues and their reviews had been positive, Matthews told me that they were lying and I simply did not read "interpersonal cues."[19]

107. Clearly this explanation is absurd. Among other things, had there really been issues between Wu, Mayer and I, then why hadn't Matthews or Winn addressed this issue with me?

108. In addition, if I didn't read interpersonal cues well, then why didn't Matthews or Winn read those interpersonal cues?

109. The answer is obvious. Matthews and Winn did not read any negative "interpersonal cues" from Mayer and Wu towards me because there were not any ones that merited notice or discussion. Clearly, if there had been a real problem,

---

[19]Matthews was clearly reiterating the official party line from senior management at Monitor. Had he not done so, his own career would have been threatened the same way Winn's career was clearly threatened.

Matthews or Winn would have brought that to my attention. But, they did not do so because Wu and Mayer sent me flowers, and there had not been any indication of any difficulties.

110. Rather, Monitor, as an organization, clearly supported lying and liars. Monitor's real concern was with keeping Merck happy to ensure that Monitor maximized its billings.

111. Also, I clearly had a highly developed means of reading people, since I clearly read Goldman accurately. Given the nature of our work, I did not witness Goldman commit any fraudulent activities, or say anything fraudulent about Vioxx. Yet, given her demeanor, manner, and vague, non-specific, dodging answers to Winn's questions, I knew in my gut that she was a problem.

112. As shown in the subsequent report from U.S. congressman Waxman, my read was entirely correct. Thus, not only did I read interpersonal cues, but I read them better and more accurately than other members of my team.

### E. The DB & Wilder Team's Interpretation of My Vioxx Experience

113. It is difficult for a rationale person to believe that any attorney believes it is credible to use a performance review written by Foti to harm me.

33

114. As noted by the Supreme Court and FDA, Merck and Monitor, Foti and Gray (1) minimized the VIGOR study's potentially serious cardiovascular findings, (2) omitted, suppressed, or concealed material facts concerning the dangers and risks associated with Vioxx, and (3) purposefully downplayed the serious nature of the risks associated with Vioxx. *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010). Thus, the Supreme Court ruled investors could pursue fraud claims against Merck and its officers, Jennings' contacts, for fraud. Ultimately, Merck agreed to pay investors over $1.0 billion to settle their claims [($830 million for the settlement and $232 million for fees and expenses.) (U.S. District Court, New Jersey District, Case No: 2:05-cv-02367-SRC-CLW, Docket No.: 949-2, Page 132, Filed 02/08/16)].

115. Foti and Gray were key players in engineering the strategies and tactics that ultimately led the Supreme Court to allow investors to sue Merck for fraud both while I was on the Vioxx marketing team and after I was removed. In fact, as shown through numerous subsequent legal filings, Foti's and Gray's actions were inhumane and led to the needless deaths of thousands of Americans, not to mention the needless suffering of members of their families.

34

116. Given the Supreme Court of the United States deemed Merck's conduct misleading and indicative of fraud, it is impossible to understand how anyone can use a retaliatory performance review written by Foti and based on feedback from Gray to harm me. *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010).

117. My decision to act with integrity (Exhibit C, Page 2, Point 3D), while Foti and Gray, in the words of the Supreme Court, "suppressed" and "concealed material facts" and mislead the public by purposefully downplaying the risks of a dangerous drug that killed thousands of Americans, shows Foti and Gray are sick and evil, not that I acted improperly. *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010).

118. Further, Merck's decision to retaliate and harm people that made negative comments about Vioxx is also well known due to numerous lawsuits filed against Merck. Thus, the fact that Merck would require Monitor to retaliate against me was part of Merck's pattern of behavior as described above.

35

119. Monitor was clearly not an impartial or unbiased party. Rather, Jennings stated his goal was to ensure Monitor earned $50 million in consulting fees from Merck in 2002.

120. If Merck was willing to publicly withdraw ~$140,000 in funds from organizers of an annual Spanish family physician meeting in a clearly retaliatory fashion after the group denied Merck's request to drop Laporte from the list of scheduled speakers because Merck did not like what Laporte wrote about Vioxx, do you honestly think any rational person believes Merck would pay Jennings and Monitor $50 million in consulting fees and allow Monitor to have staff, like me, that Merck viewed as "anti-Merck" and "anti-Vioxx?"

121. Anyone who thinks Merck would withdraw $140,000 in funding, and pay $50 million to Monitor while I was on its staff is crazy. Winn did not last either.[20]

---

[20]Winn left Monitor shortly after I did. My perception of Winn was that he had a degree of integrity which was incompatible with Monitor management and Merck. It was clear to me that it would be difficult for Winn to survive long on the R&D team, particularly since Winn was tasked with working with some of the worst perpetrators of the Vioxx fraud, including Goldman, and Alise Reicin, a named defendant in the investor fraud suit that found its way to the Supreme Court. Reicin was one of the authors of the deeply flawed and dishonest NEJM paper (Exhibit F, Page 554). Descriptions of Goldman's and Reicin's activities can be found in Exhibit F, Pages 561-570.

122. Likewise, Dr. Fries of Stanford went on record with NPR claiming Dr. Sherwood from Merck threatened him, Singh, and implicitly Stanford's research funding if Dr. Singh did not stop making "anti-Merck" and "anti-Vioxx" comments.[21]

123. Thus, the idea that Merck would openly pull funding and threaten doctors and scientists makes it clear that there was no way Merck would be willing to pay Monitor $50 million in consulting fees if Monitor did not tow the party line and kept someone like me on staff.

124. I never had a chance of being successful at Monitor because I was honest about Vioxx's cardiovascular risks.

125. In the same way Merck personnel in Marketing and R&D executed plans to harm Stover and Dr. Singh, it is not believable that Merck would not also seek to "boil" me in "oil" and ensure I "flamed" out.

126. The Merck executives clearly only cared about the value of their stock option packages. Thus, the reality is that I had no more of a chance of success than Laponte.

---

[21]Prakash, Snigdha "Did Merck Try to Censor Vioxx Critics?" *NPR*, June 9, 2005.

127. Given people have no problem understanding that Elon Musk will fire people who disagree with him, in a situation such as the one I encountered at Monitor and Merck, reasonable, unbiased people would not have any problems understanding that Jennings and Monitor would fire people who did not agree with them.[22]

## F. DB's Wild Claims

128. Given the circumstances highlighted above it is insane that the DB and Wilder teams used Foti's performance review to harm me from 2006 to 2022.

129. Over time, DB's stories have changed and become dumber and dumber. Yet, no matter how stupid, DB seems willing to say anything.

130. The DB and Wilder teams' story until July 11, 2022 when I filed an amended complaint against DB's former general counsel (Case No. 1:20-cv-04632-SEG, Docket No. 39) was that I was complicit in the Vioxx fraud simply because I was at Merck for several months.  As described above, that claim is

---

[22]Thomas Barrabi.  "Ex-Tesla employee reveals what Elon Musk is like at work: 'Don't argue with him.'" *New York Post*, August 16, 2022.

ludicrous, and fails to show even the most basic understanding of the pharmaceutical industry.

131. Vioxx earned over a $1.0 billion in revenue in the US alone in 2000.[23] Vioxx had a substantial marketing operation, and spent $161 million on DTC advertising alone in 2000.[24]

132.  I was explicitly staffed on the Vioxx marketing team to complete market overviews and competitive landscapes for colon polyps, Alzheimer's Disease, and cancer.  I worked in New York.  Foti and Gray were in Boston.  Merck's Vioxx team was in New Jersey.  I rarely attended meetings with Merck.  Thus, it is unclear exactly when and how the DB and Wilder teams thinks I would have been made aware of Merck's fraudulent activities.

133. As stated in the Supreme Court case, Merck and Monitor made efforts to "conceal," "suppress" and mislead.  Thus, they certainly were not going out of their way to broadcast their illegal efforts to me or anyone else for that matter.

---

[23]Korcok, Milan, "DTC ads in US having huge impact on drug sales." *Canadian Medical Association Journal*. August 6, 2002.

[24]Korcok, Milan, "DTC ads in US having huge impact on drug sales." *Canadian Medical Association Journal*. August 6, 2002.

134. Likewise, the majority of the time I worked in R&D, I worked in the Project Management division. To my knowledge there was no fraud in that department. Nor did I witness any dishonesty or unethical business practices.

135. It was not until after the lay-off when I was moved to the Regulatory Affairs team that I witnessed stomach churning behavior, and within a few weeks of being staffed on the Regulatory Affairs team, I announced I was leaving to go to business school because my intolerable experience with that team, Foti and Gray.

136. Thus, the claim I was complicit in fraud is clearly refuted by documentary evidence given my responsibilities and assignments were documented.

137. After I filed my Amended Complaint on July 11, 2022, the Wilder and DB teams then ridiculously pivoted to claiming that I am mentally ill for not participating in the Vioxx fraud, and I somehow failed to perform my duties. Those sick claims are untethered to reality and documented facts.

138. Documentary evidence, including Exhibits A-C, does not show I was "disabled" due to mental illness, or that I failed to perform my duties, or that I showed any signs of "mental illness." Rather, the documentation clearly shows

that Foti and Gray were frauds, and Monitor incentivized junior staff to lie about me to ensure Monitor could bill Merck $50 million in consulting fees in 2002.

139. The Wilder and DB teams' claim that my first project in R&D in Project Management showed I was not performing is insane given the lay-off. Obviously, if my work in Project Management was not up to par, let alone showed mental illness or that I was disabled, then I would have been laid off, not given more responsibility.

140. Rather, documentary evidence shows I succeeded in R&D where others failed (Exhibit C, Page 1, Point 1). As described in Exhibit C, I took over the responsibilities of other people who Monitor had determined had failed to perform their duties. (Exhibit C, Page 1, Point 1). If I had failed to perform any of my job responsibilities, then that fact would have been noted in my performance reviews. Instead, documentary evidence states the opposite. In fact, there are no documented incidents of how I failed to do anything.

141. Since, after the lay-off, I was given more work, another promotion in job responsibilities, and significantly more responsibility, then it was clear that it was not Monitor's view that I had underperformed in my first R&D project given I

41

essentially kept my first project role and was assigned an additional project with Regulatory Affairs.

142. Obviously, if someone is underperforming, she is not promoted and given more responsibility and triple the number of projects.

143. Rather, firms routinely use lay-offs to purge underperforming employees.

144. Since roughly 25-50% of the people I was hired with were laid off in the summer of 2001, Monitor would have let me go in the lay-off rather than promoted me if my job performance in the Project Management department was sub-par, and I was "mentally ill" and "disabled." Given the documentary evidence, the Wilder and DB teams' claims are ridiculous.

***Marketing***

145. In general, it is utterly absurd to use a performance review that was written by a known liar whose concern was advancing his own personal interests, and who the Supreme Court deems was willing to mislead, conceal, and suppress. *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 644-48, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010). Clearly, Merck did not pay over $1.0 billion to investors to settle their fraud claims because their fraud claims did not have merit. How anyone can use

42

Foti's feedback in light of the Vioxx litigation and Foti's and Gray's part in the Vioxx fraud is almost impossible for any person with even a modicum of integrity or intelligence to understand.

146. Given the nature of the work I did to provide market overviews and competitive landscapes for colon polyps, Alzheimer's Disease and cancer, there was no room for "opinion," let alone "strong opinions." The information in the slide presentations I was tasked with preparing had to be factually and scientifically accurate.

147. Thus, I did not experience significant problems working with Monitor or Merck personnel when I was working on this part of the project. In fact, I was based in New York, while Foti and Gray were in Boston. Merck personnel were in New Jersey. Thus, I did the vast majority of the work in New York, and had relatively little contact with Merck when I worked on this project.

148. Likewise, there was no room for "not listening well to the ideas of others" when I was working on colon polyps, or Alzheimer's Disease because the whole point of the slides prepared for Merck was to document factual information.

43

149. Before developing marketing ideas, it was necessary to document the current state of the market and competitive landscape. Thus, given the nature of the work, expressing ideas on how colon polyps should be diagnosed or treated was not part of the mandate. Nor was Monitor tasked with expressing its ideas on which drugs physicians should prescribe to treat colon polyps. Rather, my job was to report information accurately on what physicians did and the then current state of the market.

150. Nor was there room for "debating with management" because there was nothing to debate. For example, either a drug was prescribed by doctors to treat colon polyps or it was not.

151. Nor was there room for not being "collaborative" because either the work was scientifically and technically accurate or it was not. The work was not about collaborating about ideas; it was about reporting information accurately.

152. Thus, the lines from Foti's performance review the Wilder and DB teams used to undermine and discredit me from 2006 to 2016 were pieces of feedback that could only relate to the marketing of Vioxx to patients with osteoarthritis and the VIGOR trial data.

44

153. Therefore, the work I spent the majority of my time doing on colon polyps, Alzheimer's Disease, and cancer was not work that would lend itself to claiming I had "strong opinions" was not being "collaborative," "listening well to the ideas of others," or "debating with management."

154. Rather, if Monitor had wanted to critique my work performance on the Vioxx marketing team while I produced the market overview and competitive landscape for colon polyps, then Foti would have claimed I was incompetent, and lacked technical skills.  For example, if I failed to incorporate some drugs that treated colon polyps into the slides, then Monitor would have claimed that I was not accurate and incompetent.  Likewise, if I failed to accurately report how colon polyps were treated, then Monitor would have claimed I lacked the intellectually capabilities to do my job.  Yet, none of that feedback was in Monitor's review because Foti's review had nothing to do with my work on colon polyps, Alzheimer's Disease, or cancer.

155. In fact, Foti's review stated,

Maura has done a very good job at synthesizing a lot of information in multiple disease states to help create comprehensive and informative summaries.  These summaries have been instrumental in bringing the client team up to speed and

45

determining what we know, what we don't know, and where we should head next.

Foti also wrote,

She has produced good documents summarizing findings from a wide set of data. I have found that the contents of these materials is (a) logically laid out; (b) relatively clear, comprehensive, and descriptive; and (c) not overly interpretive or leading in point of view.

156. Based on Foti's written performance review, it is obvious that the problems I experienced on the Vioxx team were due to the VIGOR study data and marketing of Vioxx to osteoarthritis patients.  As Foti himself stated, I did a "good job" on my core responsibilities of working on projects for colon polyps, Alzheimer's Disease, and cancer.

157. As shown through several examples, Merck was unwilling to pay fees to people or organizations Merck considered to be "anti-Vioxx" or "anti-Merck." Thus, in order for Foti to earn more money from his work at Merck, Foti was required to tell the lies Merck wanted him to tell, and he needed people on the Monitor team that were willing to lie the way Merck wanted them to lie.

158. Thus, Gray was promoted and earned more money by agreeing to lie, while I was removed from the Vioxx team for refusing to lie.

159. Foti's comments in my performance review were based on feedback from Gray. However, Gray was clearly not an unbiased party. Rather, Gray accepted more money and a promotion by lying about Vioxx, and like other Merck personnel, Gray and Foti were willing to harm others that were not willing to lie or ignore the cardiovascular risks shown in the VIGOR data.

160. The negative feedback in Foti's performance review is clearly based on the marketing of Vioxx to osteoarthritis patients, not based on the work I was brought on to do on colon polyps, Alzheimer's Disease, and cancer. Thus, the negative feedback in Foti's review has clearly been proven false because the negative feedback was designed to support Merck's contention that anyone who did not support Merck should be "boiled in oil," "flame out" or be harmed.

161. In addition, Gray was a Harvard graduate in her twenties who was promoted to my level. As shown in *The New York Times* article contained in Exhibit F, there were clearly reasons to be concerned about the cardiovascular risks posed by Vioxx. Given an average person reading *The New York Times* article in Exhibit F was capable of understanding the risks posed by Vioxx, Grey had no excuse given her educational background, years of work experience, and long

47

period of time on the Vioxx marketing team to claim that she did not understand there were valid reasons to be concerned about the VIGOR data.  The ridiculous contention that a Harvard graduate in her twenties was unable to understand basic facts and information published at the time in *The New York Times* is ridiculous. Grey knew what she was doing, and she showed a blatant disregard for human life and human suffering anyway.

162. If juries of people only 18 years old who did not have the benefit of a Harvard education were able to understand the Vioxx fraud after only a short period of time at a trial, then the claim that Cheryl Gray, a Harvard graduate in her twenties, with several years of work experience, and over two years of work experience on the Vioxx team was not able to grasp basic facts (1) published in *The New York Times* warning about the dangers of Vioxx, and (2) a FDA warning letter to Merck, is clearly absurd.

163. Claiming that a job title inures someone from culpability in lies, deceit and fraud is a level of stupidity that is difficult to comprehend.

164. Gray is a dishonest liar who was solely interested in advancing her own career and financial position, and had no regard for who she killed or injured in the

process.  Gray was bought and paid for the same way that Merck bought and paid for the FDA advisory committee that decided to sidestep Vioxx safety issues even after the VIGOR trial data clearly showed it was likely the drug was dangerous.

## G. Ridiculous Claims of Mental Illness

165. It is obvious from reading Exhibits A-C that using my Monitor work experience to claim I am "mentally ill" and "disabled" is insane.  No one reading those reviews would believe that the person described in the reviews was "mentally ill" or "disabled."

166. Rather, what is clear is I was retaliated against due to the Vioxx fraud and Jennings desire to ensure Monitor generated $50 million in billings from Merck in 2002.

167. It is also rather sick that the DB and Wilder teams believe that Foti and Grey, people who showed a blatant disregard for human life and human suffering and were key members of a team that eventually forced Merck to pay over a $1.0 billion to investors for fraud are their key sources of data about me.

49

Dated: Baltimore, MD
August 17, 2022

Respectfully submitted,


BY: _Maura O'Neill_
Maura O'Neill, Plaintiff
601 King Street, Suite 200 - #465
Fairfax, VA 22314
moneill@rahillco.com


Sworn to before me this
17th day of August, 2022

LAKENDRA T BRYANT
Notary Public - State of Maryland
Baltimore County
My Commission Expires Jul 13, 2026

Notary Public

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**MAURA O'NEILL,**

       Plaintiff,

  v.

**NYU LANGONE MEDICAL CENTER, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL, GRADY HEALTH SYSTEM, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL FORSYTH, COLLEGE PARK POLICE DEPARTMENT,**

       Defendants.

**CIVIL ACTION FILE NO.
1:22-cv-00011-SEG**

## LR 7.1(D) FONT COMPLIANCE CERTIFICATION

The undersigned certifies that the within and foregoing **AFFIDAVIT** was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

51

Dated:  Alexandria, VA
August 17, 2022

Respectfully submitted,


BY: Maura O'Neill
Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **MAURA O'NEILL,**<br><br>                    Plaintiff,<br>      v.<br><br>**NYU LANGONE MEDICAL CENTER, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL, GRADY HEALTH SYSTEM, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL FORSYTH, COLLEGE PARK POLICE DEPARTMENT,**<br><br>                    Defendants. | **CIVIL ACTION FILE NO. 1:22-cv-00011-SEG** |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have this day caused to be served a true and correct copy of the foregoing by emailing and mailing a copy of the foregoing to each Defendant at the following addresses:

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Brantley Rowlen, Esq.
Chase Parker, Esq.
24 Drayton Street, Suite 300
Savannah, GA 31401
Telephone: 912.525.4960
E-Mail: rowlen@lbbslaw.com
E-Mail: chase.parker@lewisbrisbois.com

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
Parks Kalervo Stone, Esq.
3348 Peachtree Road NE
Suite 1400
Atlanta, GA 30326
Telephone: 470.419.6651
E-Mail: parks.stone@wilsonelser.com

**WATSON SPENCE LLP**
Michael R. Boorman, Esq.
999 Peachtree Road, N.E.
Suite 1130
Atlanta, GA 30309
Telephone: 229.436.1545
E-Mail: mboorman@watsonspence.com

**THOMAS KENNEDY SAMPSON & TOMPKINS, LLP**
Jeffrey Emery Tompkins, Esq.
Candance J. Rodgers, Esq.
Ebonei B. Simpkins, Esq.
3355 Main Street
Atlanta, GA 30337
Telephone: 404.688.4503
E-Mail: j.tompkins@tkstlaw.com
E-Mail: c.rodgers@tkstlaw.com

Dated: Alexandria, VA
August 17, 2022

Respectfully submitted,


BY: _Maura O'Neill_
Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

# Exhibit A

**CITI** _ **INC.**
A L:        / Flowers
16.     . Avenue
New Y  k, NY 10128
(212) 410-0303 • (800) 248-4692
www.citifloral.com

FTD
🕊 Teleflora
afs

.a O'Neill

h Company

Madison Ave. 9 F.

5 co D

ATIONS! CONGRATULATIONS! CONGRATULATIONS!

...on the ... you
... it! We
... have done it
... you.
From your 3-week
life partners ☺

# Exhibit B

# UPWARD EVALUATION

| | |
|---|---|
| Evaluatee: Maura O'Neill/NY/Monitor | Case Code: JSN-COT |
| Evaluator: Amy Feldman/NY/Monitor | Start Date: 01-Apr-01 |
| Strength of Read: ○ Low ○ Med ◉ High | End Date: 30-Sep-01 |

### Guidelines for Upward Reviews

**CONTEXT – Nature of client engagement and evaluator/evaluatee relationship:**

On JSN COT, Maura managed me on the Project Management stream of work, which I joined many months into the project. The case was a difficult one on from the political perspective as the client was not fully 'bought into' the project as a whole or to the piece that we were working on.

## DETAILED EVALUATION BY SKILL SET

### PLANNING

Strength of Read: ○ Low ○ Med ◉ High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| E set goals and objectives for me in my work | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E frequently delayed his/her involvement to the last minute, leading to firedrills | ○0 | ●1 | ○2 | ○3 | ○4 | ○5 | ○6 | ○7 |
| E accurately estimated the amount of time required to accomplish tasks | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E generally prioritized tasks or activities for the team | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E made sure I had a workplan to focus my efforts | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E adjusted and reprioritized the workplan or activities flexibly to reflect changes in project scope or client needs | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| Overall, I felt E's planning contributed greatly to an efficient case process | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |

Comments:

### MANAGEMENT

Strength of Read: ○ Low ○ Med ◉ High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| E provided useful direction when I asked for it | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E defined and communicated his/her expectations of me clearly | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E regularly reviewed my progress at appropriate junctures | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E provided tools and tactics that I could use to complete tasks effectively | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E ran effective meetings | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| Overall, E's role in managing the project greatly contributed to the smooth delivery of valuable output to the client | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |

Comments:

### COMMUNICATION

Strength of Read: ○ Low ○ Med ◉ High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| E kept me informed of the direction, goals and client context of the case team | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E conveyed his/her ideas and opinions clearly | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E usually responded to my communications in an appropriate timeframe, given his/her commitments | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E rarely pushed his/her views aggressively and in ways which did not invite questions | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E helped me understand how the team members' individual outputs fit together in acheiving the project's overall objectives | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Overall, E's communication ability contributed to the smooth delivery of my outputs to the team | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |

Comments:

## CONTRIBUTION TO LEARNING

Strength of Read: ○ Low  ○ Med  ● High

| | 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=... |
|---|---|---|---|---|---|---|---|---|
| E suggested actions or steps that I could undertake to improve my performance | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| E stimulated me to think and develop ideas to help the case | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E provided opportunities whenever appropriate to increase my learning and meet my PD objectives | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| Through his/her actions and advice, E made a great contribution to my learning on this case | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |

Comments:

## OPENNESS TO LEARNING

Strength of Read: ○ Low  ○ Med  ● High

| | 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=... |
|---|---|---|---|---|---|---|---|---|
| When I gave critical feedback to E, he/she reacted in ways which made it harder for me to want to do it again | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| E's negative emotional reactions to a variety of situations intimidated me, making me uncomfortable raising questions or concerns | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| E asked me for feedback | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E understood and accepted his/her personal responsibility for creating and fixing difficult situations | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| E demonstrated notable improvement on issues I brought to his/her attention | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| I am comfortable that E will accept feedback (whether it has been requested or not) and make his/her best effort to act on it | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |

Comments:

## LEADERSHIP

Strength of Read: ○ Low  ○ Med  ● High

| | 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=... |
|---|---|---|---|---|---|---|---|---|
| E's articulation of the client's issues and our ability to influence them inspired me to contribute | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E complained about the team's work, but didn't propose solutions | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| Despite the hard work I put in for the case, E rarely expressed any appreciation for my efforts | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |

| | |
|---|---|
| E demonstrated courage and wisdom in confronting difficult issues | 0 1 2 3 4 5 ●6 7 |
| E helped me to understand some of the larger issues facing Monitor, and how I could contribute to resolving them | 0 1 2 3 4 5 ●6 7 |
| E motivated me by helping me understand Monitor's direction and connecting it to my aspirations | 0 1 2 3 4 5 ●6 7 |
| Comments: | |



## OVERALL EVALUATION

Strength of Read:  ○ Low   ○ Med   ● High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| I would be happy to work with E again | | | 0 1 2 3 4 5 6 ●7 | | | | |
| I really do not enjoy interacting with E | | | 0 ●1 2 3 4 5 6 7 | | | | |

## SUMMARY COMMENTS

### EVALUATEE'S AREAS OF STRENGTH (WITH CONSTRUCTIVE LEARNING ORIENTED FEEDBACK)

Maura's greatest strength in my opinion is her willingness and desire to help consultants to develop.  Maura was very supportive and active in terms of providing learning opportunities that were in line with my PD goals and was patient in iterating on documents to ensure that learning occured. I would value and welcome the opportunity to work with Maura again for this reason.

### EVALUATEE'S AREAS FOR IMPROVEMENT (WITH CONSTRUCTIVE LEARNING ORIENTED FEEDBACK)

### GENERAL COMMENTS

Have you discussed this review with the Evaluatee?   ○ Yes  ● No

## UPWARD EVALUATION FORM

E▯▯▯▯▯▯▯▯ ▯▯▯▯: ▯▯▯▯▯▯▯▯▯ ▯▯▯▯▯▯
E▯▯▯▯▯▯▯▯ ▯▯▯▯: ▯▯▯▯▯▯ ▯▯▯▯▯▯▯▯
C▯▯▯▯ C▯▯▯: ▯▯▯-C▯▯
D▯▯▯: ▯▯▯▯ 9, 2001
▯▯▯▯▯▯: ▯▯▯▯ ▯▯ ▯▯▯▯▯▯ ▯▯▯ ▯▯▯▯▯▯▯▯▯. ▯▯▯▯ ▯▯▯▯▯▯▯ (▯▯▯▯▯ ▯▯▯▯▯▯-▯▯ ▯▯▯▯▯▯▯▯▯▯▯▯ ▯▯▯▯ ▯▯▯▯▯▯) ▯▯ ▯▯▯ ▯▯▯▯▯▯. C▯▯▯▯▯▯▯▯ ▯▯▯▯▯▯▯▯ ▯▯▯ ▯▯ ▯-▯▯▯▯ ▯▯▯▯ ▯▯▯ ▯▯▯▯▯▯▯▯ ▯▯▯▯▯▯▯▯▯ ▯▯▯▯; ▯▯▯ ▯▯▯▯ ▯ ▯▯▯ ▯▯▯▯▯▯ ▯▯ ▯▯▯ ▯▯▯▯ ▯-▯▯▯▯.

