## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAURA O'NEILL,

        Plaintiff,

v.

NYU LANGONE HOSPITALS,
NEW YORK- PRESBYTERIAN
HOSPITAL QUEENS, LENOX
HILL HOSPITAL, GRADY
MEMORIAL HOSPITAL
CORPORATION, MOUNT SINAI
BETH ISRAEL, NORTHSIDE
HOSPITAL, INC., COLLEGE
PARK POLICE DEPARTMENT,

        Defendants.

CIVIL ACTION FILE NO.:
1:22-cv-00011-SEG



FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

OCT 11 2022

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**EMERGENCY MOTION**

## PLAINTIFF'S MOTION TO ENJOIN AND HEARING REQUEST

    **COMES NOW** Plaintiff Maura O'Neill ("Plaintiff"), and, moves the Court

for a permanent injunction against Grady Memorial Hospital Corporation

("Grady") and all Northside Hospital, Inc. ("Northside") under O.C.G.A. § 9-5-1,

O.C.G.A. §§ 31-33-1, 31-33-2, O.C.G.A. § 24-12-1, O.C.G.A. § 16-10-94.1,

O.C.G.A. § 16-10-94(a), O.C.G.A. § 16-10-94(c), O.C.G.A. § 24-7-702, O.C.G.A.

§ 16-11-67, O.C.G.A. § 16-11-62(1), and O.C.G.A. § 24-9-901.

    Plaintiff is entitled to a permanent injunction to prevent Grady's and

Northside's ongoing illegal acts, including, but not limited to the illegal withholding of records and information from O'Neill in violation of state and federal statutes. This motion is supported by Plaintiff's Brief in Support of Permanent Injunction and prior filings in this action.

## A.  Grady's and Northside's Unconstitutional Standard

Separate but equal.  During a dark phase in American history, separate but equal was regarded, not simply as a valid legal doctrine, but as constitutional law, supported by the Supreme Court, to deprive one group of people of its constitutional rights. *Plessy v. Ferguson*, 163 U.S. 537, 538, 16 S. Ct. 1138, 1138, 41 L. Ed. 256 (1896).  Separate is of course, not equal, and the systems of inhumane discrimination separate but equal authorized remains a stain on American history.  Here, the defendants in this action have employed another system, "Higher and Different."  Under the illegal and unconstitutional Higher and Different farce, Plaintiff is held to Higher and Different standards that not only do not exist, but are in fact so farcical that they are untethered to reality, let alone any legal or ethical standard.  As described in detail below, at the same time Plaintiff is held to farcical Higher and Different standards that simply do not exist for other people, the defendants in this action have repeatedly violated Plaintiff's most basic human rights, broken numerous federal and state laws, destroyed evidence, and commit numerous criminal acts; all in order to protect a man who

2

has racked up more signed legal agreements per year than Harvey Weinstein to silence the women he raped and abused.[1]

### B. Legal Alteration of Medical Records

Altering a medical record to attempt to hide acts of fraud, medical malpractice, or criminal behavior is a felony, and the falsification of medical records can cause healthcare providers to be indicted on criminal charges and face onerous civil penalties.[2] According to the American Health Information Management Association ("AHIMA"), providers should make a new note and include the current date and time if they wish to change medical records.[3] The note should be labeled, "Late Entry," "Correction," or "Addendum." *Id.* Importantly, it is paramount that the provider *explain the relationship of the new note to a previous one, including the reason for the error, and the source of the new information. Id. (Emphasis added). Records should always reflect who did*

---

[1]When *The New York Times* published its article on October 5, 2017 that played a large part in Harvey Weinstein's downfall, the *Times,* after months of investigation, had been able to track down eight settlement agreements Weinstein signed with his victims. Kantor, Jodi; Twohey, Megan. "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades." *The New York Times.* October 5, 2017. O'Neill was informed Wilder has at least six or seven signed agreements with women he raped or abused. At the time the *Times* article about Weinstein was published, Weinstein was 65 years old. Wilder is only 49. Thus, Wilder has accumulated more signed documents per year than Weinstein.

[2]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

[3]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24

***what.*[4]** *(Emphasis added).*  Finally, a provider making a change to a medical record should draw a line through the incorrect entry, although the text should be legible.[5]

If an omission in a medical record is noticed after a short amount of time, a late entry can be made only if the person documenting has "total recall" of the omitted information.[6]  Thus, filling in missing information after the fact may lead to a misrepresentation of events if done improperly, and filling in omissions may also be illegal, and lead to criminal charges.

HIPAA requires all hospitals, including Hospital Defendants[7] to have standard audit controls, and to "[i]mplement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information."  45 C.F.R. § 164.312(b).

### *C. Criminal Acts*

---

[4]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

[5]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

[6]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

[7]On January 4, 2022, Plaintiff filed a complaint against several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYPQ"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").[7]

The alteration and / or falsification of medical records is a crime in most

states, and is usually dealt with harshly. *Elbar, Inc. v. Claussen* (1989, Tex App

Dallas) 774 SW2d 45. Alteration of a patient's record by a doctor for the purpose

of defeating an actual or potential claim "is reprehensible and evidences a moral

deficiency and disregard for the rights of others that [courts] regard as odious and

repugnant." *Paris v. Michael Kreitz, Jr.,* 75 NC App 365, 331 SE2d 234 P.A.,

(1985). In most cases the act of requesting copies of a client's hospital records by

an attorney investigating a claim triggers a health care provider's apparent need to

alter medical records to affect the outcome of the investigation. *Langager v. Lake*

*Havasu Community Hospital,* 799 F2d 1354, 135 (1986, CA9 Ariz).

### D. Request for Information

On June 6, 2022 Plaintiff started sending letters to hospitals, including

Grady and Northside, requesting two basic pieces of information:

- Confirmation the hospital does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at the hospital about O'Neill or receive any information about her medical records or have access to information about her medical care.
- Confirmation the hospital does not have any additional records, data, or information that the hospital used to make decisions about O'Neill's healthcare that are not included in her medical record.

Despite the fact that the two requests for information are incredibly basic,

not a single one of the Hospital Defendants fully complied with HIPAA and state

laws and responded to O'Neill's request. Georgia law gave Grady and Northside

5

thirty days to respond, yet neither did. Thus, Northside and Grady failed to comply with HIPAA and state law requirements. [*See* O.C.G.A. §§ 31-33-1, 31-33-2, O.C.G.A. § 24-12-1].

Given the Hospital Defendants lack of responsiveness, in June 2022, O'Neill went to New York, and spoke to Beth Israel. Beth Israel stated it does not have a Power of Attorney or authorization on file. It also stated the only information it has on record is in O'Neill's medical record, and referred O'Neill to its parent company, Mount Sinai Health System ("MSHS"). However, MSHS refused to respond to O'Neill's requests for information or state whether MSHS has records about O'Neill Beth Israel does not possess even though New York's Public Health Law § 18(2) required the New York Defendants to respond within ten days, and MSHS failed to comply with the law. Likewise, when O'Neill spoke to the medical records department at NYU Langone, she was informed that the Patient Relations team, an arm of NYU's legal team, has additional records about Plaintiff.

Thus, what became obvious is that the Hospital Defendants are maintaining two separate and distinct sets of records. One O'Neill has access to (e.g., the records at Beth Israel) and another O'Neill has been deprived access to (e.g., the records at MSHS) despite the fact that an organizaiton maintaining two sets of books is clearly a red flag showing consciousness of guilt of fraud. Given the fact the Hospital Defendants have two sets of records, it is clear that the Hosptial

6

Defendants purposefully sought to defraud and harm O'Neill despite their

fiduciary duties to O'Neill.

### E. Georgia Law

Under Georgia law, a "record" means:

a patient's health record, including, but not limited to, evaluations, diagnoses, prognoses, laboratory reports, X-rays, prescriptions, *and other technical information used in assessing the patient's condition, or the pertinent portion of the record relating to a specific condition or a summary of the record.* O.C.G.A. § 31-33-1. (Emphasis added).

Thus, under Georgia law, O'Neill has a right to view "information" used in

"assessing" her "condition" or the pertinent portion of the record relating to a

specific condition. O.C.G.A. § 31-33-1. Despite the plain language of the statute,

both Grady and Northside have failed to provide O'Neill with any facts to support

the baseless opinions contained in O'Neill's medical records from Grady and

Northside, despite O'Neill's June letters.

Rather, it is clear when reading O'Neill's medical records from Grady and

Northside that her medical records are based on information that is not contained in

her medical records. In fact, there is no factual basis or support for numerous

statements written in Gray's and Northside's medical records, and it is clear

Defendant's support for several statements in Plaintiff's medical records is due to

conversations Grady and Northside had with various third parties about O'Neill

without her knowledge or consent.

