## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**MAURA O'NEILL,**

Plaintiff,

v.

**NYU LANGONE HOSPITALS, NEW YORK- PRESBYTERIAN HOSPITAL QUEENS, LENOX HILL HOSPITAL, GRADY MEMORIAL HOSPITAL CORPORATION, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL, INC., COLLEGE PARK POLICE DEPARTMENT,**

Defendants.

**CIVIL ACTION FILE NO.:
1:22-cv-00011-SEG**

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**OCT 11 2022**

KEVIN P. WEIMER, Clerk
By: _Kimberly Hatch_ Deputy Clerk

**EMERGENCY MOTION**

## PLAINTIFF'S MOTION TO ENJOIN AND HEARING REQUEST

**COMES NOW** Plaintiff Maura O'Neill ("Plaintiff"), and, moves the Court

for a permanent injunction against Grady Memorial Hospital Corporation

("Grady") and all Northside Hospital, Inc. ("Northside") under O.C.G.A. § 9-5-1,

O.C.G.A. §§ 31-33-1, 31-33-2, O.C.G.A. § 24-12-1, O.C.G.A. § 16-10-94.1,

O.C.G.A. § 16-10-94(a), O.C.G.A. § 16-10-94(c), O.C.G.A. § 24-7-702, O.C.G.A.

§ 16-11-67, O.C.G.A. § 16-11-62(1), and O.C.G.A. § 24-9-901.

Plaintiff is entitled to a permanent injunction to prevent Grady's and

Northside's ongoing illegal acts, including, but not limited to the illegal withholding of records and information from O'Neill in violation of state and federal statutes. This motion is supported by Plaintiff's Brief in Support of Permanent Injunction and prior filings in this action.

## A.  *Grady's and Northside's Unconstitutional Standard*

Separate but equal.  During a dark phase in American history, separate but equal was regarded, not simply as a valid legal doctrine, but as constitutional law, supported by the Supreme Court, to deprive one group of people of its constitutional rights. *Plessy v. Ferguson*, 163 U.S. 537, 538, 16 S. Ct. 1138, 1138, 41 L. Ed. 256 (1896).  Separate is of course, not equal, and the systems of inhumane discrimination separate but equal authorized remains a stain on American history.  Here, the defendants in this action have employed another system, "Higher and Different."  Under the illegal and unconstitutional Higher and Different farce, Plaintiff is held to Higher and Different standards that not only do not exist, but are in fact so farcical that they are untethered to reality, let alone any legal or ethical standard.  As described in detail below, at the same time Plaintiff is held to farcical Higher and Different standards that simply do not exist for other people, the defendants in this action have repeatedly violated Plaintiff's most basic human rights, broken numerous federal and state laws, destroyed evidence, and commit numerous criminal acts; all in order to protect a man who

has racked up more signed legal agreements per year than Harvey Weinstein to silence the women he raped and abused.[1]

## B. Legal Alteration of Medical Records

Altering a medical record to attempt to hide acts of fraud, medical malpractice, or criminal behavior is a felony, and the falsification of medical records can cause healthcare providers to be indicted on criminal charges and face onerous civil penalties.[2]  According to the American Health Information Management Association ("AHIMA"), providers should make a new note and include the current date and time if they wish to change medical records.[3]  The note should be labeled, "Late Entry," "Correction," or "Addendum." *Id.*  Importantly, it is paramount that the provider ***explain the relationship of the new note to a previous one, including the reason for the error, and the source of the new information.  Id.  (Emphasis added).  Records should always reflect who did***

---

[1]When *The New York Times* published its article on October 5, 2017 that played a large part in Harvey Weinstein's downfall, the *Times*, after months of investigation, had been able to track down eight settlement agreements Weinstein signed with his victims. Kantor, Jodi; Twohey, Megan. "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades." *The New York Times.* October 5, 2017. O'Neill was informed Wilder has at least six or seven signed agreements with women he raped or abused.  At the time the *Times* article about Weinstein was published, Weinstein was 65 years old.  Wilder is only 49.  Thus, Wilder has accumulated more signed documents per year than Weinstein.
[2]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.
[3]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24

**what.**[4] *(Emphasis added)*.  Finally, a provider making a change to a medical record should draw a line through the incorrect entry, although the text should be legible.[5]

If an omission in a medical record is noticed after a short amount of time, a late entry can be made only if the person documenting has "total recall" of the omitted information.[6]  Thus, filling in missing information after the fact may lead to a misrepresentation of events if done improperly, and filling in omissions may also be illegal, and lead to criminal charges.

