## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**MAURA O'NEILL,**

       Plaintiff,

    v.

**NYU LANGONE HOSPITALS, NEW YORK- PRESBYTERIAN HOSPITAL QUEENS, LENOX HILL HOSPITAL, GRADY MEMORIAL HOSPITAL CORPORATION, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL, INC., COLLEGE PARK POLICE DEPARTMENT,**

       Defendants.

**CIVIL ACTION FILE NO.:**
1:22-cv-00011-SEG



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 18 2022

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

---

## MEMORANDUM OF LAW IN OPPOSITION TO NEW YORK PRESBYTERIAN HOSPITAL QUEEN'S MOTION TO DISMISS

---

October 18, 2022

Maura O'Neill
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

Maura O'Neill ("Plaintiff") submits this memorandum in opposition to the motion to dismiss filed by Defendant New York Presbyterian Hospital Queens ("NYPQ") (the "Motion") (Docket No. 23).

## PRELIMINARY **STATEMENT**

On April 25, 2022, Defendant NYPQ filed New York Presbyterian Hospital / Queens' Brief in Support of its Motion to Dismiss (the "Brief") (Docket No. 23-1).[1]  In the Brief, NYPQ claimed Plaintiff's claims should be dismissed because this court lacks jurisdiction, and the fraud and Racketeer Influence and Corrupt Organizations Act ("RICO") claims are time barred.  (Docket No. 23-1, Page 2, ¶1).  In addition, NYPQ claimed the RICO claim fails because O'Neill did not state NYPQ was part of a RICO enterprise.  (Docket No. 23-1, Page 2, ¶1).  NYPQ also claimed that O'Neill failed to properly state the five elements for a cause of action for fraud (Docket No. 23-1, Page 18, ¶3), and NYPQ moved for judgment pursuant to Rule 12(c). (Docket No. 23-1, Page 2, ¶1).  As described below, NYPQ is incorrect on all points.

---

[1]On January 4, 2022, Plaintiff filed a complaint against several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYPQ"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").

As described below, the RICO claim invokes a federal question and thereby invokes federal jurisdiction, and the state law fraud claim invokes diversity of citizenship jurisdiction under federal law.  Specifically, whenever there is a substantive right enforceable in any state court, it is enforceable in federal courts if the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

NYPQ's claim Plaintiff's RICO and fraud claims are time barred are also incorrect because O'Neill's claims are not time barred under the four year statute of limitations.  In particular, when making the claim O'Neill's causes of action were time barred, the sole "evidence" to support this claim supplied by NYPQ was that O'Neill recorded her visit to NYPQ on January 1-2, 2018.  However, simply because O'Neill recorded a conversation does not mean someone commit fraud.  Clearly, NYPQ's claim that simply because someone records a conversation means someone commit fraud is untethered to reality and totally ridiculous.  In addition, by making this foolish claim, NYPQ violated court rules and illegally fabricated its own "facts," rather than follow legal requirements and accept the allegations in the Complaint (Docket No. 1) as true.

In addition, while NYPQ lied and asserted in its Brief that Plaintiff's complaint was based on one event that occurred at NYPQ on January 1-2, 2018,

2

that statement is totally false as shown in NYPQ's own medical records. Rather, O'Neill did not receive a copy of her medical record from NYPQ until after January 7, 2018. Given NYPQ providers modified O'Neill's medical record on January 7, 2018, O'Neill could not have asserted a fraud or RICO claim until January 8, 2018. Thus, O'Neill's RICO and fraud claims are not time barred because statute of limitations did not begin to accrue until January 8, 2018.

The alteration and / or falsification of medical records is a crime in most states, and is usually dealt with harshly. Alteration of medical records can be a felony if done intentionally and willfully, as was the case with NYPQ's alteration of O'Neill's medical record. In most cases the act of requesting copies of records by an attorney triggers a health care provider's apparent need to alter medical. Such is the case here. O'Neill's records were clearly altered by NYPQ personnel on January 7, 2018 after O'Neill requested a copy of her medical record.

The portion of O'Neill's medical record that Plaintiff does possess shows NYPQ's medical record relied on conversations NYPQ had with third parties after Plaintiff left NYPQ. Thus, O'Neill's Complaint (Docket No. 1) is not barred by the statute of limitations because the medical record was altered on January 7, 2018. Specifically, NYPQ's record is clearly based on false information provided to NYPQ without O'Neill's knowledge or consent. The names of all the

3

individuals NYPQ spoke to about O'Neill on or about January 7, 2018, and the details of NYPQ's conversations about O'Neill must be included in O'Neill's designated record sets under 45 CFR § 164.501. Yet, NYPQ is refusing to disclose that information in violation of state and federal laws. As a result, NYPQ has and is continuing to fraudulently conceal information from O'Neill. Thus, NYPQ's claim O'Neill did not state a fraud claim with particularity pursuant to Rule 9(b) is not just hypocritical, but utterly ridiculous in light of the fact NYPQ is violating federal and state statutes and failing to provide O'Neill with information about her health she is entitled to see under state and federal laws.

NYPQ's decision to hide information from O'Neill manifests constructive fraud given it is clear when reading O'Neill's medical record from NYPQ that the medical record is based on information that is not contained in O'Neill's medical record. Thus, NYPQ was incorrect as a matter of law when it stated O'Neill failed to properly state a claim for fraud by stating five elements of common law fraud. The patient-physician relationship is a relationship of trust and confidence. Because of this confidential relationship, an exception arises to the requirement in typical fraud cases that a defendant make some actual misrepresentation. Within the confidential relationship, silence when the doctor should speak or failure to disclose what should be disclosed constitute fraud as much as an actual

misrepresentation.  Thus, while NYPQ claimed O'Neill had to prove actual fraud as defined, O'Neill's duty was to plead constructive fraud.  O.C.G.A. § 23-2-51.

NYPQ also filed a motion pursuant to Rule 12(c).  However, a motion seeking judgment on the pleadings can only be filed after an answer has been filed. Given no answer was filed by NYPQ, NYPQ is not entitled to relief under Rule 12(c) because NYPQ did not fulfil the statutory requirements.

## STATEMENT OF FACTS

The statement of facts is contained in the accompanying affidavit of Maura O'Neill dated October 18, 2022 (the "Affidavit").  For east of review, the same information will not be repeated herein.

## LEGAL ARGUMENT

## POINT I: DEFENDANT FAILED TO CONFORM WITH THE STANDARD OF REVIEW.

### A. Standard of Review

A proposition that is at the heart of the application of the Rule 12(b)(6) motion is that for purposes of the motion to dismiss, (1) the complaint is construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader. *Mamani v. Berzain*, 825 F.3d 1304, 1306 (11th Cir. 2016). The burden is on the moving party to prove that no legally cognizable claim for

relief exists. *Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 399 (6th Cir. 2012). Here, Defendant failed to meet its burden. NYPQ's claim Plaintiff's RICO and fraud claims are time barred is incorrect. In particular, when making the claim O'Neill's causes of action were time barred, the sole "evidence" to support this claim supplied by NYPQ was that O'Neill recorded her visit to NYPQ on January 1-2, 2018. However, simply because O'Neill recorded a conversation does not mean someone commit fraud. By making this foolish claim, NYPQ violated court rules and illegally fabricated its own "facts," rather than follow legal requirements and accept the allegations in the Complaint as true.