### Strength of Read

▯▯▯▯▯▯ ▯▯▯▯▯▯▯▯▯ ▯▯▯▯ *overall* ▯▯▯▯▯▯▯▯▯ ▯▯ ▯▯▯▯ ▯▯▯ ▯▯▯▯ ▯▯▯▯▯▯▯▯. B▯▯▯ ▯▯▯▯▯ ▯▯▯▯▯▯▯▯ ▯▯ ▯▯ ▯▯ ▯▯▯ ▯▯▯▯ ▯▯ ▯▯▯▯▯▯▯▯▯▯ ▯▯▯ ▯▯▯▯▯ ▯▯▯▯▯ ▯▯▯▯ ▯▯▯ ▯▯▯▯▯▯▯▯. (C▯▯▯▯▯ ▯▯▯ ▯▯ ▯▯▯ ▯▯▯▯▯▯▯▯▯▯)

**High**       ▯▯▯▯▯▯       ▯▯▯

*Please note, you must also indicate your strength of read for your manager in relation to each of the following categories.*

## Planning

| | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read (Circle one) Low Med High | 1. | E set goals and objectives for me in my work | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 2. | *E frequently delayed his/her involvement to the last minute, leading to firedrills* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 3. | E accurately estimated the amount of time required to accomplish tasks | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 4. | E generally prioritized tasks or activities for the team | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 5. | E made sure I had a workplan to focus my efforts | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 6. | E adjusted and reprioritized the workplan or activities flexibly to reflect changes in project scope or client needs | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 7. | Overall, I felt that E's planning contributed greatly to an efficient case process | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

My perception of the planning process was that Maura did a great job keeping me informed of what was going on and how events would impact my work. I felt that overall on the case, we had some problems with planning, but I felt that it was because the case was understaffed, rather than anything that Maura did to contribute to the situation. When working with Maura, I didn't feel any panic or experience unresolved confusion; throughout the case I was confident that Maura knew what was going on and what needed to be done. I also knew that when I had questions or was confused, she would answer my questions and address any concerns I had.

In light of the circumstances (a lot of work and very demanding clients), I was amazed at how low my levels of stress were during the case. I think that Maura's planning contributed to a very good case experience for me. I felt that I could trust her when she told me that something needed to be done immediately; I didn't worry about false fire drills. I feel like she kept the ship together, and I felt that her planning was the main reason that our work on our module had gone as well as it had.

During the case, I felt like Maura always had a ton of work to do, and at times I was worried about how she handled all the work that she had to do. Somehow she pulled it off and didn't kill us (or even damage us) in the process. I feel that I could have been more proactive and tried to take on more work, but I didn't do this effectively, which meant that the load that Maura was carrying remained pretty heavy.

## Management

| Strength of Read | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Low | 1. | E provided useful direction when I asked for it | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 2. | E defined and communicated his/her expectations of me clearly | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Med | 3. | E regularly reviewed my progress at appropriate junctures | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 4. | E provided tools and tactics that I could use to complete tasks effectively | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| High | 5. | E ran effective meetings | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 6. | Overall, E's role in managing the project greatly contributed to the smooth delivery of valuable output to the client | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

Maura was more than a team leader; she acted as a mentor as well. I feel like she was always upfront in telling me what her expectations were. I didn't feel like there were any surprises on the team—I feel like I had a good sense of what was going on. I know if must have been challenging to manage two CTMs who were physically located in a different office—sometimes, we didn't "get" things as quick as we might have had we been in the same office. One of the most helpful things about working with Maura was that she really made an effort to provide direction when I asked for it. I never felt unsupported or out in space—I felt that even though she didn't see me on a regular basis (due to us being in different offices), she was able to walk the fine line of making sure I had enough information to do my job, but not too much guidance that I felt micromanaged. I was wholly pleased by her management skills; I had expected a rockier road because we wouldn't be working out of the same office.

Her style is not to dictate. Instead, she worked to get us (her CTMs) involved as partners in the process. When I joined the case, I was told that my interaction with the client would be minimal. Maura encouraged me to participate in meetings. I feel like I could have done more, but due to an unexpected rearrangement in teams I did not have a chance to scale up my responsibilities as much as I would have liked. I believe I could have been more proactive about getting work from her. I feel like this case demanded a huge amount from case team leaders, and I don't think she was supported by us as well as some other CTLs were, due to our relatively low skill levels and lack of experience with slide-writing.

## Communication

| Strength of Read | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read Low Med High | 1. | E kept me informed of the direction, goals and client context of the case team | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 2. | E conveyed his/her ideas and opinions clearly | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 3. | E usually responded to my communications in an appropriate timeframe, given his/her other commitments | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 4. | E rarely pushed his/her views aggressively and in ways which did not invite questions | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 5. | E helped me understand how the team members' individual outputs fit together in achieving the project's overall objectives | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 6. | Overall, E's communication ability contributed to smooth delivery of my outputs to the team | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

To provide a little context, let me briefly summarize my impressions of the client situation. Merck is a politically charged organization composed of very smart, driven, confident, and aggressive (some would say pushy) people who have their own agendas and opinions on what we should be doing with our time. Working at Merck is difficult. It is a stressful environment for an outsider—the culture is one that demands perfection. Overall, the client is the toughest that I've seen during my brief tenure at Monitor (with a little more than 10 cases under my belt). I feel like Maura did a great job communicating with the client, especially in light of the tough circumstances. I felt that she was tested, but that she did earn their trust. This trust came about through tireless work on Maura's part. I know that she labored over documents, to make sure that every world in them was as she wanted, and she also made an effort to get to know people on the client team. My sense was that the client enjoyed working with her and respected her.

In terms of internal communication—I feel like Maura did a great job of keeping my informed of what was going on. If she didn't know, she'd tell me that. I never got the sense that she was withholding information; I feel like she was upfront and transparent to me.

My one criticism is that sometimes, Maura seemed to dilute her sentences with qualifiers (such as sort-of, basically, and actually). This is related to point number 4 above. I feel like there were a few times in meetings where her message was diminished because she seemed unsure of herself. I realize that due to the client situation, she had to be really careful about what she was saying, but I also think that using fewer qualifiers would have gotten the same message across. I thought that she was dead-on with a lot of what she was saying, so perhaps my bias in believing that her points were valid overshadows Maura's need to communicate that she was feeling

some uncertainty about what she was saying.

## Contribution to Learning

| | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read | 1. | E suggested actions or steps that I could undertake to improve my performance | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Low | 2. | E stimulated me to think and develop ideas to help the case | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Med | 3. | E provided opportunities whenever appropriate to increase my learning and meet my PD objectives | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| High | 4. | Through his/her actions and advice, E made a great contribution to my learning on this case | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

I feel like Maura went out of her way to help me on this case, but I didn't take as much advantage of the opportunities as I could have. (The modules were unexpectedly reorganized mid-way through the case, so I left Maura's module and went to work 100% on another module with which I had previously been 50% involved.) Maura was willing to have me more involved in meetings, for example, but I didn't take advantage of this before I left the module.

One event that stands out in my mind as a good example of how Maura made time to share her knowledge was the time when I was working on a batch of slides. Despite having a tight deadline and other demands on her time, Maura took the time to explain ways to make the slides better. She also showed me some tips in PowerPoint that saved me time and prevented frustration. I appreciated the fact that she didn't care just about the end result (getting the slides done)—she also took the time to teach me, so that the next time I made slides for her I would be able to do my job more efficiently.

Overall, I regret not having more of a chance to work with Maura because I think that I could continue to learn a lot from her.

## Openness to Learning

| | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read | 1. | *When I gave critical feedback to E, he/she reacted in ways which made it harder for me to want to do it again* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 2. | *E's negative emotional reactions to a variety of situations intimidated me, making me uncomfortable raising questions or concerns* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Low | 3. | E asked me for feedback | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Med | 4. | E understood and accepted his/her personal responsibility for creating and fixing difficult situations | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| High | 5. | E demonstrated notable improvement on issues I brought to his/her attention | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 6. | I am comfortable that E will accept feedback (whether it has been requested or not) and make his/her best effort to act on it | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

Throughout the case, I found Maura very easy to approach with my concerns and comments. I felt comfortable throughout the case, and felt that Maura was very open to listening to my concerns. I can remember at one point in the case, I was concerned that the client felt that we had a hidden agenda. I talked to Maura about my concerns, and rather than dismissing them, she took me seriously and addressed my concerns in a later meeting with the client. I wouldn't have felt as comfortable discussing issues like this with her if I felt like I would be dismissed—I never got that impression from her. When she did disagree with me, I always felt like I got a clear explanation of her rationale that allayed my concerns.

## Leadership

|  |  |  | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read | 1. | E's articulation of the client's issues and our ability to influence them inspired me to contribute | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Low | 2. | *E complained about the team's work, but didn't propose solutions* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Med | 3. | *Despite the hard work I put in for the case, E rarely expressed any appreciation for my efforts* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| High | 4. | E demonstrated courage and wisdom in confronting difficult issues | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|  | 5. | E helped me to understand some of the larger issues facing Monitor, and how I could contribute to resolving them | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|  | 6. | E motivated me by helping me understand Monitor's direction and connecting it to my aspirations | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

Comments:

One of the very pleasant things about working with Maura was that she did express appreciation for a job well done. I feel like we all pushed ourselves really hard on the case; it was comforting to realize that even though the case was difficult, she still had time to give encouragement and praise.

I'd like to spend a moment talking about Point #4 (E demonstrated courage and wisdom in confronting difficult issues). Usually when I write up these evaluations I have nothing to say on this point. For Maura, however, there was one instance that stands out in my mind as an example of her wisdom. During the case, I had some concerns about the other module with which I was involved. I left a vague message for Maura. She sensed that I was troubled, and followed up with me later that night. (This all happened right before an important off-site meeting.) Maura stayed on the phone with me for more than an hour, calmed me down, helping me clarify my thoughts, think about what the implications might be for the case, and ultimately suggested next steps that I could take. She also got involved with the solution by talking to another manager. I had felt some concern about elevating that issue to a higher level because I wasn't sure if I was over-reacting. Through talking with Maura, I felt like I had a clearer idea of what my role should be in the situation.

## General Summary Section

| | | | No Data to Answer | Strongly Disagree | Moderately Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Moderately Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|---|---|---|
| Strength of Read **HIGH** | 1. | I would be happy to work with E again | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 2. | *I really do not enjoy interacting with E* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

A☐☐ ☐☐☐☐☐ ☐☐☐☐☐ ☐☐☐☐☐☐☐☐☐☐ ☐☐☐☐ ☐☐☐ ☐☐☐☐☐ ☐☐☐☐ ☐☐ ☐☐☐☐ ☐☐☐☐☐ E?

I went through a difficult time on the case—I needed knee surgery—and Maura was completely supportive. I had absolutely no struggle when scheduling and attending doctor's appointments and physical therapy sessions. I was amazed at how flexible and accommodating she was, and worried that she could have asked me to do more. She seemed to want to shield me from doing too much work, but my concern was that she ended up picking up a lot more herself. I greatly appreciate the support that she gave me during that time—it meant the world to know that my team supported me throughout physical therapy, even though attending the PT sessions meant that I was working less hours that others on the team (and that whatever work I didn't do was picked up my team).

I felt like she did a really good job writing slides—it was really neat to see the process that she went through when revising her slides. I soon realized that I should not be surprised when I saw her slides show up in other people's presentations. She has a way of communicating information that makes it accessible and understandable. I wish I'd had more time to learn some of her techniques.

My one outstanding concern is about burn-out. I don't know if it's just a function of this case, or if Maura is like this in general, but I have rarely seen one person work so many hours for such an extended period of time. At the same time that Maura was expressing concern over my knee, I was expressing concern to her over the amount of work that she was doing. ALL of the other CTLs seemed to be in the same boat—everyone was exhausted—so I don't think that it's a problem with Maura in general. If, however, this was a theme on her past cases, I'd be concerned, because no one can work that hard and not get worn out.

Overall, I really enjoyed working with Maura and regret not being able to spend more time on her module. She has assured me that she's available for questions even though I'm no longer working directly with her. I'm sure that I'll continue to learn from her either directly through occasional phone calls, or vicariously though her slide decks. I would welcome the opportunity to work with her again.

# UPWARD EVALUATION

| Evaluatee: | Maura O'Neill/NY/Monitor | Case Code: | JSN-COT |
| Evaluator: | Kuan Wu/CAM/Monitor | Start Date: | 01-Apr-01 |
| Strength of Read: ○ Low ○ Med ● High | | End Date: | 30-Sep-01 |

**Guidelines for Upward Reviews**

**CONTEXT - Nature of client engagement and evaluator/evaluatee relationship**

The goal of the JSN-COT case was to help the development organization align with other divisions of Merck, handle higher throughput, and accommodate increasing product scale. This was the first case sold to the research division of Merck, and thus the case team often aimed to over-deliver.

I worked with Maura after August 7 on one of the 6 modules. Due to the layoffs, we were the only two members of our specific module.

## DETAILED EVALUATION BY SKILL SET

### PLANNING

Strength of Read: ○ Low ○ Med ● High

| | 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7 |
|---|---|---|---|---|---|---|---|---|
| E set goals and objectives for me in my work | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| E frequently delayed his/her involvement to the last minute, leading to firedrills | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| E accurately estimated the amount of time required to accomplish tasks | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E generally prioritized tasks or activities for the team | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| E made sure I had a workplan to focus my efforts | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E adjusted and reprioritized the workplan or activities flexibly to reflect changes in project scope or client needs | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| Overall, I felt E's planning contributed greatly to an efficient case process | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |

Comments:
Planning is one of Maura's strengths. She had a clear path in mind for every deliverable, and made adjustments to the workplan accordingly.

### MANAGEMENT

Strength of Read: ○ Low ○ Med ● High

| | 0=No Data to Answer | 1=Slightly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7 |
|---|---|---|---|---|---|---|---|---|
| E provided useful direction when I asked for it | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| E defined and communicated his/her expectations of me clearly | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ |
| E regularly reviewed my progress at appropriate junctures | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ |
| E provided tools and tactics that I could use to complete tasks effectively | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| E ran effective meetings | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| Overall, E's role in managing the project greatly contributed to the smooth delivery of valuable output to the client | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ |

Comments:

### COMMUNICATION

Strength of Read: ○ Low ○ Med ● High

| 0=No Data | 1=Strongly | 2=Moderately | 3=Slightly | 4=Neither Agree | 5=Slightly | 6=Moderately | |

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| E kept me informed of the direction, goals and client context of the case team | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| E conveyed his/her ideas and opinions clearly | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E usually responded to my communications in an appropriate timeframe, given his/her commitments | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E rarely pushed his/her views aggressively and in ways which did not invite questions | ○0 | ○1 | ○2 | ○3 | ○4 | ●5 | ○6 | ○7 |
| E helped me understand how the team members' individual outputs fit together in achieving the projects overall objectives | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |
| Overall, E's communication ability contributed to the smooth delivery of my outputs to the team | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |

Comments:
Communication between Maura and I suffered as a result of different bases of operation. During times of client pressure, it became obvious that working out of different offices was not optimal. Communication by phone was not as adequate as we had hoped. One result of this was that it often seemed like Maura wanted to get all her ideas out on the table before opening up for discussion.

Sometimes I felt overwhelmed by such monologues. Trying to capture everything she said became a difficult task in those situations.

## CONTRIBUTION TO LEARNING

Strength of Read: ○ Low  ○ Med  ● High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| E suggested actions or steps that I could undertake to improve my performance | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E stimulated me to think and develop ideas to help the case | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E provided opportunities whenever appropriate to increase my learning and meet my PD objectives | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| Through his/her actions and advice, E made a great contribution to my learning on this case | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ○6 | ●7 |

Comments:
Because Maura was re-assigned to my portion of the case abruptly after August 7, we were placed in a situation where we both had to learn from each other.

One of the best qualities about Maura is her willingness to talk about issues, be they client issues or personal development issues. Whenever I had a question about either of those topics, Maura willingly took time out of her day to listen to my thoughts and give her thoughts on the situation.

## OPENNESS TO LEARNING

Strength of Read: ○ Low  ○ Med  ● High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| When I gave critical feedback to E, he/she reacted in ways which made it harder for me to want to do it again | ○0 | ○1 | ●2 | ○3 | ○4 | ○5 | ○6 | ○7 |
| E's negative emotional reactions to a variety of situations intimidated me, making me uncomfortable raising questions or concerns | ○0 | ○1 | ●2 | ○3 | ○4 | ○5 | ○6 | ○7 |
| E asked me for feedback | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E understood and accepted his/her personal responsibility for creating and fixing difficult situations | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| E demonstrated notable improvement on issues I brought to his/her attention | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |
| I am comfortable that E will accept feedback (whether it has been requested or not) and make his/her best effort to act on it | ○0 | ○1 | ○2 | ○3 | ○4 | ○5 | ●6 | ○7 |

Comments:

## LEADERSHIP

Strength of Read: ○ Low  ○ Med  ● High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| E's articulation of the client's issues and our ability to influence them inspired me to contribute | ○ 0 | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ● 6 | ○ 7 |
| E complained about the team's work, but didn't propose solutions | ○ 0 | ● 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ○ 6 | ○ 7 |
| Despite the hard work I put in for the case, E rarely expressed any appreciation for my efforts | ○ 0 | ● 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ○ 6 | ○ 7 |
| E demonstrated courage and wisdom in confronting difficult issues | ○ 0 | ○ 1 | ○ 2 | ○ 3 | ● 4 | ○ 5 | ○ 6 | ○ 7 |
| E helped me to understand some of the larger issues facing Monitor, and how I could contribute to resolving them | ○ 0 | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ● 6 | ○ 7 |
| E motivated me by helping me understand Monitor's direction and connecting it to my aspirations | ○ 0 | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ● 6 | ○ 7 |

Comments:
Maura always made a point to thank me for the work I had done, which made it much easier to contribute more. In addition, she took the time, when appropriate, to fill me in on the larger scope of our actions and decisions.

## OVERALL EVALUATION

Strength of Read:  ○ Low   ○ Med   ● High

| 0=No Data to Answer | 1=Strongly Disagree | 2=Moderately Disagree | 3=Slightly Disagree | 4=Neither Agree nor Disagree | 5=Slightly Agree | 6=Moderately Agree | 7=Strongly Agree |
|---|---|---|---|---|---|---|---|
| I would be happy to work with E again | ○ 0 | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ● 6 | ○ 7 |
| I really do **not** enjoy interacting with E | ○ 0 | ● 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 | ○ 6 | ○ 7 |

## SUMMARY COMMENTS

### EVALUATEES'S AREAS OF STRENGTH (WITH CONSTRUCTIVE LEARNING ORIENTED FEEDBACK)

- Planning
- Personal organizational skills
- Execution of tasks
-

### EVALUATEE'S AREAS FOR IMPROVEMENT (WITH CONSTRUCTIVE LEARNING ORIENTED FEEDBACK)

It could have been caused by the extreme amount of work on her plate, but it seemed that Maura was tense when she is under extreme pressure. However, I was fortunate to also see her at times when she was not so tense. Also, taking time to establish a rapport with case team members would help everyone feel more comfortable.

### GENERAL COMMENTS

I believe Maura is making great strides to be an effective CTL.

Have you discussed this review with the Evaluatee?    ● Yes  ○ No 

Dear Maura,                                                                            8/17

Here are my background files in case you guys need them. The purple is alignment/interfaces, the green is regulatory, and the red is the pipeline analysis. Aside from that, they are not very organized inside! The emails I sent you are probably the best references; these files mostly contain my notes and scrap paper.

Thanks so much for everything this summer. You have really been a great module leader, mentor, and friend. I hope all goes well with the case. You'll have to let me know how it turns out. I will email you my email address at school.

Thanks again,
Kelley

# Exhibit C

MONITOR GROUP

650 MADISON AVENUE, 9TH FLOOR

NEW YORK, NY 10022

John Matthews

December 16, 2001

Office of Admissions
Kellogg School of Management
Northwestern University

I am writing to recommend Maura O'Neil for admission to your MBA program. I have known Maura for approximately 9 months, primarily as her manager on a consulting engagement at Monitor Company. During that time, Maura took on a range of roles and responsibilities, which gave me good opportunities to assess her performance and trajectory. In addition, Maura and I have had more general discussions about her strengths and weaknesses and her career intentions.

1. Maura began our work together with a desire to improve her client management skills. This case provided her with the chance to be responsible for multiple senior clients are a major pharmaceutical company in a division undergoing significant organizational change. Over the duration of the case, Maura built productive relationships with all of her client contacts and emerged from the experience having successfully delivered outputs at or above their expectations in a very demanding environment where others failed. Maura also improved in her communication to her managers. Based on feedback that I provided Maura about her style of interaction with me, she was able to improve the focus of our discussions, keep me better informed about her progress and involve me in difficulties at appropriate times. Finally, Maura improved her understanding of her own skills and skill gaps and has been reflective about her career path in ways that many consultants in her cohort are not.

2. Maura's leadership abilities are quite strong in some respects. She sets priorities well for those who work for her and offers a good balance of autonomy and mentorship. Feedback from people she managed was consistent in praising her for giving them independence to test new skills and develop in new roles, while at the same time providing a good safety net. She also is able to push her team when necessary to meet difficult objectives, and leads in part by participating with her team, sharing the burden of the work. At the same time, Maura also needs to work on some of her other leadership skills. Specifically, she sometimes had difficulty understanding interpersonal cues, particularly during times of stress. Her tendency is to believe that those who work for her will be open about any criticism they have, and communicate it to her in a direct way, as she does for those around her. She has not yet mastered the ability to interpret people's behavioral signals, and read them as indications of potential problems with her team. In addition, she is good at mentoring consultants working for her on technical consulting skills and takes responsibility for that part of her job as a manager and leader. However, she is more hesitant about taking on a broader role in

helping consultants develop in a more comprehensive way that is only tangentially related to any specific situation on the engagement. I do not believe that these are fatal leadership issues for Maura, and I believe that spending time in a business school would be an excellent way for Maura to gain a better understanding of her leadership gaps and fill them.

3. See specific responses below

    A. Maura's greatest strengths lie in her intellectual abilities. She is at the top of her cohort (other Monitor consultants applying to business school) in her ability to design, conduct and oversee analysis. In a circumstance of working for world-class scientists, she impressed our clients consistently with her organizational and process analysis, and her methodology for conducting the analysis. She is also very strong in her ability to communicate this analysis in ways that clients can understand and act upon, both through writing documents and through leading meetings.

    B. Maura's historical career performance appears to be in approximately the same range as the rest of her cohort. In our engagement, she was responsible for leading major pieces of work and managing senior clients. This was perhaps slightly more advanced than others of her age, but within expectations. I believe that Maura does have more significant potential than most of her cohort, however.

    C. In discussions about her career plans, Maura has demonstrated a passion for business, and business careers with a high degree of analytic content in particular. I believe that she is, appropriately, open to a variety of possibilities and is not focused on a specific post-MBA job or career. My expectation is that Maura would return to professional services in some capacity.

    D. On many dimensions, Maura has excellent interpersonal skills. She has a high degree of integrity, displayed often through her unfailing commitment to delivering high quality work and insights to her client. She clearly has internalized her responsibility to serve her clients and works hard to make sure that she delivers value. She is also very open to learning and actively seeks out feedback from others. One area that I do believe is of high importance for Maura, however, is in understanding non-verbal interpersonal dynamics. She looks for people around her to be thoughtful and transparent about their opinions, and often does not pick up on other signals, both intended and unintended.

    E. Maura has demonstrated excellent leadership qualities in some regards, such as her teaching and mentoring of her junior consultants, and her strong general management skills. She also does a good job most of the time in balancing her management and interventions with the opportunities that her junior consultants want and need in order to develop their skills. Maura displayed great initiative in taking on new roles on our engagement and stepped into quite difficult situations when needed. Some of her interpersonal skills described in D that require work will be critical to other aspects of Maura's leadership in the future. In addition, she often did not perceive her broader leadership roles with her junior consultants in helping to guide them generally within Monitor and within their careers.

3. Please address the following components of the candidate's character. Cite specific examples where possible.

a. Intellectual ability (e.g. analytical skills, communication, creativity, curiosity)

b. Career performance (relative to others in the industry)

c. Career focus (clarity of post-degree plans)

d. Interpersonal skills (e.g. maturity, listening skills, team skills, sense of humor, sincerity, concern for others)

e. Leadership potential (e.g. initiative, contribution beyond expected responsibilities)

4. Please rate the applicant on the following five components. To whom are you comparing the applicant? _____

_Other   Monitor   consultants   applying   to   MBA   programs_

| | No information | Outstanding | Strong | Average | Below Average |
|---|---|---|---|---|---|
| Intellectual ability | | X | | | |
| Career performance | | | X | | |
| Career focus | | | X | | |
| Interpersonal skills | | | | X | |
| Leadership potential | | | X | | |

Overall impression of candidate:    ☐ Outstanding candidate (Top 5%)
                                ☒ Strong candidate (15%)
                                ☐ Average candidate (50%)
                                ☐ Below Average candidate (Bottom 30%)

Are you willing to speak with an admissions officer about this candidate? ☒ Yes   ☐ No

Signature _____ Date _12/15/01_

Since your evaluation will become a part of the applicant's formal application, your prompt response in returning this form is essential to a timely decision. Thank you for your assistance.

Produced with
**Embark**

# Exhibit D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

TRANSMITTED BY FACSIMILE

Raymond V. Gilmartin
President and CEO
Merck & Co., Inc.
P.O. Box 1000, UG3BC-10
North Wales, PA 19454-1099

RE:  NDA 21-042
     Vioxx (rofecoxib) tablets
     MACMIS ID # 9456

# WARNING LETTER

Dear Mr. Gilmartin:

This Warning Letter concerns Merck & Co. Inc.'s (Merck) promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets. Specifically, we refer to promotional audio conferences given on behalf of Merck by Peter Holt, MD, a press release, and oral representations made by Merck sales representatives to promote Vioxx. As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.



PLAINTIFF'S EXHIBIT

MRK-AAF0007777

Raymond V. Gilmartin                                                                                          Page 2
Merck & Co., Inc.
NDA 21-042

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

## Background

Vioxx is a NSAID with selective cyclooxygenase 2 (COX-2) inhibitory properties. It was approved on May 20, 1999, for the treatment of primary dysmenorrhea, for the management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis.