7

According to Rule 111-8-40-18(1)(d):

> At any time during or after their course of treatment, patients shall be provided with copies of their medical records upon their written requests …Copies shall be provided within a reasonable time period not to exceed thirty (30) days after the request. Rule 111-8-40-18(1)(d).

Yet, Grady and Northside failed to comply with these legal requirements since O'Neill sent her letters to Grady and Northside in June of 2022, it is now October, and neither Northside or Grady have complied with state laws.  Likewise, according to Rule 111-8-40-18(2):

> All entries in the patient's medical records shall be accurate and legible and shall contain sufficient information to support the diagnosis and to describe the treatment provided and the patient's progress and response to medications and treatments.

> Likewise, under Rule 111-8-40-18(2)(a),
> The date of the entry and the signature of the person making the entry, shall accompany all entries in the patient's medical record. ***Late entries shall be labeled as late entries.***

The rules highlighted above are very clear.  Yet, both Grady and Northside violated these incredibly basic and very easy to understand rules in order to harm O'Neill and aid Wilder.  Failure to follow Rule 111-8-40-18(2) clearly shows not only a consciousness of guilt, but a knowing intention to willfully harm O'Neill.  Thus, given the prior criminal acts of both Northside and Grady, clearly neither institution had any intention of responding to O'Neill's June 2022 letters.

### F. Motion to Compel and Response

8

As a result of Grady's and Northside's and the other Hospital Defendant's failures to adhere to state and federal laws, on August 18, 2022, Plaintiff served a motion to compel each of the Hospital Defendants to produce information state laws and HIPAA required Hospital Defendants to produce, but which each Defendant failed to produce (Docket No. 58). Not only is it not typical for hospitals to violate HIPAA and state laws and fail to provide the information O'Neill requested as described in the Motion to Compel, but hospitals typically provide the information O'Neill requested within only a few days because failing to do so warrants corrective action from the Department of Health and Human Services ("HHS"), and other regulatory agencies.

In addition, HIPAA requires all Hospital Defendants to have a compliance officer to comply with state and federal healthcare laws and regulations. 45 C.F.R. § 164.530. Thus, Grady, Northside and each Hospital Defendant knew their failure to comply with HIPAA and state laws warranted action from regulatory agencies, but Grady, Northside and each Hospital Defendant broke laws with impunity anyway. Clearly, actions such as these in which healthcare providers knowingly and willfully break the law are not the norm.

In 2013, HIPAA regulations were amended by the HITECH Act which requires health care providers to provide medical records to a patient who writes a letter to the health care provider requesting the records. In applying section

9

164.524 of title 45, Code of Federal Regulations, the HITECH Act provides that

patient requests for electronic records should not be accompanied by a standard

HIPAA authorization.  45 CFR § 164.524.  The patient's request under the

HITECH Act may be as simple as the following:

I am a patient of [Health care provider's name]. My birth date is [patient's birth date]. I request copies of any and all of my medical records including, but not limited to, radiological films, billing records, and outside records. Please provide the records in electronic form on CD in the Adobe Acrobat.pdf format, and send them to:

SIGNED:
[Patient's name]

§ 8:3. Electronic medical records under HITECH Act, Ga. Law Of Torts Preparation For Trial § 8:3 (2022 ed.)

Georgia requires healthcare providers provide each patient with a complete

and current copy of her medical record, upon written request, to any person who

has received health care services from the provider.  Ga. Code Ann. §§ 31-33-1,

31-33-2.  The legislative purpose behind Health Records Act was to ensure that

patients have access to medical records in the custody and control of healthcare

providers.  *Cotton v. Med-Cor Health Information Solutions, Inc.*, 1996, 221

Ga.App. 609, 472 S.E.2d 92.

In the Motion to Extend Time, (Docket No. 60), O'Neill informed the Court

that filing an Amended Complaint will be a waste of time for both Plaintiff and

Defendants at this juncture given Hospital Defendants have failed to comply with

HIPAA and state laws and failed to send O'Neill the information she requested in

letters dated June of 2022 as described at length in Plaintiff's Motion to Compel.

(Docket No. 58-1, Pages 9-19).   Thus, in the Motion to Extend Time (Docket No.

60), O'Neill also asked the Court to delay the deadline for O'Neill to file an

Amended Complaint until after she received the information she requested from

Hospital Defendants in June of 2022.  Despite the fact O'Neill made clear in the

Motion to Compel (Docket No. 58) that Hospital Defendants were violating both

state and federal statutes, the Court completely ignored the facts presented by

Plaintiff in the Motion to Compel (Docket No. 58) and Motion for an Extension to

Time (Docket No. 60) in an order dated September 9, 2022 (the "Order"), even

though this Court did not present a single case or valid reason for ignoring

Plaintiff's arguments in either the Motion to Compel (Docket No. 58) or Motion

for an Extension of Time (Docket No. 60).  Rather, the Order is devoid of case law

supporting the Court's rulings because there is no case law to support flagrantly

violating federal statutes, state laws, public policy, and public safety.

### G. Northside

Medical records are protected by Georgia's constitutional right of privacy

and cannot be disclosed without the consent of the patient unless their production

is otherwise required by Georgia law. *King v. State,* 272 Ga. 788, 790(1), 535

S.E.2d 492 (2000).  In the absence of a waiver, a patient must be afforded notice

and an opportunity to object prior to the disclosure of her medical records. *Id.*

Here, Northside spoke to Wilder's agents about Plaintiff without first obtaining

O'Neill's consent, and Northside disclosed confidential information to Wilder's

agents despite the fact Northside stated in an email dated June 9, 2022 that

Northside does not have a Power of Attorney or any authorization on file to allow

Northside to speak to any third party about Plaintiff. Thus, despite the fact

Georgia law on medical information should be viewed in light of the fact that

Georgia law views the right of privacy "as a fundamental constitutional right,

having a value so essential to individual liberty in our society that its infringement

merits careful scrutiny by the courts," Northside chose to flagrantly violate

O'Neill's rights under the law.

Instead, Northside's medical records is filled with nothing more than *ipse*

*dixit* opinions based on false information provided to Northside about Plaintiff

without O'Neill's knowledge or consent and despite the fact that a physician's

recorded recollection of a patient's medical history, which contain medical

opinions of a third party, is inadmissible as a medical record in litigation.

*Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424.

Thus, not only did Northside violate O'Neill's privacy rights, but Northside also

produced an *ipse dixit* record that is inadmissible in court because the statements in

the record are not supported by facts contained in the medical record. *Id.*

Northside's medical records also clearly evidence criminal acts. O'Neill went to Northside in January of 2018 because a test showed she had been drugged with opiates. As shown on her recordings of her time at Northside, O'Neill told the triage nurse, doctor, and other nurses and healthcare providers that she had been drugged with opiates. But, after O'Neill left Northside, her medical records from her time with the triage nurse, doctor, and other ER providers were altered to erase all mentions of the test showing she had been drugged with opiates. Under Rule 111-8-40-18(2)(a), *"Late entries shall be labeled as late entries."* Yet, Northside did not label the changes to O'Neill's medical records as "late entries." Nor did Northside label its entries in O'Neill's medical records after she left as "Corrections," or "Addendums." Nor did Northside *explain the relationship of the new note to a previous one, including the reason for the error, and the source of the new information. Id. (Emphasis added). Records should always reflect who did what.[8] (Emphasis added).[9]* Changing information after the fact has led to misrepresentation of events in other cases and criminal charges. Thus, it is clear Northside's acts were criminal and designed to harm O'Neill and aid Wilder.

---

[8]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

[9]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

In addition, despite the HITECH Act, in a filing with the Court, Northside claimed that it was not required to respond to O'Neill's June 2022 "letters" despite the fact that the HITECH Act makes it quite clear that a letter is a sufficient means of requesting information. (Docket No. 63, Page 4, ¶2).

### H. Grady

Grady's medical record and treatment decisions make clear Grady relied on conversations with third parties to make decisions about Plaintiff, thus the names of all the individuals Grady spoke to about O'Neill, and the details of Grady's conversations about O'Neill must be included in O'Neill's designated record sets under 45 CFR § 164.501. Since Grady is refusing to disclose that information, it is clear Grady abused O'Neill, and refused to put a urine sample in O'Neill's rape kit to aid and abet Wilder even though Grady committed the offense of tampering with evidence, O.C.G.A. § 16-10-94(a), and its actions are punishable by imprisonment. O.C.G.A. § 16-10-94(c).