HIPAA requires all hospitals, including Hospital Defendants[7] to have standard audit controls, and to "[i]mplement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information."  45 C.F.R. § 164.312(b).

### C. Criminal Acts

---

[4]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

[5]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

[6]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

[7]On January 4, 2022, Plaintiff filed a complaint against several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYPQ"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").[7]

The alteration and / or falsification of medical records is a crime in most states, and is usually dealt with harshly. *Elbar, Inc. v. Claussen* (1989, Tex App Dallas) 774 SW2d 45. Alteration of a patient's record by a doctor for the purpose of defeating an actual or potential claim "is reprehensible and evidences a moral deficiency and disregard for the rights of others that [courts] regard as odious and repugnant." *Paris v. Michael Kreitz, Jr.,* 75 NC App 365, 331 SE2d 234 P.A., (1985). In most cases the act of requesting copies of a client's hospital records by an attorney investigating a claim triggers a health care provider's apparent need to alter medical records to affect the outcome of the investigation. *Langager v. Lake Havasu Community Hospital,* 799 F2d 1354, 135 (1986, CA9 Ariz).

## D. Request for Information

On June 6, 2022 Plaintiff started sending letters to hospitals, including Grady and Northside, requesting two basic pieces of information:

- Confirmation the hospital does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at the hospital about O'Neill or receive any information about her medical records or have access to information about her medical care.
- Confirmation the hospital does not have any additional records, data, or information that the hospital used to make decisions about O'Neill's healthcare that are not included in her medical record.

Despite the fact that the two requests for information are incredibly basic, not a single one of the Hospital Defendants fully complied with HIPAA and state laws and responded to O'Neill's request. Georgia law gave Grady and Northside

thirty days to respond, yet neither did.  Thus, Northside and Grady failed to comply with HIPAA and state law requirements. [See O.C.G.A. §§ 31-33-1, 31-33-2, O.C.G.A. § 24-12-1].

Given the Hospital Defendants lack of responsiveness, in June 2022, O'Neill went to New York, and spoke to Beth Israel.  Beth Israel stated it does not have a Power of Attorney or authorization on file.  It also stated the only information it has on record is in O'Neill's medical record, and referred O'Neill to its parent company, Mount Sinai Health System ("MSHS").  However, MSHS refused to respond to O'Neill's requests for information or state whether MSHS has records about O'Neill Beth Israel does not possess even though New York's Public Health Law § 18(2) required the New York Defendants to respond within ten days, and MSHS failed to comply with the law.  Likewise, when O'Neill spoke to the medical records department at NYU Langone, she was informed that the Patient Relations team, an arm of NYU's legal team, has additional records about Plaintiff.

Thus, what became obvious is that the Hospital Defendants are maintaining two separate and distinct sets of records.  One O'Neill has access to (e.g., the records at Beth Israel) and another O'Neill has been deprived access to (e.g., the records at MSHS) despite the fact that an organizaiton maintaining two sets of books is clearly a red flag showing consciousness of guilt of fraud.  Given the fact the Hospital Defendants have two sets of records, it is clear that the Hosptial

Defendants purposefully sought to defraud and harm O'Neill despite their fiduciary duties to O'Neill.

### E. Georgia Law

Under Georgia law, a "record" means:

> a patient's health record, including, but not limited to, evaluations, diagnoses, prognoses, laboratory reports, X-rays, prescriptions, ***and other technical information used in assessing the patient's condition, or the pertinent portion of the record relating to a specific condition or a summary of the record.*** O.C.G.A. § 31-33-1. (Emphasis added).