## B. Plausibility Standard

The purpose of a 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint, not its merits. *Nelson v. Temple Univ.*, 920 F.Supp. 633, 634 n.2 (E.D. Pa. 1996). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In assessing the plausibility of the plaintiff's claims, a court first identifies allegations that constitute nothing more

than "legal conclusions" or "naked assertions." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Because those

allegations are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129

S.Ct. 1937.  The court then assesses "the 'nub' of the plaintiff['s] complaint—the

well-pleaded, nonconclusory factual allegation[s]" in order to determine whether

the complaint states a plausible claim for relief.  *Wainberg v. Dietz & Watson, Inc.,*

2017 WL 5885840, at (E.D. Pa. Nov. 28, 2017).  Judgment on the pleadings should

not be granted "unless the moving party has clearly established that no material

issue of fact remains to be resolved and the party is entitled to judgment as a matter

of law."  *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir.

2006).  Here, there is no question that there are material issues of fact that remain

to be resolved as described below.

## POINT II:  THIS COURT HAS SUBJECT MATTER AND DIVERSITY JURISDICTION.

In its Brief, NYPQ claimed this Court does not have jurisdiction (Docket

No. 23-1, Pages 8-14).  However, this claim is deeply flawed since the RICO claim

invokes a federal question and thereby invokes federal jurisdiction, and the state

law fraud claim invokes diversity of citizenship jurisdiction under federal law.

Specifically, whenever there is a substantive right enforceable in any state court, it

is enforceable in federal courts if the controversy is between citizens of different states and the amount in controversy exceeds $75,000. *Markham v. City of Newport News*, C.A.4 (Va.) 1961, 292 F.2d 711. Such is the case here. Thus, this court has jurisdiction to adjudicate Plaintiff's claims against NYPQ.

In the Brief, NYPQ also argued that NYPQ lacked sufficient contacts with the state of Georgia under the long-arm statute. (Docket No. 23-1, Page 9, ¶1). Georgia's long arm statute allows local federal courts to exercise personal jurisdiction on any basis consistent with state law and allowable under due process clause of the U.S. Constitution. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.* (11th Cir. 2010) 593 F3d 1249, 1257-1258. In particular, subsection (1) of Georgia's long arm statute, O.C.G.A. § 9-10- 91(1) states, "[a] court of this state may exercise personal jurisdiction over any nonresident... if the [nonresident] transacts any business within this state." Thus, a Georgia court may exercise personal jurisdiction over a nonresident if the tortfeasor "transacts any business within this state." O.C.G.A. § 9-10-91(1).

Georgia trial courts have broad authority to exercise personal jurisdiction over any nonresident who transacts any business within Georgia. Physical presence of the non-resident in Georgia is not required, and a single event may be sufficient for the exercise of long-arm jurisdiction if its effects are substantial

8

enough. *Wright v. Safari Club Intern.*, 307 Ga. App. 136, 706 S.E.2d 84 (2010). When determining whether a nonresident satisfies the "transacts any business within this state" prong of Georgia's long-arm statute, the nonresident's email, telephone calls, and other intangible acts, though occurring while the nonresident is physically outside of Georgia, must be considered. *Jordan Outdoor Enterprises, Ltd. v. That 70's Store*, LLC, 819 F. Supp. 2d 1338 (M.D. Ga. 2011).

Here, as described in Exhibit A, NYPQ regularly conducts clinical research in the state of Georgia and has done so for numerous years. Part of the role of NYPQ's researchers shown in Exhibit A, is to send emails to researchers in Georgia on a regular basis. In addition, NYPQ's researchers are required to conduct telephone calls with employees in the state of Georgia on a regular basis to discuss matters such as clinical research, patient care, and healthcare. Thus, this court clearly has personal jurisdiction under the first prong of O.C.G.A. § 9-10-91.

NYPQ's Brief also misrepresented case law. In particular, NYPQ quoted the case of *Allegiant Physicians Servs., Inc. v. Sturdy Mem'l Hosp.,* and used this case to claim NYPQ did not have sufficient contacts with the state of Georgia. *Allegiant Physicians Servs., Inc. v. Sturdy Mem'l Hosp.*, 926 F. Supp. 1106, 1109 (N.D. Ga. 1996). However, NYPQ's statement was incorrect given the reason the *Allegiant* court rejected the contract is because the parties in the *Allegiant* case

9

"agreed to a choice-of-law provision…and that choice of law was Massachusetts' law." *Id.* Thus, the Court concluded that the parties' decision to invoke Massachusetts law, and not Georgia law, weighed against contacts with Georgia. *Id.* Here, there is no choice of law for NYPQ to rely upon, thus, NYPQ's use of the *Allegiant* case does not support NYPQ's argument.

NYPQ also falsely claimed that, "It also cannot be said that specific jurisdiction exists because none of the alleged conduct occurred in Georgia…and nothing about the claims relates in any way to Georgia." (Docket No. 23-1, Page 15, ¶2). However, NYPQ is wrong yet again. It does not take an attorney or anyone with legal training to know that maintaining two sets of records is a hallmark of fraud. (Affidavit ¶2-7). In fact, even simple Google searches make clear that a company maintaining two separate sets of records is clearly acting with fraudulent intent. Thus, it appears that NYPQ had a clear *intent* to deceive O'Neill and a clear *consciousness of guilt.* If the information contained in NYPQ's other files was, in fact, obtained legally, and medically valid, then NYPQ would include that information in O'Neill's medical records. However, it is clear NYPQ is well aware of the fact that the information contained in the other files is based on criminal acts, lies, and fraud. Thus, NYPQ has sought to hide information from

O'Neill in a manner that any person on the street would recognize as intended to deceive and harm despite the fact NYPQ has a fiduciary duty to O'Neill.

In addition, even if this district court found it lacked jurisdiction, this court must transfer this action to the proper court. 28 U.S.C.A. § 1631. Specifically, under 28 U.S.C. § 1631, if a "court finds that there is a want of jurisdiction" over a matter, it "shall, if it is in the interest of justice, transfer such action...to any other such court in which the action ... could have been brought at the time it was filed." 28 U.S.C. § 1631 is mandatory—that is, "where a court finds that it lacks jurisdiction, it *must* transfer such action to the proper court." *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985).

### POINT III:  DEFEDANT FAILED TO CONFORM WITH REQUIREMENTS FOR RULE 12(c) JUDGMENT.

A Rule 12(c) motion is analogous to a motion to dismiss except that it may be filed after an answer. *Vivid Entertainment, LLC v. Fielding*, 2013 WL 4451068 (C.D. Cal. 2013).  Here, because NYPQ did not file an answer, NYPQ's request for a Rule 12 (c) motion is procedurally improper and should be denied by this court as procedurally defective as a matter of law.