Prior to approval, endoscopy studies were submitted to the original NDA database demonstrating that treatment with Vioxx 25 mg or 50 mg daily was associated with a significantly lower percentage of endoscopically apparent gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. Because the correlation between findings of endoscopic studies and the relative incidence of clinically serious upper gastrointestinal (GI) events was unknown, after approval, Merck sponsored the VIGOR study to obtain information regarding clinically meaningful upper GI events and to develop a large controlled database for overall safety assessment.

The VIGOR study included approximately 4000 patients per treatment arm (Vioxx 50 mg a day or naproxen 1000 mg a day) treated for a median time of 9 months. The primary endpoint of the study was the relative risk of confirmed PUBs (perforations, symptomatic ulcers, and GI bleeds) in patients with rheumatoid arthritis taking Vioxx 50 mg daily (two to four times the approved dosing regimen for Vioxx in osteoarthritis), compared to patients taking naproxen, 1000 mg daily. The study also compared the safety and tolerability of the two treatments in patients with rheumatoid arthritis. The results of the study demonstrated that patients on Vioxx had a significantly lower cumulative incidence of PUB's compared to patients on naproxen (2.08% and 4.49% for Vioxx and naproxen, respectively).

Other important results from the VIGOR study included the unexpected findings that investigator reported serious cardiovascular events occurred in 101 patients (2.5%) in the Vioxx treatment group compared to 46 patients (1.1 %) in the naproxen treatment group, and MIs occurred in 20 patients among 4047 in the Vioxx treatment group (0.5%), compared to four patients among 4029 in the naproxen treatment group (0.1%). These unexpected findings were extensively discussed at the FDA Arthritis Advisory Committee Meeting on February 8, 2001. Although, the reason for these differences is not clear, possible explanations include both an ability of naproxen to function as a cardioprotective agent and a pro-thrombotic property of Vioxx.

MRK-AAF0007778

Raymond V. Gilmartin                                                                        Page 3
Merck & Co., Inc.
NDA 21-042

## Promotional Audio Conferences

We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations.  These audio conferences were held on June 8, 2000, June 13, 2000, June 16, 2000, and three on June 21, 2000, and were moderated by Merck employees.

On December 12, 2000, we sent you a written inquiry about your involvement with and influence on the initiation, preparation, development, and publication of audio conferences given by Dr. Holt.  We also asked you to describe the nature of the relationship between you and Dr. Holt.  In your response dated January 5, 2001, you stated that, "Dr. Holt entered into a speaker contract with Merck on June 22, 1999."  You also stated that, "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000.  Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

The promotional audio conferences identified above, arranged by, and presented on behalf of, Merck were false or misleading in that they minimized the MI results of the VIGOR study, *minimized the* Vioxx / Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen.  Our specific objections follow.

<u>Minimization of MI Results</u>

Statements made during the promotional audio conferences identified above minimize the potentially serious MI risk that may be associated with Vioxx therapy.  For example, in your June 21, 2000, audio conference you begin your discussion of the MI rates observed in the VIGOR study by stating, "When you looked at the MI rate the rate was different for the two groups.  The MI rate for Vioxx was 0.4 percent and if you looked at the Naprosyn arm it was 0.1 percent, so there was a reduction in MIs in the Naprosyn group."  You then present your explanation as to why the Vioxx treatment arm had an increased rate of MIs compared to the naproxen treatment arm.  Specifically, you state that,

> Vioxx is a wonderful, effective, selective COX-2 inhibitor that inhibits COX-2 but at the doses used does not inhibit COX-1.  So therefore without the COX-1 inhibition you don't inhibit platelets, you don't prolong bleeding time and therefore it cannot be used as a cardiovascular protective drug.  Naprosyn on the other hand is a wonderful platelet inhibitor, prolongs bleeding time and inhibits platelets identically to aspirin.  Obviously the binding with Naprosyn is reversible and with aspirin is irreversible, but the effect on platelets and bleeding time is identical in terms of its effect and therefore functions as a wonderful drug for cardiovascular prophylaxis.  So basically the MI rates are in sync with what we know about Vioxx and what *we know about Naprosyn.*

In fact, the situation is not at all clear.  There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs.  Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading, and minimizes the potential seriousness of this finding.  As you know, the

MRK-AAF0007779

Raymond V. Gilmartin                                                                    Page 4
Merck & Co., Inc.
NDA 21-042

reason for the difference between Vioxx and naproxen has not been determined; it is also possible that
Vioxx has pro-thrombotic properties. Also, the MI rate that you report for Vioxx is inaccurate; the MI
rate for Vioxx in the VIGOR study was 20 MIs among 4047 patients (0.5%), not 0.4%, as you stated.

Your minimization of the seriousness of the MI rates observed in the Vioxx treatment arm of the
VIGOR trial is further reinforced in your audio conferences by your discussion of a retrospective
analysis of this trial. For example, in your June 21, 2000, audio conference, you state that,

> ...Merck went and pulled out those patients that again were enrolled in VIGOR and asked the
> question, who were those patients that really needed secondary cardiovascular prophylaxis
> from the get go, and that ended up being four percent of the study group in VIGOR based on
> whether there was a prior MI, stroke, TIA, angina, CABG or PTCA....Now if you look at the
> remaining part of VIGOR, which is 96 percent of the VIGOR population, and once again
> looked for the MI rate between Naprosyn and Vioxx, there's no statistically significant
> difference in the MI rate between Naprosyn and Vioxx. In fact, Naprosyn is 0.2 percent and
> Vioxx is 0.1 percent.

Your claim that the MI rate for naproxen was 0.2 percent and for Vioxx was 0.1 percent is again
inaccurate. Contrary to your claim that there was a higher rate of MIs in the naproxen group compared
to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients
(0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

Moreover, you again minimize the Vioxx MI rate observed in the VIGOR study by your comparison of
this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long-Term Arthritis
Safety Study (CLASS). For example, in your June 21, 2000, audio conference you state, "Now if you
remember the crude MI rate of Vioxx in VIGOR that number was 0.4 percent which is basically the
same or in fact a little bit less then the crude MI rate of Celebrex in CLASS which is 0.5 percent."
Your claim that the MI rates of Vioxx compared to Celebrex were basically the same, "or in fact a little
bit less" is misleading. You are comparing MI rates from two different trials with different patient
populations. For example, patients who had angina or congestive heart failure with symptoms that
occurred at rest or minimal activity and patients taking aspirin, including low-dose (325 mg or less,
daily or every other day) or other antiplatelet agents (e.g., ticlopidine) were excluded from the VIGOR
trial. The CLASS trial in contrast, did not exclude patients of this type. The CLASS trial thus may
have included patients at a higher risk for MIs.

<u>Minimization of Vioxx / Coumadin Interaction</u>

Statements made during your promotional audio conferences also minimize the risk of Vioxx therapy
in patients who are taking warfarin. For example, in your June 16, 2000, audio conference you stated
that, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors
have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely
in terms of post-op and with Coumadin." Your statement that Vioxx can be used safely with warfarin
minimizes the precaution in the PI that states that "...in post-marketing experience, bleeding events
have been reported, predominately in the elderly, in association with increases in prothrombin time in
patients receiving Vioxx concurrently with warfarin." Your promotion minimizing the risk of using
Vioxx and warfarin concurrently is particularly troublesome because Merck was aware of this
potentially dangerous drug interaction in 1999, well before these audio conferences occurred. In fact,

MRK-AAF0007780

Raymond V. Gilmartin                                                                 Page 5
Merck & Co., Inc.
NDA 21-042

Merck began disseminating a revised PI in October 1999, which included new information about this risk.

The seriousness of this interaction is further minimized by your suggestion that COX-2 inhibitors, including Vioxx, can be used safely with warfarin because it "has the benefit of not having platelet aggregation and bleeding time." This claim implies that Vioxx is safer than other NSAIDS used in combination with warfarin. However, Vioxx has not been studied in head-to-head trials prospectively designed to assess this specific endpoint. Your superiority claim is therefore misleading.

We note that earlier in your June 16, 2000, promotional audio conference you state, "It can be used in people with Coumadin, although with Coumadin you've got to check their INR three and four days after you add the Cox inhibitor to the Coumadin because there may be a bump in the INR." This disclosure does not correct the overall misleading message, however, nor does it correct your suggestion that Vioxx is safer than other NSAIDs in patients taking warfarin.

<u>Omission of Important Risk Information</u>

Your promotional audio conferences fail to present serious and significant risks associated with Vioxx therapy. For example, your promotional audio conferences fail to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. You also fail to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx. Moreover, you fail to present Vioxx's precautions for use in patients who have liver and kidney disease, information about patient populations in which Vioxx's use is not recommended, such as women in late pregnancy, and information about Vioxx's most common adverse events.

<u>Unsubstantiated Superiority Claims</u>

You make several unsubstantiated superiority claims for Vioxx throughout your promotional audio conferences. For example, in your June 16, 2000, audio conference, you claim that, "The importance of [VIGOR and CLASS] is that the data is going to really help change I believe the package inserts for [Vioxx and Celebrex] down the road because it really shows once again that they are safer than non-steroidals." Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was **higher** in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF-related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group. Furthermore, your claim that the VIGOR and CLASS trials "show once again that they are safer than non-steroidals" is also misleading because it implies that the results of the VIGOR trial (i.e., patients on Vioxx had a significantly lower cumulative incidence of PUBs than patients on naproxen) can be applied to the entire class of NSAIDs.

In your June 16, 2000, audio conference you state, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and

MRK-AAF0007781

Raymond V. Gilmartin                                                                                    Page 6
Merck & Co., Inc.
NDA 21-042

bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This claim
suggests that Vioxx is safer, or has fewer side effects, than other NSAIDs used in the post-operative
setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not
been studied, however, in head-to-head trials prospectively designed to assess its safety compared to
other NSAIDS in the post-operative setting. Your superiority claim is therefore misleading.

Further examples of your unsubstantiated superiority claims include your claim that, "In terms of half
life Vioxx has a half life of 17 hours and is truly a once a day drug, whereas Celebrex has a half life of
11 hours and is a BID (twice a day) drug," stated in your June 16, 2000, audio conference. This claim
is misleading because it suggests that Celebrex must be dosed twice a day for all of its approved
indications. In fact, Celebrex is approved for use either twice a day, or once a day, for the treatment of
osteoarthritis. Therefore, your claim that Celebrex is a "BID drug" is misleading.

<u>Promotion of Unapproved Uses</u>

Your audio conferences are misleading because they promote Vioxx for unapproved uses. For
example, in your June 21, 2000, conference, you claim that in the VIGOR study, "...the Vioxx 50
milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating
the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is
effective for the treatment of rheumatoid arthritis when this has not been demonstrated. The VIGOR
study was not designed to assess the efficacy of Vioxx for the treatment of rheumatoid arthritis. Your
claim that Vioxx is "absolutely equally effective" to naproxen in treating patients with rheumatoid
arthritis is also misleading because this has not been demonstrated by adequate and well-controlled
clinical studies, and because the VIGOR study was not capable of assessing their comparative
effectiveness.

Your promotional audio conferences are also misleading because they suggest that Vioxx is safe and
effective for other unapproved uses such as the prevention of cancer and invasive cancer, and for the
treatment of Alzheimer's disease and gout. Examples of claims that promote Vioxx for unapproved
uses, include, but are not limited to, your claims in your June 16, 2000 audio conference that,
"...COX-2 seems to be able to interfere with...programmed cell death. Therefore, you get this
increased cell growth which allows polps to form, cancer and then invasive cancer. And by blocking
COX-2 you can actually prevent the development of colon polyps, cancer and invasive cancer."
Additional examples include your claims that "So we tried it [Vioxx] after Vioxx was released and
really within one or two pills acute attacks of gout were being shut down," and "Specifically, if you
looked at potential uses of these drugs, the most exciting right now I guess in two areas, one is
Alzheimer's disease...."

## Press Release

We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety
Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above.
Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile,"
is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to
naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is
misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment
group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

MRK-AAF0007782

## Oral Representations

Merck sales representatives have engaged in false or misleading promotional activities that also minimize the potentially serious MI results observed in the VIGOR trial. Specifically, Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings. At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA), in Ocean City, Maryland, June 9 – June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works just like aspirin (i.e., inhibits clotting and platelet aggregation). In addition, during the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP), in Los Angeles, California, June 3 – June 6, 2001, your representative stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin. These statements made by your sales representatives are misleading for the reasons stated above.

## Conclusions and Requested Actions

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001. This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1. Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2. Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3. A written statement of your intent to comply with "1" and "2" above.

Your written response should be received no later than October 1, 2001. If you have any questions or comments, please contact Lesley Frank, Ph.D., JD, by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857. We remind you that only written communications are considered official.

MRK-AAF0007783

Raymond V. Gilmartin                                                        Page 8
Merck & Co., Inc.
NDA 21-042

In all future correspondence regarding this particular matter, please refer to MACMIS ID #9456 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list.  We are continuing to evaluate other aspects of your promotional campaign for Vioxx, and may determine that additional remedial messages will be necessary to fully correct the false or misleading messages resulting from your violative conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

                                        Sincerely,

                                        {See appended electronic signature page}

                                        Thomas W. Abrams, R.Ph., MBA
                                        Director
                                        Division of Drug Marketing,
                                         Advertising, and Communications