A patient is entitled to trust her physician and rely on what he tells the patient. *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452, 459, 504 S.E.2d 514, 523 (1998). Yet, here, Grady's decision to hide information from O'Neill manifests fraud given it is clear when reading O'Neill's medical record from Grady that the medical record is based on information that is not contained in O'Neill's medical record. In fact, there is no factual support for

14

numerous statements written in O'Neill's medical record, and it is clear that

Grady's basis for several statements in O'Neill's medical record is due to

conversations Grady had with various third parties about Plaintiff without

O'Neill's knowledge or consent, and without giving Plaintiff an opportunity to

respond to false information given to Grady about O'Neill behind her back.

Like Northside's medical records, Grady's also clearly evidence criminal

acts. As shown on her recordings of her time at Grady, O'Neill told the triage

nurse, doctor, and other nurses and healthcare providers that she had been drugged

had vomited that morning, was naeuous and had been told by the security guard at

the Embassy Suites where she stayed that he had been paid enough by Wilder to

allow Wilder to enter O'Neill's room when she was asleep. However, after

O'Neill left Grady, her medical records from her time with the triage nurse, doctor,

and other ER providers were altered to erase all mentions of the fact she was made

sick by the drugs Wilder administered, and a security guard let Wilder into her

room. Under Rule 111-8-40-18(2)(a), "***Late entries shall be labeled as late***

***entries.***" Yet, Grady did not label the changes to O'Neill's medical records as

"late entries." Nor did Grady label its entries in O'Neill's medical records after

O'Neill left as "Corrections," or "Addendums." Nor did Grady ***explain the***

***relationship of the new note to a previous one, including the reason for the error,***

***and the source of the new information. Id. (Emphasis added). Records should***

*always reflect who did what.*[10] *(Emphasis added).*[11] Changing information has led to misrepresentation of events in other cases and criminal charges. Thus, it is clear Grady's acts were criminal and designed to harm O'Neill and aid Wilder.

## I. Ex Parte Communication

A judge who obtains extrinsic information for purposes unrelated to a case cannot consider the information in deciding an issue in the case. *U.S. v. Siegelman*, 799 F. Supp. 2d 1246 (M.D. Ala. 2011). Likewise, a judge's actions in meeting *ex parte* with panel of experts, appointed by the judge to investigate state mental health institutions, so the judge could receive a preview of the panel's conclusions and discern that the experts' methodology was sound, was grounds for disqualification of the judge; allowing an off-the-record briefing on issues and prohibiting opposing counsel from discovering what was said in meetings resulted in an unauthorized private investigation by the judge. *Edgar v. K.L.*, 93 F.3d 256, 45 Fed. R. Evid. Serv. 31 (7th Cir. 1996). The better practice is for a district court judge not to receive *ex parte* communications from law enforcement officers or investigators. *U.S. v. Siegelman*, 799 F. Supp. 2d 1246 (M.D. Ala. 2011).

---

[10]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.
[11]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

According to Rule 9, Appearance of Counsel, "An attorney representing a party who will not be filing a document shall enter a separate notice of appearance as counsel of record indicating the name of the party represented." Here, no attorney has filed a notice claiming to represent Plaintiff's interests. Thus, it is improper for the Court to hear any argument by any person other than O'Neill.

## J. Hearing Request

As stated above, Plaintiff's medical records from rape exams present shining examples of *ipse dixit*--i.e., the expert claims that it is so merely because he says that it is so. Yet, as counsel to Hospital Defendants is surely well aware, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible as evidence. Rather, *Daubert* and *Kumho Tire Co.*, as well as Rule 702, require that expert opinion be connected to existing data by something more than dubious inferences that amount to an expert's assertion that 'it is so because I say it is so." Thus, O'Neill's medical records are fraudulent on their faces because they do not contain the information provided by third parties, without O'Neill's knowledge or consent, that provide the actual basis for the subjective opinions that are not supported by facts or data in O'Neill's records.

O'Neill was aware of the fact Wilder's attorney, Watson, called or had others call Hospital Defendants in order to harm O'Neill, however, O'Neill was unprepared for Hospital Defendants to flagrantly violate federal and state statutes

17

and commit criminal acts by destroying evidence in order to aid and abet Wilder.

O'Neill believed Hospital Defendants would not overtly commit crimes to harm

her and alter her medical records, and thereby incur criminal liabilities, because

O'Neill believed Hospital Defendants would put their own reputations and

interests above the interests of the Wilder team.

In addition, O'Neill expected Hospital Defendants would document their

phone conversations with the Wilder team because HIPAA and state privacy rules

require them to do so.  42 CFR § 482.13(B)(1).  However, given no Hospital

Defendant has been able to produce a Power of Attorney or any proof that any

Hospital Defendant had any right to speak to any third party about O'Neill,

Plaintiff has been shocked by Hospital Defendants' overt violations of federal

statutes, particularly in light of the fact all Hospital Defendants are required to

have compliance officers under HIPAA. 45 C.F.R. § 164.530.

Given it is illegal and in blatant violation of HIPAA and state laws to

maintain PHI, patient information, and medical records on a patient and fail to

disclose that information to the patient, O'Neill did not believe that Hospital

Defendants would be corrupt or stupid enough to maintain two separate sets of

records: one set O'Neill had access to, and another she did not.  However, after

O'Neill went to Beth Israel and NYU Langone in June of 2022, it became clear

that the Hospital Defendants were attempting to maintain two separate and distinct

record sets. In most cases, it appears that the hospital which provided services has one set of *ipse dixit* records, while its parent company, maintains an entirely different set of records. Likewise, the medical records department at NYU Langone informed O'Neill that the "Patient Relations" division had an entirely different set of records about O'Neill even though when asked, the medical records person O'Neill spoke to informed her that in his decade of working at NYU Langone he had never seen patient PHI moved to the Patient Relations department. Likewise, it appears that Lenox Hill Hospital's parent company, Northwell Health, also maintains a separate and distinct set of medical records about O'Neill.

It does not take an attorney or anyone with legal training to know that maintaining two sets of records is a hallmark of fraud. In fact, even simple Google searches make clear that a company maintaining two separate sets of records is clearly acting with fraudulent intent. Thus, it appears that Northside, Grady and each Hospital Defendant had a clear *intent* to deceive O'Neill and a clear *consciousness of guilt*. If the information contained in their other files was, in fact, obtained legally, and medically valid, then the Hospital Defendants would include that information in O'Neill's medical records. However, it is clear that all Hospital Defendants are well aware of the fact that the information contained in their other files is based on criminal acts, lies, and fraud. Thus, each Hospital Defendant has sought to hide information from O'Neill in a manner that any person on the street

would immediately recognize as intended to deceive and harm despite the fact each Hospital Defendant had a fiduciary duty to O'Neill.

Despite that duty, what is abundantly obvious is that each Hospital Defendant has broken state and federal laws and ignored their duties in order to aid and abet the Wilder team. No one in their right mind believes that the employees at Hospital Defendants that conspired with the Wilder team to create two sets of medical records, destroy evidence, and violate state and federal statutes did so without expecting something of value in return. In the Larry Nasser case, the former FBI agent that closed cases against Nasser to aid and abet the USA Gymnastics in covering up the sexual abuse of minors was promised a high paying security job at the U.S. Olympic Committee upon his retirement from the FBI.[12]

It is not only clearly unethical and immoral, but also illegal, to seek to profit from a scheme to defraud. By maintaining two separate records about O'Neill each of the Hospital Defendants is seeking to profit from a criminal scheme and enterprise. The responses from NYU Langone, Beth Israel, Grady and Northside that O'Neill's valid requests under state laws and HIPAA amounted to "discovery," knowing full well state and federal law said otherwise, 45 C.F.R. § 164.530, was clearly a blatant attempt to further use deception and fraud to

---

[12]Tim Evans, Tony Cook, Marisa Kwiatkowski, Sarah Bowman, "Indianapolis FBI leader eyed head USA Gymnastics job after sitting on Nassar allegations." *Indianapolis Star*, July 16, 2021.

continue to profit from their illegal schemes.  The Supreme Court adverted to "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."  Thus, since defendants have violated state and federal law, they cannot assert a right deny access to O'Neill to the information sought in her letters due to false claims of "discovery" in a court.

In addition, what is clear from the *ipse dixit* medical records is that because there is no factual support to the records, and because the medical records are not legally admissible as evidence, the only way the Hospital Defendants can continue to maintain two sets of records and continue to mislead and harm O'Neill by violating state and federal statutes is because the Wilder/DB teams are continuing to stalk and abuse O'Neill.  Because without stalking and abuse, the Hospital Defendants would release the information contained in O'Neill's June 2022 letters. Thus, for the last several years, as O'Neill has gone to other healthcare providers, she has been greeted by the same type of illegal activities and criminal acts given the only way for the Wilder/DB teams to maintain the farce of Hospital Defendants' medical records is by continuing to stalk and abuse O'Neill.  Thus, by agreeing to prepare fraudulent medical records, committing criminal acts, destroying evidence, and violating state and federal laws, Hospital Defendants

have effectively made themselves accessories to the DB/Wilder teams' other crimes and abuses.