Thus, under Georgia law, O'Neill has a right to view "information" used in "assessing" her "condition" or the pertinent portion of the record relating to a specific condition. O.C.G.A. § 31-33-1. Despite the plain language of the statute, both Grady and Northside have failed to provide O'Neill with any facts to support the baseless opinions contained in O'Neill's medical records from Grady and Northside, despite O'Neill's June letters.

Rather, it is clear when reading O'Neill's medical records from Grady and Northside that her medical records are based on information that is not contained in her medical records. In fact, there is no factual basis or support for numerous statements written in Gray's and Northside's medical records, and it is clear Defendant's support for several statements in Plaintiff's medical records is due to conversations Grady and Northside had with various third parties about O'Neill without her knowledge or consent.

7

According to Rule 111-8-40-18(1)(d):

> At any time during or after their course of treatment, patients shall be provided with copies of their medical records upon their written requests …Copies shall be provided within a reasonable time period not to exceed thirty (30) days after the request. Rule 111-8-40-18(1)(d).

Yet, Grady and Northside failed to comply with these legal requirements since O'Neill sent her letters to Grady and Northside in June of 2022, it is now October, and neither Northside or Grady have complied with state laws.  Likewise, according to Rule 111-8-40-18(2):

> All entries in the patient's medical records shall be accurate and legible and shall contain sufficient information to support the diagnosis and to describe the treatment provided and the patient's progress and response to medications and treatments.

> Likewise, under Rule 111-8-40-18(2)(a),
> The date of the entry and the signature of the person making the entry, shall accompany all entries in the patient's medical record. ***Late entries shall be labeled as late entries.***

The rules highlighted above are very clear.  Yet, both Grady and Northside violated these incredibly basic and very easy to understand rules in order to harm O'Neill and aid Wilder.  Failure to follow Rule 111-8-40-18(2) clearly shows not only a consciousness of guilt, but a knowing intention to willfully harm O'Neill.  Thus, given the prior criminal acts of both Northside and Grady, clearly neither institution had any intention of responding to O'Neill's June 2022 letters.

***F. Motion to Compel and Response***

As a result of Grady's and Northside's and the other Hospital Defendant's failures to adhere to state and federal laws, on August 18, 2022, Plaintiff served a motion to compel each of the Hospital Defendants to produce information state laws and HIPAA required Hospital Defendants to produce, but which each Defendant failed to produce (Docket No. 58). Not only is it not typical for hospitals to violate HIPAA and state laws and fail to provide the information O'Neill requested as described in the Motion to Compel, but hospitals typically provide the information O'Neill requested within only a few days because failing to do so warrants corrective action from the Department of Health and Human Services ("HHS"), and other regulatory agencies.

In addition, HIPAA requires all Hospital Defendants to have a compliance officer to comply with state and federal healthcare laws and regulations. 45 C.F.R. § 164.530. Thus, Grady, Northside and each Hospital Defendant knew their failure to comply with HIPAA and state laws warranted action from regulatory agencies, but Grady, Northside and each Hospital Defendant broke laws with impunity anyway. Clearly, actions such as these in which healthcare providers knowingly and willfully break the law are not the norm.

In 2013, HIPAA regulations were amended by the HITECH Act which requires health care providers to provide medical records to a patient who writes a letter to the health care provider requesting the records. In applying section

9

164.524 of title 45, Code of Federal Regulations, the HITECH Act provides that

patient requests for electronic records should not be accompanied by a standard

HIPAA authorization.  45 CFR § 164.524.  The patient's request under the

HITECH Act may be as simple as the following:

I am a patient of [Health care provider's name]. My birth date is [patient's birth
date]. I request copies of any and all of my medical records including, but not
limited to, radiological films, billing records, and outside records. Please provide
the records in electronic form on CD in the Adobe Acrobat.pdf format, and send
them to:

SIGNED:
[Patient's name]

§ 8:3. Electronic medical records under HITECH Act, Ga. Law Of Torts
Preparation For Trial § 8:3 (2022 ed.)