Further, a judgment on the pleadings is essentially on the merits and may be entered only if the legal issues presented may be conclusively determined.  *U.S. v.*

11

*Chelsea Towers, Inc.*, 295 F. Supp. 1242 (D.N.J. 1967).  In addition, a Rule 12(c)

motion is appropriate only if there are no material facts in dispute and the moving

party is entitled to judgment as a matter of law.  *Cannon v. City of West Palm*

*Beach*, 250 F.3d 1299 (11th Cir. 2001).  Here, there are material facts in dispute.

Among other things, as described in the Affidavit (Affidavit ¶1-20), NYPQ has

withheld material records from O'Neill, and presumably set up two sets of records.

Thus, New York-Presbyterian Healthcare System, has a different set of records

NYPQ does not possess.  The Supreme Court noted, one who has himself

participated in a violation of law cannot be permitted to assert in a court of justice

any right founded upon or growing out of the illegal transaction."  *Gibbs & Sterrett*

*Mfg. Co. v. Brucker*, 111 U.S. 597, 601, 4 S. Ct. 572, 574, 28 L. Ed. 534 (1884).

In this case, there is no question there are material facts in dispute, thus, NYPQ's

Rule 12 (c) motion is procedurally improper, and must be denied by this court.

## POINT IV:  DEFENDANT'S STATUTE OF LIMITATIONS ARGUMENTS ARE INCORRECT AS A MATTER OF LAW.

In the Brief, NYPQ also claimed, "O'Neill's claims also fail because they

are time-barred," (Docket No. 23-1, Page 2, ¶1).  However, this claim is incorrect

because Plaintiff's claims are not time barred under a four year statute of

limitations.   As NYPQ is well aware, NYPQ's interactions with O'Neill

continued past the date of her ER visit on January 1-2, 2018. In particular, NYPQ

fraudulently altered O'Neill's medical record on January 7, 2018. Thus, there is

no way O'Neill could have known all the facts to file either a fraud or RICO

claim until after January 8, 2018. Thus, O'Neill's claims are not time barred.

## A. Federal RICO

Courts have held that a civil cause of action does not accrue under RICO,

18 U.S.C.A. §§ 1961-1968, until the amount of damages becomes clear and

definite. 18 U.S.C.A. § 1964(c). *Crimson Galeria Limited Partnership v. Healthy*

*Pharms, Inc.*, 337 F. Supp. 3d 20, R.I.C.O. Bus. Disp. Guide (CCH) P 13076 (D.

Mass. 2018). Thus, there is no way that O'Neill could have known the full extent

of the damage from her visit to NYPQ on January 1-2, 2018 until after January 7,

2018 because she did not have a copy of her medical record. O'Neill promptly

requested a copy of her medical record, but did not receive a copy until after

January 7, 2018. Thus, O'Neill's claims are not time barred.

Further, courts have held that under RICO, the separate accrual rule

provides that a civil cause of action accrues and triggers a new four–year

limitations period each time the plaintiff discovers or should have discovered an

injury caused by a RICO violation. *Bivens Gardens Office Bldg., Inc. v. Barnett*

13

*Bank of Florida, Inc.*, 906 F.2d 1546 (11th Cir. 1990).  The Eleventh Circuit has held that with respect to each independent injury to the plaintiff that restarts the statute of limitations accrual, a RICO cause of action begins to accrue as soon as the plaintiff discovers the existence and source of his injury *and* that the injury is part of a pattern.  Because a RICO plaintiff must prove that his injury is part of a pattern of racketeering activity, an injured party must know, or have reason to know, that his injury is part of a pattern before he can be expected to file a civil RICO cause of action.  *Bivens,* 906 F.2d at 1554-55.  Here, because the medical records are clearly part of the pattern of racketeering activity, and form the basis of numerous instances of mail and wire fraud, and O'Neill did not receive a copy of her record until after January 7, 2018, there is no question that O'Neill's claims are not barred by the statute of limitations because the RICO pattern of sending fraudulent records by wire was not established until after January 7, 2018.

B. **State RICO**

O'Neill can also assert RICO claims against NYPQ under Georgia's state RICO cause of action.  OCGA § 16-14-8 provides a five-year statute of limitation for a civil action brought for RICO violations.  Given the conduct in question has

still not terminated and NYPQ is continuing to fraudulently conceal information

from O'Neill, under the Georgia RICO statute, Plaintiff's claims are timely.

## C. **Fraud**

The statute of limitation begins to run on any given claim on the date the claim

accrues, in other words, on the date that suit on the claim can first be brought.

*Renee Unlimited, Inc. v. City of Atlanta*, 301 Ga. App. 254, 687 S.E.2d 233 (2009).

Here, given O'Neill did not have a copy of her medical record until after January 7,

2018, it is clear the statute of limitations did not begin to run on O'Neill's claims

until after January 8, 2018.

## D. **Fraudulent Concealment**

OCGA § 9-3-96 provides: "If the defendant or those under whom he claims

are guilty of a fraud by which the plaintiff has been debarred or deterred from

bringing an action, the period of limitation shall run only from the time of the

plaintiff's discovery of the fraud."  The plain meaning of "debar" means that

O'Neill could not have asserted a claim against NYPQ before 2021 for maintaining

two separate sets of records as described in the Affidavit (Affidavit ¶2-8).  Thus,

there is no question O'Neill timely filed fraud claims against NYPQ given NYPQ

sought to deceive O'Neill, and illegally maintained two separate sets of medical

records. 28 U.S.C. § 2401(b).  *Rahn v. U.S.*, 222 F. Supp. 775 (S.D. Ga. 1963).

O'Neill did not reasonably expect that NYPQ would prepare two separate and distinct sets of records as described in the Affidavit (Affidavit ¶2-8), and clearly NYPQ did not prepare two sets of records until on or about January 7, 2018.  In fact, O'Neill did not even believe a hospital would do something so blatantly fraudulent as described in the Affidavit (Affidavit ¶2-8).  Given NYPQ is using a different legal entity to hide information, O'Neill could not have discovered the extent of NYPQ's fraud until the fall of 2022 (Affidavit ¶1-20).

## POINT V:  DEFENDANTS LIED TO O'NEILL.

The only support for the baseless opinions in O'Neill's NYPQ medical record are the providers own personal judgment.  Thus, O'Neill's medical records from NYPQ presents a shining example of *ipse dixit*--i.e., the expert claims that it is so merely because he says that it is so.  Yet, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."  *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987).  "Reliability cannot be established by the mere *ipse dixit* of an expert."  *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Nimely v. City of New York*, 414 F.3d 381, 396-397 (2d Cir. 2005).

16

"'Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough.' " *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).  Obviously, the same principles hold in cases involving medical decisions, and decisions are not valid if they are based on only unsubstantiated opinions to support decisions.  *Cathell v. Brown*, 8 Vet. App. 539 (1996).