MRK-AAF0007784

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
/s/
--------------------
Thomas Abrams
9/17/01 03:19:22 PM
```

MRK-AAF0007785

# Exhibit E

**Burrelle's NEWSEXPRESS**
Page 1 of 2 (NTL52SWA)

Tue May 22, 2001
Appears On Page C1
Circulation: 1,110,143

**The New York Times**

# Doubts Are Raised on the Safety of 2 Popular Arthritis Drugs

By MELODY PETERSEN

Doctors are beginning to worry that Vioxx and Celebrex, two wildly popular arthritis drugs, may not be as safe as they were initially believed to be.

Research presented to the Food and Drug Administration earlier this year showed that patients taking Vioxx, a Merck & Company drug, had a higher, but still relatively low, risk of heart attacks than patients taking an older pain reliever. The study received little public attention at the time, but the F.D.A. is considering whether to add information on possible cardiovascular side effects to both drugs' labels.

Now Wall Street is becoming aware of the possible problems, with at least one analyst warning that the problem could particularly affect Merck.

The two drugs, which cause fewer ulcers than many other pain relievers, are among the best-selling medicines in the world. And both Pharmacia, which makes Celebrex, and Merck are heavily dependent on the drugs for the sales growth that Wall Street expects.

Celebrex is Pharmacia's biggest-selling drug, generating sales of $2.3 billion in the 12 months ending in March, according to IMS Health. Pfizer co-markets Celebrex with Pharmacia. Merck sold $1.7 billion of Vioxx in the same period, making it the company's second-biggest drug behind the cholesterol medicine Zocor.

Millions of Americans have tried Vioxx or Celebrex, many of them prompted to request them from doctors after seeing television advertisements paid for by the two companies, which are locked in a fierce marketing battle.

While the data is still limited, a large study sponsored by Merck last year showed that patients taking Vioxx had four times the risk of heart attacks of patients taking another pain reliever, naproxen, which is sold both generically and under the brand names Naprosyn or Aleve. The risk, which appears to increase over time, was still low, however, at about 4 heart attacks per 1,000 patients.

Merck says the research does not show a problem with Vioxx. Instead, the company says, naproxen acted to reduce heart attacks by working much like aspirin.

The information from Merck's study was presented to the Food and Drug Administration in February when the companies asked for changes on their drug labels to reflect data showing that Vioxx and Celebrex caused fewer ulcers than other pain relievers.

In an April 27 report, Richard R. Stover, a pharmaceutical industry analyst at Arnhold & S. Bleichroeder Inc., did his own analysis of what he called "disturbing data" from Merck's study. In an interview, Mr. Stover said he was warning his clients, many of them institutional investors who hold Merck shares, that they should watch the issue carefully since it could hurt the company's stock price.

Some doctors, however, say they are worried about both drugs.

Continued on Page 5

**Copyright © 2001**
**The New York Times**

Burrelle's NEWSEXPRESS
Page 2 of 2 (NTL52SWA)

Tue  May 22, 2001

**The New York Times**

"There must be a warning," said Dr. M. Michael Wolfe, chief of the gastroenterology section at the Boston University School of Medicine and a member of the F.D.A. advisory committee that reviewed the issue earlier this year.

"The marketing of these drugs is unbelievable," Dr. Wolfe added. "I'm sure there are many people out there who are taking these drugs that should not be."

Several doctors say they are worried about the possibility of heart attacks because many of the arthritis patients taking the drugs are elderly and have a higher risk of cardiovascular problems to begin with.

The current debate centers on whether the higher heart attack rate found in patients taking Vioxx is a result of the drug's actually causing damage in some patients or to an absence of the heart-protecting benefits that naproxen may have.

Merck's scientists say that naproxen appears to help reduce heart attacks by stopping or slowing the production of a substance called thromboxane. Thromboxane is thought to cause platelets in the blood to stick together, leading to blood clots.

"Naproxen had a similar antiplatelet effect to aspirin," said Dr. Eve E. Slater, senior vice president of external policy for Merck's research labs, "and those people had fewer heart attacks."

Neither Vioxx nor Celebrex have been shown to have the same heart-protecting benefit.

Dr. Slater also said that Mr. Stover's report was flawed and biased in favor of Pharmacia.

But regulators and some doctors say they still worry that there may be more of a problem with Vioxx.

And even if Vioxx and Celebrex do not damage the heart, the fact that they do not have the heart-protecting benefits of aspirin reduces the ability of the companies to market them as being significantly safer than other pain relievers.

In letters sent to physicians involved in Vioxx clinical trials, Merck recommended last year that doctors consider prescribing low doses of aspirin to patients taking Vioxx if they are at high risk of heart attacks. But those low doses of aspirin could increase the risk of ulcers — the main side effect that both Vioxx and Celebrex were developed to avoid.

The two drugs, known as Cox-2 inhibitors, have been shown to significantly reduce stomach ulcers compared with pain relievers like aspirin and ibuprofen. In rare cases, serious ulcers can lead to death.

So far, no studies have been done to measure whether patients have fewer ulcers if they take low doses of aspirin with either Vioxx or Celebrex.

At an F.D.A. advisory meeting in February, Dr. Maria Lourdes Villalba, a medical officer at the agency, summed up her analysis of Merck's study, saying that the company had proved that Vioxx, which is known generically as rofecoxib, caused fewer serious ulcers than naproxen. But she said that in her opinion, the potential safety advantage was offset by a higher risk of heart problems.

"Over all, there was no safety superiority of rofecoxib over naproxen," Dr. Villalba concluded, "mainly due to an excess of serious cardiovascular events."

Dr. Villalba said that because there were no studies that proved Merck's theory that naproxen worked like aspirin to decrease heart attacks, the F.D.A. was concerned that the higher rate of heart attacks found with Vioxx might have been caused by the drug's producing blood clots.

Both Merck and Pharmacia say that patients taking either Vioxx or Celebrex and low doses of aspirin will still have fewer ulcers than if they were taking a drug combination like ibuprofen and aspirin.

Dr. G. Steven Geis, Pharmacia's vice president for arthritis and cardiovascular clinical research, said, "We believe that if a patient is on low-dose aspirin and needs a drug for arthritis, celecoxib is a good option."

Celecoxib is the generic name for Celebrex.

Dr. Slater of Merck said, "There is still a tremendous benefit with these drugs."

Source: https://www.industrydocuments.ucsf.edu/docs/qpgw0217

# Exhibit F

# How Vioxx Exposed Conflicts of Interest at the Food and Drug Administration and The New England Journal of Medicine

### HARVEY BERMAN*

## ABSTRACT

This paper analyzes the twelve-month period between August 2000 and August 2001 during which Merck & Co. launched an aggressive marketing campaign for its new anti-inflammatory drug, Vioxx (rofecoxib), published its seminal VIGOR (Vioxx gastrointestinal outcomes research) study in *The New England Journal of Medicine* (NEJM), and applied to FDA to extend the clinical indications of Vioxx to include rheumatoid arthritis. This paper examines the VIGOR study as it was published, analyzes the deliberations of the *ad hoc* Arthritis Advisory Committee convened by FDA in February 2001, and, based on internal e-mails within Merck & Co., exposes what Merck & Co. scientists knew about the increased risk of heart attacks attributable to Vioxx. This paper demonstrates the following: 1) that Merck & Co.'s VIGOR study contained critical defects that should have been obvious to a careful editor; 2) that the study did not merit publication; 3) that the *ad hoc* Arthritis Advisory Committee sidestepped its responsibility to acknowledge the increased cardiovascular risk of the drug; and 4) that Merck & Co. knew of these increased risks while actively promoting the drug. Had the outcomes been different at the NEJM or the *ad hoc* Arthritis Advisory Committee, Vioxx would not have been approved, further systematic studies on cardiovascular risk would have been mandated, and thousands of lives might have been spared the risks of fatal and non-fatal heart attacks clearly known but deliberately obscured, misrepresented, and dismissed by each of the participants.

## INTRODUCTION

In August 2000, American figure skating star Dorothy Hamill appeared on *Larry King Live* to discuss, among other topics, her battle with rheumatoid arthritis and its effect on her career and personal life. The skater described a new drug she was taking, called Vioxx. As Ms. Hamill said, before taking Vioxx she "felt old, . . . depressed, . . . [and] tired all the time. . . . [A]nd my doctor prescribed Vioxx for me, and it's as

* PhD, MPH. Associate Professor, Department of Pharmacology and Toxicology at the Jacobs School of Medicine and Biomedical Sciences. The author thanks the following readers for their comments on different versions of this manuscript: Jess Alderman, MD, JD, Dennis Bertram, MD, William Scheider, PhD, and Stan Halvorsen, PhD; Nell Aronoff, MLS (Medicine) and Marcia Zubrow, MLS (Law) for assistance in searching different databases; Don Trainor for rendering the artwork in Figure 1; David M. Holmes, MD and Kim Griswold, MD for helpful resources on the practice of family medicine; and the Buffalo campus of the *Romanell Center for Clinical Ethics and the Philosophy of Medicine* for hosting preliminary presentations of this paper.

if I've been given a new life . . . it's just been amazing."[1] Although it appeared to be a casual conversation, Hamill's testimony on *Larry King Live* was, in fact, a tightly scripted, well-rehearsed recitation produced and written by Merck & Co., the maker of Vioxx.[2] The audience had no idea that Hamill's presence on *Larry King Live* was orchestrated by Merck & Co. Missing from that presentation was any mention of the measurable risk of fatal heart attacks associated with Vioxx.

Vioxx (rofecoxib), approved by FDA for osteoarthritis treatment and introduced to the market on May 24, 1999, was destined to be a blockbuster drug, an entity that would earn Merck & Co. and its shareholders billions of dollars. The prevalence of arthritis was increasing among an aging population, and existing NSAIDs (nonsteroidal anti-inflammatory drugs) carried potential for fatal gastrointestinal bleeding.[3] Vioxx, it was thought, could effectively address the effects of inflammation without causing gastrointestinal problems. Describing Vioxx as a miracle drug, Merck & Co. advertised "Everyday Victories" won by ordinary people over debilitating pain.[4] Millions of prescriptions were written for the drug, which earned Merck & Co. more than $2.5 billion annually.[5] As such, it was a surprise when, five and half years after its launch, Merck & Co. signaled on September 30, 2004 that it was voluntarily withdrawing Vioxx from the marketplace, citing an increased risk of myocardial infarctions in patients taking the drug.[6] This worldwide recall of Vioxx[7] was described as "the largest drug withdrawal in history,"[8] made by one of the oldest and most established drug manufacturers in the world.[9]

Since its origins in the seventeenth century, Merck & Co. had prided itself on its safety record, never having to recall a drug in the United States.[10] What went wrong?

---

[1] *Larry King Live: What's the Best Way to Combat Arthritis?* (CNN television broadcast Aug. 29, 2000), http://transcripts.cnn.com/TRANSCRIPTS/0008/29/lkl.00.html [https://perma.cc/5LN9-SY96].

[2] THOMAS J. NESI, POISON PILLS: THE UNTOLD STORY OF THE VIOXX DRUG SCANDAL, 20–26 (Thomas Dunne Books 1st ed. 2008).

[3] Ángel Lanas, Patricia Carrera-Lasfuentes, Yolanda Arguedas, Santiago García, Luis Bujanda, Xavier Calvet, Julio Ponce, Ángeles Perez-Aísa, Manuel Castro, Maria Muñoz, Carlos Sostres, Luis A García-Rodríguez, *Risk of Upper and Lower Gastrointestinal Bleeding in Patients Taking Nonsteroidal Anti-Inflammatory Drugs, Antiplatelet Agents, or Anticoagulants*, 13 CLIN. GASTROENTEROL HEPATOL 209–19 (2015).

[4] NESI, *supra* note 2, at 20. "Everyday Victories" was a television commercial for Vioxx featuring Dorothy Hamill.

[5] *Id.* at 11; Peter Juni, Linda Nartey, Stephan Reichenbach, Rebekka Sterchi, Paul A. Dieppe & Matthias Egger, *Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis*, 364 LANCET 2021–2029 (2004). *See also* Eric J. Topol, *Failing the Public Health: Rofecoxib, Merck and the FDA*, 351 NEW ENG. J. MED., 1707–09 (2004).

[6] Associated Press, *Merck Announces Withdrawal of Vioxx Painkiller*, N.Y. TIMES, Sept. 30, 2004, https://www.nytimes.com/2004/09/30/business/merck-announces-withdrawal-of-vioxx-painkiller.htm. [https://perma.cc/TU5X-KNUM].

[7] Press Release, Merck, Merck Announces Voluntary Worldwide Withdrawal of VIOXX® (Sept. 30, 2004), https://web.archive.org/web/20120417053059/http://www.merck.com/newsroom/vioxx/pdf/vioxx_press_release_final.pdf [https://perma.cc/L67Y-TQ7E].

[8] NESI, *supra* note 2, at 12; *See also* Bloomberg News, *FDA Report Links Vioxx to 27,785 Heart Attacks, Deaths*, BALTIMORE SUN (Nov. 3, 2004), https://www.baltimoresun.com/news/bs-xpm-2004-11-03-0411030332-story.html [https://perma.cc/T2EB-FX8B].

[9] FRAN HAWTHORNE, THE MERCK DRUGGERNAUT: THE INSIDE STORY OF A PHARMACEUTICAL GIANT 19–49 (John Wiley & Sons 2003).

[10] *Id.* at 14.

FOOD AND DRUG LAW JOURNAL

Why was Vioxx withdrawn after five-plus years on the market? Its safety profile was published in *The New England Journal of Medicine* (NEJM), one of the most prestigious and venerable medical journals in the world and, if adverse reactions to Vioxx were so prevalent, why had it not been flagged when it underwent editorial review in the *Journal*? Did Merck & Co. know of this cardiovascular risk, and if so, when?[11]

Cardiovascular disease is a leading cause of death in the United States,[12] so recognizing an event as common as heart attack and asking whether it is attributable to a single drug intervention is less obvious than recognizing a rare event. Perhaps the more appropriate question, considering that rheumatoid arthritis is an inflammatory disease typically accompanied by cardiovascular disease,[13] is whether Merck & Co. should have *expected* the possibility of myocardial infarctions and been prepared to monitor their incidence.

This paper addresses the approval of Vioxx and the underlying research supporting or opposing that approval through a focus on the VIGOR trial (Vioxx Gastrointestinal Outcomes Research) published in NEJM on November 23, 2000.[14]

Today, there is an extensive cache of data that chronicles the development of Vioxx, its path to approval, and its eventual withdrawal by Merck & Co. In addition to the published VIGOR study, the complete data set on which the VIGOR studies were based is available through FDA, allowing comparison of published and unpublished data. The contents of internal e-mails among Merck & Co. employees as disclosed in Vioxx personal injury litigation are also available.[15] These e-mails allow one to assess what company officials knew prior to publishing the VIGOR study, how they deliberated prior to presenting their data before FDA advisory panels, and how these deliberations affected their marketing strategy during the time Vioxx was on the market. In short, we have a window on the forthrightness of one of the world's most prominent and respected pharmaceutical manufacturers and which division of the company—its marketing division or research scientists—controlled when to release a potential blockbuster drug. In a similar vein, one can gauge what FDA understood of the Merck & Co. data and the actions it took to ensure the public's safety. Vioxx drew

---

[11] Vioxx (rofecoxib) and Celebrex (celecoxib) are a class of drug known as inhibitors of cyclo-oxygenase 2, or COX-2 inhibitors, sometimes referred to as "coxibs."

[12] Melonie Heron, *Deaths: Leading Causes for 2015*, 66 NAT'L VITAL STAT. REP. 1–76 (2017).

[13] Nicola Goodson, *Coronary Artery Disease and Rheumatoid Arthritis*, 14 CURRENT OPINION IN RHEUMATOLOGY 115 (2002).

[14] Claire Bombardier, Loren Laine, Alise Reicin, Deborah Shapiro, Ruben Burgos-Vargas, Barry Davis, Richard Day, Marcos Bosi Ferraz, Christopher J. Hawkey, Marc C. Hochberg, Tore K. Kvien & Thomas J. Schnitzer, *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW ENG. J. MED. 1520 (2000). It will also be of interest to keep in mind, but discussed here only obliquely, the CLASS study (Celecoxib Long-term Arthritis Safety Study) published only two months earlier in the *Journal of the American Medical Association* by a group from Pfizer concerning their COX-2 inhibitor, Celebrex (celecoxib). Fred E. Silverstein, Gerald Faich, Jay L. Goldstein, Lee S. Simon, Theodore Pincus, Andrew Whelton, Robert Makuch, Glenn Eisen, Naurang M. Agrawal, William F. Stenson, Aimee M. Burr, William W. Zhao, Jeffrey D. Kent, James B. Lefkowith, Kenneth M. Verburg & G. Steven Geis, *Gastrointestinal Toxicity with Celecoxib vs Nonsteroidal Anti-Inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial*, 284 J. AM. MED. ASS'N 1247 (2000).

[15] Alex Berenson, *Vioxx Verdict Raises Profile of Texas Lawyer*, N.Y. TIMES (Aug. 22, 2005), https://www.nytimes.com/2005/08/22/business/vioxx-verdict-raises-profile-of-texas-lawyer.html [https://perma.cc/F4EU-MZGZ].

attention by virtue of its publication in NEJM. By examining the VIGOR trial, one can evaluate the integrity of editorial review at NEJM.

## I.    THE VIGOR TRIAL AND ITS PUBLICATION IN THE NEW ENGLAND JOURNAL OF MEDICINE

The editors at NEJM were lax in their review of VIGOR, and as published in the *Journal*, the VIGOR study suffered from several fatal and misleading flaws. First, the authors of the study referenced the relative risk for gastrointestinal effects of Vioxx relative to naproxen; in contrast, they inverted the expression of relative risk of subjects experiencing a heart attack by comparing naproxen relative to Vioxx, obscuring the magnitude of the cardiovascular events (*See* Equations 1 and 2, below). Second, in providing a single statement of cardiovascular risk within the text, the authors diminished the significance of such cardiovascular events. Third, the authors explained that any increased cardiovascular events were unrelated to action of Vioxx but were related to a theory that naproxen was cardioprotective, offering this without any supporting evidence. Each of these flaws was obvious, and the editors should have noted them and either challenged the authors to provide more information or rejected the study until further information was available.

The object of the VIGOR trial was not to determine the efficacy of Vioxx, something that had been evaluated two years earlier in a Phase III study conducted by Merck & Co.,[16] but to assess its gastrointestinal safety, which would separate the COX-2 inhibitors such as Vioxx from the traditional NSAIDs such as naproxen. The VIGOR trial also served as the basis for a supplemental New Drug Application (sNDA) through which Merck & Co. requested a label change to delete any reference to adverse gastrointestinal side effects and to extend indications for Vioxx to include rheumatoid arthritis, thereby improving marketing strategies.[17]

The VIGOR study was a double-blind, randomized, clinical trial in which 8,076 patients with rheumatoid arthritis were monitored with the aim of comparing the gastrointestinal safety of rofecoxib (50 mg per day), twice the dose approved by FDA for treatment of osteoarthritis, to naproxen (500 mg, two-times per day).[18]

The adverse gastrointestinal effects of Vioxx were measured according to two separate endpoints. The first endpoint focused on three features: *upper gastrointestinal bleeding*, as identified through endoscopy, an upper gastrointestinal barium x-ray, or the presence of blood in stools; *upper gastrointestinal perforation*, defined as an opening in the stomach or duodenal wall requiring surgical or laparoscopic repair; and *gastric outlet obstruction*, defined as a tight edematous pylorus, or inability to insert an endoscope tip as based on the clinical opinions of attending physicians after

---

[16] Vioxx was approved for treatment of acute pain, dysmenorrhea, and osteoarthritis on May 20, 1999. U.S. FOOD & DRUG ADMIN., DRUG APPROVAL PACKAGE: VIOXX (ROFECOXIB) TABLETS & SUSPENSION, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2002/21-042s007_Vioxx.cfm   [https://perma.cc/JX B8-L53Z] (2002). Of note here is that in her promotion of Vioxx, Dorothy Hamill suffered from rheumatoid arthritis, not osteoarthritis. As such, she was prescribed Vioxx off-label.

[17] *See* Scott Gottlieb, *FDA Refuses Companies' Request to Drop Ulcer Warning*, 322 BMJ 385 (2001).

[18] Bombardier et al., *supra* note 14.

endoscopic examination.[19] This triad—bleeding, perforation, and obstruction—is described as a *complicated* gastrointestinal adverse event.[20]

The second endpoint also has three features: *symptomatic* gastroduodenal ulcers, reduced hemoglobin count, and the presence of orthostatic hypotension.[21] Symptomatic ulcers, while more common than upper gastrointestinal complications, are far less serious.[22] Yet these and other symptoms (dyspepsia, abdominal pain, epigastric discomfort, nausea, and heartburn) are typically responsible for patients electing to discontinue treatment.[23] It is important to note that the presence of symptomatic signs does not correlate with development of complicated gastrointestinal symptoms.

The VIGOR study came to two broad conclusions concerning gastrointestinal safety. First, the long-term use of rofecoxib, at twice the maximal dose approved by FDA, led to "significantly lower rates of clinically important upper gastrointestinal events and complicated upper gastrointestinal events" than did twice-daily treatment with standard doses of the nonselective COX inhibitor naproxen.[24] Second, the "incidence of complicated upper gastrointestinal bleeding and bleeding from beyond the duodenum was significantly lower among patients who received rofecoxib."[25]

Treatment with rofecoxib was associated with an approximately two-fold reduction in upper gastrointestinal effects (relative risk = 0.5), upper gastrointestinal complications (relative risk = 0.4), and upper (relative risk = 0.4) and lower (relative risk = 0.5) gastrointestinal bleeding (Equation 1).[26] That is, the beneficial gastrointestinal response to rofecoxib with respect to the primary outcome—bleeding, gastrointestinal perforations, or obstruction—was reduced relative to that for naproxen.[27] Based on the analyses of risk and the time-to-event data, FDA reviewers agreed that Merck & Co. scientists had "successfully demonstrated a risk reduction of clinically relevant GI adverse events for [the population taking] rofecoxib compared to [that taking] naproxen."[28]

$$\text{Equation 1.} \qquad \text{Relative Risk} = \frac{\text{Vioxx}}{\text{Naproxen}} = 0.5$$

---

[19] *Id.* at 1521–22.

[20] *Id.*

[21] *Id.*

[22] U.S. FOOD & DRUG ADMIN., FDA ADVISORY COMMITTEE BRIEFING DOCUMENT: NDA 21-042, s007, VIOXX GASTROINTESTINAL SAFETY (2001), https://web.archive.org/web/20180127041342/https:/www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_03_med.doc [https://perma.cc/JXB8-L53Z].

[23] Bombardier et al., *supra* note 14, at 1524.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 1522.

[27] U.S. FOOD & DRUG ADMIN, STATISTICAL REVIEWER BRIEFING DOCUMENT FOR THE ADVISORY COMMITTEE, https://web.archive.org/web/20180127041347/https:/www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_04_stats.doc [ https://perma.cc/JYM7-XLBP].

[28] FDA ADVISORY COMMITTEE BRIEFING DOCUMENT: NDA 21-042, *supra* note 22, at 11.

However, systemic chronic inflammation predisposes patients with rheumatoid arthritis to an increased risk of cardiovascular disease. Such accompanying cardiovascular comorbidity raises questions of Vioxx safety in patients with rheumatoid arthritis,[29] and would be expected to be front and center in safety studies on patients with rheumatoid arthritis, yet it was not mentioned.

Buried in the text of the VIGOR study was the sole statement concerning cardiovascular effects: "Myocardial infarctions were less common in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent) . . . relative risk, 0.2"[30] (Equation 2). The structure of this statement is peculiar; while the authors reported the risk of adverse gastrointestinal effects of rofecoxib in reference to those elicited by naproxen, which is the usual way of addressing risk relative to a comparator, they inverted the analysis and reported the risk of the comparator relative to that of the study drug, i.e., *risk of myocardial infarction with naproxen relative to rofecoxib.* There is no logical/reasonable/discernable explanation for expressing risk in this manner, but it obscures the significance of the finding that heart attacks were almost five times more common in the rofecoxib than in the naproxen group.

$$\text{Equation 2.} \qquad \text{Relative Risk} = \frac{\text{Naproxen}}{\text{Vioxx}} = 0.2$$

Little additional information or analysis of the cardiovascular risk was presented until the penultimate paragraph, wherein the authors conjectured that the decreased risk associated with naproxen was attributable to "the theory" that naproxen exerted an otherwise unknown "coronary protective effect" due to a "potent antiplatelet aggregation effect" and rofecoxib, as a COX-2 selective inhibitor, lacked this effect.[31] The VIGOR authors explain the balance of myocardial infarctions in favor of naproxen as being due to its antiplatelet effect rather than the possible pro-thrombotic effects of rofecoxib. As Dr. S. L. Targum, a consultant-scientist at FDA, notes, "[t]his hypothesis is not supported by any prospective placebo-controlled trials with naproxen."[32] Regardless of the underlying mechanism, and with respect to cardiovascular safety, "the results . . . are favorable for naproxen," prompting the conclusion that "naproxen would be the underlined drug."[33]

The data Merck & Co. submitted to FDA for the sNDA but did not include in the published VIGOR study reveals a more alarming safety concern. According to the Kaplan-Meier plot Merck & Co. submitted as part of their sNDA package, reporting the incidence of myocardial infarctions on the y-axis as an explicit function of time on

---

[29] Goodson, *supra* note 13.

[30] Bombardier et al., *supra* note 14, at 1523.

[31] *Id.*

[32] Memorandum from Shari L. Targum, Med. Officer, Division of Cardio-Renal Drug Products, U.S. Food & Drug Admin., to Sandra Cook, Project Manager, and Maria L. Villalba, Med. Officer, Div. of Anti-Inflammatory Drug Products, U.S. Food & Drug Admin., Consultation NDA 21-042, S-007 Review of Cardiovascular Safety Database 23 (Feb. 1, 2001), https://web.archive.org/web/20180127041412/https://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.doc [https://perma.cc/TND2-5HV4].

[33] *Id.* at 12 (underlining in original).

the x-axis (Figure 1)[34] the risk of developing a cardiovascular event during treatment with Vioxx was 2.37 times greater than during treatment with naproxen (p=0.0016; CI, 1.39, 4.06). The incidence of myocardial infarction increased with time in a nonlinear manner, a greater incidence appearing after only three to four months of treatment, and an even sharper deviation beginning at eight months of treatment.[35] That is to say, adverse cardiovascular effects are observed after a relatively short course of treatment with Vioxx.

*FIGURE 1: Kaplan-Meier Plot Relating Incidence of Myocardial Infarctions Versus Time of Treatment with Rofecoxib (Vioxx) and Naproxen*



*Figure 1. Kaplan-Meier (time-to-event) plot illustrating the cumulative incidence (%) of myocardial infarctions as an explicit function of time over a duration of twelve months in patients with rheumatoid arthritis as reported in the VIGOR study. This figure is taken from Qian Li (supra note 27, at 12). The downward (black) arrows denote times at three- and eight-months duration of Vioxx (rofecoxib) treatment where the incidence of myocardial infarctions increases in a nonlinear manner. The upward (grey) arrow denotes the time of 5.5 months duration of naproxen treatment where the increase in myocardial infarctions is observed to increase.*

Also, aspirin use was not permitted in this study. Patients requiring low-dose aspirin for reasons of cardiac health were excluded, as were patients at increased risk of mortality from cardiovascular disease (angina, congestive heart failure, myocardial

---

[34] FDA ADVISORY COMMITTEE BRIEFING DOCUMENT: NDA 21-042, *supra* note 27, at 12.

[35] *Id.* at 12.

infarction, coronary artery bypass surgery, stroke, and uncontrolled hypertension).[36] Thus, the VIGOR trial demonstrated significantly increased cardiovascular events, even while it excluded those most at risk for these events, patients with rheumatoid arthritis and cardiovascular disease who were most likely to use the drug. Thus, the use of Vioxx within the less homogeneous general population might lead to significantly greater incidence of myocardial infarction and stroke, a public health problem of unimaginable proportions.

To add to these factors, the study of Vioxx at a single dose (50 mg per day) when the effective dose is not known, and against a single comparator (naproxen, 500 mg, two-times per day), raises concerns of so-called dose-creep, where the patient increases the dose of the analgesic (pain reliever) on the mistaken notion that the drug is safe; this is a potential safety issue. With this as background one can now examine the manuscript as reviewed by NEJM.

## II.   THE NEW ENGLAND JOURNAL OF MEDICINE PUBLISHES AN "EXPRESSION OF CONCERN"

What can be said about the care exercised in the *Journal's* review of the VIGOR trial and the *Journal's* scientific evaluation prior to publication? First, the inverted expression of cardiovascular risk attributable to Vioxx relative to naproxen (Equation 2) is peculiar, in that it obfuscates the risk of cardiovascular effects of Vioxx. Second, minimal discussion of cardiovascular risks within the middle of the text—providing no more detail and with wording no different from that in the abstract—diminishes the significance of such risks. Third, the idea of a "theory" in which naproxen provides a coronary protective effect was offered with no corroborating citations. The style and structure of the narrative, the presentation of the data, and offering theories without supporting documentation should have been obvious to a careful reviewer or editor. These oddities supported—or at least did not adversely impact—the interests of Merck & Co.

Having published the VIGOR trial in November 2000, the *Journal* eventually published an "expression of concern" in December 2005.[37] This was at a time when litigation was moving from depositions into the trial phase.

As suggested by e-mails at NEJM's editorial offices, the concern was less about apprehension for the public's health than potential criticism against the *Journal* for oversights in its review of the VIGOR trial.[38] The *Journal* feared that its reviewers and editors had not critically questioned the limited description concerning cardiovascular events or the coronary protective effect attributed to naproxen, particularly since the VIGOR authors had offered no evidence in support of such an idea. Moreover, NEJM's editor, Gregory Curfman, acknowledged that "lax editing might have helped the authors make misleading claims in the article."[39] Further, he disclosed that after

---

[36] For information on cardiovascular disease, see Ctr. for Disease Control & Prevention, *About Heart Disease*, https://www.cdc.gov/heartdisease/about.htm [https://perma.cc/HV9P-ACLN].

[37] Gregory D. Curfman, Stephen Morrissey & Jeffrey M Drazen, *Expression of Concern: Bombardier et al., "Comparison of upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,"* 353 NEW ENG. J. MED. 2813 (2005).

[38] David Armstrong, *How The New England Journal Missed Warning Signs on Vioxx.*, WALL ST. J. (May 15, 2006), https://www.wsj.com/articles/SB114765430315252591 [https://perma.cc/W4VS-ZL37].

[39] *Id.*

publication of the VIGOR trial, the *Journal* sold 929,000 reprints of the article, mostly to Merck & Co., earning the *Journal* additional revenue of between $697,000 and $836,000.[40]