Denying someone access to healthcare is clearly a human rights violation, however, the Wilder/DB team has done just that. The facts and circumstances surrounding Brittney Spears conservatorship raised public outrage over the pop star's mistreatment and abuse by her conservator, her father, and other members of the Spears family.[13] The treatment of Spears was widely regarded as abusive, and a deprivation of Brittney Spears fundamental human rights.[14] However, O'Neill has been treated far worse than Brittney Spears. While Brittney Spears agreed to a conservator, had an attorney representing her interests, and had a court overseeing decisions made about her healthcare, O'Neill has had the Wilder/DB team control her healthcare from 2016-2022 from the shadows and by withhold healthcare and medical information from O'Neill, and encouraging healthcare providers to criminally alter their medical records and produce *ipse dixit* records.

As a result, O'Neill has only been provided with *ipse dixit* records, and has been subjected to a series of lies and abuse. Among other things, O'Neill has had to prove that the Wilder/DB team lied when it claimed she had a stroke when in

---

[13]Ronan Farrow and Jia Tolentino, "Britney Spears Conservatorship Nightmare," *The New Yorker*, July 3, 2021.

[14]Margaret Bushko, "Toxic: A Feminist Legal Theory Approach to Guardianship Law Reform," 81 Md. L. Rev. Online 141, 160 (2022).

fact she has never had a stroke, suffers from high blood pressure when in fact she has low blood pressure, never had migraines, has never taken illegal drugs, is not a drug addict, and is not delusional or paranoid.  Yet, despite the false nature of these claims, all these false claims were made about O'Neill in *ipse dixit* format.  It is mathematically impossible that the false claims made about O'Neill (e.g., stroke, high blood pressure, migraine, drug addiction, paranoid, delusional), constitute anything other than fraud and criminal acts given the falsification of business records is a crime. O.C.G.A. § 16-10-94.1; N.Y. Penal Law § 175.10.

Even prisoners are treated better than O'Neill.  For example, allegations of habeas petitioner, who was confined for treatment at state hospital pursuant to the Kansas Sexually Violent Predator Act, that the Kansas Department of Social and Rehabilitation Services (SRS) improperly denied his request for copies of his treatment records, and that the records were not protected from disclosure because the information in the records was not compiled in anticipation of litigation, stated an actionable claim.  *Merryfield v. Kansas Social and Rehabilitation Services*, 2010, 236 P.3d 528, 44 Kan.App.2d 324.  Thus, the prisoner was able to see his records even though Grady, Northside and the other Hospital Defendants are denying O'Neill access to her records and the information she requested in her June 2022 letters.

### K. Information Request

Given Northside and Grady have broken numerous laws and statutes, failed to comply with even the most basic of statutory requirements, Plaintiff files this motion to enjoin Grady and Northside from withholding information O'Neill has a right to under the law.  O'Neill requests Grady and Northside:

a. Provide the following information:

1. [Defendant] does not have any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in 2018.

2. No related entity, LLC, SPV, parent company, individual, partnership, corporation, or any other entity, or law firm hired by [Defendant] or business associates, as defined by 45 CFR 160.103, has any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in 2018.[15]

3. [Defendant] [has / does not have], and [has had since (date) / has never had], a medical release form, Power of Attorney, or other authorization on file that would allow any person or entity to speak to any person at [Defendant] about Maura O'Neill or receive any information about Maura O'Neill's medical records or have access to information about Maura O'Neill's medical care.

4. [Defendant] [did/did not] have [an authorization] to speak with law enforcement about O'Neill.

---

[15]In February of 2019, Plaintiff sent letters to DB.  DB was willing to deny DB had possession of Plaintiff's medical records, but DB was not willing to deny that (1) a related entity or law firm hired by DB had copies of those records or (2) DB discussed O'Neill's medical records with a third party.  Thus, there is reason to believe Hospital Defendants would hide information with a related entity or law firm.

b. Produce a list of names of all individuals Grady and Northside spoke to about O'Neill's health. (e.g., Grady spoke to Beth Israel and the College Park Police).

c. Provide detailed statement of all information procured from any third party about O'Neill's health (e.g., NYPD, College Park Police, other provider).

d. Stop using deceptive legalese in an attempt to thwart and deceive Plaintiff (e.g., Accounting of Disclosures).

If the court determines the written motion papers are insufficient, Plaintiff requests a hearing so that the Court can collect any additional information it deems relevant. Federal Rule of Civil Procedure ("FRCP") 43(c) permits the Court to take evidence at a hearing when a motion relies on facts outside the record.

Plaintiff also asks the Court to waive the time requirements of the motion rule and grant an immediate hearing. An expedited procedure is necessary because filing an Amended Complaint and responding to Hospital Defendants' motions to dismiss will be a waste of time for both Plaintiff and Hospital Defendants at this juncture given Hospital Defendants have failed to comply with HIPAA and state statutes and send O'Neill the information she requested as described at length in this motion.

**WHEREFORE,** Plaintiff Maura O'Neill respectfully requests that this Court **GRANT** the instant Motion.

Dated:  Washington, DC
October 6, 2022

Respectfully submitted,


BY: _Maura O'Neill_
Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MAURA O'NEILL,<br><br>       Plaintiff,<br><br>   v.<br><br>NYU LANGONE HOSPITALS,<br>NEW YORK- PRESBYTERIAN<br>HOSPITAL QUEENS, LENOX<br>HILL HOSPITAL, GRADY<br>MEMORIAL HOSPITAL<br>CORPORATION, MOUNT SINAI<br>BETH ISRAEL, NORTHSIDE<br>HOSPITAL, INC., COLLEGE<br>PARK POLICE DEPARTMENT,<br><br>      Defendants. | CIVIL ACTION FILE NO.:<br>1:22-cv-00011-SEG |

## **ORDER**

Upon the motion of Plaintiff, Maura O'Neill, and for good cause shown, it is

hereby:

**ORDERED** that Grady Memorial Hospital Corporation ("Grady") and

Northside Hospital, Inc. ("Northside") will comply with O.C.G.A. §§ 31-33-1, 31-

33-2, O.C.G.A. § 24-12-1 and provide O'Neill with:

- Any and all information [Defendant] used to make decisions about
  O'Neill's healthcare that is not included in the medical record. If
  [Defendant] does not have any additional records, data, or information

that [Defendant] used to make decisions about Maura O'Neill that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in 2018, then [Defendant] will provide a simple plain language statement showing it does not have any additional records, data or information that [Defendant] used to make decisions about O'Neill.

- [Defendant] will state if it [has / does not have], and [has had since (date) / has never had], a medical release form, Power of Attorney, or other authorization on file that would allow any person or entity to speak to any person at [Defendant] about Maura O'Neill or receive any information about Maura O'Neill's medical records or have access to information about Maura O'Neill's medical care.
- Produce a list of names of all individuals and entities [Defendant] spoke to about O'Neill's health.
- Provide detailed statement of all information procured from any third party about O'Neill's health.
- Provide documentation showing whether [Defendant] [did/did not] have [an authorization] to speak with law enforcement about O'Neill.

**ORDERED** that Grady and Northside will provide O'Neill with plain language responses to requests for information that directly and completely respond to requests for information or plain language letters stating the rationale for withholding protected health information.

Date: _____

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAURA O'NEILL,

      Plaintiff,

    v.

NYU LANGONE HOSPITALS,
NEW YORK- PRESBYTERIAN
HOSPITAL QUEENS, LENOX
HILL HOSPITAL, GRADY
MEMORIAL HOSPITAL
CORPORATION, MOUNT SINAI
BETH ISRAEL, NORTHSIDE
HOSPITAL, INC., COLLEGE
PARK POLICE DEPARTMENT,

      Defendants.

CIVIL ACTION FILE NO.:
1:22-cv-00011-SEG

## **ORDER**

Upon the motion of Plaintiff, Maura O'Neill, and for good cause shown, it is hereby:

**ORDERED** that a hearing will be set on _____ at _____. The hearing will be held at _____.

**ORDERED** that _____ will appear at the hearing to be held on _____.

29

Date: _____


_____

United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAURA O'NEILL,

        Plaintiff,

v.

NYU LANGONE HOSPITALS,
NEW YORK- PRESBYTERIAN
HOSPITAL QUEENS, LENOX
HILL HOSPITAL, GRADY
MEMORIAL HOSPITAL
CORPORATION, MOUNT SINAI
BETH ISRAEL, NORTHSIDE
HOSPITAL, INC., COLLEGE
PARK POLICE DEPARTMENT,

        Defendants.