Georgia requires healthcare providers provide each patient with a complete

and current copy of her medical record, upon written request, to any person who

has received health care services from the provider.  Ga. Code Ann. §§ 31-33-1,

31-33-2.  The legislative purpose behind Health Records Act was to ensure that

patients have access to medical records in the custody and control of healthcare

providers.  *Cotton v. Med-Cor Health Information Solutions, Inc.*, 1996, 221

Ga.App. 609, 472 S.E.2d 92.

In the Motion to Extend Time, (Docket No. 60), O'Neill informed the Court

that filing an Amended Complaint will be a waste of time for both Plaintiff and

Defendants at this juncture given Hospital Defendants have failed to comply with

HIPAA and state laws and failed to send O'Neill the information she requested in letters dated June of 2022 as described at length in Plaintiff's Motion to Compel. (Docket No. 58-1, Pages 9-19). Thus, in the Motion to Extend Time (Docket No. 60), O'Neill also asked the Court to delay the deadline for O'Neill to file an Amended Complaint until after she received the information she requested from Hospital Defendants in June of 2022. Despite the fact O'Neill made clear in the Motion to Compel (Docket No. 58) that Hospital Defendants were violating both state and federal statutes, the Court completely ignored the facts presented by Plaintiff in the Motion to Compel (Docket No. 58) and Motion for an Extension to Time (Docket No. 60) in an order dated September 9, 2022 (the "Order"), even though this Court did not present a single case or valid reason for ignoring Plaintiff's arguments in either the Motion to Compel (Docket No. 58) or Motion for an Extension of Time (Docket No. 60). Rather, the Order is devoid of case law supporting the Court's rulings because there is no case law to support flagrantly violating federal statutes, state laws, public policy, and public safety.

### G. Northside

Medical records are protected by Georgia's constitutional right of privacy and cannot be disclosed without the consent of the patient unless their production is otherwise required by Georgia law. *King v. State,* 272 Ga. 788, 790(1), 535 S.E.2d 492 (2000). In the absence of a waiver, a patient must be afforded notice

11

and an opportunity to object prior to the disclosure of her medical records. *Id.* Here, Northside spoke to Wilder's agents about Plaintiff without first obtaining O'Neill's consent, and Northside disclosed confidential information to Wilder's agents despite the fact Northside stated in an email dated June 9, 2022 that Northside does not have a Power of Attorney or any authorization on file to allow Northside to speak to any third party about Plaintiff. Thus, despite the fact Georgia law on medical information should be viewed in light of the fact that Georgia law views the right of privacy "as a fundamental constitutional right, having a value so essential to individual liberty in our society that its infringement merits careful scrutiny by the courts," Northside chose to flagrantly violate O'Neill's rights under the law.

Instead, Northside's medical records is filled with nothing more than *ipse dixit* opinions based on false information provided to Northside about Plaintiff without O'Neill's knowledge or consent and despite the fact that a physician's recorded recollection of a patient's medical history, which contain medical opinions of a third party, is inadmissible as a medical record in litigation. *Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424. Thus, not only did Northside violate O'Neill's privacy rights, but Northside also produced an *ipse dixit* record that is inadmissible in court because the statements in the record are not supported by facts contained in the medical record. *Id.*

Northside's medical records also clearly evidence criminal acts. O'Neill went to Northside in January of 2018 because a test showed she had been drugged with opiates. As shown on her recordings of her time at Northside, O'Neill told the triage nurse, doctor, and other nurses and healthcare providers that she had been drugged with opiates. But, after O'Neill left Northside, her medical records from her time with the triage nurse, doctor, and other ER providers were altered to erase all mentions of the test showing she had been drugged with opiates. Under Rule 111-8-40-18(2)(a), *"**Late entries shall be labeled as late entries.**"* Yet, Northside did not label the changes to O'Neill's medical records as "late entries." Nor did Northside label its entries in O'Neill's medical records after she left as "Corrections," or "Addendums." Nor did Northside ***explain the relationship of the new note to a previous one, including the reason for the error, and the source of the new information.*** *Id. (Emphasis added).* ***Records should always reflect who did what.***[8] *(Emphasis added).*[9] Changing information after the fact has led to misrepresentation of events in other cases and criminal charges. Thus, it is clear Northside's acts were criminal and designed to harm O'Neill and aid Wilder.