It is clear when reading O'Neill's medical record from NYPQ that her medical records are based on information that is not contained in her medical records.  Instead, NYPQ's medical records are filled with nothing more than *ipse dixit* opinions based on false information provided to NYPQ about Plaintiff without O'Neill's knowledge or consent and despite the fact that a physician's recorded recollection of a patient's medical history, which contain medical opinions of third party are inadmissible as a record in litigation.  *Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424.  Thus, NYPQ produced an *ipse dixit* medical record that is inadmissible in a court of law because the statements in the record are not supported by facts in the records.  *Id.*

## POINT VI:  DEFENDANTS' MEDICAL RECORDS CLEARLY EVIDENCE CRIMINAL ACTS.

The alteration and / or falsification of medical records is a crime in most states, and is usually dealt with harshly.  *Elbar, Inc. v. Claussen* (1989, Tex App Dallas) 774 SW2d 45.  Alteration of medical records can be a felony if done intentionally and willfully.  *Elbar, Inc. v. Claussen* (1989, Tex App Dallas) 774 SW2d 45.  Such was the case here with NYPQ.

Alteration of a patient's record by a doctor for the purpose of defeating an actual or potential claim "is reprehensible and evidences a moral deficiency and disregard for the rights of others that [courts] regard as odious and repugnant." *Paris v. Michael Kreitz, Jr.,* 75 NC App 365, 331 SE2d 234 P.A., (1985).  In most cases the act of requesting copies of a client's hospital records by an attorney investigating a claim triggers a health care provider's apparent need to alter medical records to affect the outcome of the investigation.  *Langager v. Lake Havasu Community Hospital,* 799 F2d 1354, 135 (1986, CA9 Ariz).

## POINT VII:  DEFENDANT IS PART OF RICO ENTERPRISE.

NYPQ also claimed that Plaintiff was required to "meet the "heightened" pleading requirement of Rule 9(b)."  (Docket No. 23-1, Page 7, ¶1).  However, given NYPQ's ongoing fraudulent concealment, and apparent maintenance of two separate sets of records as described in the Affidavit (Affidavit ¶2-8), NYPQ's claims are not only hypocritical, but laughable.  Given NYPQ's medical record is

18

*ipse dixit*, inadmissible in a court of law, and it is unclear precisely how NYPQ is fraudulently concealing information, where precisely NYPQ got its information from, or what basis NYPQ used for the stupid claims contained in O'Neill's record, NYPQ's claim that O'Neill failed to meet the heightened pleading standard of Rule 9(b) is not only laughable, but completely hypocritical.

On the one hand, NYPQ commit wire fraud by sending an *ipse dixit* medical record that contains absolutely no support for the false claims made about Plaintiff in the medical record. Yet, on the other hand, NYPQ claims in its filings that O'Neill failed to meet heightened pleading standards under Rule 9(b). The fact that NYPQ believes it is acceptable to hold O'Neill to Higher and Different standards that no human would be able to attain is not only hypocritical, but sick given NYPQ's fiduciary duty and duties under both HIPAA and state laws to disclose to O'Neill all the information NYPQ maintains about Plaintiff as described in the Affidavit (Affidavit ¶11-14).

NYPQ's claim that O'Neill did not pled two predicate acts is also without merit, given, as NYPQ is well aware, NYPQ has commit wire fraud on more than two occasions. In particular, as NYPQ is surely well aware, when NYPQ sent an *ipse dixit* copy of O'Neill's medical record via email to O'Neill in 2018 sending the fraudulent medical record via email constituted one predicate act and instance

of wire fraud under the RICO statute.  Likewise, when the head of NYPQ's ER gave false information to O'Neill on the phone in 2018 about O'Neill's medical record after O'Neill informed the head of the ER that her record had been fraudulently altered, the false and misleading claims made by the ER head to O'Neill constituted another predicate act and instance of wire fraud.  Thus, NYPQ's claim that NYPQ has not commit enough predicate acts is without merit, and NYPQ has clearly exhibited a "pattern" as required by the RICO statute.

NYPQ also moved to dismiss the RICO claim by stating Plaintiff's "RICO claims are deficient in their failure to claim sufficient predicate acts and an "enterprise" such as would warrant the application of RICO."  (Docket No. 23-1, Page 17, ¶1).  Here too, NYPQ is incorrect.  An "enterprise" under the RICO statute includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Section 1961(4).  Here, NYPQ was associated with a RICO enterprise, because each Defendant in the Predator Protection Enterprise agreed to participate in, and did participated in, a conspiracy to violate 18 U.S.C. § 1962(c), and NYPQ caused its employees to participate in the conspiracy to violate 18 U.S.C. § 1962(c) through the commission of predicate acts, including wire fraud.

## POINT VIII:  PLAINTIFF HAS VALID FRAUD CLAIM.

NYPQ also claimed O'Neill's fraud claimed failed because Plaintiff did not state five elements required in the case *Next Century Communs. Corp. v. Ellis*, 318 F.3d 1023, 1027 (11th Cir. 2003). (Docket No. 23-1, Page 18, ¶3). Further, NYPQ claimed, "a Georgia fraud claim is only sustainable if the plaintiff can "show not only that he relied on some misrepresentation, but also that [their] reliance was reasonable." (Docket No. 23-1, Page 18, ¶3). However, NYPQ is incorrect as a matter of law, and NYPQ confused actual and constructive fraud even though both are defined by statute. O.C.G.A. § 23-2-51. Specifically, NYPQ claimed O'Neill had to prove actual fraud as defined by O.C.G.A. § 23-2-51, when in fact her only duty is to show constructive fraud. O.C.G.A. § 23-2-51.

The patient-physician relationship is a relationship of trust and confidence given the patient entrusts his medical condition to the trained physician. Because of this confidential relationship, an exception arises to the requirement in typical fraud cases that defendant make some actual misrepresentation. Within the confidential relationship, silence when the doctor should speak or failure to disclose what should be disclosed constitute fraud as much as an actual misrepresentation. *Carroll v. Piedmont Medical Care Corporation*, 352 Ga. App. 348, 834 S.E.2d 868 (2019). Thus, within the doctor-patient relationship, plaintiff need not prove actual fraud because the relationship itself creates a duty that

21

requires the doctor to inform the patient about his condition. *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 507 S.E.2d 411 (1998). In a concealment context, "there must be evidence that there was an intent to conceal by silence." *Carroll v. Piedmont Medical Care Corporation*, 352 Ga. App. 348, 834 S.E.2d 868 (2019).