In their expression of concern, the editors asserted that they "recently obtained information regarding inaccuracies in data" in the published VIGOR trial. They drew attention to a belated finding of three additional myocardial infarctions in the Vioxx group that had been unaccounted for in the 2000 submission to the *Journal*, and which Merck & Co. was aware of but failed to include in the published data.[41] The editors had become aware of these three additional myocardial infarctions in 2001 but took refuge in the fact that at least two of the Merck & Co. authors were also aware of them. Accordingly, the editors explain, "certain calculations and conclusions in the article [are] incorrect."[42] In particular, the editors reported the relative risk of 4.25 without the three unreported myocardial infarctions, and a relative risk of 5.00 when those three were included, concluding that the published article resulted in an "understatement of the difference in risk of myocardial infarction between the rofecoxib [Vioxx] and naproxen groups." In either calculation, risk of cardiovascular events indicates an increased danger of myocardial infarctions, something the editors did not criticize during their review of the VIGOR manuscript.[43]

In spite of their 2005 statement, the editors' arguments are not entirely convincing. First, they ignore obvious deficiencies in their own review of the manuscript, instead relying on the rationalization that "at least two of the [Merck] authors" knew of the three additional cases of myocardial infarction and could have included this information in the original submission.[44]

Second, the editors criticize the VIGOR authors for including in the 2000 manuscript only "summary percentages, not actual numbers of myocardial infarctions." A careful editorial review would have required the authors to provide precise numbers. The *Journal* had the responsibility and were in a position to request additional data and clarification prior to publication.

## III. PROCEEDINGS OF THE *AD HOC* ARTHRITIS ADVISORY COMMITTEE, FEBRUARY 2001

FDA authority and its powers of enforcement are derived from the Federal Food, Drug, and Cosmetic Act of 1938, providing for enforcement against drugs that are

---

[40] *Id.*

[41] Curfman et al., *supra* note 37.

[42] *Id.*

[43] As far as the Merck & Co. authors were concerned, the inclusion of three additional myocardial infarctions "[did] not suggest a difference in the conclusions" between the published data and the updated data. Yet, in contrast to their contentions in the VIGOR paper, the Merck & Co. authors acknowledged that the Vioxx-treated group demonstrated a significant risk of myocardial infarction. Claire Bombardier, Loren Laine, Ruben Burgos-Vargas, Barry Davis, Richard Day, Marcos Bosi Ferraz, Christopher J. Hawkey, Marc C. Hochberg, Tore K. Kvien, Thomas J. Schnitzer & Arthur Weaver, *Response to Expression of Concern Regarding VIGOR Study*, 354 NEW ENG. J. MED. 1196 (2006).

[44] Curfman et al., *supra* note 37, at 2813.

adulterated or misbranded.[45] The legal concept of a drug, whether it is adulterated or misbranded, depends in large part on the representations by the drug manufacturer on the label and packaging, including drug contents, putative inert ingredients, indications, adverse effects, and directions for use. While the problems with Vioxx had nothing to do with adulteration and misbranding, they had much to do with how the drug was represented by Merck & Co. to physicians, patients, *Journal* editors, and the lay press.

Merck & Co.'s principal interest in conducting the VIGOR study and in submitting the sNDA in 2001 was to change the allowable wording on the Vioxx label. Another purpose for the sNDA was to expand the indications for use of Vioxx, to include not only osteoarthritis but rheumatoid arthritis as well.

The *ad hoc* Arthritis Advisory Committee convened by FDA in February 2001 took up the matter of changing the label, expanding drug indications, and assessing Vioxx safety, and was a linchpin in the lifeline of Vioxx. The meeting took place over two days and discussed Celebrex (celecoxib) (February 7, 2001)[46] and Vioxx (rofecoxib) (February 8, 2001).[47] In attendance were scientists from FDA (both days),[48] Pfizer's subsidiary G.D. Searle (first day), and Merck & Co. (second day),[49] as well as ten invited consultant-experts, including the Acting Chair, E. Nigel Harris, Dean of the Morehouse School of Medicine.[50] Before each day's meeting, the staff secretary read

[45] Scott Bass and William McConagha, *FDA Enforcement Powers*, *in* FOOD AND DRUG LAW AND REGULATION 727–33 (David G. Adams, Richard M. Cooper, Martin J. Hahn & Jonathan S. Kahan eds., 2015); 21 U.S.C. § 351 (2013); Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 352 (2013).

[46] Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 1–99 (Feb. 7, 2001), wayback.archive-it.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t1_01.pdf/ [https://perma.cc/P6KR-YJYY]; Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 100–99 (Feb. 7, 2001) wayback.archive-it.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t1_02.pdf/ [https://perma.cc/QTC6-SHV9]; Ctr. for Drug Evaluation and Research, FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 200–37 (Feb. 7, 2001) wayback.archiverit.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t1_03.pdf/ [https://perma.cc/9B82-A8YB].

[47] Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 1–99 (Feb. 8, 2001), wayback.archive-it.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2_01.pdf/ [https://perma.cc/47YN-3UBJ]; Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 100–99 (Feb. 8, 2001), wayback.archive-it.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2_02.pdf/ [https://perma.cc/2BWR-M4CX]; Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., Transcript of Arthritis Advisory Committee Meeting 200–37 (Feb. 8, 2001), wayback.archive-it.org/7993/20170404100826/https://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2_03.pdf/ [https://perma.cc/A93C-NK6B].

[48] Speakers for FDA were Dr. Lawrence Goldkind, a gastroenterologist; Dr. Shari Targum, a cardiologist; and Dr. Qian Li, a biostatistician.

[49] Representatives from Merck & Co. included Dr. Bonnie Goldman, from its Department of Regulatory Affairs, and she introduced two speakers: Dr. Alan Nies, a clinical pharmacologist, and Dr. Alise Reicin, a research scientist who was part of the VIGOR study. Also, Dr. Goldman described Merck & Co.'s intention in submitting the sNDA to extend the use of Vioxx to patients with rheumatoid arthritis, and that the "highly significant results [on GI safety] merit modification of the product label to reflect a more appropriate presentation of the demonstrated GI safety" of Vioxx. Ctr. for Drug Evaluation and Research, *supra* note 47–48; *see also* Ctr. for Drug Evaluation and Research, U.S. FOOD & DRUG ADMIN., *Arthritis Advisory Committee Proceeding*, 9 (Feb. 8, 2001) (print version).

[50] The other consultant experts were Janet Elashoff, PhD; David Wofsy, MD; Steven Nissen, MD; Ileana Pina, MD; M. Michael Wolfe, MD; Allan R. Sampson, MD; Frank E. Harrell, Jr., PhD; and Byron Cryer, MD. In addition, standing members of the advisory committee were Leigh F. Callahan, MD and

FOOD AND DRUG LAW JOURNAL                    VOL. 75

a statement concerning the "issue of conflict of interest with regard to this meeting," adding that "in accordance with 18 United States Code 208(b), full waivers have been granted to Drs. Frank Harrell, Steven Nissen, Ileana Pina, M. Michael Wolfe and Allan Sampson."[51] The secretary went on to say that FDA wishes to "disclose for the record that Dr. Steven Nissen, Ileana Pina, H. James Williams and M. Michael Wolfe have interests which do not constitute a financial interest,"[52] "but which could create the appearance of a conflict."[53] Nevertheless, Drs. Nissen, Pina, Williams, and Wolfe were granted permission to participate in the discussion on Vioxx because the "agency has determined, notwithstanding these interests, that the interest of the government in their participation outweighs the concern that the integrity of the agency's programs and operations may be questioned."[54] We know from these waivers that the participation of the six individuals engendered a conflict of interest, but we are not privy to the nature of the conflict or conflicts. Often, such conflicts of interest involve ownership of stock in excess of a certain worth or the promise of stock options, speaker fees, consultant fees, or grants to conduct research on a drug company's products.[55]

Another consultant, Byron Cryer, described as a "guest expert," also had "reported interests which we believe should be made public to allow the participants to objectively evaluate his comments."[56] In 1997, Dr. Cryer had received a research grant from Merck & Co. to conduct a small clinical study on rofecoxib; he had been (it is not clear if he was at the time of the meeting) a paid consultant for work on celecoxib (Celebrex) and rofecoxib (Vioxx); and he had received speaking fees on behalf of a number of drug manufacturers including G.D. Searle, Pfizer, and Merck & Co.[57]

Of the ten invited reviewers, seven had unspecified interests in products from the companies they were about to evaluate, although the nature and degree of the interests were not specified.[58] Of significance, as Harris and Berenson noted in *The New York Times*, those individuals with financial ties to either Merck & Co. or Pfizer voted to approve Vioxx.[59] The conflicts of interest in this case were significant because the

---

James H. Williams, MD. Ctr. for Drug Evaluation and Research, *supra* note 46, at 2–3; Ctr. for Drug Evaluation and Research, *supra* note 47, at 2.

[51] *Id.* at 4.

[52] *Id.* at 5.

[53] *Id.* at 5. This statute, 18 U.S.C. § 208(b), part of the criminal code, allows that penalties will not be exacted against an individual appointed to serve on an advisory committee if he "makes full disclosure of the financial interest," 18 U.S.C. § 208(b)(1), and if the official making the appointment "certifies in writing that the need for the individual's services outweighs the potential for a conflict of interest created by the financial interest involved," 18 U.S.C. § 208(b)(3).

[54] *FDA Advisory Committees: Financial Conflicts of Interest Overview*, U.S. FOOD & DRUG ADMIN., Slide 9, https://www.fda.gov/media/87421/download [https://perma.cc/FTK3-WZSM] (last accessed Feb. 13, 2021).

[55] *Id.* at Slide 3.

[56] Ctr. for Drug Evaluation and Research, *supra* note 47, at 5.

[57] Ctr. for Drug Evaluation and Research, *supra* note 47, at 4–5.

[58] I indicate that seven individuals—Harrell, Nissen, Pina, Wolfe, Sampson, Williams, Cryer—were identified as having conflicts of interest, but am unable to identify the eighth individual mentioned by Harris and Berenson (2005). *See infra* note 59.

[59] Gardiner Harris & Alex Berenson, *10 Voters on Panel Backing Pain Pills Had Industry Ties*, N.Y. TIMES (Feb. 25, 2005), https://www.nytimes.com/2005/02/25/politics/10-voters-on-panel-backing-pain-pills-had-industry-ties.html [https://perma.cc/66GZ-3JQJ].

Committee was asked to evaluate not the drug efficacy, which had been evaluated three years earlier, but to determine the drug's safety, requiring an evaluation not just of benefit but of risk, leaving a large margin for subjective bias.

Noteworthy, too, is that the advisory committee comprised experts on arthritis (Elashoff and Wofsy), cardiovascular and renal drugs (Nissen and Pina), gastrointestinal drugs (Wolfe), endocrine and metabolic drugs (Sampson), and a biostatistician (Harrell). The committee lacked a primary care physician defined as, among others, an internist or a practitioner of family medicine.[60] Such physicians provide coordinated, long-term care, not merely disease-oriented care, for individuals and families irrespective of age, gender, or disease status, and guide their patients to specialized care when deemed necessary.[61]

As previously stated, the principal questions concerned whether to change the Vioxx label with respect to gastrointestinal and cardiovascular safety, how to advise physicians about supplementing Vioxx with low-dose aspirin, how to balance gastrointestinal benefit and cardiovascular risk, and whether further studies were warranted.[62]

As for gastrointestinal safety, there was uniform agreement that Vioxx was safer on the stomach than traditional NSAIDs.[63] With respect to cardiovascular safety, Alise Reicin, a Merck & Co. scientist, described the increased incidence of cardiovascular events in the Vioxx-treated group relative to naproxen, claiming that the "risk of sustaining a cardiovascular event on rofecoxib is similar to placebo and to NSAIDs" lacking antiplatelet activity.[64] Merck & Co. had not previously acknowledged such a result. The Committee ignored the statement and continued its deliberations. Dr. Steven Nissen, Chief of Cardiovascular Medicine at the Cleveland Clinic, noted that there was an unequivocal increase in "hard endpoints" of myocardial infarction, cardiovascular death, and stroke.[65] The question, he asked, was whether the differences observed in these hard endpoints reflected a "very low rate in the naproxen group or a

---

[60] Barbara Starfield, Leiyu Shi & James Macinko, *Contribution of Primary Care to Health Systems and Health*, 83 THE MILLBANK QUARTERLY 457 (2005). Mark W. Friedberg, Peter S. Hussey & Eric C. Schneider, *Primary Care: A Critical Review of the Evidence on Quality and Costs of Health Care*, 29 HEALTH AFF. 766 (2010).

[61] Starfield et al., *supra* note 59, at 458. Friedberg et al., *supra* note 59, at 757. It is the author's opinion that for FDA to be successful in its mission to protect the public from potential harm, it is vital that the *ad hoc* advisory committees include primary care physicians who, by virtue of their general medical practice, bring a broader perspective to drug evaluation than medical specialists. Primary care physicians have a holistic view of human physiology, are knowledgeable in clinical pharmacology, employ a broad array of drugs that requires them to be familiar with the beneficial and the adverse effects, treat a diversity of individuals and families, are cost conscious, and are likely to cast a skeptical glance toward the optimistic claims of the drug manufacturer. *See supra* note 60; *see also* Julie P. W. Bynum, Chiang-Hua Chang, Andrea Austin, Don Carmichael & Ellen Meara, *Outcomes in Older Adults with Multimorbidity Associated with Predominant Provider of Care Specialty*, 65 J. AM. GERIATRIC SOC'Y 1916 (2017). Derek Hellenberg, Farion R. Williams, Mohan Kubendra & Resmi S. Kaimal, *Strengths and Limitations of a Family Physician*, 7 J. FAMILY MED. & PRIMARY CARE 284 (2018). *Access to Primary Care*, U.S. DEPT. HEALTH & HUMAN SERVS., https://www.healthypeople.gov/2020/topics-objectives/topic/social-determinants-health/interventi ons-resources/access-to-primary#:~:text=Research [https://perma.cc/VH8Z-V652].

[62] Ctr. for Drug Evaluation and Research, *supra* note 47, at 147.

[63] *Id.* at 106, 186, 188–89.

[64] *Id.* at 56–69.

[65] *Id.* at 152.

very high rate of events in the rofecoxib group."[66] Nissen posited that the data suggested "at least in part" a protective effect of naproxen, and then proffered data in what was described as a recent journal article (not disclosed),[67] describing rates of myocardial infarction among people taking aspirin. The additional data were independent of the review and were not available for prior examination by the other members of the Committee. There is also the manner of *how* Nissen presented that data. The rates of myocardial infarction among aspirin users were, according to Nissen, comparable in magnitude to the rates reported by Merck & Co. for naproxen, a comparison that was meant to stand as evidence in support of the "hypothesis of a protective effect for naproxen,"[68] suggesting an effect of naproxen similar to the protective effects known for low-dose aspirin. The Acting Chair, Nigel Harris, cautioned the committee that the aspirin data did not "rise to the level of other data" that was available to the advisory committee meeting.[69]

Nissen then raised two questions for which there were no obvious answers. First, did Vioxx cause an increased risk of myocardial infarction over placebo? There were no placebo controls, in spite of Reicin's earlier comments, and this was something that over the ensuing years Merck & Co. did not conduct.[70] Second, was it possible to "neutralize [the cardiovascular effects] . . . with low dose aspirin?"[71] While presenting these as open questions, neither Nissen nor the Committee offered any guidance to FDA for mandating that additional studies be conducted. Indeed, Nissen found support for his questions in David Wofsy, a rheumatologist, who proclaimed that "further studies are always warranted. It is hard to imagine any presentation to this committee that wouldn't raise important questions" requiring further data.[72] In point of fact, the question of a need for additional studies, as announced by Dr. Harris at the start of the meeting, was part of the Committee's mandate. Yet, generalizations of the sort raised by Dr. Wofsy diminished the significance of a requirement for further examination. Lost in this discussion was that Vioxx had been—and would be—promoted

---

[66] *Id.*

[67] *Id.* at 151; Collaborative Group of the Primary Prevention Project, *Low-Dose Aspirin and Vitamin E in People at Cardiovascular Risk: A Randomised Trial in General Practice*, 357 LANCET 89 (2001).

[68] Ctr. for Drug Evaluation and Research, *supra* note 47, at 153. This argument is quite surprising for a medical scientist; that two drugs produce similar effects does not imply that they do so through identical pharmacological mechanisms. Moreover, the data in Figure 1 show the rates of cardiovascular events for both rofecoxib and naproxen did, in fact, increase over the duration of the study. Thus, naproxen was not cardioprotective, but merely produced fewer adverse cardiovascular events compared with Vioxx.

[69] Ctr. for Drug Evaluation and Research, *supra* note 47, at 155.

[70] Contemporaneous with the VIGOR trial, Merck & Co. was sponsoring additional trials on the effect of Vioxx on colon polyps (APPROVe). The APPROVe study, published in 2005 after Vioxx was withdrawn, concluded in this placebo-controlled study that among "patients with a history of colorectal adenomas the use of rofecoxib [Vioxx] was associated with an increased cardiovascular risk." Robert S. Bresalier, Robert S. Sandler, Hui Quan, James A. Bolognese, Bettina Oxenius, Kevin Horgan, Christopher Lines, Robert Riddell, Dion Morton, Angel Lanas, Marvin A. Konstam & John A. Baron, *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW ENG. J. MED. 1092, 1092 (2005). Prior to this, they relied on the idea that the standard of care dictated that they not employ a placebo arm. It was this trial that demonstrated an unequivocal increase in the number of cardiovascular events in patients taking Vioxx. There was no confusion due to any so-called cardioprotective event of the comparator. Merck & Co. was forced to halt this trial when the cardiovascular risks could not be dismissed.

[71] Ctr. for Drug Evaluation and Research, *supra* note 47, at 166.

[72] *Id.* at 163.

aggressively to an aging and increasingly larger segment of the population vulnerable to its cardiovascular risk.

As for FDA guidance to physicians, Nissen suggested that the committee could say that "this population getting naproxen was associated with a lower cardiovascular event rate than [the group] getting rofecoxib."[73] Nissen proposed that in the absence of any cardioprotective effect of Vioxx, and COX-2 inhibitors as a class, "what we saw was [a] cardioprotective effect of naproxen or excess risk for [Vioxx],"[74] a conclusion that while seemingly acknowledging the possibility of a cardiotoxic effect of Vioxx, downplayed it. The advisory committee, Nissen concluded, could offer no guidance to physicians on whether or not to prescribe aspirin as a cardioprotective adjunct with Vioxx; it was a "matter of clinical judgement . . . . [No] guidance beyond that is possible based upon the data."[75] Yet, it is clear that the Committee discussion plainly acknowledged not only that "there is not a cardioprotective effect for COX-2 inhibitors," but there existed the evident possibility that Vioxx was cardiotoxic, to which Nissen declared that the committee should be "very cautious about how we modify [the label] so that we do not overstate the issue of risk."[76]

The consideration of risk that is centrally enmeshed within three surprising developments of the advisory committee meeting. First, Nissen's comments understated the seriousness of the cardiovascular effects and, surprisingly for a cardiologist, accepted the balance in favor of gastrointestinal safety. Second, the committee members allowed themselves to be hamstrung by a seemingly surmountable technicality: the primary endpoint of the VIGOR study and the sNDA concerned gastrointestinal effects, not cardiovascular effects. To quote Wofsy, the committee discussion focused "on a question that was not the primary endpoint of the study . . . . So, we find ourselves . . . talking about whether the label should talk about the cardioprotective effects of non-steroidal anti-inflammatory drugs, and that was not the goal of any of the studies that we have seen,"[77] an opinion echoed by Dr. Cryer.[78] In that the purpose of the advisory committee was the evaluation of drug safety, these statements—that the committee was evaluating gastrointestinal safety and not cardiovascular safety—are incomprehensible.[79]

Finally, the Arthritis Advisory Committee in 2001 recommended a wording change on the Vioxx label that acknowledged cardiovascular risk as well as a reduced gastrointestinal harm,[80] a rather limited recommendation in that the advisory committee had available the full compilation of the Merck & Co. data and the accompanying FDA analysis by Drs. Goldkind, Targum, and Li. But in attempting to institute the advisory committee recommendations, FDA met considerable resistance

---

[73] *Id.* at 168.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at 169–70.

[78] *Id.* at 174.

[79] Gurkipal Singh, appearing in 2004 before a Senate committee investigating the withdrawal of Vioxx, testified that, with regard to the gastrointestinal safety of the drug, "the tradeoff of 500% increase in heart attacks for a 50% reduction in stomach bleeds did not seem attractive," a view he had expressed even before his Senate testimony. NESI, *supra* note 2 at 179.

[80] Ctr. for Drug Evaluation and Research, *supra* note 47, at 197–210.

from Merck & Co., who, after debating with FDA over the warning label for nearly two years, eventually achieved the label they desired, one in which the cardiovascular effects were subordinate to the gastrointestinal effects, and diminished to a lower position on the label.[81] While the committee expressed concern about increased risks of heart attack attributable to Vioxx, as Berenson et al. reported, "none suggested that Vioxx be withdrawn."[82]

## IV.   AFTER THE ARTHRITIS ADVISORY COMMITTEE MEETING, AUGUST 2001

Six months after the meeting of the *ad hoc* Arthritis Advisory committee, Nissen and his colleagues, Debabrata Mukherjee and Eric Topol, published a quite different account of the cardiovascular toxicity of Vioxx in the *Journal of the American Medical Association*.[83] The authors searched medical databases to "identify all published, English-language, randomized, double-blind trials of COX-2 inhibitors from January 1998 to February 2001."[84] Not surprisingly, the authors identified the CLASS and VIGOR trials that were the subject of the February meetings, and two other studies, Study 085 and Study 090,[85] part of the data that Merck & Co. submitted in support of its sNDA for Vioxx. In presenting their analysis, the authors included the precise data available to the *ad hoc* Arthritis Advisory Committee and presented the Kaplan-Meier time-to-event plot (Figure 1), showing the increasing cardiovascular events that occur after three months and then further after eight months of treatment. They observe that "the VIGOR trial demonstrated significantly increased risk of cardiovascular event rates with use of rofecoxib [Vioxx] *although the study enrolled patients who did not require aspirin for protection from ischemic events*."[86] As at the *ad hoc* Arthritis Advisory Committee in February, these results, they argue, can arise either from a "significant prothrombic [cardiotoxic] effect from rofecoxib or an antithrombic [protective] effect from naproxen (or conceivably both)."[87] In addition, they analyzed four aspirin trials, which stated that aspirin reduced all cardiovascular events by 15% and myocardial infarctions by 30%,[88] numbers in line with the effects of naproxen reported by Merck & Co.

Mukherjee et al. recommended caution in considering prescriptions for Vioxx and other COX-2 inhibitors, advice not dissimilar to what was recommended at the

---

[81] Gottlieb, *supra* note 17. Alex Berenson, Gardner Harris, Barry Meier &Andrew Pollack, *Despite Warnings, Drug Giant Took Long Path to Vioxx Recall*, N.Y. TIMES (Nov. 14, 2004), https://www.nytimes.com/2004/11/14/business/despite-warnings-drug-giant-took-long-path-to-vioxx-recall.html [https://perma.cc/82PD-TTG8].

[82] Berenson et al., *supra* note 81.

[83] Debabrata Mukherjee, Steven E, Nissen & Eric J. Topol, *Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, 286 J. AM. MED. ASS'N 954 (2001).

[84] *Id.* at 955.

[85] Study 085 and Study 090 concerned the efficacy and measures of safety of rofecoxib and another NSAID, nabumetone, versus placebo, in patients with knee-joint osteoarthritis. *Id.*

[86] *Id.* at 957 (emphasis added).

[87] *Id.* at 957.

[88] P.S. Sanmuganathan, Parviz Ghahramani, Peter R. Jackson, Erica J. Wallis & L.E. Ramsay, *Aspirin for Primary Prevention of Coronary Heart Disease: Safety and Absolute Benefit Related to Coronary Risk Derived from Meta-Analysis of Randomised Trials*, 85 HEART 265, 265 (2001).

Arthritis Advisory Committee. But they go further than the Arthritis Advisory Committee in two marked respects. First, while noting that administration of COX-2 inhibitors resulted in an increased incidence of hypertension that can increase risk of adverse cardiovascular events, and that rheumatoid arthritis is accompanied by a higher risk of myocardial infarction, the authors noted a "prothrombotic effect seen with rofecoxib," one that "may potentially be dose dependent."[89] They concluded that the data "suggest a potential increase in cardiovascular event rates for presently available COX-2 inhibitors."[90] Second, and more significantly, they "believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents."[91] In the absence of such studies, they "urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."[92] All of which is to say that they clearly acknowledged the prothrombotic effects of Vioxx and the increased risk of heart attack associated with the drug, and they recommended additional trials to address the cardiovascular risk associated with COX-2 inhibitors, none of which Dr. Nissen had recommended at the *ad hoc* Arthritis Advisory Committee just six months earlier.

Indeed, these recommendations could have been made by the *ad hoc* Arthritis Advisory Committee based on information available at the February 2001 meeting. Had the committee made such recommendations, it is possible that the Merck & Co. sNDA for Vioxx may not have been approved, and FDA would have been in a position to require more studies regarding cardiovascular safety, something the committee members seemingly ignored, and would have spared the public of an extra 3.5 years in which the drug was aggressively marketed.

## V.   WHAT DID MERCK & CO. KNOW ABOUT THE CARDIOVASCULAR EFFECTS OF VIOXX?

The VIGOR authors buried relevant cardiovascular endpoints in the middle of their paper within a brief narrative and excluded a Kaplan-Meier time-to-event survival analysis (Figure 1) that demonstrated an increased risk of myocardial infarction in patients taking Vioxx relative to those taking naproxen. In presenting that data, the authors inverted the analytic expression (Equation 2, above), obscuring the significance of the cardiovascular risk. Moreover, the VIGOR authors chose to interpret their results supporting never-before-known myocardial benefits of naproxen as an anti-thrombogenic, cardioprotective drug. Finally, by electing to exclude patients with cardiovascular disease (i.e., by excluding patients taking low-dose aspirin for its blood-thinning, anti-platelet activity), the VIGOR investigators excluded those most at risk for myocardial infarction. It is worth noting, too, that not a single consequence of these actions was injurious in the marketing of Vioxx or its FDA approval. In all cases, the published data favored the interest of the drug sponsor.

Before the VIGOR trial was even considered, as early as 1996, e-mails among unnamed Merck & Co. officials expressed concern about a "substantial chance [of]

---

[89]  Mukherjee et al., *supra* note 83, at 958.

[90]  *Id.*

[91]  *Id.* at 958.

[92]  *Id.*

significantly higher rates" of myocardial infarctions among the group taking Vioxx.[93] In an e-mail of February 25, 1997, a Merck & Co. executive, Briggs Morrison, expressed the view that if Merck & Co. were to proscribe aspirin for patients taking Vioxx, they would "get more thrombotic events," which would, in effect, "kill [the] drug."[94] In response, Alise Reicin, one of the VIGOR authors, suggested a way around the proscription of aspirin: to exclude high-risk patients who presented with existing cardiovascular disease, which "may decrease the CV event rate, so that a difference between the [Vioxx and naproxen] groups would not be evident."[95]

While Merck & Co. refused to publicly acknowledge its doubts about Vioxx, the VIGOR trial confirmed those doubts exactly as expressed in e-mail correspondence to Merck & Co. employees from Ed Scolnick, president of Merck & Co. Research Laboratories. In an e-mail dated March 9, 2000, Scolnick acknowledged that the cardiovascular "events are clearly there" and, moreover, that their nature is "mechanism based as we worried it was."[96] Mechanism-based—or class—effects are those for which adverse effects (myocardial infarction and stroke) arise through the precise biological pathway responsible for the beneficial effects (reduced gastrointestinal erosion). While Scolnick and his colleagues were aware of this problem, Merck & Co. continued to extol the safety of Vioxx in press releases such as one in which "Merck confirms favorable cardiovascular safety profile of Vioxx."[97]

---

[93] The following discussion focuses on internal e-mails from Merck & Co. employees, but also benefits from reporting of Alex Berenson, Gardiner Harris & Barry Meier, *Despite Warnings, Drug Giant Took Long Path to Vioxx Recall*, N.Y. TIMES (Nov. 14, 2004), http://nytimes.com/2004/11/14/business/despite-warnings-drug-giant-took-long-path-to-vioxx-recall.html [https://perma.cc/845F-GKTP]; Anna Wilde Mathews & Barbara Martinez, *E-mails Suggest Merck Knew Vioxx's Dangers at Early Stage*, WALL ST. J. (Nov. 1, 2004), https://www.wsj.com/articles/SB109926864290160719 [https://perma.cc/PN42-TWAK]; NESI, *supra* note 2.

[94] E-mail from Briggs Morrison to Thomas Simon, Elliot Ehrich, Brian Daniels & Alise Reicin (Feb. 25, 1997), https://www.industrydocuments.ucsf.edu/docs/qpww0217 [https://perma.cc/C99J-TCH6] ("I know this has been discussed to death, but [in the] real world is everyone is on it, so why exclude [aspirin] AND without COX-1 inhibition [by aspirin] you will get more thrombotic events and kill the drug.").

[95] E-mail from Alise Reicin to Thomas Simon, Elliot Ehrich, Brian Daniels & Briggs Morrison (Feb. 25, 1997), https://www.industrydocuments.ucsf.edu/docs/qpww0217 [https://perma.cc/C99J-TCH6].

[96] E-mail from Edward M. Scolnick to Deborah Shapiro, Alise Reicin & Alan Nies (Mar. 9, 2000), https://www.industrydocuments.ucsf.edu/drug/docs/#id=fzgw0217 [https://perma.cc/FB85-485H].