CIVIL ACTION FILE NO.:
1:22-cv-00011-SEG

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENJOIN

---

October 6, 2022

Maura O'Neill
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

LEGAL ARGUMENT ..................................................................................... 4

   POINT I:  DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO ACCESS
HER HEALTHCARE INFORMATION. ......................................................... 4

   POINT II:  DEFENDANTS FRAUDULENTLY CONCEALED MATERIAL
INFORMATION FROM PLAINTIFF............................................................. 13

   POINT III:  DEFENDANTS LIED TO O'NEILL............................................ 16

   POINT IV:  DEFENDANTS' MEDICAL RECORDS CLEARLY EVIDENCE
CRIMINAL ACTS. ........................................................................................ 18

   POINT V:  DEFENDANT'S CONDUCT IS ILLEGAL. ............................... 19

   POINT VI:  PLAINTIFF IS ENTITLED TO PERMANENT INJUNCTIVE
RELIEF........................................................................................................... 24

CONCLUSION .............................................................................................. 25

Maura O'Neill ("Plaintiff") submits this memorandum of law in support of her Motion to Enjoin and Hearing Request.

## PRELIMINARY STATEMENT

On June 6, 2022 Plaintiff started sending letters to Grady Memorial Hospital Corporation ("Grady"), Northside Hospital, Inc. ("Northside") and other Hospital Defendants requesting basic information.[16] Despite the fact that O'Neill's requests for information are incredibly basic, not a single one of the Hospital Defendants fully complied with state and federal laws and responded to O'Neill's request. The time for the Georgia Hosptial Defendants to respond was thirty days. Yet, not a single Hospital Defendant complied with applicable laws.

Georgia law requires healthcare providers provide a complete and current copy of a medical record, upon written request, to any person who has received health care services from the provider. O.C.G.A. §§ 31-33-1, 31-33-2. The legislative purpose behind Health Records Act was to ensure that patients have access to medical records in the custody and control of healthcare providers.

---

[16]On January 4, 2022, Plaintiff filed a complaint alleging several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYPQ"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").

1

Likewise, the Health Insurance Portability and Accountability Act ("HIPAA") gives an individual the right to access information about her healthcare, and requires healthcare organizations to disclose all records it used to make healthcare decisions. What is obvious from reading Plaintiff's medical records from Grady and Northside is that the records are based on information that is not contained in the medical records, but was provided by third parties. While Grady and Northside were required by law to disclose to O'Neill that they had conversations with third parties about her, the hospitals instead covered-up the fact that they received information from third parties, had conflicts of interest, and made decisions about O'Neill based on information illicitly obtained from others.

It is illegal, and by definition black letter fraud, for any healthcare provider to make diagnosis and treatment decisions and not disclose to the person the basis of said diagnosis and treatment decision. Thus, Plaintiff's medical records from Grady and Northside are fraudulent because the records fail to disclose that healthcare decisions were based on false and slanderous information provided without Plaintiff's knowledge or consent.

Because of a physician's superior medical knowledge and his relationship with a patient, the doctrine of constructive fraud applies when a healthcare provider makes inaccurate statements to his patient concerning treatment or

2

diagnosis. Also inherent in the physician-patient relationship is an affirmative duty

for the physician to disclose all material facts to the patient. A physician's or other

healthcare provider's failure to disclose material information concerning a patient's

condition or treatment constitutes fraudulent concealment. In addition, when a

physician has knowledge of a material fact concerning the patient's physical

condition, the fiduciary relationship renders the physician's silence fraudulent.

 At this point, the only support for baseless opinions contained in O'Neill's

medical records are the providers own personal judgments. Thus, O'Neill's

medical records from rape exams present shining examples of *ipse dixit*--i.e., the

expert claims that it is so merely because he says that it is so. Yet, as counsel to

Grady and Northside are surely well aware, without more than credentials and a

subjective opinion, an expert's testimony that 'it is so' is not admissible as

evidence. Rather, *Daubert* and *Kumho Tire Co.*, as well as Rule 702, require that

expert opinion be connected to existing data by something more than dubious

inferences that amount to an expert's assertion that 'it is so because I say it is so."

Thus, O'Neill's medical records are fraudulent on their face because they do not

contain the information provided by third parties without O'Neill's knowledge or

consent that provide the actual basis for the subjective opinions that are not

supported by facts or data contained in O'Neill's medical records.

3

In addition, providers at Grady and Northside failed to perform even the most basic of tasks. It is clear that rather than provide objective medical care to O'Neill, Grady and Northside acted as agents for the Wilder team and took a series of steps to harm O'Neill. Continuing to withhold information from O'Neill is simply extending the destructive and abusive pattern of criminal acts and fraud to which O'Neill has been subjected.

## LEGAL ARGUMENT

## POINT I:  DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO ACCESS HER HEALTHCARE INFORMATION.

HIPAA gives an individual the right to access information about her healthcare, 45 CFR § 164.524, and requires healthcare organizations to disclose all records it used to make healthcare decisions. 45 CFR § 164.501. On June 6, 2022 Plaintiff started sending letters to hospitals, including Grady and Northside, requesting two basic pieces of information:

- Confirmation the hospital does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at the hospital about O'Neill or receive any information about her medical records or have access to information about her medical care.
- Confirmation the hospital does not have any additional records, data, or information that the hospital used to make decisions about O'Neill's healthcare that are not included in her medical record.

Despite the fact that the two requests for information are incredibly basic,

not a single one of the Hospital Defendants fully complied with HIPAA and state

laws and responded to O'Neill's request.[17,18,19,20,21,22]  Georgia law gave Grady and

Northside thirty days to respond, yet neither did.  Thus, Northside and Grady failed

---

[17]Northside stated it does not have a Power of Attorney, but has failed to state if it has any other authorization to talk to a third party about O'Neill.  Northside has also not disclosed if all information used to make decisions about O'Neill are in her medical record.

[18]Grady sent a medical record, but failed to include a Power of Attorney, authorization, or any additional information outside the medical record.

[19]Lenox Hill has not provided any response.

[20]NYU Langone stated it has no Power of Attorney, and claimed it spoke to others about O'Neill.  Yet, NYU Langone has provided no authorization, and further claimed it had not unlawfully disclosed O'Neill's medical information.  O'Neill's medical record also does not contain references to any third parties, even though NYU Langone spoke to third parties.

[21]Beth Israel stated it does not have a Power of Attorney or authorization on file.  It also stated the only information it has on record is in O'Neill's medical record.  However, its parent company, Mount Sinai Health System ("MSHS") refuses to respond to O'Neill's requests for information or state whether MSHS has records about O'Neill Beth Israel does not possess.

[22]Like Beth Israel, NYPQ stated it does not have a Power of Attorney or authorization on file.  It also stated the only information it has on record is in O'Neill's medical record.  However, NYPQ refused to tell O'Neill if a parent company or another entity has additional records about O'Neill that NYPQ does not possess.  In February of 2019, Plaintiff sent letters to DB.  DB was willing to deny that DB had possession of Plaintiff's medical records, but DB was not willing to deny that (1) a related entity or law firm hired by DB had copies of those records, or (2) DB discussed O'Neill's medical records with a third party.  Thus, there is reason to believe Hospital Defendants would hide information with a related entity or law firm.

to comply with HIPAA and state law requirements. [*See* O.C.G.A. §§ 31-33-1, 31-33-2, O.C.G.A. § 24-12-1].

## A. O'Neill's Rights

While O'Neill has an absolute right under HIPAA to view information used to make decisions about her, the Hospital Defendants have made a concerted effort to cover-up the fact that the Wilder team made phone calls about O'Neill, and Plaintiff's healthcare was dictated by the Wilder team. For example, in a letter sent on July 5, 2022, NYU Langone stated,

> Please know that the designated record set is limited to records that are used in whole or in part by or for NYU Langone to make decisions about individuals. This information does not include the names of all individuals that have provided information about you and/or their conversations.

Thus, NYU Langone buried the details of conversations it had with other individuals, and claimed this information was not part of the designated record set.

A "designated record set" is defined in 45 CFR 164.501 as a group of records maintained by or for a covered entity that comprises the:

- Medical records and billing records about individuals maintained by or for a covered health care provider;
- Enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or
- Other records that are used, in whole or in part, by or for the covered entity to make decisions about individuals.

6

According to the Department of Health and Human Services ("HHS"), this last category includes records that are used to make decisions about any individuals, whether or not the records have been used to make a decision about the particular individual requesting access.[23]

HHS also defines the term "record" as any item, collection, or grouping of information that includes PHI and is maintained, collected, used, or disseminated by or for a covered entity.[24] PHI is protected health information and is defined as individually identifiable health information...that is: (1) transmitted by electronic media; (2) maintained in electronic media; or (3) transmitted or maintained in any other form or medium. 45 CFR § 160.103.