---

[8]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

[9]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

In addition, despite the HITECH Act, in a filing with the Court, Northside

claimed that it was not required to respond to O'Neill's June 2022 "letters" despite

the fact that the HITECH Act makes it quite clear that a letter is a sufficient means

of requesting information.  (Docket No. 63, Page 4, ¶2).

### H. Grady

Grady's medical record and treatment decisions make clear Grady relied on

conversations with third parties to make decisions about Plaintiff, thus the names

of all the individuals Grady spoke to about O'Neill, and the details of Grady's

conversations about O'Neill must be included in O'Neill's designated record sets

under 45 CFR § 164.501.  Since Grady is refusing to disclose that information, it is

clear Grady abused O'Neill, and refused to put a urine sample in O'Neill's rape kit

to aid and abet Wilder even though Grady committed the offense of tampering with

evidence, O.C.G.A. § 16-10-94(a), and its actions are punishable by imprisonment.

O.C.G.A. § 16-10-94(c).

A patient is entitled to trust her physician and rely on what he tells the

patient.  *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App.

452, 459, 504 S.E.2d 514, 523 (1998).  Yet, here, Grady's decision to hide

information from O'Neill manifests fraud given it is clear when reading O'Neill's

medical record from Grady that the medical record is based on information that is

not contained in O'Neill's medical record.  In fact, there is no factual support for

numerous statements written in O'Neill's medical record, and it is clear that

Grady's basis for several statements in O'Neill's medical record is due to

conversations Grady had with various third parties about Plaintiff without

O'Neill's knowledge or consent, and without giving Plaintiff an opportunity to

respond to false information given to Grady about O'Neill behind her back.

Like Northside's medical records, Grady's also clearly evidence criminal

acts.  As shown on her recordings of her time at Grady, O'Neill told the triage

nurse, doctor, and other nurses and healthcare providers that she had been drugged

had vomited that morning, was naeuous and had been told by the security guard at

the Embassy Suites where she stayed that he had been paid enough by Wilder to

allow Wilder to enter O'Neill's room when she was asleep.  However, after

O'Neill left Grady, her medical records from her time with the triage nurse, doctor,

and other ER providers were altered to erase all mentions of the fact she was made

sick by the drugs Wilder administered, and a security guard let Wilder into her

room.  Under Rule 111-8-40-18(2)(a), "*Late entries shall be labeled as late*

*entries.*"  Yet, Grady did not label the changes to O'Neill's medical records as

"late entries."  Nor did Grady label its entries in O'Neill's medical records after

O'Neill left as "Corrections," or "Addendums."  Nor did Grady *explain the*

*relationship of the new note to a previous one, including the reason for the error,*

*and the source of the new information.  Id.  (Emphasis added).  Records should*

*always reflect who did what.*[10] *(Emphasis added).*[11]  Changing information has led to misrepresentation of events in other cases and criminal charges.  Thus, it is clear Grady's acts were criminal and designed to harm O'Neill and aid Wilder.

## I. Ex Parte Communication

A judge who obtains extrinsic information for purposes unrelated to a case cannot consider the information in deciding an issue in the case.  *U.S. v. Siegelman*, 799 F. Supp. 2d 1246 (M.D. Ala. 2011).  Likewise, a judge's actions in meeting *ex parte* with panel of experts, appointed by the judge to investigate state mental health institutions, so the judge could receive a preview of the panel's conclusions and discern that the experts' methodology was sound, was grounds for disqualification of the judge; allowing an off-the-record briefing on issues and prohibiting opposing counsel from discovering what was said in meetings resulted in an unauthorized private investigation by the judge.  *Edgar v. K.L.*, 93 F.3d 256, 45 Fed. R. Evid. Serv. 31 (7th Cir. 1996).  The better practice is for a district court judge not to receive *ex parte* communications from law enforcement officers or investigators.  *U.S. v. Siegelman*, 799 F. Supp. 2d 1246 (M.D. Ala. 2011).