Given NYPQ's medical record makes clear NYPQ relied on conversations with third parties in the medical record about Plaintiff, the names of all the individuals NYPQ spoke to about O'Neill, and the details of NYPQ's conversations about O'Neill must be included in O'Neill's designated record sets under 45 CFR § 164.501. A patient is also entitled to trust her physician and rely on what he tells the patient. *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452, 459, 504 S.E.2d 514, 523 (1998). Yet, here, NYPQ's decisions to hide information from O'Neill manifests fraud given it is clear when reading O'Neill's medical record from NYPQ that the medical record is based on information that is not contained in O'Neill's medical records. In fact, there is no factual support for numerous statements written in O'Neill's medical records, and it is clear that NYPQ's basis for several statements in O'Neill's medical records is due to conversations NYPQ had with various third parties about Plaintiff without

O'Neill's knowledge or consent, and without giving Plaintiff an opportunity to respond to false information given to NYPQ about O'Neill behind her back.

## POINT IX: PLAINTIFFS SHOULD BE GIVEN EVEFY OPPORTUNITY TO CURE PLEADING DEFECTS.

Plaintiff intends to alter her complaint. However, in order to modify her Complaint, O'Neill needs the Hospital Defendants, including Northside, to produce the information O'Neill requested in her Motion to Enjoin. (Docket No. 87-1, Page 24, ¶1-Page 25). O'Neill informed the court in her Motion for Extension of Time (Docket No. 60, Page 5, ¶2-Page 6, ¶2), the fact Northside has failed to comply with HIPAA and state laws has created additional complications for O'Neill. Northside is blatantly lying by claiming the information O'Neill sought in letters she sent in June 2022 constituted "discovery," (Docket Nos. 63).

As noted in the Motion for Extension of Time (Docket No. 60) filed in August of 2022, filing an Amended Complaint and responding to Northside's motions to dismiss has been a waste of time for both Plaintiff and Northside at this juncture given Northside has failed to comply with HIPAA and state statutes, and Northside failed to send O'Neill the information she requested as described at length in Plaintiff's Motion to Compel (Docket No. 58). Thus, O'Neill also asked the Court to delay the deadline for O'Neill to file an

Amended Complaint until after she received the information she requested from Hospital Defendants as described in Plaintiff's in her Motion for Extension of Time (Docket No. 60, Page 5, ¶2-Page 6, ¶2).

Despite the fact O'Neill made clear in the Motion to Compel (Docket No. 58, Page 7, ¶1- Page 17, ¶1), that Hospital Defendants were violating both state and federal statutes, the Court completely ignored the facts presented by Plaintiff in the Motion to Compel (Docket No. 58) and Motion for an Extension to Time (Docket No. 60). Given this court ignored her request, O'Neill will file a motion pursuant to Rule 15(a)(2) and Rule 15(d).

In determining whether to grant a Rule 15(a) motion to amend, the Supreme Court stated the standard, "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. at 182, 83 S. Ct. at 230. A plaintiff typically will not be precluded from amending a complaint in order to state a claim or from adding a claim to an otherwise proper complaint. *Ward Electronics Service, Inc. v. First Commercial Bank*, 819 F.2d 496 (4th Cir. 1987).

Plaintiffs are allowed "multiple opportunities to state a claim." *Sprague v. Salisbury Bank and Trust Company*, 969 F.3d 95 (2d Cir. 2020). The amended

24

complaint then "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir.1996). In addition, "facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). This approach "ensures that a particular claim will be decided on the merits rather than on technicalities." *Dole v, Arco Chem. Co.*, 921 F.2d 484,487 (3d Cir.1990). Plaintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss. Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure§ 1474 (3d ed. 2008) ("Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading."). Thus, O'Neill should be allowed to amend her complaint, particularly in light of the fact Northside is fraudulently concealing information from O'Neill that she has a right to see under HIPAA and state laws as described in the Motion to Enjoin. (Docket No. 87-1).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests the Court **DENY** the motion and grant such other further relief the Court deems equitable.

## LR 7.1(D) FONT COMPLIANCE CERTIFICATION

The undersigned certifies that the within and foregoing **MEMORANDUM OF LAW AND MOTION TO ENJOIN** were prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have this day caused to be served a true and correct copy of the foregoing by emailing and mailing a copy of the foregoing to each Defendant at the following addresses:

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Brantley Rowlen, Esq.
Chase Parker, Esq.
24 Drayton Street, Suite 300
Savannah, GA 31401
Telephone: 912.525.4960
E-Mail:  rowlen@lbbslaw.com
E-Mail:  chase.parker@lewisbrisbois.com

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
Parks Kalervo Stone, Esq.
3348 Peachtree Road NE
Suite 1400
Atlanta, GA 30326
Telephone: 470.419.6651
E-Mail: parks.stone@wilsonelser.com

**WATSON SPENCE LLP**
Michael R. Boorman, Esq.

26

999 Peachtree Road, N.E.
Suite 1130
Atlanta, GA 30309
Telephone: 229.436.1545
E-Mail: mboorman@watsonspence.com

**THOMAS KENNEDY SAMPSON & TOMPKINS, LLP**
Jeffrey Emery Tompkins, Esq.
Candance J. Rodgers, Esq.
3355 Main Street
Atlanta, GA 30337
Telephone: 404.688.4503
E-Mail: j.tompkins@tkstlaw.com
E-Mail: c.rodgers@tkstlaw.com

**SCRUDDER, BASS, QUILLIAN, HORLOCK,
LAZARUS & ADELE LLP**
Henry E. Scrudder, Jr.
Teddy L. Sutherland
Sophia Welf
900 Circle 75 Parkway
Suite 850
Atlanta, Georgia 30339-3053
Telephone: (770) 612-9200
Facsimile: (770) 612-9201
hscrudder@scrudderbass.com
tsutherland@scrudderbass.com
swelf@scrudderbass.com

**HALL BOOTH SMITH, PC**
Tiffany R. Winks
Georgia Bar No. 626413
Austin Atkinson
Georgia Bar No. 935864
191 Peachtree St. NE
Suite 2900
Atlanta, GA 30303

404-954-5000
twinks@hallboothsmith.com
aatkinson@hallboothsmith.com

in accordance with Rule 5(b)(2)(E).