[97] Mathews & Martinez, *supra* note 93. Indeed, the marketing of Vioxx continued at full throttle. As Nesi described it, marketing representatives were trained to play "Dodgeball Vioxx" in which they were to evade questions about any incidences of myocardial infarction, claiming that they had not heard such things. NESI, *supra* note 2, at 194. For a pointed description of Merck & Co. marketing practices see Henry A. Waxman, *The Lessons of Vioxx—Drug Safety and Sales*, 352 NEW ENG. J. MED. 2576, 2577–78 (2005). *See also* Memoranda from Henry A. Waxman to Democratic Members of the Gov't Reform Comm., at 24 (May 5, 2005), https://www.industrydocuments.ucsf.edu/wp-content/uploads/2014/11/waxmanmemo_vioxx.pdf [https://perma.cc/57J9-Z3UJ]. Merck & Co. was concerned about the "mechanism-based" blood-clotting, or thrombogenic, problems associated with Vioxx as far back as 1999, two years prior to publication of VIGOR. E-mails detailed how, after reviewing the VIGOR data, Ed Scolnick discussed plans to patent a reformulation of Vioxx containing an additional (unspecified) drug that would reduce the tendency for platelets to clot, thereby preventing the thrombogenic mechanism that was undermining Vioxx. Theresa Agovino, *AP: Merck Tried to Alter Vioxx in 2000* (2005), http://www.dailypress.com/health/sns-ap-vioxx-safety,0,4594516.story [https://perma.cc/9UJS-64U8]. While Merck & Co. pursued talks with the patent department, they continued to promote the cardiovascular safety profile of Vioxx. See E-mail from Alise Reicin to Jonathan A. Tobert (Nov. 28, 2002), https://www.industrydocuments.ucsf.edu/docs/#id=msww0217 [https://perma.cc/MUP3-QAC2]. She mentions that Scolnick expressed interest in "evaluating whether Naproxen is in fact a cardioprotective agent," something they touted two years earlier in the VIGOR publication, and eighteen months earlier in their presentation before the *ad hoc* Arthritis

One damning piece of evidence of Merck & Co.'s knowledge of heart attack risk at the time the VIGOR trial was submitted for publication is found within the metadata stored in Microsoft Word documents. Within the VIGOR manuscript submitted to *The New England Journal of Medicine*, were "track changes" acknowledging that "Merck had deleted references to heart attack victims before formally submitting the article to the journal."[98]

Merck & Co. had no evidence in support of a cardioprotective effect of naproxen. In an e-mail dated March 13, 2000 to Ed Scolnick and Alan Nies, a clinical pharmacologist at Merck & Co., Alise Reicin, provided a research abstract for "the only study I could find which assessed the potential cardioprotective effects of an NSAID."[99] The abstract, dated 1993, was not about naproxen but flurbiprofen, a chemical derivative of ibuprofen, an NSAID chemically different from naproxen. Later, on January 31, 2001, and prior to the *ad hoc* Arthritis Advisory Committee meeting, clearly upset with the data and the naproxen-based explanation, Scolnick sent an e-mail to Raymond Gilmartin, Merck & Co. CEO, and David Anstice, president of Human Health-The Americas, pointing out that:

> there is no way to prove that . . . ALL the difference between Vioxx and naproxen is due to the benefit of naproxen. IT IS IMPOSSIBLE TO PROVE THIS; IT IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY. . . . The FDA will NEVER allow it to be fully dismissed.[100]

However, FDA did allow it to be dismissed, eventually approving the sNDA application. Scolnick's frustration is understandable; as Merck & Co. scientist Briggs Morrison remarked in his appraisal of the data analysis, Merck & Co. was "'fitting the data to a hypothesis' rather than letting the data generate hypotheses."[101] The exercise, he wrote, seemed "wishful thinking, not a critical interpretation of the data."

As early as 2000, Merck & Co. discussed conducting a study that directly assessed the cardiovascular safety of Vioxx; however, such a study, they feared, would send the "wrong signal about the company's confidence in Vioxx."[102] Merck & Co. felt that "at present," [i.e., 2000] while they were in a heated competition with Pfizer's Celebrex, there was no "compelling marketing need for such a study," and that the "implied

---

Advisory Committee she described the cardioprotective effect as an indisputable property of naproxen. *See supra* notes 50, 58–69.

[98] Symposium, *Ethics and Professionalism in the Digital Age–A Symposium of the Mercer Law Review*, 60 MERCER L. R., 961 (2009).

[99] E-mail from Alise Reicin to Edward M. Scolnick & Alan S. Nies (Mar. 13, 2003), https://www.industrydocuments.ucsf.edu/docs/#id=xthw0217 [https://perma.cc/CX9U-R2G7].

[100] E-mail from Edward M. Scolnick to Raymond Gilmartin & David W. Anstice (Jan. 31, 2001), https://www.industrydocuments.ucsf.edu/docs/#id=shhw0217 [https://perma.cc/NJC3-MCTK].

[101] E-mail from Briggs Morrison (Aug. 17, 2001), https://www.industrydocuments.ucsf.edu/drug/docs/#id=lnhw0217 [https://perma.cc/ZM5M-8L9M]. Morrison in an e-mail thread described the data as "at best [an] hypothesis-generating level of information," and that such data were pooled from multiple populations "to support a preconceived hypothesis rather than critically review the data to generate hypotheses." *Id.*

[102] Alex Berenson, Gardner Harris, Barry Meier & Andrew Pollack, *Despite Warnings, Drug Giant Took Long Path to Vioxx Recall*, N.Y. TIMES (Nov. 14, 2004), https://www.nytimes.com/2004/11/14/business/despite-warnings-drug-giant-took-long-path-to-vioxx-recall.html [https://perma.cc/EH4Z-DNM2].

message [of such a study] is not favorable,"[103] suggesting a coalescence of marketing and research. Merck & Co., in refusing to conduct a "study solely to determine whether Vioxx might cause heart attacks and strokes," struck a "recurring theme . . . that Vioxx was safe unless proved otherwise."[104]

To demonstrate that Vioxx was not harmful to cardiovascular health, Merck & Co. authored a meta-analysis that appeared in *Circulation*, the flagship organ of the American Heart Association.[105] The stated intention of the study was to "determine whether there was an excess of CV thrombotic events in patients treated with rofecoxib"[106] compared with other NSAIDs. The authors of this meta-analysis reported "no evidence for an excess of CV events for rofecoxib"[107] and concluded more strongly that Vioxx "was not associated with excess CV thrombotic events"[108] relative to other NSAIDs. This further promoted the Merck & Co. theory that any differences between these agents "are likely the result of the [cardioprotective] antiplatelet effects" of naproxen.[109] This meta-analysis was submitted on October 2, 2001 and accepted for publication on October 3, 2001, a day later, raising questions about the quality and depth of review and the intentions of the *Journal*. The publication listed seven authors, five being Merck & Co. employees who participated in VIGOR. The first two authors, M. A. Konstam and M. R. Weir, were associated with academic institutions[110] and were described as the recipients of gift authorship.[111]

## VI.  IMPLICATIONS FOR PUBLIC SAFETY

The published VIGOR study, the deceit in marketing Vioxx, and the carelessness in the editorial review of the VIGOR trial represent a betrayal of public trust and an abdication of responsibility on the parts of Merck & Co. and NEJM. Merck & Co. scientists knew early on that the drug posed a fatal risk to patients, turned a blind eye to unwelcome data, and promoted a theory for which they had neither evidence nor belief, while continuing to extol the safety of the drug.

This behavior cannot be solely attributable to individual research scientists, as it is clear that Merck & Co.'s marketing division played an outsized role in promoting the

---

[103] *Id.*

[104] *Id.*

[105] Marvin A. Konstam, Matthew R. Weir, Alise Reicin, Deborah Shapiro, Rhoda S. Sperling, Eliav Barr & Barry J. Gertz, *Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib*, 104 CIRCULATION 2280 (2001).

[106] *Id.* at 2285.

[107] *Id.* at 2287.

[108] *Id.*

[109] *Id.* at 2280.

[110] According to e-mails, Merck & Co. employee Rhoda Sperling, one of the authors on the paper, sent Konstam and Weir finished manuscripts and asked for their comments, an example of gift authorship. The draft sent to Konstam and Weir was virtually identical to that appearing in *Circulation*. Letter from Rhoda Sperling to Marvin A. Konstam & Matthew Weir (July 12, 2001), https://www.industrydoc uments.ucsf.edu/docs/ztww0217 [https://perma.cc/8J9X-VW8Z]. Dr. Konstam disagrees with claims that that his "role in the *Circulation* paper was insufficient for him to be described as an author." Lisa Nainggolan, *Konstam Offers New Details on His Role in Vioxx Meta-Analysis*, MEDSCAPE, May 8, 2009, https://www.medscape.com/viewarticle/702606_print [https://perma.cc/9N25-77HX].

[111] Joseph S. Ross, Kevin P. Hill, David S. Egilman & Harlan M. Krumholz, *Guest Authorship and Ghostwriting in Publications Related to Rofecoxib*, 299 J. AM. MED. ASS'N 1800 (2008).

drug. The marketing team applauded the Merck & Co. scientists for their efforts to "defuse the CV risk issue for Vioxx."[112] The marketing division of Merck & Co. conducted its own study, the ADVANTAGE trial, published in *Annals of Internal Medicine*, a peer-reviewed journal and the official organ of the American College of Physicians.[113] Unknown to the editors of the journal, ADVANTAGE was a *seeding trial*, "marketing in the guise of science," as the stunned editors later expressed it,[114] during which Merck & Co. recruited physicians to prescribe Vioxx under the false impression that they were participating in a randomized clinical trial.[115] In internal communications, Merck & Co.'s marketing team was aware that ADVANTAGE was not a scientific research study and chose to hide that fact as implied in the observation: "IT MAY BE A SEEDING STUDY . . . LET'S NOT CALL IT THAT."[116] This note demonstrated a callous disregard for a patient's right to informed consent. Furthermore, in a critical analysis of the ADVANTAGE paper, Hill et al. underscored Merck & Co.'s willingness to risk "patient injury for marketing purposes."[117]

At the NEJM, having offered no explanation of its lax editorial oversight, the editors were quick—in the face of litigation—to offer an "expression of concern" absolving themselves of responsibility and placing blame on Merck & Co. scientists.[118] Overall, this much is clear: Merck & Co. and the NEJM increased medical risk to the public and compromised the evidence-based practice of medicine.[119] Less clear is a path

---

[112] E-mail from Margie McGlynn to Alise Reicin (May 25, 2000), https://www.industry documents.ucsf.edu/docs/xgfw0217 [https://perma.cc/L9DQ-6A2H].

[113] Jeffrey R. Lisse, Monica Perlman, Gunnar Johansson, James R. Shoemaker, Joy Schechtman, Carol S. Skalky, Mary E. Dixon, Adam B. Polis, Arthur J. Mollen & Gregory P. Geba, ADVANTAGE Study Group, *Gastrointestinal Tolerability and Effectiveness of Rofecoxib Versus Naproxen in the Treatment of Osteoarthritis: A Randomized, Controlled Trial*, 139 ANNALS OF INTERNAL MED. 539 (2003). ADVANTAGE is an acronym for *Assessment of Differences between Vioxx And Naproxen To Ascertain Gastrointestinal tolerability and Effectiveness*.

[114] Harold C. Sox & Drummond Rennie, *Seeding Trials: Just Say "No,"* 149 ANNALS OF INTERNAL MED. 279 (2008).

[115] Kevin P. Hill, Joseph S. Ross, David S. Egilman & Harlan M. Krumholz, *The ADVANTAGE Seeding Trial: A Review of Internal Documents*, 149 ANNALS OF INTERNAL MED. 251 (2008). The purported purpose of the ADVANTAGE study was testing of a research hypothesis concerning, for example, the efficacy, tolerability, and side effects of Vioxx. The real aim of recruiting the unsuspecting physicians was to change their prescribing habits and to convert them to advocating for the new drug.

[116] E-mail from Rebecca Higbee to Kyra Lindemann, Christine Fanelle & Jan D. Weiner (March 19, 1999), https://www.industrydocumentslibrary.ucsf.edu/drug/docs/tkgw0217 [https://perma.cc/KA5Y-AW XQ].

[117] Hill et al., *supra* note 115, at 256.

[118] Curfman et al., *supra* note 37.

[119] As a practical example of the impact of misleading and false medical claims on evidence-based medicine, see JOHN ABRAMSON, *False and Misleading: The Misrepresentation of Celebrex and Vioxx*, in OVERDOSED AMERICA: THE BROKEN PROMISE OF AMERICAN MEDICINE (HarperCollins 2008). Abramson describes his puzzlement upon receiving a letter sent by Pharmacia, the parent company of Pfizer, the manufacturer of Celebrex (celecoxib), and mandated by FDA warning physicians about "false and misleading claims" made regarding the safety of Celebrex on the gastrointestinal tract, an increase in bleeding problems associated with its COX-2 inhibitor Celebrex. At the same time, reading a review in the Drug Therapy section of *The New England Journal of Medicine*, "The Coxibs, Selective Inhibitors of Cyclooxygenase-2" by Garret A. FitzGerald and Carlo Patrono, Abramson noted that the authors claimed otherwise, that coxibs were safe on the gastrointestinal tract, that gastrointestinal bleeding was not a problem, and, moreover, nor was there an increased incidence of cardiovascular toxicity. Abramson noted the authors were merely repeating "unsubstantiated claims" and they underplayed the cardiovascular safety of coxibs. As reported in *NEJM*, FitzGerald received grant support from Merck & Co. and he served as a

572          FOOD AND DRUG LAW JOURNAL          VOL. 75

through which FDA can protect the public from drugs submitted by determined, well-financed pharmaceutical companies.[120]

As a gatekeeper, FDA defines what is allowable in marketing the drugs it approves. However, FDA shares one fault in common with medical journals: both rely on the good faith of drug companies to provide honest and complete information and to be forthright in their representations. It falls to medical journals, as both public megaphone and medical authority, to uphold standards of medical practice. Yet, in two of the three cases mentioned here—NEJM and *Circulation*—the journals failed the public and exploited its trust. *Annals of Internal Medicine* was blindsided by Merck & Co.; the evidence indicates that they were victimized by Merck & Co.'s submission of the ADVANTAGE seeding study.

Perhaps there is no infallible mechanism through which FDA can protect the public in all cases from all possible drug interactions.[121] FDA is destined to function in a business environment in which journals and pharmaceutical manufacturers, each in search of prestige and profit, find the allure of great success irresistible, surrendering to the Circe-like temptation of marketing the next blockbuster drug or publishing the next celebrated study.[122]

The entire Vioxx chronicle was marked by misrepresentations and obfuscations that lead to death and compromised cardiac health for thousands of patients.[123] The marketing activities of drug companies, the fallibility of journal editors, and the environment in which FDA functions require a healthy skepticism in assessing optimistic claims. Perhaps the best advice in assessing claims made in the medical

---

consultant to Merck & Co.; Patrono received grant support from Merck & Co. and served as a consultant to Merck & Co. and Pharmacia.

[120] DANIEL P. CARPENTER, REPUTATION AND POWER: ORGANIZATIONAL IMAGE AND PHARMACEUTICAL REGULATION AT THE FDA 665–72, 737 (Princeton University Press, 2010). Carpenter describes Merck & Co. as "perhaps the single most trusted corporate name at FDA in the late twentieth century," *Id.* at 737, and that, having "killed" or abandoned drugs they thought problematic before launch, Merck & Co. had developed credibility for not submitting drugs in which they had little faith, *Id.* at 665–72.

[121] Of interest is testimony by David J. Graham, *Insider: FDA Won't Protect Public*, CBS NEWS (Dec. 7, 2020, 11:03 AM) https://www.cbsnews.com/news/insider-fda-wont-protect-public/ [https://perma.cc/M7KC-CBYN]; *FDA, Merck and Vioxx: Putting Patient Safety First?: Hearing Before the Senate Committee on Finance* (Nov. 18, 2004) (Testimony of David J. Graham) https://www.finance.senate.gov/imo/media/doc/111804dgtest.pdf [https://perma.cc/WJ2T-Y3FE]. Jeanne Lenzer, *FDA Is Incapable of Protecting US Against Another Vioxx*, 329 BMJ 1253 (November 27, 2004).

[122] NEJM and *The Lancet* each published pertinent studies on drugs for combatting COVID-19. It became apparent that the data were not available to outside reviewers nor even to one of the authors. Both journals were quick to retract the papers. Ironically, the lead author, Mandeep R. Mehra, was unable to vouch for the accuracy of the data presented in the retracted papers, an irony in that he is the senior editor at a medical journal, the *Journal of Heart and Lung Transplantation.* Allysia Finley, *The Lancet's Politicized Science on Antimalarial Drugs*, WALL ST. J. (June 1, 2020), https://www.wsj.com/articles/the-lancets-politicized-science-on-antimalarial-drugs-11591053222 [https://perma.cc/5JL7-YEXA]; Frank Gannon, *Sullied*, 21 EMBO REPS. Aug. 6, 2020, https://doi.org/10.15252/embr.202051371 [https://perma.cc/4XE3-3A6A].

[123] David J. Graham, David Campen, Rita Hui, Michele Spence, Craig Cheetham, Gerald Levy, Stanford Shoor & Wayne A. Ray, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cyclooxygenase 2 Selective and Non-selective Non-steroidal Anti-inflammatory Drugs: Nested Case-control Study,* 365 LANCET 475 (2005).

# Exhibit G



**Confidential Document**

STANFORD UNIVERSITY MEDICAL CENTER
STANFORD, CALIFORNIA 94305

RECEIVED
JAN 2 2 2001
E. M. Scolnick

COPY

STANFORD UNIVERSITY SCHOOL OF MEDICINE
DEPARTMENT OF MEDICINE
Division of Immunology and Rheumatology
1000 Welch Road, Suite 203
Palo Alto, CA 94304
(650) 723-6003
(650) 723-9656 (Fax)

January 9, 2001

Mr. Raymond Gilmartin
Chief Executive Officer
Merck and Co.
One Merck Drive
Whitehouse Station, New Jersey 08889

Dear Dr. Gilmartin,

A series of serious events involving certain employees of, and possibly a policy of, Merck & Co. has come to my attention rather accidentally and I wanted to relay these events which might have substantial implications and complications. The result is harmful to the traditionally very fine Merck public image and is counter-productive to the Vioxx sales effort. My perspective is that of the Principal Investigator of ARAMIS (Arthritis, Rheumatism, and Aging Medical Information System). This NIH-funded national data bank first identified and quantitated the stealth epidemic of NSAID gastropathy, quantitated differences in toxicity among NSAIDs, and ARAMIS investigators have worked hard for a long time to find and implement ways of reducing the frequency of serious GI adverse events with NSAIDs. I believe that the Cox-1 sparing agents are our best approach toward better drug safety in this area.

My accidental involvement: On Saturday October 28th I received a call at home from Dr. Louis Sherwood of Merck Pharmaceuticals. Dr. Sherwood complained that Dr. Gurkirpal Singh of our group had an anti-Merck bias and was giving lectures that were irresponsibly anti-Merck and specifically anti-Vioxx. Dr. Singh was held to have used a slide which depicted a person hiding data under the covers, had called Merck the "Firestone of the drug industry", and had requested data from Merck which was not appropriate for him to have. Dr. Sherwood suggested that if this continued Dr. Singh would "flame out" and there would be consequences for myself and for Stanford. Dr. Sherwood had previously called Dr. Judith Swain, Chair of our Department, and subsequently called Dr. Edward Harris, Chair of our Division, with similar complaints. I agreed to look into the matter and to take appropriate action and indicated that it is not our policy to bias any presentation in any direction. I asked him to provide me with full details of any such transgression that occurred after this date.



PLAINTIFF'S
EXHIBIT
14

Confidential - Subject To Protective Order

MRK-ABH0002204

Confidential Document

I spoke with Dr. Singh and reviewed the slides of his presentation. The talk was mainly about the frequency and severity of NSAID Gastropathy and secondly about the advantages of the new Cox-1 sparing agents, of which Vioxx is one. Equal numbers of slides were devoted to Celebrex and to Vioxx. The talk was strongly in favor of broad use of the new Cox-1 sparing agents. Data were mainly from the standard studies, although three slides were from a presented but not yet published randomized renal toxicity study of Celebrex and Vioxx by Andrew Whelton comparing side-by-side renal and cardiovascular toxicity which was not in favor of Vioxx. The little man under the covers was not in the sequence, having been removed when Dr. Singh succeeded in getting the requested data (again not favorable to Vioxx), from Merck. Dr. Singh clearly did not understand the "Firestone" reference and indicated that he had not made the statement. I asked Dr. Singh to be certain to be rigorously balanced in future presentations and he agreed, although stressing that he had also been balanced in the past. I talked with three people who had been in Dr. Singh's audience; one thought the presentation contained humor directed at Merck but that the data were balanced and the other two found the presentations completely unremarkable.

The much broader issues, which surfaced at the American College of Rheumatology meetings, were most disturbing and involve suppression of data by Merck and a consistent pattern of intimidation of investigators by Merck staff, principally Dr. Sherwood but also others on his staff.

A number of physicians have concerns that Vioxx may have some serious and under-emphasized drug toxicity problems, particularly at the 50 mg dose approved for pain control—these concerns are shared by the FDA renal reviewer. Vioxx has been reported to have more frequent peripheral edema problems, more aggravated hypertension, more congestive heart failure, and more heart attacks than other NSAIDs, especially Celebrex. Some 0.4 % of Vioxx subjects had heart attacks compared with 0.1 % in the naproxen arm in the Merck-sponsored VIGOR study and this was statistically significant. Some of these data have been described in the Wall Street Journal and may have affected stock prices but there has been little information presented to date in the medical literature. Merck presented two posters on the VIGOR trial at the recent ACR meetings which did not contain data on the side effects of interest; the posters were very well attended, with everyone wanting to know about the data on these points, but it was not available. I tried unsuccessfully to get the data myself; it is hard to judge these areas without the numerical details. Yet, one could not avoid the conclusion that because of the interest in these issues the data would have been presented had they been favorable. There was a lot of muttering and a lot of people with concerns. The publication of the VIGOR trial recently in the NEJM did not contain the data on edema and fluid retention at all, and dismissed the heart attack data with weak arguments.

Even worse were the allegations of Merck damage control by intimidation, often with a pattern of going to the Dean or Department Head with complaints of anti-Merck bias and always alleging unbalanced anti-Vioxx presentations. This has happened to at least eight investigators: Dr. Singh; Dr. Peter Lipsky, now research chief at the Arthritis Institute;

Confidential - Subject To Protective Order

Confidential Document

Dr. Andrew Whelton of Hopkins; Dr. Michelle Petri of Hopkins; Dr. David Yocum of Tucson, currently head of the FDA advisory panel; Dr. Lee Simon of Harvard; Dr. James McMillen; and Dr. Thomas Stillman. I suppose I was mildly threatened myself, although I have never spoken or written on these issues.

I documented the intimidation of the individuals listed above by personally speaking with each of them. Dr. Simon believes that one of his two academic appointments has been jeopardized. Dr. McMillen believes that his VCF appointment at Hershey was revoked because of these accusations. Dr. Petri had a speaking engagement unprofessionally cancelled by Merck and an unrenowned speaker substituted; he was also bothered by phone calls from Merck persons alleging unbalanced presentations. Dr. Singh had a speaking engagement cancelled and the audience was told that he had been fired. Dr. David Yocum had similar experiences. Dr. Lipsky, while at Southwestern, was forced to do a slide by slide justification of a CME program felt to be critical of Vioxx. These are respected investigators with long experience and high integrity. I also spoke with several past Merck employees who asked to remain anonymous but who confirmed the existence of a pattern of intimidation through the Department Chairs or the equivalent, often with the hint of loss of Merck funding to the institution.

An ironic result of all this is that Vioxx is getting more scrutiny of its salt and water toxicity than if the data had been clearly presented, and Merck is taking a big public relations hit among rheumatologists. The investigators whose balance was criticized are prominent and several advise the FDA—a role not often given to unbalanced presenters. In the view of most rheumatologists including myself, Vioxx (and Celebrex) represent a major medical advance in terms of improving GI safety, which is the dominant toxicity of NSAIDs and is the most common serious adverse event of NSAIDs. These drugs should on balance, save a substantial number of lives. The fluid retention and related problem data are actually not all that bad, and the cover-up is a worse problem than the side effects of fluid retention and hypertension and CHF, which could be handled by stronger labeling for at risk patients, or by other means. Else, there is a risk of case reports of seriously complicated congestive heart failure or other serious adverse reactions, which could threaten the drug approval. The heart attack data, of course, need to be confirmed or refuted by further study, as do the data on comparative renal toxicity between Cox-1 sparing agents.

I spoke with Dr. Sherwood at length on November 22 and aired the above concerns directly. He defended by saying that Merck was a great company and, therefore, could not be doing anything inappropriate. He said that he had been with Merck for 13 years and had never noticed anything that was not appropriate. He noted that he had previously been a Department Chair and that he knew what was appropriate and what was not, and that he knew how to get things done through the network. He said that if he heard about something that was alleged to be anti-Vioxx that it was his right to call anyone he wanted to about it. When told that each of the investigators maintained that presentations had been balanced he said he didn't want to get into "he said, she said" kinds of discussions. He said that there weren't any problems with the drug and that anyway they only occurred at high dose. When told that an ex-Merck employee had quoted him as saying

MRK-ABH0002206

Confidential Document

"we only have three problems, Whelton, Simon, and McMillen, and Simon has been taken care of" there was a long pause and then he said that he "did not remember" saying that. When told that while both I and the people I had talked with had often had differences in viewpoint with one or another drug firm, none of us had ever heard of harassment of investigators through their institutions he did not have a response but said that he "heard me."

From the discussions above I make three conclusions. First, some investigators at some times probably do make statements that may seem seriously unbalanced to those vested or instructed in opposite opinions and that close attention to strict impartiality is essential for any person making presentations on any such subject.   Second, Merck has been attempting to systematically downplay some unusual side effect patterns of Vioxx.   I would hesitate to use the term "hiding data" but Merck has certainly not been forthcoming with data and has made access to the data difficult. Finally, and most importantly, Merck employees have systematically attacked those investigators or speakers who expressed what Merck staff felt were critical opinions in a manner which seriously impinges on academic freedom.

I believe that these are serious matters and that Merck should take care of them internally, in its own interest, and in the interest of patients.  I will appreciate your response to the issues raised here and to learning about actions which have been taken.

Sincerely,

James F. Fries, M. D.
Professor of Medicine

cc: Mr. David Anstice, President Merck U. S. Human Health
    Dr. Ed Skolnick, President Merck Research Labs

Confidential - Subject To Protective Order

MRK-ABH0002207

# Exhibit H

To:        Scolnick, Edward M.
From:      Anstice, David W.
Cc
Bcc:
Date:      2001-12-06 13:51:33
Subject:   FW: Analyst Report on VIOXX

He will be there!

——Original Message——
From:    Jordan, Laura J.
Sent:    Thursday, December 06, 2001 8:45 AM
To:      Anstice, David W.
Subject: RE: Analyst Report on VIOXX

yes, unfortunately - he has RSVP'd that he will be there

——Original Message——
From:    Anstice, David W.
Sent:    Thursday, December 06, 2001 8:43 AM
To:      Jordan, Laura J.
Subject: FW: Analyst Report on VIOXX

Laura, Can you find out if Stover will be attending the meeting please. David

——Original Message——
From:    Anstice, David W.
Sent:    Thursday, December 06, 2001 8:42 AM
To:      Scolnick, Edward M.
Subject: RE: Analyst Report on VIOXX

Ed, Stover is amazing. I will find out from Laura Jordan if he will be at the meeting.  David

——Original Message——
From:    Scolnick, Edward M.
Sent:    Wednesday, December 05, 2001 10:32 PM
To:      Anstice, David W.
Cc:      Merrill, Debora D.
Subject: RE: Analyst Report on VIOXX

David if he says this I will boil him in oil at the meeting. I have never seen any analyst provide data anaylsis on his own. I think merck should do something about him.I will have the medical letter, the goldman scahs quote from fitzgerald and the funk artice ready to give him in person. i will walk from the stage , ahnd them to him in a binder and suggest to him that they just may be nbetter qualified than he is to judge medical data/Ed

Debbie please get a binder with the medicla letter on cobs, the science artic elast weak by colin funk and the GS quotes and full article with fitzgeralds comments and have 6 copies ready for the meeting for me to hand 9out if I need them .you should be in whs tuesday in room/ ed
——Original Message——
From:    Anstice, David W.
Sent:    Wednesday, December 05, 2001 11:33 AM
To:      Scolnick, Edward M.; Kim, Peter S; Lewent, Judy C.; Frazier, Kenneth C.; Lahner, Joanne
Subject: FW: Analyst Report on VIOXX

FYI. Stover, again. Please note the final paragraph. David.

——Original Message——

*Anstice*

EXHIBIT NO. *38*

*3-17-05*

L. GOLKOW

Confidential - Subject To Protective Order

MRK-ABI0005912



PLAINTIFF'S
EXHIBIT
**237**

From:     Sender, Gary L.
Sent:     Wednesday, December 05, 2001 10:18 AM
To:       Anstice, David W.
Cc:       Rowan, Jean A.
Subject:     Analyst Report on VIOXX

A RE-ANALYSIS OF MERCK'S META-ANALYSIS
07:16am EST  5-Dec-01 Arnhold & S. Bleichroeder (Rick Stover (212) 698-3141) MR

Arnhold and S. Bleichroeder, Inc.


COX-2 Inhibitor Outlook


A RE-ANALYSIS OF MERCK'S META-ANALYSIS

Merck's Data Show Cardiotoxicity of Vioxx in Arthritis Patients
In this paper, we present the results of our reanalysis of Merck's data. We have
regrouped the analyses to provide greater homogeneity within the patient
population/disease groupings. These include RA and OA, the two most relevant
patient groups/diseases for Vioxx in current clinical use. We conclude that data
from the meta-analysis do not support Merck's contention that naproxen is
cardioprotective. Vioxx CV event rates are comparable when compared to placebo
and to naproxen in both rheumatoid and osteoarthritis patients.

Arcoxia (etoricoxib), Merck's second-generation COX-2 inhibitor, shows
comparable cardiovascular event rates versus naproxen, as has been seen with
Vioxx, posing increased uncertainty for the future of Merck's COX-2 inhibitor
franchise, we believe.

Because of the excess of serious adverse thrombotic events seen with Vioxx in
the VIGOR trial, Merck performed a pooled analysis (meta-analysis) of serious
adverse cardiovascular events that occurred in all clinical trials of Vioxx up
to September 2000. Merck presented preliminary results of its meta-analysis at
the FDA's Arthritis Advisory Committee meeting on February 8, 2001. Merck
researchers also presented these findings at the European Congress of
Rheumatology (EULAR 2001) meeting in Prague in June, and subsequently published
more comprehensive data from the analysis in Circulation in early November.

The meta-analysis is the foundation of Merck's defense of Vioxx's cardiovascular
safety and the contention that the results of the VIGOR study may have shown an
"aspirin-like" cardioprotective effect of naproxen. Specifically, the authors
of the study concluded:
"This analysis provides no evidence for an excess of CV events for rofecoxib
(Vioxx) relative to either placebo or the non-naproxen NSAIDs that were
studied."
"Differences observed between rofecoxib and naproxen are likely the result of
the anti-platelet effects of the latter agent."

Naproxen cardioprotection, consistent with its anti-platelet activity, takes on