Individually identifiable health information is "information that is a subset of health information, including demographic information collected from an individual, and:

(1)     Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(2)     Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a

---

[23]https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html
[24]https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html

7

reasonable basis to believe the information can be used to identify the individual." 45 CFR § 160.103.

As shown through the previous definitions, under HIPAA, O'Neill has an absolute right to any information about any decision made about her by Hospital Defendants including the names of any individuals that provided information to Defendants about O'Neill and the conversations Defendants had with third parties about O'Neill.

## B. Denial of Access

HIPAA contains grounds and conditions for denial of access to protected health information, 45 CFR 164.524(a)(2)-(4). An individual is not required to provide a reason for requesting access to her information, and the individual's rationale for requesting access, if voluntarily offered or known by the healthcare provider, is not a permitted reason to deny access.[25] Thus, the reason offered by Grady and Northside for denying access to O'Neill, namely "discovery," (Docket Nos. 63 and 64) is not a legally permissible reason under HIPAA or state laws.

In addition, under HIPAA, if a healthcare provider denies access, in whole or in part, to protected health information requested by the individual based on one or more permitted grounds, the healthcare provider *MUST* provide a denial in writing

---

[25]https://www.hhs.gov/hipaa/for-professionals/faq/2046/under-what-circumstances-may-a-covered-entity/index.html

to the individual no later than 30 calendar days after the request (or no more than

60 calendar days if the covered entity notified the individual of an extension)

according to 45 CFR 164.524(b)(2).[26] In addition, under federal regulations, the

denial must be in plain language and describe the basis for denial; if applicable, the

individual's right to have the decision reviewed and how to request such a review;

and how the individual may submit a complaint to the healthcare provider or the

HHS Office for Civil Rights. 45 CFR 164.524(d).  In addition, under HIPAA, all

healthcare providers must, to the extent possible, provide the individual with

access to any other protected health information requested, after excluding the PHI

to which the entity has a ground to deny access.  45 CFR §164.524(d)(1).

Likewise, under Georgia law, a healthcare provider must provide medical

records to a patient within 30 days of the receipt of a records request.  O.C.G.A. §§

31-33-1, 31-33-2, O.C.G.A. § 24-12-1.  A physician must either grant access to

medical records or give a justified written denial of access within 30 days of

receipt of the request for release.  45 CFR §164.524(b)(2).

Thus, even if Grady or Northside wanted to refuse to send PHI to O'Neill,

Grady and Northside were required by HIPAA to inform O'Neill in writing that

---

[26]https://www.hhs.gov/hipaa/for-professionals/faq/2046/under-what-circumstances-may-a-covered-entity/index.html

they were denying access to some PHI. For example, if Grady wanted to deny

O'Neill access to information because it compiled information in reasonable

anticipation of, or for use in, a legal proceeding, then Grady was required to send

O'Neill a letter stating that was the case.[27] However, even if that was Grady's

intention, Plaintiff still retained the right to access the underlying PHI from the

designated record set(s) used to generate the information about O'Neill for use in a

legal proceeding.[28]

The laws are clear. All the Hospital Defendants had to do was read an HHS

website to know that each Hospital Defendant was violating federal statutes.

However, Grady and the other Hospital Defendants are clearly violating black

letter federal and state statutes.

## C . **Privacy Laws**

Medical records are protected by Georgia's constitutional right of privacy

and cannot be disclosed without the consent of the patient unless their production

is otherwise required by Georgia law. *King v. State,* 272 Ga. 788, 790(1), 535

S.E.2d 492 (2000). In the absence of a waiver, a patient must be afforded notice

---

[27]https://www.hhs.gov/hipaa/for-professionals/faq/2046/under-what-circumstances-may-a-covered-entity/index.html
[28]https://www.hhs.gov/hipaa/for-professionals/faq/2046/under-what-circumstances-may-a-covered-entity/index.html

and an opportunity to object prior to the disclosure of her medical records. *Id.* For example, in the case *Juric v. Bergstraesser,* the patient's allegations that his physician disclosed to patient's wife the patient's personal information learned during course of treatment, and that such disclosure was provided to his wife and her counsel, and was used by his wife as a basis to take adverse actions against the patient in his "marital dispute," resulting in the patient being forced to undergo a psychiatric examination and being denied visitation for months with his young daughter, stated a claim against the physician for breach of the implied covenant of trust and confidence inherent in the patient-physician relationship. *Juric v. Bergstraesser*, 44 A.D.3d 1186, 844 N.Y.S.2d 465 (3d Dep't 2007).

Here, Grady and Northside spoke to Wilder's agents about Plaintiff without first obtaining O'Neill's consent, and Grady and Northside disclosed confidential information to Wilder's agents despite the fact Northside stated in an email dated June 9, 2022 that Northside does not have a Power of Attorney or any authorization on file to allow Northside to speak to any third party about Plaintiff. Grady has failed to respond to O'Neill's requests. Thus, despite the fact Georgia's laws on medical information should be viewed in light of the fact that Georgia law views the right of privacy "as a fundamental constitutional right, having a value so essential to individual liberty in our society that its infringement merits careful

11

scrutiny by the courts," Grady and Northside chose to flagrantly violate O'Neill's rights under the law.  Likewise, speaking to anyone without O'Neill's knowledge or consent violates HIPAA's privacy laws.  *45 CFR Part 160 and Part 164, Subparts A and E.*

Worse still, the information used to harm O'Neill in Grady's and Northside's medical records was based on fake accounts Wilder set up in O'Neill's name to impersonate O'Neill.  At no time in her entire life has O'Neill ever been in a "relationship" with Wilder, or even had a personal conversation with him for that matter.   In fact, other than the times Wilder had O'Neill drugged from 2017 onwards, O'Neill has only ever spoken to Wilder for a grand total of three hours during the two and a half years O'Neill worked at DB from 2004 to 2007.  Any claim of a "relationship" between Plaintiff and Wilder, a psychopath, stalker, and rapist, is completely false.  Instead, in order to create a "relationship" that never existed, Wilder set-up fake accounts in O'Neill's name in WhatsApp, Viber, Line, and Google Voice, and Wilder and his rapist associates used those fake accounts to impersonate O'Neill.  Forensic reviews of O'Neill's phones, computers, and electronic devices showed there was no communication between O'Neill and Wilder or any of the other rapists who claimed to have "consensual" sexual relations with O'Neill from 2017 to

12

2022. Instead, Wilder and his rapist associates have stalked and spied on

O'Neill and sent fake messages pretending to be O'Neill. By incorporating

the stupid and false claims of Wilder and his rapists associates into their

medical records, Grady and Northside violated O.C.G.A. § 16-11-67, O.C.G.A.

§ 16-11-62(1), and O.C.G.A. § 24-9-901. It is really rather stupid that Grady and

Northside expect people to believe that the Hospital Defendants illegally altered

O'Neill's medical records after O'Neill left the hospitals' premises in violation of

criminal statutes, but Grady and Northside think using fake messaging accounts

that are not shown on Plaintiff's phone is reasonable. If there really was a

"relationship" between Wilder and O'Neill or Wilder's rapist associates, why have

Grady and Northside failed to account for their sources of information in O'Neill's

medical records, and thereby violated criminal statutes. Based on the facts, it is

clear Grady and Northside know they commit criminal acts and falsified records to

harm O'Neill, the same way Wilder set-up fake accounts to impersonate O'Neill.

## POINT II: DEFENDANTS FRAUDULENTLY CONCEALED MATERIAL INFORMATION FROM PLAINTIFF.

The patient-physician relationship is a relationship of trust and confidence

given the patient entrusts his medical condition to the trained physician. Because

of this confidential relationship, an exception arises to the requirement in typical

13

fraud cases that defendant make some actual misrepresentation. Within the confidential relationship, silence when the doctor should speak or failure to disclose what should be disclosed constitute fraud as much as an actual misrepresentation. *Carroll v. Piedmont Medical Care Corporation*, 352 Ga. App. 348, 834 S.E.2d 868 (2019). Thus, within the doctor-patient relationship, plaintiff need not prove actual fraud because the relationship itself creates a duty that requires the doctor to inform the patient about his condition. *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 507 S.E.2d 411 (1998). In a concealment context, "there must be evidence that there was an intent to conceal by silence." *Carroll v. Piedmont Medical Care Corporation*, 352 Ga. App. 348, 834 S.E.2d 868 (2019).

The Court of Appeals found evidence of intent to conceal in the case of *Quattlebaum v. Cowart*. *Quattlebaum v. Cowart*, 182 Ga. App. 473, 356 S.E.2d 91 (1987). In that case, the defendant did not advise his patient that defendant had failed to connect the left hepatic duct to the small intestine. In furtherance of the fraud, the physician, prepared misleading and incorrect medical records on this point. The court found a reasonable inference of a knowing concealment and cover-up, not just a mere misstatement. *Quattlebaum v. Cowart*, 182 Ga. App. 473, 356 S.E.2d 91 (1987).