---

[10]Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.
[11]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.

According to Rule 9, Appearance of Counsel, "An attorney representing a party who will not be filing a document shall enter a separate notice of appearance as counsel of record indicating the name of the party represented." Here, no attorney has filed a notice claiming to represent Plaintiff's interests. Thus, it is improper for the Court to hear any argument by any person other than O'Neill.

## J. *Hearing Request*

As stated above, Plaintiff's medical records from rape exams present shining examples of *ipse dixit*--i.e., the expert claims that it is so merely because he says that it is so. Yet, as counsel to Hospital Defendants is surely well aware, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible as evidence. Rather, *Daubert* and *Kumho Tire Co.*, as well as Rule 702, require that expert opinion be connected to existing data by something more than dubious inferences that amount to an expert's assertion that 'it is so because I say it is so." Thus, O'Neill's medical records are fraudulent on their faces because they do not contain the information provided by third parties, without O'Neill's knowledge or consent, that provide the actual basis for the subjective opinions that are not supported by facts or data in O'Neill's records.

O'Neill was aware of the fact Wilder's attorney, Watson, called or had others call Hospital Defendants in order to harm O'Neill, however, O'Neill was unprepared for Hospital Defendants to flagrantly violate federal and state statutes

17

and commit criminal acts by destroying evidence in order to aid and abet Wilder. O'Neill believed Hospital Defendants would not overtly commit crimes to harm her and alter her medical records, and thereby incur criminal liabilities, because O'Neill believed Hospital Defendants would put their own reputations and interests above the interests of the Wilder team.

In addition, O'Neill expected Hospital Defendants would document their phone conversations with the Wilder team because HIPAA and state privacy rules require them to do so. 42 CFR § 482.13(B)(1). However, given no Hospital Defendant has been able to produce a Power of Attorney or any proof that any Hospital Defendant had any right to speak to any third party about O'Neill, Plaintiff has been shocked by Hospital Defendants' overt violations of federal statutes, particularly in light of the fact all Hospital Defendants are required to have compliance officers under HIPAA. 45 C.F.R. § 164.530.

Given it is illegal and in blatant violation of HIPAA and state laws to maintain PHI, patient information, and medical records on a patient and fail to disclose that information to the patient, O'Neill did not believe that Hospital Defendants would be corrupt or stupid enough to maintain two separate sets of records: one set O'Neill had access to, and another she did not. However, after O'Neill went to Beth Israel and NYU Langone in June of 2022, it became clear that the Hospital Defendants were attempting to maintain two separate and distinct

record sets.  In most cases, it appears that the hospital which provided services has one set of *ipse dixit* records, while its parent company, maintains an entirely different set of records.  Likewise, the medical records department at NYU Langone informed O'Neill that the "Patient Relations" division had an entirely different set of records about O'Neill even though when asked, the medical records person O'Neill spoke to informed her that in his decade of working at NYU Langone he had never seen patient PHI moved to the Patient Relations department. Likewise, it appears that Lenox Hill Hospital's parent company, Northwell Health, also maintains a separate and distinct set of medical records about O'Neill.

It does not take an attorney or anyone with legal training to know that maintaining two sets of records is a hallmark of fraud.  In fact, even simple Google searches make clear that a company maintaining two separate sets of records is clearly acting with fraudulent intent.  Thus, it appears that Northside, Grady and each Hospital Defendant had a clear *intent* to deceive O'Neill and a clear *consciousness of guilt.*  If the information contained in their other files was, in fact, obtained legally, and medically valid, then the Hospital Defendants would include that information in O'Neill's medical records.  However, it is clear that all Hospital Defendants are well aware of the fact that the information contained in their other files is based on criminal acts, lies, and fraud.  Thus, each Hospital Defendant has sought to hide information from O'Neill in a manner that any person on the street

would immediately recognize as intended to deceive and harm despite the fact each Hospital Defendant had a fiduciary duty to O'Neill.