Dated:  Atlanta, GA                    Respectfully submitted,
October 18, 2022


BY: _Maura O'Neill_____
Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

28

# EXHIBIT A

**Jurisdiction in Georgia**
NYU Langone, New York Presbyterian, and Beth Israel

| | Start Date | End Date | NY Institution | NY Investigator | Georgia Institution | Study Name |
|---|---|---|---|---|---|---|
| **NYU Langone Hospitals** | | | | | | |
| 1 | 10/8/10 | | NYU Cancer Institute at New York University Medical Center | Howard S. Hochster, MD NYU Langone Health | Veterans Affairs Medical Center - Atlanta (Decatur) | Irinotecan Hydrochloride and Cetuximab With or Without Ramucirumab in Treating Patients With Advanced Colorectal Cancer With Progressive Disease After Treatment With Bevacizumab-Containing Chemotherapy |
| 2 | 10/1/05 | | NYU Hassenfeld Center | Sharon L Gardner, MD NYU Langone Health | Emory University | Temozolomide,Thiotepa and Carboplatin With Autologous Stem Cell Rescue Followed by 13-cis-retinoic Acid in Patients With Recurrent/Refractory Malignant Brain Tumors |
| 3 | 8/29/16 | | NYU Langone Health | Catherine Diefenbach, MDNYU Perlmutter Cancer Center | Emory University Hospital | Safety & Efficacy Study of Combination of Pembrolizumab and Lenalidomide, in Patients With Relapsed Non-Hodgkin and Hodgkin Lymphoma |
| **New York Presbyterian Hospitals** | | | | | | |
| 4 | 11/2/12 | | New York Presbyterian Hospital | | Georgia Endoscopy Center | A Study Of PF-00547659 In Patients With Moderate To Severe Ulcerative Colitis (TURANDOT) |
| 5 | 2/1/11 | | New York Presbyterian Hospital | | Atlanta Endoscopy Center | A Study To Assess The Efficacy And Safety Of PF-04236921 In Subjects With Crohn's Disease Who Failed Anti-TNF Therapy (ANDANTE) |
| 6 | 8/2/12 | | New York Presbyterian Hospital | | Emory University Hospital | A Study Of Inotuzumab Ozogamicin Versus Investigator's Choice Of Chemotherapy In Patients With Relapsed Or Refractory Acute Lymphoblastic Leukemia |
| 7 | 4/30/07 | | New York Presbyterian Hospital | | Emory Winship Cancer Institute | Dasatinib in Polycythemia Vera |
| 8 | 10/1/02 | | New York Presbyterian Hospital | | Morehouse School of Medicine | Warfarin Versus Aspirin in Reduced Cardiac Ejection Fraction (WARCEF) Trial (WARCEF) |
| 9 | 10/3/07 | | New York Presbyterian Hospital | | Emory Winship Cancer Institute | Dasatinib in Polycythemia Vera |
| 10 | 7/12/22 | | New York Presbyterian Hospital | | Emory University Winship Cancer Institute | A Study of RNK05047 in Subjects With Advanced Solid Tumors/Diffuse Large B-cell Lymphoma (CHAMP-1) |
| **Beth Israel / Mount Sinai** | | | | | | |
| 11 | 6/12/14 | | Beth Israel Hospital | | Winship Cancer Institute, Emory University | Chemoradiation or Brachytherapy for Rectal Cancer (CORRECT) |
| 12 | 12/1/09 | | Mount Sinai School of Medicine | | Emory University | Evaluation of GSK561679 in Women With Post-Traumatic Stress Disorder |
| 13 | 8/1/08 | | Mount Sinai Medical Center | | Emory University Winship Cancer Institute | Safety and Dose Determining Study of BT062 in Patients With Relapsed or Refractory Multiple Myeloma |
| 14 | 6/10/22 | | Mount Sinai Hospital | | Emory University School of Medicine | CQ for Non Europeans With Mild to Severe UC |

*Source: clinicaltrials.gov*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MAURA O'NEILL,**<br><br>          Plaintiff,<br><br>   v.<br><br>**NYU LANGONE HOSPITALS, NEW YORK- PRESBYTERIAN HOSPITAL QUEENS, LENOX HILL HOSPITAL, GRADY MEMORIAL HOSPITAL CORPORATION, MOUNT SINAI BETH ISRAEL, NORTHSIDE HOSPITAL, INC., COLLEGE PARK POLICE DEPARTMENT,**<br><br>          Defendants. | **CIVIL ACTION FILE NO.:**<br>1:22-cv-00011-SEG<br><br><br><br><br><br><br><br><br><br><br>**AFFIDAVIT** |

## PLAINTIFF'S AFFIDAVIT IN OPPOSITION TO MOTION TO DISMISS

I, Maura O'Neill, being duly sworn, deposes and states as follows:

1. On January 4, 2022, I filed a complaint against several hospitals, where I went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYU"), and Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").

## A. HIPAA Request / Two Sets of Records

2.  On June 6, 2022, I started sending letters to hospitals requesting two basic

pieces of information:

- Confirmation the hospital does not have, and has never had, any authorization on file that would allow any person or entity to speak to any person at the hospital about O'Neill or receive any information about her medical records or have access to information about her medical care.
- Confirmation the hospital does not have any additional records, data, or information that the hospital used to make decisions about O'Neill's healthcare that are not included in her medical record.

3.  Despite the fact that the two requests for information are incredibly basic,

not a single one of the Hospital Defendants fully complied with HIPAA and state

laws and responded to my request.

4.  Given the Hospital Defendants lack of responsiveness, in June 2022, I went

to New York, and spoke to Beth Israel.  Beth Israel stated it does not have a

Power of Attorney or authorization on file.  It also stated the only information it

has on record is in my medical record, and referred me to its parent company,

Mount Sinai Health System ("MSHS").

5.  However, MSHS refused to respond to my requests for information or state

whether MSHS has records about me Beth Israel does not possess even though

New York's Public Health Law § 18(2) required the New York Hosptial

Defendants to respond within ten days, and MSHS failed to comply with the law.

6.  Likewise, when I spoke to the medical records department at NYU

Langone, I was informed that the Patient Relations team, an arm of NYU's legal

team, has additional records about me.

7. Thus, what became obvious is that the Hospital Defendants are maintaining

two separate and distinct sets of records. One I have access to (e.g., the records at

Beth Israel) and another I have been deprived access to (e.g., the records at

MSHS) despite the fact that an organizaiton maintaining two sets of books is

clearly a red flag showing consciousness of guilt of fraud.

8. A as result of my conversations with Beth Israel and NYU Langone, on

June 26, 2022, I sent an email to NYPQ asking:

> It has come to my attention that other hospitals are seeking to hide the
> information I requested in my letters to your organization dated June 6, 2022
> and June 10, 2022 because the information I seek is contained in a different
> department or separate legal entity. Thus, while I went to the medical records
> department of a hospital to request the information, the information I seek is
> actually housed in an affiliated entity or department. Thus, I need to know if
> New York-Presbyterian Queens Hospital has a parent company or affiliated
> entity that could potentially have any information about me. In particular,
> please let me know the relationship between New York-Presbyterian Queens
> Hospital and New York-Presbyterian Hospital.

9. NYPQ never responded to this email and never denied that it has two sets

of records.

10. If NYPQ was not committing fraud, and did not have two sets of records,

NYPQ would have denied that another legal entity had a different set of records.

11. Given the fact the NYPW has two sets of records, it is clear NYPQ

purposefully sought to defraud and harm me despite its fiduciary duties to me.

## B. Criminal Acts

12. Altering a medical record to attempt to hide acts of fraud, medical malpractice, or criminal behavior is a felony, and the falsification of medical records can cause healthcare providers to be indicted on criminal charges and face onerous civil penalties.[1]

13. According to the American Health Information Management Association ("AHIMA"), providers should make a new note and include the current date and time if they wish to change medical records.[2]

14. The note should be labeled, "Late Entry," "Correction," or "Addendum." *Id.*

15. Importantly, it is paramount that the provider ***explain the relationship of the new note to a previous one, including the reason for the error, and the source of the new information.*** *Id.* *(Emphasis added)*.