greater strategic importance for Merck's COX-2 franchise given the disclosure of
an excess of serious adverse thrombotic events with Arcoxia at poster
presentations at the American College of Rheumatology (ACR) meeting in
mid-November.

A meta-analysis combines the results of multiple studies to support findings

Confidential - Subject To Protective Order

MRK-ABI0005913

that a single study may be too small to confirm. The degree of homogeneity of the studies included in a meta-analysis is critical to the validity of its findings. By contrast, heterogeneity among the pooled studies of a meta-analysis may serve to obscure relevant findings; in this case adverse CV events associated with Vioxx.

The FDA first criticized Merck's meta-analysis in a presentation to the Arthritis Advisory Committee at the February meeting, having concluded that the heterogeneity of the clinical studies included in Merck's meta-analysis did obscure relevant facts. Heterogeneity among the studies included:

Different patient populations being studied in different disease conditions, e.g., rheumatoid arthritis (RA), osteoarthritis (OA), Alzheimer's disease, and chronic low-back pain. Differences in study duration from four weeks for chronic low-back pain to several years in Alzheimer's treatment and prevention studies. However, the inclusion of Alzheimer's patients derives from an interim analysis of studies that had not been completed. FDA reviewers noted that differences in adverse CV events did not appear in VIGOR until six weeks after treatment had begun. They also noted that the risk ratio may increase over time.

Differences in Vioxx doses of 12.5 mg., 25 mg., and 50 mg., which were given once daily. The FDA reviewers were concerned that CV risk of Vioxx appeared to increase with dose, suggesting a dose-dependent effect. If so, this would tend to support a molecule-based toxicity rather than a mechanism-based problem. In effect, the FDA was suggesting that Merck's 28,000-patient pooled analysis combined apples, oranges, and grapefruits, giving us a "fruit salad," but little else.

The publication of the meta-analysis, however, provides a basis from which to analyze the data set more completely. It permits one to take a closer look at the bowl of apples, the plate of oranges, and the basket of grapefruits.

In looking specifically at arthritis patients, we came up with very different conclusions. Summarizing these with respect to Vioxx:

1. We found that Vioxx-treated patients experienced a higher incidence of CV events, compared to patients given placebo in both RA and OA studies.
2. We found that Vioxx-treated patients experienced a higher incidence of CV events compared to patients given naproxen both in RA studies other than VIGOR and in OA studies. The higher rate was similar to the magnitude of difference in CV event rates seen in comparisons to placebo.

We found comparisons of CV event rates to non-naproxen NSAIDs to be highly suspect. Four out of five of these OA studies, which enrolled 94% of the patients, consisted of two phases. In the first phase were Vioxx-placebo comparisons. In the second, placebo patients were randomized to either Vioxx or non-naproxen NSAIDs. As a result, the annualized CV event rate seen with Vioxx in the placebo control phase was 1.93% as compared to 1.09% in the non-naproxen NSAID phase.

We continue to believe that Vioxx's cardiovascular toxicity profile represents a serious public health issue. But Merck's persistence in advancing the "myth" of "naproxen cardioprotection" may pose an even more serious public health concern since naproxen lacks aspirin's ability to bind to platelets irreversibly.

Please contact Arnhold & S. Bleichroeder for the full report.

Richard R. Stover

Confidential – Subject To Protective Order

MRK-ABI0005914

Senior Analyst
(212) 698-3141
rick.stover@asbinc.com

Stephanie H. O'Brien
Research Associate
(212) 698-3149
stephanie.obrien@asbinc.com

Gary Sender
(267) 305-1444  UG4AB-15

Confidential - Subject To Protective Order

MRK-ABI0005915

# Exhibit I

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LATOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
VIRGINIA BROWN-WAITE, FLORIDA
JON C. PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT,
INDEPENDENT

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY    (202) 225–5074
FACSIMILE    (202) 225–3974
MINORITY    (202) 225–5051
TTY    (202) 225–6852

http://reform.house.gov

## MEMORANDUM

## May 5, 2005

**To:**          **Democratic Members of the Government Reform Committee**

**From:**          **Rep. Henry A. Waxman**

**Re:**          **The Marketing of Vioxx to Physicians**

On November 9, 2004, the Committee on Government Reform requested that Merck provide the Committee with a wide range of documents related to the anti-inflammatory drug Vioxx. The request expressly sought "all presentations, training sessions, or materials given to Merck employees and agents who marketed Vioxx" and "all records of communication provided to healthcare providers and pharmacists concerning the safety and efficacy of the drug."[1] In response to this request, Merck provided the Committee with over 20,000 pages of internal company documents, including course curricula, bulletins to the field, training manuals, company talking points, memoranda among senior executives, and promotional materials for use with physicians. The Committee also received documents from FDA related to Vioxx.

These documents provide an extraordinary window into how Merck trained its sales representatives and used them to communicate to physicians about Vioxx and its health risks. In fact, the documents may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns.

To assist members in their preparation for the May 5, 2005, hearing on FDA and Vioxx, this memorandum summarizes the key documents received by the Committee. It assesses how Merck trained its sales representatives, whether this training was consistent with a primarily educational purpose for contacts with physicians, and whether Merck's sales representatives were instructed to discuss fairly and accurately the cardiovascular risks of Vioxx with physicians.

---

[1] Letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin (Nov. 9, 2004).

The Committee did not receive documents from Pfizer related to its anti-inflammatory drugs Celebrex and Bextra, nor has the Committee received or reviewed documents from other drugs companies related to the marketing of other drugs.  Thus, this memorandum cannot assess whether Merck's practices are better or worse than or the same as those of other drug companies.

**************************************************

## TABLE OF CONTENTS

EXECUTIVE SUMMARY......................................................................................................2

I.     INTRODUCTION ........................................................................................................4

II.    HOW MERCK TRAINED ITS SALES REPRESENTATIVES ...........................................7

     A.  General Sales Techniques.......................................................................................7

     B.  Specific Marketing Strategies...............................................................................12

III.   COMMUNICATIONS ABOUT VIOXX AND ITS RISKS................................................16

     A.  The VIGOR Trial.................................................................................................16

     B.  The FDA Advisory Committee Meeting.................................................................20

     C.  The *New York Times* Article ...............................................................................23

     D.  *JAMA* Study .......................................................................................................25

     E.  Changes to the Vioxx Label .................................................................................26

IV.   CONCLUSION............................................................................................................29

**************************************************

2

**EXECUTIVE SUMMARY**

By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after evidence of Vioxx's risks had already surfaced. Even as evidence mounted that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. How could this have happened?

A partial answer may be found by examining the strategies that Merck used to market Vioxx to physicians. Based on a review of the Merck documents, it appears that Merck sent over 3,000 highly trained representatives into doctor's offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" — to overcome the cardiovascular "obstacle" to increased sales.

The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bitesize piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise[] his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive," and "expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals. The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products.

The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a *New York Times* article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

For example, the Merck documents show:

3

- **After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs.** This card omitted any reference to the VIGOR findings and was based on data FDA considered to be inappropriate for a safety analysis.

- **After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE … OR THE RESULTS OF THE … VIGOR STUDY."** If physicians asked about the VIGOR study, Merck representatives were directed to respond, "I cannot discuss the study with you."

- **After the *New York Times* reported on the cardiovascular dangers of Vioxx, Merck instructed its field staff to tell physicians that patients on other anti-inflammatory medications were eight times more likely to die from cardiovascular causes than patients on Vioxx.** The Merck bulletin told its sales force to show physicians the Cardiovascular Card and state: "Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDS .8 vs. Placebo 0."

After extensive negotiations, FDA and Merck agreed on a label change for Vioxx in April 2002 that mentioned the cardiovascular findings from the VIGOR study. The final label included the statement that the significance of these findings were "unknown." According to the documents, Merck instructed its representatives to emphasize this statement on new label to counter physician safety concerns.

Drug companies maintain publicly that their representatives play a vital role in the health care system by educating physicians about new drugs and ongoing research. But the Merck documents reveal another side to company marketing efforts. The documents show that Merck trained its representatives to capitalize subtly on every interaction with physicians to promote Merck products. When concerns about Vioxx's safety arose, Merck appeared to use this highly trained force to present a misleading picture to physicians about the drug's cardiovascular risks. Merck's promotional efforts appear to explain in part why Vioxx sales remained strong even as the evidence of the drug's dangers mounted.

## I.    INTRODUCTION

On September 30, 2004, Merck & Co, Inc., announced that in a major clinical trial, patients on the anti-inflammatory drug Vioxx had experienced significantly more heart attacks and strokes than those on a placebo. On the same day, Merck voluntarily withdrew Vioxx from the market.[2]

---

[2] Merck, *Merck Announces Voluntary Worldwide Withdrawal of Vioxx* (Sept. 30, 2004) (online at http://www.vioxx.com/vioxx/documents/english/hcp_notification_ physicians.pdf).

At the time of Vioxx's withdrawal, more than 2 million patients around the world were taking the drug.[3]  Since May 1999, when Vioxx was approved by the Food and Drug Administration, more than 100 million prescriptions had been dispensed in the United States alone.[4]  Vioxx is considered safer for the stomach than aspirin and other anti-inflammatory drugs.  Yet recent research indicates many, if not most, patients on Vioxx were at low or very low risk of stomach problems and would have done well on standard medications.[5]

When exposure to a drug is so widespread, even a small safety problem can have major public health consequences.  A recent study estimated that as many as 88,000 to 140,000 Americans may have suffered Vioxx-related heart attacks, strokes, and other serious medical complications.[6]

The vast majority of Vioxx prescriptions were written after serious safety questions were first raised.  In March 2000, less than a year after approval, Merck announced the results of a clinical trial in which Vioxx was associated with significantly more heart attacks and strokes than another anti-inflammatory drug.[7]  Paradoxically, following the announcement of these results, Vioxx's sales soared.  The drug reached $2 billion in sales faster than any other drug in Merck's history.[8]

Vioxx sales remained strong even as other reports of Vioxx's dangers emerged.  These included new data presented at an FDA advisory committee in February 2001,[9] a major exposé in the *New York Times* in May 2001,[10] an article in the *Journal of the American Medical*

---

[3] *Merck:  Vioxx Withdrawal a Harsh Blow to Drug Giant*, Chicago Tribune (Oct. 3, 2004).

[4] D. Graham et al., *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cyclo-oxygenase 2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs: Nested Case-Control Study*, Lancet, 475–481 (Feb. 5, 2005).

[5] Carolanne Dai, Randall S. Stafford, G. Caleb Alexander, *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release*, Archives of Internal Medicine, 171-177 (Jan. 24, 2005).

[6] *Id.*

[7] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[8] Merck, *Merck Annual Report 2001, We're Strengthening Our Arthritis Franchise* (2002) (online at http://www.anrpt2001.com/4.htm).

[9] Food and Drug Administration, *Arthritis Advisory Committee* (Feb. 8, 2001) (online at http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2.htm).

[10] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

*Association* in August 2001,[11] and changes to the Vioxx label in April 2002.[12]  Despite growing concern over Vioxx's dangers, sales in 2003 reached $2.5 billion.[13]

This memorandum summarizes key Merck documents that shed light on why clinicians continued to prescribe so much Vioxx even as evidence of harm began to mount.  Based on a review of over 20,000 pages of internal company documents, it focuses on an aspect of the drug industry that has historically been hidden from public view:  promotional activities directed at physicians.[14]

Promotions targeting physicians account for the majority of drug industry spending on marketing and promotion.  In 2003, pharmaceutical companies spent $9 billion on marketing and promotion.  Of this amount, $5.7 billion (over 60%) was aimed at physicians.[15]  As many as ninety thousand sales representatives meet with physicians about their companies' products every day.[16]

Vioxx was no exception.  According to Merck, the company assigned over 3,000 company representatives across the country to engage in face-to-face discussions with physicians about Vioxx.[17]

According to the Pharmaceutical Research and Manufacturers Association of America, an industry trade group, the efforts of pharmaceutical representatives are "essential for

---

[11] D. Mukherjee, S. Nissen, and E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[12] Food and Drug Administration, *FDA Approves New Indication and Label Changes for the Arthritis Drug, Vioxx,* FDA Talk Paper (Apr. 11, 2002).

[13] *Merck Withdraws Arthritis Medication,* Washington Post (Oct. 1, 2004).

[14] Other factors beyond the scope of this report have been cited as contributors to robust Vioxx sales. These include Merck's $300 million direct-to-consumer advertising campaign and FDA's failure to strongly and promptly warn the public and physicians of cardiovascular risks. *See New Study Criticizes Painkiller Marketing*, Washington Post (Jan. 25, 2005); Daniel H. Solomon, Jerry Avorn, *Coxibs, Science, and the Public Trust*, Archives of Internal Medicine, 158-160 (Jan. 24, 2005);

[15] According to the Pharmaceutical Research and Manufacturers Association, drug companies spent $5.7 billion on office promotion, hospital promotion, and journal advertising in 2003, compared to $3.3 billion in direct-to consumer advertising. They also spent an additional $16.3 billion in providing samples of medications to physicians. PhRMA, *Pharmaceutical Research and Promotion* (Nov. 2004).

[16] *It's All in the Detail*, Med Ad News (Oct. 1, 2004).

[17] Teleconference briefing by Merck for staff of the Government Reform Committee (Apr. 25, 2005).

physicians, allowing physicians to have sufficient information about new drugs so they can prescribe them appropriately."[18]  The trade group also has stated, "Many physicians learn about new drugs — indeed, about ongoing research in their areas of specialization — largely through information provided by the companies that market new products."[19]

In fact, the documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks.  To the contrary, it appears that Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives.  The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug.

## II.   HOW MERCK TRAINED ITS SALES REPRESENTATIVES

The documents reveal that the 3,000-person sales force Merck used to promote Vioxx to physicians was extraordinarily well trained.  Virtually every possible interaction with physicians — from the act of shaking hands to navigating through complex hospital power struggles — is addressed in some portion of the Merck materials.  The overriding goal of the training appears clear:  to maximize sales of Merck products.

This part of the memorandum describes the general training Merck provided to its sales representatives.  This training instructed the representatives in techniques thought to enhance "professional presence" and "captivate the customer."  It also addressed sensitive subjects such as medical reprints, physician targeting, hospital dynamics, and physician education.  Although not addressed here, Merck representatives were also required to attend numerous courses and exercises covering a variety of medical topics, including pharmacology, anesthesiology, rheumatology, and pain management.[20]

The next part of this memorandum (part III) examines how Merck used this highly trained sales force to communicate with physicians about the risks of Vioxx.

### A.   General Sales Techniques

Merck provided its representatives with extensive training in sales techniques.  This training emphasized that "gaining access and building relationships … are key to providing you

---

[18] PhRMA, *Marketing and Promotion of Pharmaceuticals* (Oct. 23, 2000) (online at http://www.phrma.org/publications/quickfacts/23.10.2000.184.cfm).

[19] *Id.*

[20] *See, e.g.,* Merck, *Analgesic and Anti-Inflammatory Training*, Modules 1-8 (undated).

the opportunity to influence your customers' behaviors."[21]  Merck's sales staff were instructed that a successful career can depend upon "how you present yourself professionally."[22]

Some of the training materials addressed the basic elements of a visit with physicians. For example, the course *Selling Skills* instructed representatives to begin by "painting a word picture that describes a patient type that can benefit from the Merck product."  *Selling Skills* then advised that representatives ask "strategic questions" about the physician's approach to the patient that "help you influence and control the discussion," which should be followed by a transition to a "compelling message" for the Merck product.  The fourth step in the process involved "obstacle handling," which addresses overcoming physician concerns about the product.  Finally, *Selling Skills* instructed representatives that the last step of a visit is "closing," which involves summarizing  "the point(s) you want the customer to remember," checking for agreement, asking for "a specific, realistic, measurable action," and "follow-up to ensure action."[23]

Other training materials taught more sophisticated and subtle techniques.  For example, one Merck course, entitled "Access Success," advised representatives to master nonverbal cues to communicate effectively with doctors.[24]  See Figure 1.

**Figure 1:   Merck Instruction on Face-to-Face Communication**

| Verbal (7%) | Vocal (38%) | Visual (55%) |
| --- | --- | --- |
| *What someone says when listening. . .* | *How they say something when listening. . .* | *What they're doing when listening. . .* |
| ■ Hmmm, Yes, Okay, I see | ■ Sound interested | ■ Nod head |
| ■ Acknowledge | ■ Mimic or match vocal behavior of speaker | ■ Eye contact |
| ■ Ask questions | ■ Use voice inflection and energy | ■ Smile (if appropriate) |
| ■ Summarize | ■ Use empathetic voice | ■ Don't interrupt |
| ■ Stay open to ideas | | ■ Take notes |
| ■ Short periods of silence | | ■ Openness in gestures |

---

[21] Merck, *Professional Presence* (undated).

[22] *Id.*

[23] Merck, *Selling Skills for Hospital Representatives & HIV Specialists* (undated).

[24] Merck, *Access Success* (Apr. 2000).

Similarly, the course "Captivating the Customer" recommended that field staff learn nonverbal techniques involving the eyes, head, fingers and hands, legs, overall posture, facial expression, and mirroring.[25]   Curriculum notes for leaders of the course explained the last concept further:

> Mirroring is the matching of patterns; verbal and non-verbal, with the intention of helping you enter the customer's world.  It's positioning yourself to match the person talking.  It subconsciously raises his/her level of trust by building a bridge of similarity.[26]

In a course entitled "Champion Selling," Merck sought to teach staff to "employ a variety of selling skills and techniques to more effectively handle challenging selling situations."[27]   One such technique was to analogize the "defining moments" of selling Merck drugs to critical points in the lives of "champions" in other fields, including Helen Keller, Martin Luther King, Tiger Woods, and even George Washington.[28]  See Sidebar.

Another important technique emphasized in "Champion Selling" was to assess the personality of doctors in order to determine what type of information would be most convincing to them.  For a doctor with a "technical" personality, sales representatives were taught to "use figures, percentages" in their pitches; for a doctor with a "supportive personality," representatives were advised to "focus on benefits to patients"; and for a doctor with an "expressive personality," representatives were told to "show enthusiasm; appeal to his/her ego."[29]

---

[25] Merck, *Captivating the Consumer* (June 2001).

[26] *Id.*

[27] Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

[28] *Id.*

[29] *Id.*

9

---

**Sidebar:  Analogies in Champion Selling**

*Champion Selling* instructed that when faced with a doctor who does not have time to talk about a Merck product, field staff should recall that "it's those defining moments that distinguish all champions."  Course leaders were asked to remind trainees:

- Helen Keller could have felt sorry for herself when she went blind and deaf.
- Martin Luther King could have laid low when his home was firebombed.
- Tiger Woods could have avoided the pressure by not turning pro as young as he did.
- George Washington could have finished his years with a comfortable life without the challenges of taking on the presidency.*

\* Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

---

Merck paid special attention to teaching its field representatives how to "refocus a conversation from non-business subjects to business subjects."[30]  In one curriculum, sales representatives were asked to judge sample responses to statements from doctors such as "What a nice restaurant!  I hear that the food is wonderful," "I love coming to this restaurant, my husband I come here a lot," "What a great football game yesterday," and "So what plans do you have for the holidays?"[31]  One response suggested for discussion to the last question was:

> Well, my wife and I are going to visit my grandmother.  It should be a lot of fun though I feel so bad for her.  She really has advanced osteoporosis and can't travel at all.  She wasn't on any treatment plan for the longest time.  Physician, what do you think the reasons are that some physicians don't do much about osteoporosis until it's in its advanced stages and nearly too late?[32]

Another curriculum instructed representatives to use a "respond→ advance" model to move conversation gradually from general topics to selling Merck products.[33]  See Figure 2.

---

[30] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[31] *Id.*

[32] *Id.*

[33] Merck, *Ensuring Rewarding HEL Programs* (Apr. 2000).

**Figure 2:  Instructions on Transitioning Topics**



The documents show that Merck trained its sales staff on minute details of encounters with physicians.  One Merck training course, entitled "Professional Presence," even provided detailed instructions on handshakes.[34]  See Figure 3.  The curriculum advised representatives to shake hands when "someone offers his/her hand to you," when "first meeting someone," when "greeting guests,"  when "greeting your host/hostess," when "renewing an acquaintance," and when "saying good-bye."[35]

---

[34] Merck, *Professional Presence* (undated).

[35] *Id.*

11

**Figure 3:  Merck Instruction on Handshake Technique**



The Proper Shake...

Comes with Eye Contact
Is Firm but Painless
Lasts about 3 seconds
Starts and stops crisply
Does not continue through
the entire introduction

USHH Professional
Development System
The Track to the Top

Another section of the same course instructed representatives on where to sit and how to eat when dining with physicians.  For example, the curriculum stated:  "Bread should be eaten one small bitesize piece at a time.  Break off and butter bread one single piece at a time.  Bread dipped in olive oil should also be broken off and eaten one single piece at a time."[36]

## B.      Specific Marketing Strategies

In addition to training its staff in general sales techniques, the documents show that Merck provided its sales representatives with detailed instructions on a range of sensitive subjects specific to the marketing of drugs.  The subjects covered in these materials included selectively using reprints from the medical literature that supported Merck products, tracking detailed prescribing behavior of each clinician in their territory, modeling how to get Merck drugs on hospital formularies, and fostering contact between representatives and key opinion leaders.

**Medical Reprints.**  Merck representatives were trained to use reprints of medical journal articles in sales discussions, but only when those articles presented Merck products in a favorable light.  One course workbook instructed participants that medical journal articles relating to Merck drugs fell into two categories:  "approved" and "background."  "Approved" articles were those to be discussed with doctors because they "provide solid evidence as to why [doctors] should prescribe Merck products for their appropriate patients."[37]  In contrast, "background" articles were not approved for use with physicians.[38]  According to the workbook,

---

[36] *Id.*

[37] Merck, *Join the Club* (Mar. 2001).

[38] *Id.*

12

"These articles may contain valuable background information, but this information cannot be used, and the articles cannot be referenced, during sales discussions with your customers."[39]  In fact, discussing unapproved background articles with physicians "is a clear violation of Company Policy."[40]  Merck instructed representatives to refer any questions about these articles to the medical services department.[41]

**Physician Prescribing Patterns.**  The documents reveal that Merck provided its representatives with highly detailed information on individual doctors' prescribing habits and that this data was used to target physicians to increase their prescribing of Merck drugs.  Merck purchased this prescribing data from an outside company, which obtained the data from pharmacy records of filled prescriptions.[42]  Based on this data, representatives would be given access to monthly reports on each doctor in their territory.  For each doctor, the reports showed the number of filled prescriptions for Merck and competitor products.  They also showed each doctor's "market share" by calculating the percentage of Merck versus competitor product prescriptions.  An important concept was each doctor's "Merck potential," which Merck defined as a "dollar estimate of each prescriber's total prescribing volume that can realistically be converted to Merck prescriptions."[43]

Based on the data for individual doctors, Merck's software could compile monthly reports on overall sales and market share for each representative's territory.  Representatives were told that their bonuses would be based on these overall sales figures, and representatives could see estimates of their bonus along with the data.[44]  Thus, representatives could see a direct correlation between the number of prescriptions they convinced doctors to write each month and their bonuses.

Merck also told the sales representatives that doctors would be given grades from D to A+ for each product category depending on how often they prescribed a Merck product and what percentage of their prescriptions were for the Merck product.[45]  See Figure 4.

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Merck, *Data Sources* (May 2003).

[43] Merck, *Basic Training Participant Guide* (Jan. 2002).

[44] *Id.*; Merck, *Foundations Reference Guide*, *Business Management Field Sales Performance Report (*undated).

[45] Merck, *Basic Training Participant Guide* (Jan. 2002); Merck, *Role of the National Account Executive* (undated).

13

**Figure 4:  Example of Merck Tracking of Physician Prescribing**

# Physician Profile

★ **Specialty:**  Internal Medicine

| | |
|---|---|
| Cash: | 12% |
| MediCaid: | 10% |
| Mail Order: | 10% |
| 3rd Party: | 68% |
| #1 Top Regional Plan: | 35% (24% of total market) |
| # 2 Top Regional Plan: | 25% (17% of total market) |

| | | |
|---|---|---|
| Lipids: | A, | Z Flat (5%), L Inc.(22%), P Dec(34%) |
| AHTN: | B, | Coz Dec(23% All) ACEIs 1st, CCBs 2nd,), Dio Flat(50% All) |
| Migraine: | B, | Max Inc(10%) Imitrex Dec(80%) |
| A&A: | A-, | V Flat (7,6) Ibup Flat(33%) Cel Flat(8.4%) |
| Osteo: | A, | FOS flat(59%), ERT 1st, Act Inc(5%), Evi Flat(19%) |
| Asthma: | B, | Sing Inc(8%) Acc dec(9%), Flo inc(28%), Ser inc(20%) |

Top

Slide 53 of 56

**Hospital Formularies.**  Other instruction provided by Merck addressed approaches for getting Merck drugs onto hospital formularies, which are the lists of the drugs easiest for local physicians to access.  These strategies included an elaborate simulation in which representatives played an entire cast of hospital staff, including departments of pharmacy, orthopedic surgery, emergency medicine, rheumatology, endocrinology, a pain clinic, internal medicine, anesthesiology, cardiology, nursing, and oncology.  The simulation instructions described the "power structures that existed in each department."[46]

Interactions with hospital staff in the simulation were designed to reveal lessons for representatives such as "the importance of leaving no stone unturned and the fact that all personnel in the hospital are potentially useful to you."[47]  The simulation also showed how doctors' ambitions could be used to gain formulary support.  In one scenario, a doctor described as an "ambitious Attending Physician" wants "sponsorship to enable him to attend a major symposium in Sydney, Australia. . . . He was willing to act as a sponsor for Vioxx if you offered

---

[46] Merck, *Hospital Strategy Simulation:  Roleplayers Guide* (Sept. 2000).

[47] *Id.*

14

to help him attend the meeting."[48]  In another scenario the fact that two doctors play golf together is used to gain a sponsor.[49]

Departmental power structures were explored in a scene where a senior trauma nurse is "seen by many as running the department" and does not get along with a new "ambitious young Attending Physician."[50]  The nurse sees the young doctor as "'rocking the boat,'" while he does not like "the power she wield[s]," so the representative in the simulation must turn to a more senior doctor who gets along with the nurse rather than asking the new young doctor for formulary support.[51]  In general, the representatives in the simulation learn to gauge who is influential, ambitious, or a potential informer in a given department and to use this knowledge to maximum benefit in the campaign to achieve formulary status.