14

Given Grady's medical record and treatment decisions make clear Grady relied on conversations with third parties to make decisions about Plaintiff, the names of all the individuals Grady spoke to about O'Neill, and the details of Grady's conversations about O'Neill must be included in O'Neill's designated record sets. 45 CFR § 164.501. Since Grady initially refused to disclose its conflicts of interests, it is clear Grady abused O'Neill, and refused to put a urine sample in O'Neill's rape kit to aid Wilder, to ensure there was "no evidence" O'Neill was drugged even though a person commits the offense of tampering with evidence when, with the intent to prevent the apprehension...of any person or to obstruct the prosecution or defense of any person, such person knowingly destroys...physical evidence or ...prepares... false evidence. O.C.G.A. § 16-10-94(a). Grady's actions are punishable by imprisonment. O.C.G.A. § 16-10-94(c).

A patient is entitled to trust her physician and rely on what he tells the patient. *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452, 459, 504 S.E.2d 514, 523 (1998). Yet, here, Grady's and Northside's decisions to hide information from O'Neill manifests fraud given it is clear when reading O'Neill's medical record from Grady and Northside that the medical record is based on information that is not contained in O'Neill's medical records. In fact, there is no factual support for numerous statements written in O'Neill's

15

medical records, and it is clear that Grady's and Northside's basis for several statements in O'Neill's medical records is due to conversations Grady and Northside had with various third parties about Plaintiff without O'Neill's knowledge or consent, and without giving Plaintiff an opportunity to respond to false information given to Grady and Northside about O'Neill behind her back.

## POINT III: DEFENDANTS LIED TO O'NEILL.

The only support for the baseless opinions in O'Neill's medical records are the providers own personal judgment. Thus, O'Neill's medical records from rape exams present shining examples of *ipse dixit*--i.e., the expert claims that it is so merely because he says that it is so. Yet, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987). "Reliability cannot be established by the mere *ipse dixit* of an expert." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-397 (2d Cir. 2005). "'Presenting a summary of a proffered expert's testimony in the form of conclusory

16

statements devoid of factual or analytical support is simply not enough.' " *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty*, 402 F.3d 1092 (11th Cir. 2005).

Obviously, the same principles hold in cases involving medical decisions, and decisions are not valid if they are based only on unsubstantiated opinions. *Cathell v. Brown*, 8 Vet. App. 539 (1996). It is clear when reading O'Neill's medical records from Grady and Northside that her medical records are based on information that is not contained in her medical records. Instead, Grady's and Northside's medical records are filled with nothing more than *ipse dixit* opinions based on false information provided to Grady and Northside about Plaintiff without O'Neill's knowledge or consent and despite the fact that a physician's recorded recollection of a patient's medical history, which contain medical opinions of third parties are inadmissible as a medical record in litigation. *Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424. Likewise, nothing in *Daubert* or statutes governing admission of expert testimony requires a court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *Hayward v. Kroger Co.*, 2012, 317 Ga.App. 795, 733 S.E.2d 7. Thus, not only did Northside and Grady violate O'Neill's privacy rights, but Northside and Grady also produced *ipse dixit* records that are inadmissible in court because

17

the statements in the records are not supported by facts contained in the records.

*Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424.

## POINT IV:  DEFENDANTS' MEDICAL RECORDS CLEARLY EVIDENCE CRIMINAL ACTS.

The alteration and / or falsification of medical records is a crime in most

states, and is usually dealt with harshly.  *Elbar, Inc. v. Claussen* (1989, Tex App

Dallas) 774 SW2d 45.  Alteration of medical records is usually treated as a

misdemeanor, but can be a felony if done intentionally and willfully.  *Elbar, Inc. v.*

*Claussen* (1989, Tex App Dallas) 774 SW2d 45.

Alteration of a patient's record by a doctor for the purpose of defeating an

actual or potential claim "is reprehensible and evidences a moral deficiency and

disregard for the rights of others that [courts] regard as odious and repugnant."

*Paris v. Michael Kreitz, Jr.*, 75 NC App 365, 331 SE2d 234 P.A., (1985).  In most

cases the act of requesting copies of a client's hospital records by an attorney

investigating a claim triggers a health care provider's apparent need to alter

medical records to affect the outcome of the investigation.  *Langager v. Lake*

*Havasu Community Hospital*, 799 F2d 1354, 135 (1986, CA9 Ariz).

A strong inference of *consciousness of guilt* arises where a health care

provider is unable to produce the patient's original clinical record concerning the

18

patient's treatment. *Thor v. Boska*, 38 Cal App 3d 558, 113 Cal Rptr 296 (1974, 2nd Dist). Similarly, if the jury is satisfied that the health care provider intentionally altered a patient's records, it can infer that the purpose in falsifying the documents was fraudulent, and the jury can further infer that accurate medical records would have been unfavorable to the provider's interests. *Pharr v. Cortese,* 147 Misc 2d 1078, 559 NYS2d 780 (1990).

### POINT V:  DEFENDANT'S CONDUCT IS ILLEGAL.

O'Neill learned in June of 2020 that Wilder claimed to have a power of attorney to control her healthcare. In addition, in August of 2020, Watson, claimed that said power of attorney had "been through the courts." When O'Neill pointed out that O'Neill had never signed any agreement with Wilder, and all Watson's claims were entirely false, O'Neill was informed in August that O'Neill "lost" her copy of the agreement. Setting aside the fact that Wilder and Watson are stalking O'Neill and telling ridiculous lies about O'Neill, if the Power of Attorney Watson claims O'Neill signed was indeed legitimate, which of course it is not, then Wilder or Watson would simply send a copy to O'Neill in the mail and call her on her phone rather than stalk O'Neill, lie, and claim O'Neill "lost" her copy.

Moreover, even though Watson claims to be an attorney, she ignores the law. Specifically, HIPAA requires healthcare organizations to keep copies of any

medical release forms to release medical information on file for six years.  CFR
§164.316(b)(2)(i).  Thus, if Wilder really did have a Power of Attorney, and
Watson really did have a legal right to make phone calls to healthcare
organizations when O'Neill was having rape exams performed, then those medical
release forms would be kept on file with each healthcare organization.  Yet, no
hospital has stated it has any authorization or Power of Attorney on file, or that any
person has any right to make healthcare decisions about O'Neill.

In addition, even if someone says he has a Power of Attorney, when a health
care provider reasonably believes that an individual, has been or may be subjected
to domestic violence, abuse or neglect by the personal representative, or that
treating a person as an individual's personal representative could endanger the
individual, the covered entity may choose not to treat that person as the
individual's personal representative, if in the exercise of professional judgment,
doing so would not be in the best interests of the individual.[29]  Among other things,
providers face legal liabilities for depriving others of healthcare.  In addition, the
person who claims to have a Power of Attorney and is depriving O'Neill of
healthcare, faces liability for depriving O'Neill of healthcare.

---

[29]https://www.hhs.gov/hipaa/for-professionals/faq/220/can-i-access-medical-
record-with-power-of-attorney/index.html

In addition, as a general principle, courts will not enforce illegal contracts. Restatement, Contracts § 598 (1932). See generally 5 Williston, Contracts §§ 1628, 1630 (Rev. ed. 1937). A contract is illegal if the circumstances of its formation or any of its provisions is prohibited by statute or contrary to public policy. Restatement, Contracts § 512 (1932). Thus, if the method of securing the contract, the promised performance or the method of performance contemplated, or the consideration are illegal, then the whole contract is illegal. *Bothwell v. Buckbee, Mears Co.*, 275 U.S. 274 (1927); *Cook v. Wolverine Stockyards Co.*, 344 Mich. 207, 73 N.W.2d 902 (1955).

Even if the promised performance is not illegal in itself, the contract is illegal if binding oneself to such performance is prohibited by statute or contrary to public policy. *Jordan v. Nationstar Mortgage, LLC*, 185 Wash. 2d 876, 374 P.3d 1195 (2016). In addition, mandatory rules of law prohibit the contracting of certain terms as violating public policy. *Yedidag v. Roswell Clinic Corp.*, 2015-NMSC-012, 346 P.3d 1136 (N.M. 2015). Here, there is no Power or Attorney that would allow Grady and Northside to violate HIPAA and state statutes.

Since HIPAA and state statutes state O'Neill has a right to the information she requested in her June 2022 letters, Grady and Northside must send her the information she requested or letters denying her requests since there is no legally

21

enforceable contract, Power of Attorney, or authorization Wilder or Watson could

possess that would deprive O'Neill of her rights under HIPAA and state laws.