Despite that duty, what is abundantly obvious is that each Hospital Defendant has broken state and federal laws and ignored their duties in order to aid and abet the Wilder team. No one in their right mind believes that the employees at Hospital Defendants that conspired with the Wilder team to create two sets of medical records, destroy evidence, and violate state and federal statutes did so without expecting something of value in return. In the Larry Nasser case, the former FBI agent that closed cases against Nasser to aid and abet the USA Gymnastics in covering up the sexual abuse of minors was promised a high paying security job at the U.S. Olympic Committee upon his retirement from the FBI.[12]

It is not only clearly unethical and immoral, but also illegal, to seek to profit from a scheme to defraud. By maintaining two separate records about O'Neill each of the Hospital Defendants is seeking to profit from a criminal scheme and enterprise. The responses from NYU Langone, Beth Israel, Grady and Northside that O'Neill's valid requests under state laws and HIPAA amounted to "discovery," knowing full well state and federal law said otherwise, 45 C.F.R. § 164.530, was clearly a blatant attempt to further use deception and fraud to

---

[12] Tim Evans, Tony Cook, Marisa Kwiatkowski, Sarah Bowman, "Indianapolis FBI leader eyed head USA Gymnastics job after sitting on Nassar allegations." *Indianapolis Star*, July 16, 2021.

continue to profit from their illegal schemes.  The Supreme Court adverted to "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."  Thus, since defendants have violated state and federal law, they cannot assert a right deny access to O'Neill to the information sought in her letters due to false claims of "discovery" in a court.

In addition, what is clear from the *ipse dixit* medical records is that because there is no factual support to the records, and because the medical records are not legally admissible as evidence, the only way the Hospital Defendants can continue to maintain two sets of records and continue to mislead and harm O'Neill by violating state and federal statutes is because the Wilder/DB teams are continuing to stalk and abuse O'Neill.  Because without stalking and abuse, the Hospital Defendants would release the information contained in O'Neill's June 2022 letters. Thus, for the last several years, as O'Neill has gone to other healthcare providers, she has been greeted by the same type of illegal activities and criminal acts given the only way for the Wilder/DB teams to maintain the farce of Hospital Defendants' medical records is by continuing to stalk and abuse O'Neill.  Thus, by agreeing to prepare fraudulent medical records, committing criminal acts, destroying evidence, and violating state and federal laws, Hospital Defendants

21

have effectively made themselves accessories to the DB/Wilder teams' other crimes and abuses.

Denying someone access to healthcare is clearly a human rights violation, however, the Wilder/DB team has done just that. The facts and circumstances surrounding Brittney Spears conservatorship raised public outrage over the pop star's mistreatment and abuse by her conservator, her father, and other members of the Spears family.[13] The treatment of Spears was widely regarded as abusive, and a deprivation of Brittney Spears fundamental human rights.[14] However, O'Neill has been treated far worse than Brittney Spears. While Brittney Spears agreed to a conservator, had an attorney representing her interests, and had a court overseeing decisions made about her healthcare, O'Neill has had the Wilder/DB team control her healthcare from 2016-2022 from the shadows and by withhold healthcare and medical information from O'Neill, and encouraging healthcare providers to criminally alter their medical records and produce *ipse dixit* records.

As a result, O'Neill has only been provided with *ipse dixit* records, and has been subjected to a series of lies and abuse. Among other things, O'Neill has had to prove that the Wilder/DB team lied when it claimed she had a stroke when in

---

[13]Ronan Farrow and Jia Tolentino, "Britney Spears Conservatorship Nightmare," *The New Yorker*, July 3, 2021.
[14]Margaret Bushko, "Toxic: A Feminist Legal Theory Approach to Guardianship Law Reform," 81 Md. L. Rev. Online 141, 160 (2022).

fact she has never had a stroke, suffers from high blood pressure when in fact she has low blood pressure, never had migraines, has never taken illegal drugs, is not a drug addict, and is not delusional or paranoid. Yet, despite the false nature of these claims, all these false claims were made about O'Neill in *ipse dixit* format. It is mathematically impossible that the false claims made about O'Neill (e.g., stroke, high blood pressure, migraine, drug addiction, paranoid, delusional), constitute anything other than fraud and criminal acts given the falsification of business records is a crime. O.C.G.A. § 16-10-94.1; N.Y. Penal Law § 175.10.