16. ***Records should always reflect who did what.[3]*** *(Emphasis added)*.  Finally, a provider making a change to a medical record should draw a line through the

---

[1] Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.
[2] Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24
[3] Schott, Sharon. "How Poor Documentation Does Damage in the Court Room." Journal of AHIMA 74, no. 4 (April 2003): 20-24.

incorrect entry, although the text should be legible.[4]

17. If an omission in a medical record is noticed after a short amount of time, a late entry can be made only if the person documenting has "total recall" of the omitted information.[5]  Thus, filling in missing information after the fact may lead to a misrepresentation of events if done improperly, and filling in omissions may also be illegal, and lead to criminal charges.

18. HIPAA requires all hospitals, including NYPQ[6] to have standard audit controls, and to "[i]mplement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information."  45 C.F.R. § 164.312(b).

## C. Inadmissible, Ipse Dixit Medical Record

19. The only support for the baseless opinions in my medical record from NYPQ are the providers own personal judgment.

20. Thus, my medical records from NYPQ present a shining example of *ipse*

---

[4]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.
[5]Dougherty, Michelle. "Maintaining a Legally Sound Health Record." Journal of AHIMA 73, no. 8 (April 2003): 64A-G.
[6]On January 4, 2022, I filed a complaint against several hospitals, where she went to have rape kits performed from 2017 to 2018, including NYU Langone Hospitals ("NYU Langone"), Grady Memorial Hospital Corporation ("Grady"), Beth Israel Medical Center ("Beth Israel"), New York-Presbyterian Hospital Queens, ("NYPQ"), Lenox Hill Hospital ("Lenox Hill"), Northside Hospital, Inc. ("Northside"), together ("Hospital Defendants").[6]

*dixit*--i.e., the expert claims that it is so merely because he says that it is so.

21. Yet, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

22. "Reliability cannot be established by the mere *ipse dixit* of an expert." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-397 (2d Cir. 2005).

23. "'Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough.' " *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty*, 402 F.3d 1092 (11th Cir. 2005).

24. Obviously, the same principles hold in cases involving medical decisions, and decisions are not valid if they are based only on unsubstantiated opinions. *Cathell v. Brown*, 8 Vet. App. 539 (1996).

25. It is clear when reading my medical records from NYPQ that my medical records are based on information that is not contained in my medical records.

26. Instead, NYPQ's medical records are filled with nothing more than *ipse*

6

*dixit* opinions based on false information provided to NYPQ about me without my knowledge or consent and despite the fact that a physician's recorded recollection of a patient's medical history, which contain medical opinions of third parties are inadmissible as a medical record in litigation. *Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424.

27. Likewise, nothing in *Daubert* or statutes governing admission of expert testimony requires a court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *Hayward v. Kroger Co.*, 2012, 317 Ga.App. 795, 733 S.E.2d 7.

28. Thus, not only did NYPQ violate my privacy rights, but NYPQ also produced *ipse dixit* records that are inadmissible in court because the statements in the records are not supported by facts contained in the records. *Stoneridge Properties, Inc. v. Kuper*, 1986, 178 Ga.App. 409, 343 S.E.2d 424.

### D. Motion to Compel and Response

29. As a result of the Hospital Defendant's failures to adhere to state and federal laws, on August 18, 2022, I served a motion to compel each of the Hospital Defendants to produce information state laws and HIPAA required Hospital Defendants to produce, but which each Defendant failed to produce (Docket No. 58).

30. Not only is it not typical for hospitals to violate HIPAA and state laws and

fail to provide the information I requested as described in the Motion to Compel (Docket No. 58), but hospitals typically provide the information I requested within only a few days because failing to do so warrants corrective action from the Department of Health and Human Services ("HHS"), and other regulatory agencies.

31. In addition, HIPAA requires all Hospital Defendants to have a compliance officer to comply with state and federal healthcare laws and regulations. 45 C.F.R. § 164.530.

32. Thus, each Hospital Defendant knew their failure to comply with HIPAA and state laws warranted action from regulatory agencies, but each Hospital Defendant broke laws with impunity anyway. Clearly, actions such as these in which healthcare providers knowingly and willfully break the law are not the norm.

*E. Violations*

33. I was aware of the fact Wilder's attorney, Watson, called or had others call Hospital Defendants in order to harm me, however, I was unprepared for Hospital Defendants to flagrantly violate federal and state statutes and commit criminal acts by destroying evidence in order to aid and abet Wilder.

34. I believed Hospital Defendants would not overtly commit crimes to harm me and alter my medical records, and thereby incur criminal liabilities, because I

8

believed Hospital Defendants would put their own reputations and interests above the interests of the Wilder team.

35. I believed it possible for Watson to bribe individual doctors, but I did not believe institutions, with reputations to protect, would aid and abet a sex trafficking operation.

36. In addition, I expected Hospital Defendants would document their phone conversations with the Wilder team because HIPAA and state privacy rules require them to do so.  42 CFR § 482.13(B)(1).

37. However, given no Hospital Defendant has been able to produce a Power of Attorney or any proof that any Hospital Defendant had any right to speak to any third party about me, I have been shocked by Hospital Defendants' overt violations of federal statutes, particularly in light of the fact all Hospital Defendants are required to have compliance officers under HIPAA. 45 C.F.R. § 164.530.

38. Given it is illegal and in blatant violation of HIPAA and state laws to maintain PHI, patient information, and medical records on a patient and fail to disclose that information to the patient, I did not believe that Hospital Defendants would be corrupt or stupid enough to maintain two separate sets of records: one set I had access to, and another I did not.

39. However, after I went to Beth Israel and NYU Langone in June of 2022, it

9

became clear that the Hospital Defendants were attempting to maintain two separate and distinct record sets.

40. In most cases, it appears that the hospital which provided services has one set of *ipse dixit* records, while its parent company, maintains an entirely different set of records.

41. Likewise, the medical records department at NYU Langone informed me that the "Patient Relations" division had an entirely different set of records about me even though when asked, the medical records person I spoke to informed me that in his decade of working at NYU Langone he had never seen patient PHI moved to the Patient Relations department.  Likewise, it appears that Lenox Hill Hospital's parent company, Northwell Health, also maintains a separate and distinct set of medical records about me.

42. It does not take an attorney or anyone with legal training to know that maintaining two sets of records is a hallmark of fraud.  In fact, even simple Google searches make clear that a company maintaining two separate sets of records is clearly acting with fraudulent intent.  Thus, it appears that NYPQ and each Hospital Defendant had a clear *intent* to deceive me and a clear *consciousness of guilt.*

43. If the information contained in their other files was, in fact, obtained legally, and was medically valid, then the Hospital Defendants would include that

10

information in my medical records.

44. However, it is clear that all Hospital Defendants are well aware of the fact that the information contained in their other files is based on criminal acts, lies, and fraud.