**Physician Education.**  Merck's extensive training also addressed how sales representatives could use speaker programs and other educational events as opportunities to enhance sales of Merck products.  These speaker programs, sometimes referred to as Health Education Learning (HEL) programs, often take the form of a dinner and featured speaker or panel of speakers on a topic of medical interest.  Merck advised its representatives to invite speakers based in part on whether they viewed Merck products favorably and whether they were influential among their peers.[52]  One curriculum ranked potential speakers as follows:

> A preferred speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Preferred speakers should have outstanding delivery and provide <u>favorable</u> yet balanced HEL presentations. . . . A recommended speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Recommended speakers also deliver <u>favorable</u>, scientifically balanced programs, however they may not be as strong of a speaker, or as willing to do talks. . . . A speaker classified as "Other" . . . could be one of your speakers in-development, who can deliver <u>favorable</u>, scientifically balanced HEL programs.[53]

In a training for specialty representatives, Merck explained how to create an "Advocate Action Plan" that would help them "sell through the science, by combining scientific data and marketing to create meaningful messaging."[54]  Representatives were provided detailed instructions on how to identify and cultivate a "thought leader" who can "[i]nfluence colleagues

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] Merck, *Specialty Foundations Participant Self-Study Workbook:  Specialty Representative Advocate Development* (May 2001)

[53] *Id.* (emphasis added).

[54] *Id.*

15

through peer-to-peer relationships" and "is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials for available for the product(s)."[55]

Merck told its representatives that fees and honoraria for speakers could range from $250 to $2,000 per engagement.[56]

The Merck documents indicate that education of physicians was not the only barometer of a successful event. Using the abbreviation of "Rx" for prescribing, one curriculum instructed representatives to tally the "% of attendees whose Rx of program-related Merck products increased."[57]

## III.   COMMUNICATIONS ABOUT VIOXX AND ITS RISKS

Merck's meticulous approach to marketing to physicians is reflected in its communications to physicians about Vioxx and its risks. Beginning in March 2000, a series of studies and news reports raised serious questions about the safety of Vioxx. The Merck documents reveal that the company gave its highly trained representatives detailed instructions for responding to these developments. These instructions had a common theme: reassure physicians about the safety of Vioxx by providing highly questionable information about cardiovascular risks. At the same time, Merck continued to use an array of incentives and messages to inspire its staff to market Vioxx aggressively to physicians.

### A.   The VIGOR Trial

After a major study showed a five-fold increase in the risk of heart attacks for patients on Vioxx, Merck instructed its field staff to show doctors a pamphlet suggesting that Vioxx was 8 to 11 times safer than other anti-inflammatory drugs. This pamphlet summarized studies that were not appropriate for an analysis of cardiovascular safety.

At issue was a clinical trial known as Vioxx Gastrointestinal Outcomes Research (VIGOR), whose results were announced to the public on March 27, 2000,[58] and published in the *New England Journal of Medicine* on November 23, 2000.[59] The study randomly assigned more than 8,000 patients with rheumatoid arthritis into two groups. One group received 50 mg per day

---

[55] *Id.*

[56] Merck, *Business Management, HEL Programs* (undated).

[57] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[58] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R),* PR Newswire (Mar. 27, 2000).

[59] C. Bombadier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,* New England Journal of Medicine, 1520–8 (Nov. 23, 2000).

of Vioxx for approximately nine months, while the other received the anti-inflammatory drug naproxen. According to Merck's press release, the patients receiving Vioxx had fewer gastrointestinal problems, while the patients receiving naproxen suffered fewer heart attacks and strokes.[60] The actual data from the study showed that patients in the VIGOR study on Vioxx were five times more likely to suffer a heart attack than those on naproxen.[61]

Soon after the release of these results, physicians began asking Merck representatives whether Vioxx could cause heart attacks. On April 28, 2000, in a bulletin to "all field personnel with responsibility for Vioxx," Merck provided a "new resource" "to ensure that you are well prepared to respond to questions about the cardiovascular effects of Vioxx."[62] The resource was the "Cardiovascular Card."

The Cardiovascular Card was a tri-fold pamphlet containing data that supported the safety of Vioxx. One panel, featuring the headline "Overall Mortality Rates," indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks and strokes.[63] See Figure 5. Another panel indicated that the rate of heart attack among patients on Vioxx was less than half of the rate of patients receiving placebo and virtually identical to that of patients receiving other anti-inflammatory drugs.[64]

**Figure 5: Selection from the Cardiovascular Card**

### Overall mortality and cardiovascular mortality[*,1]

Events per 100 Patient-Years

|  | VIOXX N=3,595 | NSAIDs[†] N=1,565 | Placebo N=783 |
|---|---|---|---|
| Total mortality | 0.1 | 1.1 | 0.0 |
| Cardiovascular mortality | 0.1 | 0.8 | 0.0 |

---

[60] Merck took the position that the study's cardiovascular results showed the cardioprotective effect of naproxen, not the dangers of Vioxx. *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R),* PR Newswire (Mar. 27, 2000).

[61] Merck, *Bulletin for Vioxx: New Obstacle Response* (May 1, 2000).

[62] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[63] Merck, *Cardiovascular System,* 4 (2000).

[64] *Id* at 3.

17

Merck gave its representatives specific instructions on how to use the Cardiovascular Card. According to these instructions, Merck's representatives were to refer to the mortality data and "use this page to show physicians that in terms of mortality, which is most important to the physician and their patients, the rate for total mortality and cardiovascular mortality was low."[65]

The data presented in the Cardiovascular Card appears to have little or no scientific validity. The card did not present actual numbers of events or any statistical tests of significance, which are standard in medical communications. It also did not contain any information from the VIGOR study, the most recent study of cardiovascular safety in rheumatoid arthritis patients.[66]

Instead, the card presented pooled data from clinical trials conducted prior to the drug's approval in osteoarthritis patients. For several reasons, however, these studies were not appropriate for an overall analysis of cardiovascular safety. For example:

- Vioxx's pre-approval studies involved few patients taking the doses of Vioxx that were linked to heart problems. According to FDA, fewer than 300 patients in these studies took as much as 50 mg per day of Vioxx for more than 6 months,[67] compared to approximately 4,000 patients in the VIGOR study.[68] As a result, the studies were not nearly as sensitive as VIGOR in detecting a possible problem with the drug.

- The pre-approval studies had been conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks and strokes. None of these early studies had included an expert assessment of whether adverse events were related to the cardiovascular system.[69] Such an "adjudication" process improves the quality of the data and was part of the VIGOR study.

- The pre-approval studies varied widely, involving different doses, different patient populations, and different comparator drugs. In 1999, prior to Vioxx's approval, FDA had expressed serious concerns about combining these disparate studies in a single safety analysis.[70]

---

[65] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[66] Merck, *Cardiovascular System* (2000).

[67] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety,* 19 (Feb. 8, 2001).

[68] *Id.* at 5.

[69] Telephone briefing between Merck and minority staff, Government Reform Committee (Apr. 28, 2005).

[70] In 1999, Merck attempted to combine the pre-approval studies to advance a position on Vioxx's gastrointestinal safety. FDA made a special presentation to the advisory committee on the problems with combining these different studies. Food and Drug Administration, Arthritis Advisory Committee, *Review of NDA #21-042, Vioxx (Rofecosib) Merck Research Laboratories,* 162–167 (Apr. 20, 1999).

The analyses presented in the Cardiovascular Card were not drawn from a scientific paper.[71]  The card's two references included "data on file" at Merck and a brief research abstract from a 1999 meeting of the American College of Rheumatology.[72]

When given the opportunity, FDA scientists have expressed "serious concerns" about using the data summarized on the Cardiovascular Card to address cardiovascular safety.[73]  One FDA medical reviewer, in a briefing this week with Committee staff, said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to present mortality comparisons from these trials to physicians.[74]

On May 1, 2000, Merck sent another bulletin to "all field personnel with responsibility for Vioxx."[75]  This bulletin instructed the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex."[76]  This response again involved advice to representatives to respond to physicians by "guiding them through the Cardiovascular Card."[77]

Notwithstanding the results of the VIGOR study, Merck's employees were given new financial incentives to sell Vioxx.  In the spring of 2000, Merck launched the "2000 Field

---

[71] A pooled analysis of a subset of the studies included in the card was published in the January 15, 2002, issue of the *American Journal of Cardiology*.  This analysis did not provide any data on mortality and did not present data on strokes and heart attacks as presented in the Cardiovascular Card.  A. Reicin et al., *Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-Inflammatory Drugs (Ibuprofen, Diclofenac, and Nabumetone)*, American Journal of Cardiology, 204–9 (Jan. 15, 2002).

[72] When compared against the abstract, the Cardiovascular Card appears to substantially overstate the amount of data used for the analysis of mortality.  According to the abstract, this analysis was based on data from 3,595 patients on Vioxx treated for an average of 5.5 months each.  By contrast, the Cardiovascular Card indicates that the mortality analysis was based upon 3,595 "person-years" of data on Vioxx.  This would be the equivalent of 3,595 patients treated for an average of 12 months each.  Brian Daniels and Beth Seidenberg Rahway, *Cardiovascular Safety Profile of Rofecoxib in Controlled Clinical Trials*, Arthritis and Rheumatism, S143 (1999).

[73] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[74] FDA briefing for staff of the Government Reform Committee (May 3, 2005).

[75] Merck, *Bulletin for Vioxx:  New Obstacle Response* (May 1, 2000).

[76] *Id.*

[77] *Id.*

Incentive Plan for Vioxx."[78]   This plan promised rewards to the company's hospital representatives, specialty representatives, and other sales representatives if the Vioxx share of the market for exceeded certain thresholds.  As a bulletin to field staff explained:

1.   Hit 51% . . . for at least one month by March 2000 and get $2,000!
2.   Hit 55% . . . for at least one month between April and December 2000 and get $2,000!
3.   Hit 61% . . . for at least one month between April and December 2000 and get $2,000![79]

To achieve this sales growth, in mid-2000, Merck set a basic strategy for outreach to physicians.  The plan was for field representatives to highlight Vioxx's effectiveness against pain and to transition quickly from any discussion with doctors on safety back to efficacy.  As a memo to company vice presidents dated July 28, 2000, stated:

In order to win the on-going . . . battle, many of you agree our sales force needs to STOP defending Vioxx against the outrageous claims from our competitors, and START offensively selling the core benefit of this product . . . EFFICACY.[80]

### B.   The FDA Advisory Committee Meeting

Attention to the cardiovascular risks of Vioxx surged in February 2001 as the result of a meeting of the FDA Arthritis Advisory Committee.  After FDA scientists raised serious concerns about the drug's safety, the Committee voted that doctors should be informed about the data from the VIGOR study.  The next day, however, Merck instructed its field representatives not to discuss the VIGOR results with doctors and instead reassure physicians using the Cardiovascular Card.

In advance of the advisory committee meeting, FDA scientists provided the Committee with an analysis of all studies on Vioxx conducted to date.[81]   FDA's assessment covered:

- The VIGOR study, which found a substantial and statistically significant increase in all serious thrombotic events, including heart attack and stroke, in patients on Vioxx compared to patients on naproxen;[82]

---

[78] Merck, *Bulletin for Vioxx:  2000 Field Incentive Plan for Vioxx* (Apr. 5, 2000).

[79] *Id.*

[80] Merck, *Memo re:  Offensive Positioning for Vioxx* (July 28, 2000).

[81] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety,* 19 (Feb. 8, 2001).

[82] *Id.* at 9–12.

20

- Another study, called the Advantage study, which showed a trend toward excess heart attacks in osteoarthritis patients in the Vioxx group, compared to naproxen;[83] and

- Two new studies, 085 and 090, which, according to FDA, appeared to "follow the pattern observed in the VIGOR study." These studies were conducted in patients with osteoarthritis.[84]

FDA also addressed whether Vioxx's pre-approval studies, which were the basis of the Cardiovascular Card, could be used to assess the drug's cardiovascular safety. The agency informed the committee that the studies should not be used for a safety analysis. Regarding the pre-approval study 058, the FDA reviewer wrote:

Because of the small size and short duration, this study is inadequate to detect differences in clinically relevant adverse events between rofecoxib [Vioxx] and nabumetone [another anti-inflammatory drug].[85]

Regarding study 069, which contained data on a set of other pre-approval studies, the reviewer stated:

The Division has serious concerns with a combined analysis of studies of different length and dosing regimens. The database overall included short term, low doses of rofecoxib [Vioxx]. . . . None of the studies were powered to detect differences in serious CV [cardiovascular] thrombotic events compared to the active comparator.[86]

The Arthritis Advisory Committee heard from FDA, the public, and Merck.[87] The Committee then concluded that clinicians should be informed that VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."[88]

---

[83] *Id.* at 18.

[84] *Id.* at 17.

[85] *Id.* at 19.

[86] *Id.*

[87] At the meeting, Merck presented a large pooled analysis of all Vioxx trials. In response, FDA told the advisory committee that combining so many different studies to assess safety was fundamentally flawed. Bonnie Goldmann, Regulatory Affairs, Merck Research Laboratories, *FDA Arthritis Advisory Committee* (Feb. 8, 2001); Quan Li, *Advisory Committee Presentation on Vioxx: Discussion on the Metaanalysis for Cardiovascular Risk Assessment* (Feb. 8, 2001).

[88] Food and Drug Administration, *Transcript of Meeting of Arthritis Advisory Committee, NDA # 21-042/s007, Vioxx (Rofecoxib, Merck)*, 206 (Feb. 8, 2001).

The next day, Merck sent a bulletin to "all field personnel with responsibility for Vioxx."[89]  The bulletin instructed the sales force to "stay focused on the EFFICACY messages for VIOXX."[90]  Contrary to the Committee's recommendation, the bulletin advised:

> DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE … OR THE RESULTS OF THE …VIGOR STUDY.[91]

To respond to doctors who asked about these topics, Merck instructed its field representatives to take three steps.

First, Merck told representatives to say that "because the study is not in the label, I cannot discuss the study with you."[92]  This position did not accurately reflect FDA regulations.  Under the law, pharmaceutical representatives are permitted to discuss evidence of safety concerns with doctors, even if such data are not on the drug's label.[93]

Second, Merck told the representatives to advise physicians to submit written questions to the company's medical services department.  Responses to these questions described the same highly questionable data used in the Cardiovascular Card data before discussing VIGOR and other studies.  For example, one response to a clinician contained the same mortality table used in the Cardiovascular Card, but without the column for "placebo."  The text stated, "Both the overall mortality . . . and the cardiovascular mortality was lower in the rofecoxib [Vioxx] group compared to the NSAID group."[94]

Third, Merck told representatives to refer to the Cardiovascular Card.[95]  Staff were apparently instructed not to leave this pamphlet with physicians.[96]

FDA's advisory committee meeting did not slow Merck's marketing of Vioxx.  Early in 2001, Merck launched "Project A&A XXceleration" to reach sales goals through "revised

---

[89] Merck, *Bulletin for Vioxx:  FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[90] *Id.*

[91] *Id.*

[92] Merck, *Bulletin for Vioxx:  FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[93] 21 CFR 202.1

[94] Letter from Jeffrey M. Melin, Associate Director, Medical Services to Dr. Joseph Torg (Mar. 16, 2001).

[95] Merck, *Bulletin for Vioxx:  FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[96] It was a "non leave" sales aid. *Id.*

22

targeting, messaging and advocate development." [97]  "A&A" refers to arthritis and analgesia, two clinical indications for Vioxx.  The slogan for Project A&A XXceleration was apparently "In It to Win It."[98]

As part of this effort, in an April 2001 bulletin for office-based field staff, Merck instructed that each salesperson make a list of his or her "top 50" physicians who were considered "high volume targets."[99]

On April 27, 2001, Merck executive Jo Jerman left a voice mail for field staff involved in Project A&A XXceleration.  She stated:

> The most recent performance numbers show a continued trend upward … the share of VIOXX in the A&A market is up to 17.2% — that's an all time high —and the share of VIOXX in the Coxib market 51.2% — another all-time high.  Woo doggie!  That is exciting.[100]

She concluded:

> The only thing left is to put "Project A&A XXceleration" into overdrive … the time is now and I wouldn't want anyone on the task but all of you.  Last, but certainly not least, you've got some extra dollars to shoot for as well.  As you recall from our incentive program, if you hit those 2–4 share point increases, you'll be rewarded handsomely . . . . Go get em guys, Good luck and Great selling![101]

## C.    The *New York Times* Article

On May 22, 2001, a long article on the front page of the business section of the *New York Times* raised questions about the cardiovascular safety of Vioxx.  Merck responded by instructing representatives to read favorable data on the Cardiovascular Card directly to physicians.

The *New York Times* article described a pharmaceutical industry analyst who "was warning his clients, many of them institutional investors who hold Merck shares, that they should

---

[97] Merck, *Bulletin for Vioxx:  ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[98] Merck, *MVX for Vioxx:  Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[99] Merck, *Bulletin for Vioxx: ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[100] Merck, *MVX for Vioxx:  Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[101] *Id.*

23

watch the issue carefully since it could hurt the company's stock price." The article also quoted FDA Arthritis Advisory Committee member Dr. M. Michael Wolfe, who stated, "There must be a warning . . . . The marketing of these drugs is unbelievable . . . . I'm sure there are many people out there who are taking these drugs that should not be."[102]

In response, Merck quickly issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety of Vioxx."[103]  Inside FDA, scientists rejected this conclusion.  In a warning letter to the company sent several months later, FDA would cite the title of Merck's press release as "simply incomprehensible" in the face of data from the VIGOR study.[104]

A Merck bulletin to its field representatives also emphasized the drug's safety.  The bulletin again advised:

> DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE ...VIGOR STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.[105]

In the case that a physician had further questions, Merck instructed its representatives to display the Cardiovascular Card.  The bulletin told field staff to highlight data on the card suggesting that Vioxx might be much safer than other "NSAIDS," non-steroidal anti-inflammatory drugs.[106]  Specifically, Merck advised representatives to state:

> Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDs .8 vs. Placebo 0.[107]

---

[102] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

[103] Merck, *Merck Confirms Favorable Cardiovascular Safety of Vioxx* (May 22, 2001).

[104] This warning letter contained other examples of inappropriate promotions of Vioxx. These were educational events in 2000 in which a Merck consultant provided false data or made extremely inappropriate comparisons between Vioxx and other products.  In response, Merck stated that the events violated company policy and had stopped using the speaker in question.  At the request of FDA, Merck also sent letters to physicians who attended the educational events. Letter from Thomas W. Abrams, Director, Division of Marketing, Advertising and Communications, Food and Drug Administration, to Raymond V. Gilmartin, President and CEO, Merck & Co, Inc. (Sept. 17, 2001); Letter from Louis M. Sherwood, Senior Vice President, U.S. Medical & Scientific Affairs, Merck, to Health Care Provider (Nov. 2001).

[105] Merck, *Bulletin for Vioxx:  Action Required:  Response to New York Times Article* (May 23, 2001).

[106] *Id.*

[107] *Id.*

24

### D.   *JAMA* Study

On August 22, 2001, a study published in the *Journal of the American Medical Association* (*JAMA*) raised serious questions about the safety of Vioxx and other drugs in its class.  In an alert to field representatives about this study, Merck urged them to express confidence in Vioxx's cardiovascular safety and use the Cardiovascular Card.

The *JAMA* paper reviewed new data from VIGOR and other recent studies on the safety of Vioxx and Celebrex, a similar drug.[108]  Authors Dr. Debobrate Mukherjee, Dr. Steven E. Nissen, and Dr. Eric J. Topol from the Cleveland Clinic concluded that there was evidence of a "potential increase in cardiovascular event rates for the presently available COX-2 inhibitors."[109]  Until additional studies of safety are conducted, they wrote, "we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."[110]

One day prior to the *JAMA* paper's release, Merck executive Jo Jerman left a confident and reassuring voice mail for the company's field representatives.  She stated:

> #1.  Stay focused.  Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of VIOXX.[111]

Ms. Jerman also instructed representatives that "if asked about CV effects, use your CV card."[112]  She continued: "As your piece shows, CV events and cardiovascular mortality rates between Vioxx and NSAIDS ... were similar in [osteoarthritis] studies."[113]  Ms. Jerman then reminded Merck's field representatives that additional information from the medical services department could be faxed to physicians upon request.[114]

The *JAMA* paper did not lead Merck to moderate its approach to selling Vioxx.  Instead, in the fall of 2001, Merck launched Project Offense, a major new marketing campaign with the

---

[108] D. Mukherjee, S. Nissen, E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitor*s, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[109] *Id.*

[110] *Id.*

[111] Merck, *MVX for Vioxx, Field Sales—USHH, Jo Jerman, August 21, 2001, "JAMA article" FINAL (approx 4 minutes)*, 3  (Aug. 21, 2001).

[112] *Id.*

[113] *Id.*

[114] *Id.*

goal of increasing Vioxx's share of the market.[115]  The central message of Project Offense was efficacy.  The company instructed its sales representatives to emphasize that Vioxx demonstrated a potential advantage over narcotics for pain management.

As part of Project Offense, Merck instructed field representatives to deliver the efficacy message multiple times to top prescribers (those physicians who had the highest rates of prescribing Vioxx to their patients).  The representatives were also expected to "quickly and effectively address all physician obstacles and return to the core messages for VIOXX."[116]  Merck used the term "obstacles" to refer to concerns physicians might have about prescribing Vioxx.

Project Offense included a decision tree to help address the cardiovascular safety concerns of physicians.  Known as the "CV Obstacle Response," this decision tree began by advising field representatives to tell doctors about the differences between Vioxx and aspirin.[117]

Merck then advised its field representatives to "REVIEW ENTIRE CV CARD" with doctors, including:

- CV thromboembolic Adverse Events per 100 patient years
- Specific CV events
- Overall Mortality
- CV Mortality[118]

The "CV Obstacle Response" concluded:

Doctor, I hope this data has addressed your concern.  Let me show you some new efficacy data for VIOXX.[119]

## E.    Changes to the Vioxx Label

Nearly two years after Merck filed a request for label changes for Vioxx based on the results of the VIGOR study, FDA approved a new label that discussed the cardiovascular risks of the drug.  The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses.  It also was due to a series of disputes between the agency and the company.  Under the Food, Drug and Cosmetic Act, FDA and manufacturers must agree on label changes.  For approximately six months, Merck resisted a variety of FDA's

---

[115] Merck, *Project* OFFENSE *MEETING AGENDA & CONTENT:  Representative Meetings* (2001).

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

proposals, leading to an extended series of conference calls to negotiate differences. Throughout this period, Merck continued to use the Cardiovascular Card with physicians. Eventually, it appears that FDA officials conceded on several key points of dispute.

FDA initially requested that the label warn physicians that Vioxx could cause heart attacks and other cardiovascular problems. FDA proposed that the warning state:

> VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.

> The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with VIOXX 50 mg (0.5%) as compared to patients treated with naproxen (0.1%). . . . This finding was consistent in a smaller and shorter study using VIOXX 25 mg that allowed the use of low dose ASA [aspirin]. Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators other than naproxen have not been performed.[120]

This warning was unacceptable to Merck, which sought to move information on the VIGOR study to the "precautions" section.[121]

Merck sought to add additional data to the label from other studies, including results from ongoing studies in Alzheimer's Disease.[122] FDA initially advised against including these studies, saying that the studies should be completed and their findings incorporated in the label later.[123]

On February 15, 2002, FDA proposed to Merck that the label include a special graphic called a Kaplan-Meier curve to show a worsening of cardiovascular risks on Vioxx for those with the longest exposure to the drug.[124] During a teleconference, FDA officials stated that the "best way to display the data is the Kaplan Meier curve."[125] FDA's minutes of the call add, "Note: The time devoted to how to best display cardiovascular safety from VIGOR reflects how important the Agency considers the topic of clear labeling of safety information."[126] Merck objected to the idea.[127]

---

[120] Merck, *FDA Text of 15 Oct 2001 with Merck Proposals Shown with Revision Marks* (2001).

[121] *Id.*

[122] Food and Drug Administration, *Telecon Minutes* (Jan. 30, 2002).

[123] *Id.*

[124] Food and Drug Administration, *Telecon Minutes* (Mar. 7, 2002).

[125] *Id.*

[126] *Id.*

[127] *Id.*

By the end of the negotiation, FDA gave ground on several key issues. Two Alzheimer's studies, which showed no increase in cardiovascular events, were noted in the label. The Kaplan-Meier curve was not included. The cardiovascular risk was listed not as a "warning," but as a "precaution." And perhaps most important to Merck, the label included the statement that "the significance of the cardiovascular findings of these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."

But Merck did not get everything it wanted in the label. The company had sought to include in the label data from Vioxx's pre-approval studies — the same studies summarized in the Cardiovascular Card that the company's representatives had been showing to physicians for two years.[128] FDA rejected Merck's proposal. According to the agency, the analysis of pre-approval data was "not adequately informative to warrant inclusion in the label" because the analysis included "trials of different design, size, and duration, using different doses of VIOXX and different comparators."[129]

After the label change, Merck altered its instructions to field representatives regarding cardiovascular risk. The new instructions still prohibited representatives from initiating discussion on any new cardiovascular data. But the instructions now drew heavily from the language in the label that emphasized uncertainty about the cardiovascular risk of the drug.

For example, on September 17, 2003, Merck sent a bulletin to its sales representatives about a pending abstract to be presented at a meeting of the American College of Rheumatology. The abstract, which was based on epidemiological research funded by Merck, reported a higher risk of heart attack in patients on Vioxx compared to those on its competitor Celebrex or placebo.[130] Merck instructed its representatives:

> DO NOT INITIATE DISCUSSIONS ON ANY OF THE UPCOMING ABSTRACTS ON VIOXX THAT WILL BE PRESENTED AT THIS YEAR'S AMERICAN COLLEGE OF RHEUMATOLOGY MEETING.[131]

The bulletin contained an "obstacle response" to be used in case a physician asked a Merck representative about the study. The response instructed representatives to review selected portions of the label and then say, "As stated here in the label, the significance of the cardiovascular findings ... is unknown."[132]

---

[128] Food and Drug Administration, *Telecon Minutes* (Feb. 8, 2002).

[129] *Id.*

[130] Merck, *Bulletin for VIOXX: Upcoming Abstracts for VIOXX at the 2003 American College of Rheumatology Meeting and Obstacle Response for Observational Analysis by Solomon, et. al.* (Sept. 17, 2003).

[131] *Id.*

[132] *Id.*

Similar instructions were given to representatives in response to other research showing an elevated risk of cardiovascular complications with Vioxx.[133]

Meanwhile Merck's promotional efforts continued.  In 2003, Merck launched "Project Power Play" with the objectives to "gain or extend coxib leadership,"  "play offense on efficacy," and "stay on strategy."[134]

## IV.  CONCLUSION

A review of over 20,000 pages of Merck documents suggests that the company used its sales force of thousands to counter growing evidence of concern over the safety of Vioxx.  These efforts involved providing highly questionable information to physicians and pursuing aggressive marketing strategies.  Merck's promotional activities appear to help explain robust sales of Vioxx despite mounting evidence of risk.

---

[133] Merck, *Bulletin for Vioxx:  Action Required:  Observational Analysis by Graham et al.* (Aug. 24, 2004).

[134] Merck, *Bulletin for VIOXX: Project Power Play Teleconferences* (Apr. 4, 2003).

# Exhibit J

Maura O'Neill
69 King Street
Suite 800 #405
Alexandria, VA 22314

U.S. District Court

Clerk of Court

75 Ted Turner Dr SW

Atlanta, GA 30303-3301



UNITED STATES POSTAL SERVICE     Retail

US POSTAGE PAID
**$11.55**
Origin: 22116
08/33/22
5165400241-07

USPS RETAIL GROUND®

2 Lb 7.30 Oz.

1006

C039

SHIP TO:
75 TED TURNER DR SW
ATLANTA GA 30303-3315

USPS TRACKING #

9534 6156 3744 2235 9280 22



**Handle with Care / Fragile**