Powers of Attorney, authorizations, or medical release forms that contain

provisions specially prohibited by law are void and nonenforceable. *Rape v.*

*Poarch Band of Creek Indians*, 2017 WL 4325017 (Ala. 2017). One whose rights,

such as they are, are subject to state restriction, cannot remove them from the

power of the state by making a contract about them. *S&M Brands, Inc. v. Georgia*

*ex rel. Carr*, 925 F.3d 1198 (11th Cir. 2019).

The Uniform Power of Attorney Act, which was enacted in Georgia and 25

other states shows that nothing in the Act allows the attorney to be empowered to

refuse medically beneficial treatment, and an attorney seeking to deprive someone

of treatment has led to litigation. § 11:2. Durable Power of Attorney or Proxy,

Patient Care Decision-Making. Thus, even if Wilder and Watson had a Power of

Attorney, under Georgia law, Grady and Northside were not legally allowed to

refuse O'Neill medically beneficial treatment, including testing of her urine

samples and medical records that contained the information O'Neill provided to

triage nurses, ER nurses, and healthcare providers. Likewise, New York law

required the agent act in Plaintiff's best interests. *Stein v. County of Nassau*, 642

F. Supp. 2d 135 (E.D. N.Y. 2009). Thus, the Hospital Defendants and Wilder team

had no legal right to alter O'Neill's medical records after she left the Hospital

Defendants' premises to change O'Neill's medical records to contain stupid stories

from Wilder and his rapist associates.  Given Wilder's and his rapist associates'

stories are based on fake accounts set-up in O'Neill's name without her knowledge

or consent and used to illegally impersonate Plaintiff, and videotapes of O'Neill

when she was drugged, it was clearly criminal for Grady and Northside to change

O'Neill's statements to the nurses, doctors and other healthcare providers to the

stupid mental health lies told by Wilder team in O'Neill's medical records.

**B. Business Associates**

The HIPAA Privacy, Security, and Breach Notification Rules apply to both

healthcare providers and their business associates.  A "business associate" is

generally a person or entity who "creates, receives, maintains, or transmits"

protected health information (PHI) in the course of performing services on behalf

of the covered entity (*e.g.*, management; billing personal; health record vendors;

lawyers; accountants; and malpractice insurers).  45 CFR 160.103.  Business

associates must comply with HIPAA, and HHS is required to impose HIPAA

penalties if a business associate acts in violation of statutes. 45 CFR § 160.401 and

164.404.  Thus, even if Grady or Northside have two sets of records like Beth

Israel / MSHS, Grady's and Northside's business associates are subject to

HIPAA's rules. Thus, legally, neither Grady or Northside can use a lawyer, a

parent company, or related entity to hide information from O'Neill.

## POINT VI:  PLAINTIFF IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF.

An injunction under O.C.G.A. § 9-5-1 may be granted where there is

controversy between parties and one of them is committing an act or threatening

the commission of an act that will cause irreparable injury or destroy the status quo

of the controversy before a full hearing can be had on the merits of the case.

*Eastman Kodak Co. v. Fotomat Corp.*, 317 F. Supp. 304 (N.D. Ga. 1969), appeal

dismissed, 441 F.2d 1079 (5th Cir. 1971).  Such is the case here.  As described

above, Grady and Northside are failing to comply with state and federal laws and

O'Neill faces irreparable injury as a result.  O'Neill cannot accurately amend her

complaint without the information she requested in her June 2022 letters.

An injunction serves to restrain any act contrary to equity and good

conscience, and for which no adequate remedy at law is provided.  *Waycross*

*Military Ass'n v. Hiers*, 209 Ga. 812, 76 S.E.2d 486 (1953).  Here, since Grady and

Northside are refusing to comply with state and federal laws, O'Neill has no option

but to ask the court to enjoin Grady and Northside from continuing to withhold the

information Plaintiff requested in her June 2022 letters.  Under the law, Grady and

Northside do have rights to withhold information, however, both Grady and

Northside must send O'Neill plain language denial letters stating their reasons for

denying access to information.  45 CFR 164.524(a)(2)-(4).

It is not the function of an injunction to decide a case on merits, and the

possibility that the party obtaining an injunction may not win on the merits is not

determinative of the propriety or validity of the court's granting the injunction.

*Eastman Kodak Co. v. Fotomat Corp.*, 317 F. Supp. 304 (N.D. Ga. 1969).  Rather,

each case must be determined on its particular allegations, and must be decided on

the nature, extent, and kind of equitable relief sought.  *Newport Timber Corp. v.*

*Floyd*, 247 Ga. 535, 277 S.E.2d 646 (1981).  Thus, the only determination this

court needs to make is whether Grady and Northside are violating the state and

federal statutes referenced above and in the foregoing motion.  Clearly, the answer

is yes and an injunction is necessary.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court **GRANT**

the motion and grant such other further relief the Court deems equitable.

Dated: Alexandria, VA
October 6, 2022

Respectfully submitted,


BY: _Maura O'Neill_

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **MAURA O'NEILL,** | **CIVIL ACTION FILE NO.:** |
| | **1:22-cv-00011-SEG** |
| Plaintiff, | |
| v. | |
| **NYU LANGONE HOSPITALS, NEW YORK- PRESBYTERIAN HOSPITAL QUEENS, LENOX HILL HOSPITAL, GRADY MEMORIAL HOSPITAL CORPORATION, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL, INC., COLLEGE PARK POLICE DEPARTMENT,** | |
| Defendants. | |

## LR 7.1(D) FONT COMPLIANCE CERTIFICATION

The undersigned certifies that the within and foregoing **MEMORANDUM OF LAW AND MOTION TO ENJOIN** were prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

27

Dated:  Alexandria, VA
October 6, 2022

Respectfully submitted,


BY: _Maura O'Neill_

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moncill@rahillco.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MAURA O'NEILL,**<br><br> Plaintiff,<br><br> v.<br><br>**NYU LANGONE HOSPITALS, NEW YORK- PRESBYTERIAN HOSPITAL QUEENS, LENOX HILL HOSPITAL, GRADY MEMORIAL HOSPITAL CORPORATION, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL, INC., COLLEGE PARK POLICE DEPARTMENT,**<br><br> Defendants. | **CIVIL ACTION FILE NO.: 1:22-cv-00011-SEG** |

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that I have this day caused to be served a true and

correct copy of the foregoing by emailing and mailing a copy of the foregoing to

each Defendant at the following addresses:

29

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Brantley Rowlen, Esq.
Chase Parker, Esq.
24 Drayton Street, Suite 300
Savannah, GA 31401
Telephone: 912.525.4960
E-Mail: rowlen@lbbslaw.com
E-Mail: chase.parker@lewisbrisbois.com

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
Parks Kalervo Stone, Esq.
3348 Peachtree Road NE
Suite 1400
Atlanta, GA 30326
Telephone: 470.419.6651
E-Mail: parks.stone@wilsonelser.com

**WATSON SPENCE LLP**
Michael R. Boorman, Esq.
999 Peachtree Road, N.E.
Suite 1130
Atlanta, GA 30309
Telephone: 229.436.1545
E-Mail: mboorman@watsonspence.com

**THOMAS KENNEDY SAMPSON & TOMPKINS, LLP**
Jeffrey Emery Tompkins, Esq.
Candance J. Rodgers, Esq.
3355 Main Street
Atlanta, GA 30337
Telephone: 404.688.4503
E-Mail: j.tompkins@tkstlaw.com
E-Mail: c.rodgers@tkstlaw.com


in accordance with Rule 5(b)(2)(E).

30

**SCRUDDER, BASS, QUILLIAN, HORLOCK,**
**LAZARUS & ADELE LLP**
Henry E. Scrudder, Jr.
Teddy L. Sutherland
Sophia Welf
900 Circle 75 Parkway
Suite 850
Atlanta, Georgia 30339-3053
Telephone: (770) 612-9200
Facsimile: (770) 612-9201
hscrudder@scrudderbass.com
tsutherland@scrudderbass.com
swelf@scrudderbass.com

**HALL BOOTH SMITH, PC**
Tiffany R. Winks
Georgia Bar No. 626413
Austin Atkinson
Georgia Bar No. 935864
191 Peachtree St. NE
Suite 2900
Atlanta, GA 30303
404-954-5000
twinks@hallboothsmith.com
aatkinson@hallboothsmith.com

in accordance with Rule 5(b)(2)(E).

Dated: Alexandria, VA                    Respectfully submitted,
October 6, 2022

                                         BY: _Maura O'Neill_____
                                         Maura O'Neill, Plaintiff
                                         601 King Street, Suite 200-#465
                                         Alexandria, VA 22314
                                         moneill@rahillco.com