Even prisoners are treated better than O'Neill. For example, allegations of habeas petitioner, who was confined for treatment at state hospital pursuant to the Kansas Sexually Violent Predator Act, that the Kansas Department of Social and Rehabilitation Services (SRS) improperly denied his request for copies of his treatment records, and that the records were not protected from disclosure because the information in the records was not compiled in anticipation of litigation, stated an actionable claim. *Merryfield v. Kansas Social and Rehabilitation Services*, 2010, 236 P.3d 528, 44 Kan.App.2d 324. Thus, the prisoner was able to see his records even though Grady, Northside and the other Hospital Defendants are denying O'Neill access to her records and the information she requested in her June 2022 letters.

## K. Information Request

Given Northside and Grady have broken numerous laws and statutes, failed

to comply with even the most basic of statutory requirements, Plaintiff files this

motion to enjoin Grady and Northside from withholding information O'Neill has

a right to under the law.  O'Neill requests Grady and Northside:

a.  Provide the following information:
1.  [Defendant] does not have any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in 2018.

2.  No related entity, LLC, SPV, parent company, individual, partnership, corporation, or any other entity, or law firm hired by [Defendant] or business associates, as defined by 45 CFR 160.103, has any additional records, data, or information that Defendant used to make decisions about Maura O'Neill's healthcare that are not included in Maura O'Neill's medical records from her visit(s) to [Defendant] in 2018.[15]

3.  [Defendant] [has / does not have], and [has had since (date) / has never had], a medical release form, Power of Attorney, or other authorization on file that would allow any person or entity to speak to any person at [Defendant] about Maura O'Neill or receive any information about Maura O'Neill's medical records or have access to information about Maura O'Neill's medical care.

4.  [Defendant] [did/did not] have [an authorization] to speak with law enforcement about O'Neill.

---

[15]In February of 2019, Plaintiff sent letters to DB.  DB was willing to deny DB had possession of Plaintiff's medical records, but DB was not willing to deny that (1) a related entity or law firm hired by DB had copies of those records or (2) DB discussed O'Neill's medical records with a third party.  Thus, there is reason to believe Hospital Defendants would hide information with a related entity or law firm.

b.  Produce a list of names of all individuals Grady and Northside spoke to about O'Neill's health. (e.g., Grady spoke to Beth Israel and the College Park Police).

c.  Provide detailed statement of all information procured from any third party about O'Neill's health (e.g., NYPD, College Park Police, other provider).

d.  Stop using deceptive legalese in an attempt to thwart and deceive Plaintiff (e.g., Accounting of Disclosures).

If the court determines the written motion papers are insufficient, Plaintiff requests a hearing so that the Court can collect any additional information it deems relevant. Federal Rule of Civil Procedure ("FRCP") 43(c) permits the Court to take evidence at a hearing when a motion relies on facts outside the record.

Plaintiff also asks the Court to waive the time requirements of the motion rule and grant an immediate hearing. An expedited procedure is necessary because filing an Amended Complaint and responding to Hospital Defendants' motions to dismiss will be a waste of time for both Plaintiff and Hospital Defendants at this juncture given Hospital Defendants have failed to comply with HIPAA and state statutes and send O'Neill the information she requested as described at length in this motion.

**WHEREFORE,** Plaintiff Maura O'Neill respectfully requests that this Court **GRANT** the instant Motion.

Dated:  Washington, DC
October 6, 2022

Respectfully submitted,

BY: _Maura O'Neill_

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com