45. Thus, each Hospital Defendant has sought to hide information from me in a manner that any person on the street would immediately recognize as intended to deceive and harm despite the fact each Hospital Defendant had a fiduciary duty to me.

46. Despite that duty, what is abundantly obvious is that each Hospital Defendant has broken state and federal laws and ignored their duties in order to aid and abet the Wilder team.  No one in their right mind believes that the employees at Hospital Defendants that conspired with the Wilder team to create two sets of medical records, destroy evidence, and violate state and federal statutes did so without expecting something of value in return.

47. In the Larry Nasser case, the former FBI agent that closed cases against Nasser to aid and abet the USA Gymnastics in covering up the sexual abuse of minors was promised a high paying security job at the U.S. Olympic Committee upon his retirement from the FBI.[7]

_____

[7] Tim Evans, Tony Cook, Marisa Kwiatkowski, Sarah Bowman, "Indianapolis FBI leader eyed head USA Gymnastics job after sitting on Nassar allegations." *Indianapolis Star*, July 16, 2021.

48. It is not only clearly unethical and immoral, but also illegal, to seek to profit from a scheme to defraud.

49. By maintaining two separate records about me each of the Hospital Defendants is seeking to profit from a criminal scheme and enterprise.

50. The responses from NYU Langone, Beth Israel, Grady and Northside that my valid requests under state laws and HIPAA amounted to "discovery," knowing full well state and federal law said otherwise, 45 C.F.R. § 164.530, was clearly a blatant attempt to further use deception and fraud to continue to profit from their illegal schemes.

51. The Supreme Court stated, "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."

52. Thus, since Hospital Defendants have violated state and federal law, they cannot assert a right deny access to me to the information sought in my letters due to false claims of "discovery" in a court.

53. In addition, what is clear from the *ipse dixit* medical records is that because there is no factual support to the records, and because the medical records are not legally admissible as evidence, the only way the Hospital Defendants can continue to maintain two sets of records and continue to mislead and harm me by violating state and federal statutes is because the Wilder/DB teams are continuing to stalk

and abuse me.

54. Because without stalking and abuse, the Hospital Defendants would release the information contained in my June 2022 letters.

55. Thus, for the last several years, as I have gone to other healthcare providers, I have been greeted by the same type of illegal activities and criminal acts given the only way for the Wilder/DB teams to maintain the farce of Hospital Defendants' medical records is by continuing to stalk and abuse me.

56. Thus, by agreeing to prepare fraudulent medical records, committing criminal acts, destroying evidence, and violating state and federal laws, Hospital Defendants have effectively made themselves accessories to the DB/Wilder teams' other crimes and abuses.

57. Denying someone access to healthcare is clearly a human rights violation, however, the Wilder/DB team has done just that.

58. The facts and circumstances surrounding Brittney Spears conservatorship raised public outrage over the pop star's mistreatment and abuse by her conservator, her father, and other members of the Spears family.[8]

59. The treatment of Spears was widely regarded as abusive, and a deprivation

---

[8]Ronan Farrow and Jia Tolentino, "Britney Spears Conservatorship Nightmare," *The New Yorker*, July 3, 2021.

of Brittney Spears fundamental human rights.[9]

60. However, I have been treated far worse than Brittney Spears.  While Brittney Spears agreed to a conservator, had an attorney representing her interests, and had a court overseeing decisions made about her healthcare, I have had the Wilder/DB team control my healthcare from 2016-2022 from the shadows and by withhold healthcare and medical information from me, and encouraging healthcare providers to criminally alter their medical records and produce *ipse dixit* records.

61. Even prisoners are treated better than me.  For example, allegations of habeas petitioner, who was confined for treatment at state hospital pursuant to the Kansas Sexually Violent Predator Act, that the Kansas Department of Social and Rehabilitation Services (SRS) improperly denied his request for copies of his treatment records, and that the records were not protected from disclosure because the information in the records was not compiled in anticipation of litigation, stated an actionable claim.  *Merryfield v. Kansas Social and Rehabilitation Services*, 2010, 236 P.3d 528, 44 Kan.App.2d 324.

62. Thus, the prisoner was able to see his records even though NYPQ and the other Hospital Defendants are denying me access to my records and the

---

[9]Margaret Bushko, "Toxic: A Feminist Legal Theory Approach to Guardianship Law Reform," 81 Md. L. Rev. Online 141, 160 (2022).

information I requested in my June 2022 letters.

### F. Illegal Contract

63. A contract provision is unenforceable if it fails to comply with existing, governing statutory requirements by attempting to provide fewer rights than legally mandated by such statute, as "one cannot do indirectly that which the law does not allow to be done directly." *Langford v. Royal Indem. Co.*, 208 Ga. App. 128, 129–30, 430 S.E.2d 98, 102 (1993).

64. I have never been in a relationship with Wilder, never had a conversation with him outside Deutsche Bank's office, and would never agree to be alone outside of Deutsche Bank with a psychopath like Wilder.  Any claim I have voluntarily even had a "personal" conversation with a sick freak like Wilder is lie.

65. The ridiculous "Power of Attorney," Wilder's sick and depraved attorney claims to possess is also illegal.

66. NYPQ, Wilder, Deutsche Bank, and each of the Hospital Defendants are prohibited by statute from depriving me of the information I requested in my June 2022 letters as described in the Motion to Compel. (Docket No. 58, Page 9, ¶1-Page 17).

67. Yet, NYPQ is fraudulently concealing information from me as described in my Memorandum of Support of my Motion to Compel (Docket No. 73, Page 5, ¶1-Page 7).

68. NYPQ has no legal right to violate statutes, but is doing so anyway (Docket No. 58, Page 9, ¶1-Page 17), even though even if Wilder did have a Power of Attorney, NYPQ is not allowed to hide information about my health from me because doing so is prohibited by statute, and a Georgia court may not enforce a contract that conflicts with a statute. *Langford v. Royal Indem. Co.*, 208 Ga. App. 128, 129–30, 430 S.E.2d 98, 102 (1993).

69. The ridiculous "Power of Attorney" Wilder claims to have would also be unenforceable in the state of New York because it "violates a statute imposing a penalty." *Evans-Freke v. Showcase Contracting Corp.*, 85 A.D.3d 961, 926 N.Y.S.2d 140 (2d Dep't 2011) (violation of GBL § 771); *Akers v. Mutual Life Ins. Co. of New York*, 59 Misc. 273, 112 N.Y.S. 254 (Sup 1908).

70. Thus, NYPQ has no legal means of withholding information from me.

BY: _Maura O'Neill_

Maura O'Neill, Plaintiff
601 King Street, Suite 200-#465
Alexandria, VA 22314
moneill@rahillco.com

Sworn to before me this
18th day of October, 2022

_____
Notary Public

YAZMINE M IVORY
NOTARY
EXPIRES
GEORGIA
10/21/2024
PUBLIC
FULTON COUNTY